# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| In re | Chapter 11 |
| CENTRAL OKLA. UNITED METHODIST RETIREMENT FACILITY, INC. *dba* EPWORTH VILLA, | Case No. 23-12607-SAH |
| Debtor. |  |

## DEBTOR'S NOTICE OF DECLARATION OF RON KELLY IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

Central Oklahoma United Methodist Retirement Facility, Inc. *dba* Epworth Villa ("Debtor" or "Epworth Villa") hereby gives notice (this "Notice") of the *Declaration of Ron Kelly in Support of Debtor's Chapter 11 Petition and First Day Pleadings* (the "Kelly First Day Declaration"). The Kelly First Day Declaration is annexed to this Notice as Exhibit 1.

| | |
|---|---|
| Dated: October 2, 2023<br>Oklahoma City, Oklahoma | **GABLEGOTWALS**<br><br>*/s/ Craig M. Regens*<br>Craig M. Regens, OBA # 22894<br>Scott E. Kiplinger, OBA # 33938<br>499 West Sheridan Avenue<br>BOK Park Plaza, Suite 2200<br>Oklahoma City, OK 73102<br>Telephone: (405) 568-3313<br>Facsimile: (405) 235-2875<br>Email:     cregens@gablelaw.com<br>             skiplinger@gablelaw.com<br><br>-and-<br><br>Graydon D. Luthey Jr. OBA # 5568<br>Sidney K. Swinson, OBA # 8804<br>Mark D.G. Sanders, OBA # 22922<br>110 N. Elgin Ave., suite 200<br>Tulsa, OK  74120 |

Telephone: (918) 595-4800
Facsimile: (918) 595-4990
Emails: dluthey@gablelaw.com
sswinson@gablelaw.com
msanders@gablelaw.com

*Proposed Counsel to Epworth Villa*

## Exhibit 1

**Kelly First Day Declaration**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| In re<br><br>CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC. *dba* EPWORTH VILLA,<br><br>Debtor. | Chapter 11<br><br>Case No. 23-12607-SAH |

**DECLARATION OF RON KELLY IN SUPPORT OF DEBTOR'S
CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Ron Kelly, hereby declare as follows:

1. I am the President and CEO of Central Oklahoma United Methodist Retirement Facility, Inc. *dba* Epworth Villa ("Epworth Villa" or the "Debtor"). I have served in this role since October 2017. Before joining Epworth Villa, I served initially as CFO and then later as President and CEO of Wesley Manor in Frankfort, Indiana from 1994 to 2011 and from 2011 to 2017 as Executive Director of Presbyterian Village North in Dallas, Texas.

2. I received a bachelor's degree in accounting from Illinois State University in 1989, until 1994, I was a Certified Public Accountant and worked in public accounting before joining Wesley Manor in Frankfort, Indiana.

3. As President and CEO, I am familiar with Epworth Living's day-to-day operations, financial affairs, business affairs, and books and records. Except as otherwise indicated, all facts set forth in this declaration (the "Declaration") are based on my personal knowledge, my review of relevant materials or my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial affairs. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtor.

4. On September 29, 2023, (the "Petition Date") Epworth Living filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"). In order to enable the Debtor to minimize the adverse effects of the commencement of this Chapter 11 case on its business operations, the Debtor requests various first day relief (collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other goals: (i) preserving the Debtor's assets and operations; (ii) continuing the Debtor's cash management systems and other business operations, which include making certain inter-company transfers; (iii) using cash collateral and securing fully committed new money financing of up to $4 million under a debtor-in-possession ("DIP") facility; (iv) maintaining confidential the names and health care information of the residents of Epworth Villa; and (v) approving adequate assurance to utilities to maintain utility service. The requested relief is essential to the success of this Chapter 11 case.

**I.  The Debtor's Business**.

5. Epworth Villa is a not-for-profit Oklahoma corporation formed on December 24, 1986.

6. Epworth Villa is a Life Plan Community offering vibrant retirement living for residents ages 55 and older. Located at 14901 N. Pennsylvania, Oklahoma City, Oklahoma 73134, Epworth Villa is a not-for-profit 501(c)(3) community affiliated with the Oklahoma Conference of the United Methodist Church. Epworth Villa offers distinctive apartment, cottage and garden home residences, along with a wide range of convenient services and amenities.

7. Epworth Villa is duly licensed to operate its Life Plan Community and remains in good standing with all relevant regulatory authorities.

8. A Life Plan Community provides a quality, residential living environment in which senior adults live full, independent lives as actively as they wish, with the assurance of on-site assisted living and nursing care if needed. Life Plan Communities provide private residences in a community setting. Residents enjoy common areas for dining and other activities.

9. Epworth Villa offers a complete continuum of care including independent living, assisted living, memory care assisted living, skilled nursing, rehabilitation, respite, and long-term care.

10. As of the Petition Date, Epworth Villa serves a community of approximately 401 residents.

11. As of the Petition Date, Epworth Living employs 345 individuals, of whom 47 are full-time salaried employees and 298 are paid hourly.

II. **The Debtor's Organizational Structure and Prepetition Indebtedness.**

A. The Debtor's Organizational Structure

12. Epworth Villa is owned by its parent, Epworth Living, Inc., ("Epworth Living") formed under Oklahoma law on December 6, 2012. Epworth Living also owns Epworth at Home, LLC, ("Epworth at Home") a home health care business. Neither Epworth Living nor Epworth at Home are debtors in this case. The management and staff of Epworth Villa are employed by Epworth Living.

B. The Debtor's Prepetition Indebtedness

13. Epworth Villa is the maker of the following promissory notes (collectively, the "Notes"), payable to the order of Oklahoma County Finance Authority ("OCFA"):

   a. First Mortgage Note, Series 2004B, dated January 5, 2005, in the original principal amount of $5,040,000, payable with interest thereon

  as therein provided, having a present balance of $3,500,000;

  b. First Mortgage Note, Series 2005A, dated December 7, 2005, in the original principal amount of $11,460,000, payable with interest thereon as therein provided, having a present balance of $8,080,000;

  c. First Mortgage Note, Series 2005B, dated December 7, 2005, in the original principal amount of $2,000,000, payable with interest thereon as therein provided, having a present balance of $2,000,000; and

  d. First Mortgage Note, Series 2012A, dated December 19, 2012, in the original principal amount of $72,765,000, payable with interest thereon as therein provided, having a present balance of $62,875,000.

  14. To secure its indebtedness to OCFA evidenced by the Notes, Epworth Villa and OCFA entered into the (i) Mortgage and Security Agreement, dated as of March 15, 1997, (ii) as amended and supplemented by a Supplemental Mortgage and Security Agreement, dated as of December 1, 2000, (iii) as amended and supplemented by a Second Supplemental Mortgage and Security Agreement, dated 1, 2004, (iv) as amended and supplemented by a Third Supplemental Mortgage and Security Agreement, dated as of December 1, 2005 and (v) Fourth Supplemental Mortgage and Security Agreement (with Power of Sale), dated as of December 1, 2012 (collectively, the "Mortgage/Security Agreement" and, together with the Notes, the "Prepetition Secured Debt").

  15. The "Mortgaged Property," as defined in the Mortgage/Security Agreement and covered by the lien thereof, encompasses all assets - including all owned and after-acquired property - and all monies, income, revenues, profits and the like of Epworth Villa and its estate in this bankruptcy case.

  16. The Notes were issued by Epworth Villa to OCFA to evidence loans made by OCFA to Epworth Villa from proceeds of the series of revenue bonds that remain outstanding, issued by OCFA under the (i) Bond Indenture, dated as of March 15, 1997, (ii) as

4

supplemented and amended by a Supplemental Bond Indenture, dated as of December 1, 2000, (iii) Second Supplemental Bond Indenture, dated as of December 1, 2004, (iv) Third Supplemental Bond Indenture, dated as of December 1, 2005, and (v) Fourth Supplemental Bond Indenture, dated as of December 1, 2012, entered into between OCFA and the Existing Bond Trustee[1] (collectively, the "Existing Bond Indenture").

17. Pursuant to the Existing Bond Indenture, funding of the loans evidenced by the Notes was received by OCFA through issuance of the following-described bonds (collectively, the "Bonds," and the holders thereof, the "Bondholders"):

    a. Oklahoma County Finance Authority Revenue Bonds, Series 2004B (Epworth Villa Project) Extendable Rate Adjustable SecuritiesSM (EXTRASSM), in the original principal amount of $5,040,000;

    b. Oklahoma County Finance Authority Revenue Bonds, Series 2005A (Epworth Villa Project), in the original principal amount of $11,460,000;

    c. Oklahoma County Finance Authority Revenue Bonds, Series 2005B (Epworth Villa Project) Extendable Rate Adjustable SecuritiesSM (EXTRASSM), in the original principal amount of $2,000,000; and

    d. Oklahoma County Finance Authority Revenue and Refunding Bonds (Epworth Villa Project) Series 2012A, in the aggregate principal amount of $72,765,000.

18. Pursuant to the Existing Bond Indenture, the lien of the Mortgage/Security Agreement in and to Mortgaged Property and additional collateral identified therein, including, without limitation, the Notes, the Mortgage/Security Agreement and all monies and securities held from time-to-time by the Existing Bond Trustee (collectively, the "Bond Collateral") is held by the Existing Bond Trustee, in trust, to secure the obligations of the OCFA to the Bondholders

---

[1] Capitalized terms that are used but not defined herein shall have the meanings ascribed to them in the Plan of Reorganization filed contemporaneously herewith (the "Plan").

under the Bonds. Such lien in and to the Bond Collateral is a first and prior lien, superior to the interests of all other creditors of Epworth Villa.

19. As of the date of commencement of this case, the current, aggregate indebtedness of Epworth Villa to the OCFA under the Notes is principal totaling $76,500,000.00, together with accrued interest and other charges (including reasonable fees and expenses of the Existing Bond Trustee) as provided under applicable agreements (collectively, the "Bond Debt"), including the Notes, the Mortgage/Security Agreement and the Existing Bond Indenture (collectively with other documents and agreements relating to the Bond Debt, use of the proceeds thereof and collateral therefor, the "Existing Bond Documents").

**III.   Events Leading to the Commencement of the Debtor's Chapter 11 Case**

   A.   Adverse Market Conditions

20. Like many retirement communities, the COVID-19 pandemic had a severe detrimental impact upon Epworth Villa's occupancy because it was extremely difficult to conduct marketing activities to obtain new residents, resulting in a gradual reduction in liquidity. Under that financial strain, Epworth Villa defaulted on its Bond Debt in November 2021. Thereafter, Epworth began placing entrance fees of new residents into escrow.

   B.   The Debtor's Response and the Plan Support Agreement

21. On September 13, 2022, Epworth Villa and the Existing Bond Trustee entered into a forbearance agreement (as subsequently amended, supplemented and restated, the "Forbearance Agreement"), under which the Existing Bond Trustee authorized Epworth Villa to use its revenues to pay certain budgeted expenses under an Approved Budget, as defined therein, subject to certain variances. Through the Forbearance Agreement, Epworth Villa's obligation to make payments on its Bond Debt was deferred and the Existing Bond Trustee agreed to forbear

6

from exercising its remedies under the Bond Documents to afford the parties the opportunity to negotiate a consensual resolution. Epworth Villa hired David Fields of RBC Capital Markets, who in June 2023, became employed by Raymond James, to negotiate a restructuring of the Bond Debt and to procure interim financing. After months of financial analysis and negotiations with the Existing Bond Trustee, acting at the direction of certain bondholders, (the "Consenting Holders"), the parties agreed on a plan support agreement and term sheet (together, the "Plan Support Agreement") outlining the terms under which the Bonds will be restructured, which is described more fully in the *Motion for Order Authorizing the Debtor to Assume Plan Support Agreement* [Docket No. 22]

22. As set forth in the Plan Support Agreement, the Existing Bond Claims in the aggregate outstanding principal amount of approximately $76,500,000, plus any accrued and unpaid interest thereon will be exchanged as follows: (i) eighty-five percent (85%) of the Existing Bonds plus accrued and unpaid interest through June 30, 2023 will be exchanged for the Series 2023B Bonds in the principal amount of $66,700,000, and (ii) the remaining fifteen percent (15%) of the outstanding principal of the Existing Bonds, or $9,800,000, plus remaining accrued and unpaid interest on the Existing Bonds through the Effective Date, shall be exchanged for the Series 2023C Bonds, and OCFA will issue $6,000,000 in principal amount of new Series 2023A Bonds to fund capital expenditures for the community (collectively, the "Restructuring Transaction"). The Restructuring Transaction, which will be implemented through the Plan, will ensure sufficient liquidity to support the Debtors' ongoing business operations and enable the Debtor to continue to provide quality care to the residents of the Facility.

23. The proposed reorganization of the Debtor will have minimal impact on creditors other than the holders of the Existing Bonds, which holders will have the opportunity to vote on the Plan. Under the terms of the Plan, on the Effective Date, the Residency Agreements of current Residents will be assumed and the Reorganized Debtor will pay all pre-petition and administrative claims in full. As described above, the Debtor's secured bond debt (consisting solely of the Existing Bonds) will be restructured so that upon emergence from bankruptcy the Debtor's liquidity will be enhanced and its debt service will be substantially reduced,

C. The Debtor's Prepetition DIP Financing Marketing Efforts

24. The Debtor, through the services of David Fields, made inquiries into alternatives for financing and solicited proposals for DIP financing from various lending institutions with experience in providing such financing and other potential sources of capital.

25. As a result of those efforts, the Debtor has agreed on a term sheet with Hamlin Capital Management, LLC ("HCM" or "Bondholder Representative") on the terms of a DIP Loan, which will provide the requisite funding during the pendency of Epworth's Chapter 11 case, the terms of which are the most favorable presently available to the Debtor.

26. Epworth Villa and the Bondholder Representative have agreed to the following material terms: BancFirst, acting as DIP Lender, will loan up to $4 million to Epworth Villa, funded through taxable senior lien bonds issued by Epworth Villa and sold to clients of HCM. The DIP Loan will accrue interest at the 2-year Treasury rate plus 450 basis points with a floor of 8.75%, payable upon the effective date of the Plan, to be paid from the entrance fees currently held in escrow with Trust Company of Oklahoma. The DIP Loan will be secured by a senior security interest in all assets of Epworth Villa, senior to the security interest of the Existing Bond Trustee.

**IV.    The First Day Motions**

27. The Debtor intends to continue to operate its business in the ordinary course during the pendency of this Chapter 11 case. To minimize disruptions to the Debtor's operations on the Petition Date, the Debtor has filed various motions seeking important and urgent relief from the Bankruptcy Court.

### First-Day Motions

28. The following pleadings, among others, were filed with the Petition:

    a. Debtor's Emergency Motion for Entry of Interim and Final Orders, Pursuant to 11 U.S.C §§ 105, 345, 363, 364, and 503, Authorizing the Debtor to Continue (i) to Operate Its Cash Management System Including Its Entrance Fee Escrow Policies and Practices, and Maintain Existing Bank Accounts and Business Forms, and (ii) Its Intercompany Transactions, and (iii) Granting Related Relief ("Cash Management Motion")

    b. Debtor's Emergency Motion for Interim and Final Orders (i) Approving Form of Adequate Assurance of Payment to Utility Companies, (ii) Establishing Procedures for Resolving Objections by Utility Companies, (iii) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service, and (iv) Granting Related Relief to Provide Adequate Assurance to Utilities ("Utilities Motion")

    c. Debtor's Emergency Motion for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, and 507, (i) Authorizing the Debtor to Obtain Senior Secured Superpriority Postpetition Financing, (ii) Granting Liens and Superpriority Administrative Expense Claims, (iii) Authorizing the Use of Cash Collateral, (iv) Granting Adequate Protection, (v) Modifying the Automatic Stay, (vi) Scheduling a Final Hearing, and (vii) Granting Related Relief ("Cash Collateral and DIP Loan Motion")

### Utilities Motion

29. Epworth Villa relies on several utility service providers ("Utility Providers"), for natural gas, electricity, telephone, water, internet and answering services

9

("Utility Services")[2]. Epworth Villa is current with all Utility Providers, maintains deposits with several of the providers, and all but three Utility Providers are paid via ACH.

30. The Utilities Motion requests the Court to prohibit the Utility Providers from unilaterally refusing, discontinuing, or terminating utility services to Epworth Villa. The Utilities Motion and the proposed interim and final orders provide a mechanism for the Utility Providers to challenge the proposed form of adequate assurance of payment.

31. The Debtor intends to pay all postpetition obligations owed to the Utility Providers in a timely manner and anticipates having sufficient funds to do so. Moreover, prepetition, the Debtor entered into ACH agreements (collectively, the "ACH Agreements") with all but three of the Utility Providers, pursuant to which, the Utility Providers are authorized to and, in fact, draw directly from the Debtor's bank account to satisfy invoices for Utility Services. The Debtor anticipates that the Utility Companies would, with this Court's permission, continue to make such draws pursuant to the ACH Agreements post-petition, for both pre-petition and post-petition Utility Services, and respectfully submits that such Agreements constitute a form of adequate assurance of payment. Notwithstanding the foregoing, to provide the Utility Companies who don't have ACH Agreements ("Non-ACH Utilities") with adequate assurance pursuant to sections 366(b) and 366(c) of the Bankruptcy Code, the Debtor proposes to pay a deposit directly to the Non-ACH Utilities in an amount equal to the cost of one months' utility services, calculated using the historical average for such payments during the past 12 months

---

[2] The Debtor obtains Utility Services from three Utility Companies—OG&E, the City of Oklahoma City and ONG—with refundable deposits in the possession of such Utility Companies that exceed the Debtor's historical average of one weeks' payment owed to such Utility Companies. Specifically, OG&E is in possession of a refundable deposit in the amount of $40,000.00. The City of Oklahoma City possesses a refundable deposit in the amount of $1,450.00. ONG possesses a refundable deposit in the amount of $1,102.00. The Debtor is not seeking a refund of such refundable deposits.

10

(the "Utility Deposit"), and together with the Debtor's ability to pay for pre-petition and post-petition Utility Services in the ordinary course, the ("Proposed Adequate Assurance"). Based on the foregoing, the Debtor estimates that the total amount of the Adequate Assurance Deposit or Utility Deposit will be approximately $6,100.00.

## Cash Management Motion

A. The Cash Management System.

32. Epworth Villa maintains a cash management system principally through an operating account at BancFirst, Oklahoma City (the "Operating Account") into which its revenues are deposited and from which disbursements are made to pay for operating expenses and other obligations incurred in the ordinary course of Debtor's business (the "Cash Management System").

33. Epworth Villa's Cash Management System operates as follows:

   a. Epworth Villa's revenue principally consists of resident monthly fees, Medicare and Medicaid payments, entrance fees, and government reimbursements (the "Revenue"). Payments of the Revenue to Epworth Villa are received in the form of electronic transfers and paper checks (the "Payments"). The Payments are collected in the Operating Account.

   b. Payments of operating expenses, including payments to vendors and contractors, are drawn on the Operating Account on or about the 15th day of each month. Some vendors and contractors are paid via ACH.

   c. Epworth Villa's parent entity, Epworth Living, provides accounting and administrative services to Epworth Villa and its non-debtor affiliate, Epworth at Home, Inc. Epworth Villa's payroll, associated payroll taxes and insurance premiums payments are funded through the Operating Account for payment by inter-bank transfer by Epworth Villa and Epworth at Home to Epworth Living. For payroll and associated payroll taxes, a payment via electronic transfers is made to ADP, which processes payroll for the benefit of payroll payment recipients: the employees of Epworth Villa and Epworth at Home. Epworth Living pays the insurance premium finance payments for the benefit of Epworth Villa and Epworth at Home.

       d.   Epworth Villa maintains other accounts, including an Escrow Account at the Trust Company of Oklahoma for resident entrance fees, and other restricted accounts at BancFirst, required pursuant to the terms of the Bond Documents (the "Restricted Accounts").

34.    The Cash Management System is governed by procedures that are consistent with the normal and regular operation of the kind of cash management services maintained and utilized by Debtor. The Cash Management System provides a reliable and efficient process for the Debtor's financial operations.

    B.    Compliance with U.S. Trustee Guidelines and the Bankruptcy Code.

35.    BancFirst is designated as an authorized depository in the Western District of Oklahoma pursuant to the *Western District of Oklahoma Authorized Depository Listing, Updated April 1, 2015* (the "Depository Listing") created in furtherance of the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines"). As an authorized depository, BancFirst is party to a uniform depository agreement with the U.S. Trustee, and therefore the Debtor believes that the operating account at BancFirst will be collateralized in a manner consistent with the requirements of section 345 of the Bankruptcy Code.

    C.    Intercompany Transactions.

36.    In the ordinary course of business, the Debtor engages in routine business relationships with Epworth Living (collectively, the "Intercompany Transactions"), which result in intercompany receivables and payables (the "Intercompany Claims"). Intercompany Transactions cover a number of different categories, including, but not limited to: (a) payroll, (b) payroll taxes, and (c) insurance premium finance payments.

37.    For example, Epworth Living employs 345 people (the "Employees") who provide services on behalf of, or for the benefit of, Epworth Villa. Of this workforce, 47 are

employed on a full-time basis and the remaining 298 are employed on an hourly basis.  In the ordinary course of its business, Epworth Living compensates the Employees through a payroll service, ADP, utilizing funds paid to it by the Debtor.  In the ordinary course of the Debtor's business and on a bimonthly basis, the Debtor transfers the amount required for Epworth Living to make payroll and to pay associated payroll taxes (the "Employee Wages") in exchange for such Employees providing the services necessary for the Debtor to maintain its operations.

38. In addition to making Intercompany Transfers to ensure the payment of Employee Wages, the Debtor also makes Intercompany Transfers in the ordinary course of its business to ensure that the Employees are reimbursed for business expenses, that their entitlements to paid time off ("PTO") and health insurance are honored, and that all claims to prepetition deductions, withholdings and taxes are satisfied.

39. The Debtor also makes intercompany transfers to Epworth Living to pay its proportionate share of the cost of insurance, the current policy period for which extends from September 1, 2023 through August 31, 2024.  All insurance, including property, auto, cyber liability, directors and officer's liability, employee liability, and general liability, is procured by Epworth Living for the benefit of Epworth Villa and Epworth at Home, both of which are additional insureds.  To minimize the impact on liquidity caused by the approximately $2.1 million annual insurance premium, Epworth Living has historically obtained insurance premium financing and has done so again this year.  In September 2023, Epworth Living entered into a Premium Financing Agreement with First Insurance Funding under which Epworth Villa paid as a down payment, $670,000, and which requires ten consecutive monthly payments of $147,935.78 each, due on the 30th day of the month, with the first payment due on September 30, 2023.  The amount financed is $1,417,250.98 and the total of payments is $1,479,357.80.

13

40. Intercompany Claims are reflected as journal entry receivables and payables, as applicable, in the respective entities' accounting systems. The Debtor tracks all fund transfers in its accounting system and can ascertain, trace, and account for all Intercompany Transactions. The Debtor will continue to track postpetition intercompany transfers. Discontinuing the Intercompany Transactions would unnecessarily disrupt the Cash Management System and the Debtor's operations to the detriment of the Debtor, its creditors, and other stakeholders. In addition, anticipated ordinary course Intercompany Transfers are reflected in the Initial Budget annexed to the Debtor's DIP Motion, such that the contemplated Intercompany Transfers shall be made with the consent of the DIP Lender and the Existing Bond Trustee. The Debtor seeks the authority to continue the Intercompany Transactions in the ordinary course of business on a postpetition basis, in a manner consistent with prepetition practice.

D. Business Forms.

41. As part of its Cash Management System, the Debtor uses various preprinted business forms (the "Business Forms") in the ordinary course. To minimize expenses to its estate and avoid confusion during the brief pendency of this Chapter 11 Case, the Debtor requests that the Bankruptcy Court authorize the Debtor's continued use of all existing preprinted correspondence and Business Forms (including, without limitation, letterhead, checks, and other Business Forms) as such forms were in existence immediately before the Petition Date, without reference to the Debtor's status as debtor in possession, rather than requiring the Debtor to incur the expense and delay of ordering entirely new Business Forms.

E. Entrance Fee Escrow.

42. Before a potential resident of Epworth Villa (a "Prospective Resident") or, following such individual becoming a resident of Epworth Villa, a( "Resident"), the Debtor and

the Prospective Resident enter into an agreement (each, a "Residency Agreement") that sets forth, among other things, the Resident's obligation to pay a fee to the Debtor to reserve the Prospective Resident's unit (an "Entrance Fee"), which may be fully or partially refunded to the Resident, and the amount of monthly service fees ("Monthly Service Fees") the Resident must pay while living at Epworth Villa.

43. The Debtor currently offers Prospective Residents the choice of at least two residency plans, each evidenced by a different Residency Agreement. The "80/90% Refundable Plan" offers Residents an 80% and 90%, single and double occupancy, respectively, refundable contract upon resale of the unit, or alternatively a No Refund contract under which a partial Entrance Fee refund is available for five years in a decreasing amount each year.

44. Generally, the purpose of the Entrance Fee is to pay refunds to Residents upon termination of a Residency Agreement in accordance with its terms, pay certain project costs, retire debt, and cover operating expenses of Epworth Villa. Prospective Residents typically pay, as a Reservation Deposit, 10% of the Entrance Fee upon execution of a Residency Agreement, and the remaining balance prior to occupancy. The amount of the entrance fee differs depending on the form of Residency Agreement selected and unit size. By its terms, each Residency Agreement terminates in the event of a Resident's death, or if the Resident vacates Epworth Villa by giving the Debtor written notice.

45. Since December 15, 2021, entrance fees paid by new residents have been placed into escrow with the Trust Company of Oklahoma (the "Entrance Fee Escrow") under the terms of the Escrow Agreement (the "Escrow Agreement" and, the policies and practices governing the escrowing of entrance fees pursuant to the Escrow Agreement collectively referred to herein as the "Entrance Fee Escrow Policies and Practices"). Moreover, new residents have

signed an Addendum to Residency Agreement under which they have agreed to the Entrance Fee Escrow pursuant to the terms of the Escrow Agreement. As of the Petition Date, Epworth Villa had on deposit in the Entrance Fee Escrow the amount of $14,851,664.66.

      F.      <u>Proposed Escrow and Refund of Entrance Fees</u>.

      46.      To protect Residents and Prospective Residents pending confirmation of the Plan and assuage any concerns of Prospective Residents arising from Debtor's pending Chapter 11 case, the Debtor intends to continue, in the ordinary course of its business and consistent with its long-standing practice, to deposit all entrance fees paid by New Residents on and after the Petition Date into the Escrow Account under the terms of the Addendum to Residency Agreement.

The foregoing is true and correct to the best of my knowledge and belief.


Date: October 2, 2023                                   /s/ *Ron Kelly*
                                                           Name: Ron Kelly
                                                           Title: President and CEO