*NOT YET APPROVED BY BANKRUPTCY COURT/NOT FOR SOLICITATION*

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

In re:

**CENTRAL OKLAHOMA
UNITED METHODIST
RETIREMENT FACILITY, INC.**
*d/b/a Epworth Villa*

         **Debtor.**

**Case No.  23-12607**

**Chapter 11**

## [4th PROPOSED] DISCLOSURE STATEMENT TO ACCOMPANY DEBTOR'S PLAN OF REORGANIZATION

*/s/ Sidney K. Swinson*
Graydon Dean Luthey, Jr., OBA No. 5568
Sidney K. Swinson, OBA No. 8804
Mark D.G. Sanders, OBA No. 22922
**GABLE & GOTWALS, P.C.**
110 N. Elgin Avenue, Suite 200
Tulsa, Oklahoma 74120-1495
Telephone: 918.595.4800
Facsimile: 918.595.4990
dluthey@gablelaw.com
sswinson@gablelaw.com
msanders@gablelaw.com

*Attorneys for Debtor*

Central Oklahoma United Methodist Retirement Facility, Inc. d/b/a Epworth Villa (hereafter, "Debtor" or "Epworth Villa"), as debtor in the above-captioned Chapter 11 case, submits this *Disclosure Statement* (the "Disclosure Statement") to accompany its *Debtor's Plan of Reorganization* (the "Plan").

## ARTICLE I.

## INTRODUCTION

On September 29, 2023, the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Western District of Oklahoma, commencing the instant bankruptcy case.

At the commencement of this Case the Debtor filed the Plan, which comprises the full terms of Epworth Villa's proposed reorganization. The Plan provides for the continued operation of Epworth Villa's business while restructuring its secured bond debt (consisting of the Existing Bonds). The Plan's proposed restructuring of the Debtor, described more fully herein, will have minimal impact on Residents or creditors other than Holders of Existing Bond Claims and affiliates of the Debtor. Among other things, the Residency Agreements of current residents will be assumed and continued without modification, and the Claims of all prepetition and administrative creditors will be paid in full. The Debtor's secured bond debt will be restructured so that upon emergence from bankruptcy the Debtor's liquidity will be enhanced and its debt service will be substantially reduced.

This Disclosure Statement is submitted pursuant to Section 1125 of the Bankruptcy Code to Holders of Claims against, and Interests in, the Debtor in connection with (i) the Debtor's solicitation of acceptances of its Plan, and (ii) the hearing to consider confirmation of the Plan, scheduled for December 18, 2023 at 9:30 a.m. (the "Confirmation Hearing")

The ultimate purpose of this Disclosure Statement is to provide the entities voting on the Plan with a sufficient factual basis upon which to make that important decision. Following a hearing, the Court entered its *Order Approving Disclosure Statement and Related Solicitation Materials and Procedures* (the "Disclosure Statement Order"), which, among other things, determined that this Disclosure Statement contains adequate information of a kind, and in sufficient detail, to enable hypothetical, reasonable investors typical of the Debtor's creditors to make informed judgments as to whether to accept or reject the Plan. Such approval, however, did not constitute a determination by the Court of the fairness or merits of the Plan itself. The Court's judgment on the merits of the Plan will be made following the Confirmation Hearing.

The Debtor has submitted a *reorganization* Plan because it believes that its proposed financial restructuring will provide more value to creditors than a *liquidation* of the assets of Epworth Villa. To achieve such optimal value, the Plan contemplates treatment of the Debtor's secured and unsecured creditors in accordance with the classifications and treatments set forth more fully in the Plan. You should carefully review the proposed classification and treatment to be afforded each Class before voting to accept or reject the Plan.

The Plan describes the manner in which the Debtor proposes to reorganize its financial affairs, *i.e.* how the Claims against, and Interests in, the Debtor will be classified and treated. The Plan (with accompanying Exhibits) is attached as Exhibit "1" to this Disclosure Statement.

This Disclosure Statement contains, among other things, *summaries* of certain material provisions of the Plan. Those summaries do not purport to be comprehensive, and are qualified in their entirety by reference to the provisions of the Plan itself, including all documents described therein.[1]

The Plan provides for the continued operation of Epworth Villa's business. The Debtor has submitted a *reorganization* Plan because it believes that its proposed financial restructuring will provide more value to creditors than a liquidation of the assets of Epworth Villa. To achieve such optimal value, the Plan contemplates treatment of the Debtor's secured and unsecured creditors in accordance with the classifications and treatments set forth more fully in the Plan. You should carefully review the proposed classification and treatment to be afforded each Class before voting to accept or reject the Plan.

The requirements for approval and confirmation of the Plan -- including the vote of certain creditors and interest holders to accept or reject the Plan -- and certain statutory findings that must be made by the Court, are fully described below in ARTICLE XI.

This Disclosure Statement sets forth in detail (i) the deadlines, procedures and instructions for voting to accept or reject the Plan; (ii) the record date for voting purposes; (iii) the applicable standards for tabulating votes; and (iv) the deadline and procedure for filing objections to confirmation of the Plan. In addition, detailed voting instructions accompany each Ballot.

Each Holder of a Claim or Interest entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots, in their entirety, before voting on the Plan. Those documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes.

**A Court-approved Ballot is enclosed with this Disclosure Statement for Holders of Claims and Interests that are entitled to vote to accept or reject the Plan.**

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED NOT LATER THAN 4:00 O'CLOCK P.M., PREVAILING CENTRAL TIME, DECEMBER 12, 2023**.

---

[1] Attached as Exhibits to this Disclosure Statement are copies of the following:
- Exhibit "1" – Plan
- Exhibit "2" – Disclosure Statement Order
- Group Exhibit "3" – Financial Statements
- Exhibit "4" – Liquidation Analysis
- Exhibit "5" – Feasibility Financial Projections
- Exhibit "6" – Plan Support Agreement
- Group Exhibit "7" – Selected Series 2023 Bond Documents

* * * *

The Board of Directors of the Debtor has approved the transactions contemplated by the Plan and described in this Disclosure Statement. The Debtor believes that the compromises contemplated under the Plan are fair and equitable, maximize the value of the Estate and provide the best recovery to Holders of Claims. Importantly, the proposed Plan leaves unimpaired the obligations owed to the residents under their Residency Agreements, as well as the claims of trade creditors.  Accordingly --

**THE DEBTOR BELIEVES THE PLAN REPRESENTS THE BEST POSSIBLE RETURN TO HOLDERS OF ALL CLAIMS.
IT STRONGLY URGES YOU TO VOTE IN FAVOR OF THE PLAN AFTER FULLY REVIEWING THIS DISCLOSURE STATEMENT**.

## ARTICLE II.

### DEFINITIONS

Certain capitalized terms used in this Disclosure Statement are defined in this Section. Other capitalized terms are defined within the body of other Articles of this Disclosure Statement. Any capitalized terms found in this Disclosure Statement, and not otherwise defined herein, shall have the meaning ascribed to them in the Plan and, if not defined therein, shall have the meaning accorded to them by the Bankruptcy Code or the Bankruptcy Rules (and shall be construed in accordance with the rules of construction thereunder).

The following terms shall have the respective meanings set forth below:

**"Accrued Professional Compensation Claim"** means, at any date, all accrued fees and reimbursable expenses for services rendered by a Retained Professional in this Case through and including such date, to the extent such fees and expenses have not been previously paid whether under a retention order with respect to such Retained Professional or otherwise.  To the extent that there is a Final Order denying some or all of a Retained Professional's fees or expenses, such denied amounts shall no longer be considered an Accrued Professional Compensation Claim.

**"Administrative Expense Claim"** means any Claim for costs and expenses of administration pursuant to Section 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Debtor's Estate and operating the business of the Debtor; (b) all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930; (c) claims for the value of any goods received by the Debtor within twenty (20) days before the Petition Date and Allowed in accordance with Section 503(b)(9) of the Bankruptcy Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Case pursuant to Sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

**"Affiliate"** means, with respect to any entity, an "affiliate" as defined in Section 101(2) of the Bankruptcy Code as if such entity were a debtor.

"**Allowed**" means that portion of any Claim or Interest  (a) for which no timely proof of Claim or Interest has been Filed, but which has been listed by the Debtor in the Schedules in a liquidated, non-contingent and undisputed amount; (b) as to which a proof of Claim or Interest has been timely Filed in a liquidated amount, so long as (x) no timely objection to the allowance of such Claim or Interest has been Filed, or (y) if such objection has been Filed, such objection has been overruled by a Final Order (but only to the extent such objection has been overruled); (c) as to which a Final Order has been entered allowing such Claim or Interest; or (d) with regard to an Ordinary Course Administrative Expense Claim, that portion of the subject Claim that the Debtor, in its fiduciary capacity as Debtor-in-Possession, has determined, as evidenced by payment, is a valid post-Petition Date obligation; or (e) as otherwise allowed under the Plan.

"**Assets**" means all assets of the Debtor of any nature whatsoever, including, without limitation, all property of the Debtor's Estate pursuant to Section 541 of the Bankruptcy Code.

"**Avoidance Actions**" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the Debtor or the Estate under Sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code and under similar state or federal statutes and common law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such actions or remedies.

"**Ballot**" means the ballots upon which Holders of Impaired Claims entitled to vote on the Plan may indicate its acceptance or rejection of the Plan in accordance with the instructions regarding voting.

"**Bankruptcy Code**" means Title 11 of the United States Code, as applicable to this Case.

"**Bankruptcy Rules**" means, collectively, (i) the Federal Rules of Bankruptcy Procedure, as amended, promulgated under the authority of 28 U.S.C. § 2015, and (ii) the Local Rules of the Court, as applicable to this Case.

"**Business Day**" means any day of the calendar week, except Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or any day on which commercial banks are authorized or required by law to close in the State of Oklahoma.

"**Case**" means the instant bankruptcy case commenced under Chapter 11 of the Bankruptcy Code by the Debtor on the Petition Date, being denominated as Case No. 23-12607, and currently pending before the Court.

"**Cash**" means legal tender of the United States of America and equivalents thereof.

"**Causes of Action**" means any claim, cause of action, controversy, demand, agreement, right (including to legal or equitable remedies), action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law, asserted or which may be asserted by or on behalf of the Debtor and/or the Estate, including:  (a) any right of

setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Avoidance Action; and (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in Section 558 of the Bankruptcy Code.

"**Claim**" has the meaning provided in Section 101(5) of the Bankruptcy Code.

"**Claims Bar Date**" means the applicable deadline for Filing proofs of Claim or Interest against the Debtor that is established by a Claims Order or other Court Order.

"**Claims and Noticing Agent**" means Stretto in its capacity as claims and noticing agent for the Debtor.

"**Claims Order**" means an Order of the Court establishing, *inter alia*, the Claims Bar Date and a deadline for Filing of objections to proofs of Claim or Interest.

"**Class**" means a distinct and separate category of Claims or Interests as delineated in Section 3 of the Plan.

"**Collateral**" means any property or interest in property of the Estate subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or other applicable law.

"**Confirmation**" means the act of approval of the Plan by the Court under Bankruptcy Code Section 1129 following the Confirmation Hearing.

"**Confirmation Date**" means the date on which the clerk of the Court enters the Confirmation Order on the Court's docket in the Chapter 11 Case.

"**Confirmation Hearing**" means the hearing to consider Confirmation of the Plan, as such hearing may be continued from time to time.

"**Confirmation Order**" means the Order of the Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

"**Consenting Holders**" means, collectively, (a) Holders of the Existing Bond Claims that are parties to the Plan Support Agreement, and (b) any Holder of Existing Bonds that executes a joinder to the Plan Support Agreement pursuant to its terms.

"**Contested Claim**" means a Claim (i) to the extent that the Debtor(s) or any other party in interest has legitimately interposed a timely objection or request for estimation which has not been withdrawn or determined by a Final Order; or (ii) that is Scheduled as disputed, contingent, or unliquidated, and has not been Allowed by Final Order.

"**Court**" means the United States Bankruptcy Court for the Western District of Oklahoma, to the extent it may exercise jurisdiction in this Case on reference from the United States District Court for the Western District of Oklahoma; and otherwise, the United States District Court for

the Western District of Oklahoma; or if either such Court ceases to exercise jurisdiction over this Case, such other court that exercises jurisdiction over this Case.

**"Creditor"** means a Holder of a Claim.

**"Debtor-in-Possession"** means the Debtor in its capacity as debtor-in-possession in this Case pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

**"DIP Bondholder Representative"** means Hamlin Capital Management, LLC, as representative of the bondholders issued under the indenture by and between the Debtor-in-Possession and BancFirst as DIP Trustee, which Holders are providing post-petition funding to the Debtor-in-Possession under the DIP Credit Agreement.

**"DIP Claim"** means any Claim against the Debtor arising under the DIP Credit Agreement.

**"DIP Credit Agreement"** means the Priming Superpriority Debtor-in-Possession Credit Agreement by and between the Debtor-in-Possession and the DIP Lender.

**"DIP Lender"** means BancFirst, Oklahoma City, as bond trustee for the holders of the bonds issued under the indenture by and between the Debtor-in-Possession and BancFirst as DIP Trustee, which holders are providing post-petition funding to the Debtor-in-Possession under the DIP Credit Agreement.

**"DIP Motion"** means the Debtor's Motion for Interim and Final Orders (I) Authorizing Debtor to Obtain Post-Petition Financing; (2) Authorizing Debtor in Possession to Use Cash Collateral; (3) Providing Adequate Protection; (4) Granting Liens, Security Interests and Superpriority Claims; and (5) Scheduling a Final Hearing, to be filed on the Petition Date.

**"DIP Order"** means any order, whether interim or final, authorizing the Debtor (a) to obtain postpetition financing and (b) use the cash Collateral of the Existing Bond Trustee during the Case.

**"Distribution(s)"** means Cash, property, interests in property or other value distributed to Holders of Allowed Claims, or their designated agents, under the Plan.

**"Effective Date"** means the first Business Day selected by the Debtor, with the consent of the Existing Bond Trustee, on which (a) the conditions specified in Section 10.2 of the Plan have been either satisfied or waived in accordance with the terms of Plan Section 10.2, and (b) no stay of the Confirmation Order is in effect.

**"Entrance Fee Escrow"** means the escrow account holding entrance fees received from certain Residents, which account is maintained by The Trust Company of Oklahoma on behalf of such Residents pursuant to the Escrow Agreement.

**"Escrow Agreement"** means that certain Escrow Agreement by and between Epworth Villa and The Trust Company of Oklahoma, as escrow agent.

"**Estate**" means the bankruptcy estate created with respect to the Debtor in its Case pursuant to Section 541 of the Bankruptcy Code.

"**Estimated Claim**" means a Claim in the amount estimated by the Court under the authority of Section 502(c) of the Bankruptcy Code.

"**Exculpated Party**" means, collectively, in each case in its capacity as such on and after the Petition Date: (a) the Debtor; (b) the Reorganized Debtor; (c) the Existing Bond Trustee; (d) the Consenting Holders; (e) the DIP Lender; (f) the DIP Bondholder Representative; and (g) with respect to each of the foregoing entities in clauses (a) - (f), such entity and its current and former predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals.

"**Executory Contract(s)**" means all contracts and unexpired leases to which the Debtor is a party that are subject to assumption or rejection under Section 365 of the Bankruptcy Code.

"**Existing Bond Claims**" means any Claim arising from, or related to, the Existing Bond Documents with respect to the Series 2004B, 2005A and B, and 2012A Bonds, including any and all outstanding principal, in the aggregate amount of $78,458,000, plus any and all accrued interest, fees (including, without limitation, professional fees), expenses, costs and other charges payable with respect to the Series 2004B, 2005A and B, and 2012A Bonds, which Claims are Allowed pursuant to the DIP Order and under the terms of the Plan.

"**Existing Bond Documents**" mean the Existing Bond Indenture, the Existing Bond Mortgage, and all other documentation evidencing the Existing Bonds and obligations thereunder.

"**Existing Bond Indenture**" means the Bond Indenture, by and between the Issuer and the Existing Bond Trustee dated as of March 15, 1997, as amended and supplemented by the Supplemental Bond Indenture dated as of December 1, 2000, as further amended and supplemented by the Second Supplemental Bond Indenture dated as of December 1, 2004, as further amended and supplemented by the Third Supplemental Bond Indenture dated as of December 1, 2005, and as further amended and supplemented by the Fourth Supplemental Bond Indenture dated as of December 1, 2012, as it may from time to time be further amended or supplemented pursuant to Article IX of the original Bond Indenture.

"**Existing Bond Mortgage**" means the Mortgage and Security Agreement, by and between Epworth Villa and the Issuer dated as of March 15, 1997, as amended and supplemented by the Supplemental Mortgage and Security Agreement dated as of December 1, 2000, as further amended and supplemented by the Second Supplemental Mortgage and Security Agreement dated as of December 1, 2004, as further amended and supplemented by the Third Supplemental Mortgage and Security Agreement dated as of December 1, 2005, and as further amended and supplemented by the Fourth Supplemental Mortgage and Security Agreement (with Power of Sale) dated as of December 1, 2012 , as it may from time to time be further amended or supplemented pursuant to Article XII of the original Bond Mortgage.

"**Existing Bond Trustee**" means BancFirst, Oklahoma City, as bond trustee pursuant to the Existing Bond Indenture.

"**Existing Bonds**" means the outstanding bonds that are the Oklahoma County Finance Authority Revenue and Refunding Bonds, Series 2004B, 2005A, 2005B, and/or 2012A (Epworth Villa Project).

"**Facility**" means the real estate described in the Existing Bond Indenture and the buildings, improvements and fixtures (excluding equipment which is not fixtures and which may be removed without damage to the real estate) constructed or to be constructed on such real estate and all substitutions therefor, additions thereto and replacements thereof, commonly known as Epworth Villa, Oklahoma City, Oklahoma.

"**File, Filed or Filing**" refers to the act of submitting a paper to the clerk of the Court in this Case, and acceptance and retention thereof by said clerk in the Court's files.

"**Final Order**" means an Order or judgment of the Court (a) as to which the time to appeal, petition for certiorari, or move for re-argument, rehearing or new trial has expired and as to which no appeal, petition for certiorari, or other proceedings for re-argument, rehearing or new trial shall then be pending; (b) as to which any right to appeal, petition for certiorari, reargue, rehear or retry shall have been waived in writing; or (c) in the event that an appeal, writ of certiorari, re-argument, rehearing or new trial has been sought, as to which (i) such Order of the Court shall have been affirmed by the highest court to which such Order was appealed; (ii) certiorari has been denied as to such Order; or (iii) re-argument or rehearing or new trial from such Order shall have been denied, and the time to take any further appeal, petition for certiorari or move for re-argument, rehearing or new trial shall have expired without such actions have been taken.

"**General Unsecured Claim**" means any Claim asserted against the Debtor that is not (a) a Secured Claim, (b) a Claim entitled to priority under the Bankruptcy Code or any Final Order of the Court, (c) an Existing Bond Claim, or (d) a Former Resident Refund Claim (as described in Section 4.4 of the Plan).

"**Holder**" means the entity holding legal title to a Claim or Interest.

"**Impaired**" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

"**Interest**" means, as the term is utilized in chapter 11 of the Bankruptcy Code, an ownership "interest" in the Debtor(s) as of the Petition Date.

"**Issuer**" means the Oklahoma County Finance Authority, an Oklahoma Public Trust.

"**Lien**" has the meaning set forth in Section 101(37) of the Bankruptcy Code.

"**Order**" means an order or judgment of the Court as entered on the Court's docket.

"**Ordinary Course Administrative Expense Claim**" means an Administrative Expense Claim incurred in the ordinary course of business of Epworth Villa, as Debtor-in-Possession, including, without limitation, a Claim arising under 28 U.S.C. § 1930.

"**Petition Date**" means September 29, 2023 -- the date on which the Debtor Filed its voluntary petition for relief commencing its Case.

"**Plan**" means the Debtor's Chapter 11 plan of reorganization, including all appendices, exhibits, schedules and supplements hereto (including any appendices, exhibits, schedules and supplements to the Plan that are contained in the Plan Supplement), as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and the Plan Support Agreement.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that are necessary to the implementation of the Plan, in each case subject to the terms and provisions of the Plan Support Agreement, to be filed no later than ten (10) days prior to the Confirmation Hearing, and as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, the Bankruptcy Rules and the Plan Support Agreement.

"**Plan Support Agreement**" means that certain Plan Support Agreement entered into as of September 29, 2023, by and among the Debtor, the Consenting Holders, and any subsequent entity that becomes a party thereto pursuant to the terms thereof, as amended and restated from time to time, and which is attached to this Disclosure Statement.

"**Plan Term Sheet**" means that certain term sheet describing the key terms of a plan of reorganization for the Debtor, attached as **Exhibit 1** to the Plan Support Agreement.

"**Pro Rata Share**" means the proportion that an Allowed Claim bears to the sum of all Allowed Claims within such Class for which an allocation is being determined.

"**Released Parties**" means, collectively, the following entities: (i) the Debtor, (ii) the Reorganized Debtor; (iii) the Existing Bond Trustee; (iv) the Consenting Holders; (v) the Issuer; (vi) the DIP Lender; and (vii) the DIP Bondholder Representative; underlined provided that in each case, an entity shall not be a Released Party if it: (a) elects to opt out of the releases contained in the Plan; or (b) timely Files with the Court on the docket of this Case an objection to the releases contained in the Plan that is not resolved before the Confirmation Date.

"**Releasing Parties**" means collectively, the following entities: (i) ***each Holder of a Claim or interest who has not chosen, by marking the appropriate box on the Ballot and/or Opt-Out Form, as appropriate, to opt out of the releases provided for in Section 11.10 of the Plan***; (ii) the DIP Lender; (iii) the Existing Bond Trustee; (iv) the Consenting Holders; (v) the Issuer; and (vi) with respect to each of the foregoing entities specified in clauses (i) through (v), such entity and its current and former predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and all of its respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals.

**"Reorganized Debtor"** means the Debtor on or after the Effective Date, and its successors.

**"Residency Agreement(s)"** means those certain agreements by and between Epworth Villa and any current, former, or prospective Residents, providing (a) certain rights of occupancy in the Facility, including any reservation agreement or other agreement or contract reserving rights of occupancy; (b) for certain services to such Resident; and/or (c) establishing and delineating certain entrance fees and refund rights.[2]

**"Resident(s)"** means all current, former, or prospective residents of the Facility who are or were parties to a Residency Agreement.

**"Restructuring Transaction"** means the transaction through which, among other things, the Existing Bonds shall be exchanged for newly-issued Series 2023 Bonds, as more specifically described in Section 10.01 of this Disclosure Statement and Section 6 of the Plan, and which constitutes the treatment, *inter alia*, of the Existing Bond Claims under the Plan.

**"Retained Professional"** means any entity:  (a) employed in the Case under a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, under Sections 327, 328, 329, 330, 331, or 1103 of the Bankruptcy Code (other than an ordinary course professional retained under an Order of the Court); or (b) for which compensation and reimbursement has been Allowed by the Court under Section 503(b)(4) of the Bankruptcy Code.

**"Scheduled"** means as set forth on the Schedules.

**"Schedule(s)"** means, individually or collectively, and as amended, the schedules of assets and liabilities, and the statements of financial affairs, Filed by the Debtor(s) in its Case pursuant to Section 521 of the Bankruptcy Code and associated Bankruptcy Rules.

**"Secured Claim"** means (a) any Claim that is secured by a Lien on property in which an Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court Order, to the extent of the value of the Creditor's interest in the Estate's interest in such property, as determined pursuant to Section 506(a) of the Bankruptcy Code or, (b) any Claim that is subject to setoff under Section 553 of the Bankruptcy Code, subject to the extent of the amount subject to setoff, as provided in Section 506(a) of the Bankruptcy Code, including any Claim that the Holder of which validly elects to treat as secured pursuant to Section 1111(b) of the Bankruptcy Code, or (c) any Claim that is Allowed as such pursuant to the Plan.

---

[2] Despite not having filed an objection to any pending motion, the Oklahoma Department of Securities, through counsel, appeared at the October 4, 2023 hearing on the First Day Motions.  The ODS claimed that Epworth Villa had not complied with an Order issued by the ODS and an alleged agreement between the ODS and Epworth Villa.  Immediately after the hearing, upon reviewing the ODS' documentation on which its allegations were based, it was determined that the documents relied upon by the ODS do not pertain to Epworth Villa's Residency Agreements.  The ODS continues to question whether Epworth Villa's Residency Agreements comply with Oklahoma law, and specifically whether the Residency Agreements constitute securities.  The Debtor does not believe the resolution of that issue will have a material adverse effect on the feasibility of the Plan.

"**Series 2023 Bond Documents**" means, collectively, those documents that are included as Bond Documents in the Plan Supplement, including the Series 2023 Bond Indenture, the Series 2023 Loan Agreement, the Series 2023 Bond Mortgage, and the Series 2023 Continuing Covenants Agreement together with any other document or agreement delivered as security for or relating to the Series 2023 Bonds or the Debtor's obligations under the foregoing documents, and any and all future renewals and extensions or restatements of, or amendments or supplements to, any of the foregoing. With respect to the Restructuring Transaction, the terms of the Series 2023 Bond Documents shall supersede any inconsistent provisions stated in any other document, including, without limitation, the Plan Term Sheet to the Plan Support Agreement.

"**Series 2023 Bond Indenture**" means that certain Bond Trust Indenture by and between the Series 2023 Issuer and the Series 2023 Bond Trustee, substantially in the form to be included in the Plan Supplement.

"**Series 2023 Bond Mortgage**" means that certain Amended and Restated Mortgage and Security Agreement by the Debtor in favor of the Series 2023 Bond Trustee, substantially in the form to be included in the Plan Supplement.

"**Series 2023 Bond Trustee**" means BancFirst, Oklahoma City, as bond trustee pursuant to the Series 2023 Bond Indenture.

"**Series 2023 Bonds**" means, collectively, the Series 2023A Bonds, Series 2023B Bonds, and Series 2023C Bonds.

"**Series 2023 Continuing Covenants Agreement**" means that certain Continuing Covenants Agreement between the Debtor and the Series 2023 Bond Trustee, substantially in the form to be included in the Plan Supplement and attached to this Disclosure Statement.

"**Series 2023 Issuer**" means the Oklahoma County Finance Authority, in its capacity as issuer pursuant to the Series 2023 Bond Indenture.

"**Series 2023 Loan Agreement**" means that certain Loan Agreement between the Debtor and the Series 2023 Issuer, substantially in the form to be included in the Plan Supplement and attached to this Disclosure Statement.

"**Series 2023A Bonds**" means those certain bonds to be issued by the Series 2023 Issuer in the amount of $6,000,000, as more particularly described in Section 6.2 of the Plan.

"**Series 2023B Bonds**" means those certain bonds to be issued by the Series 2023 Issuer in the amount of $66,700,000, as more particularly described in Section 6.2 of the Plan.

"**Series 2023C Bonds**" means those certain bonds to be issued by the Series 2023 Issuer in the amount of $13,724,671, as more particularly described in Section 6.2 of the Plan.

"**Stretto**" means Bankruptcy Management Solutions, Inc., d/b/a Stretto.

"**Tax Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Unimpaired**" means, with respect to a Claim or Interest, a Class of Claims or Interests that is "unimpaired" within the meaning of Section 1124 of the Bankruptcy Code.

"**United States Trustee**" means the Office of the United States Trustee for the Western District of Oklahoma.

"**Voting Agent**" means Stretto in its capacity as voting agent for the Debtor.

"**Voting Deadline**" means the date set by the Court by which all Holders entitled to vote on the Plan must submit its Ballots in order for them to be tabulated in connection with Confirmation.

"**Voting Record Date**" means November 10, 2023.


## ARTICLE III.

## OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a petitioning entity – termed a "debtor" -- is authorized to reorganize its business and/or capital structure for its benefit, and for the benefit of its creditors and interest holders (owners).

Filing a bankruptcy petition commences a Chapter 11 case and creates an "estate" that contains essentially all the debtor's property as of the petition filing date. Usually, as here, a debtor remains in exclusive possession of its property and, during the bankruptcy case, continues to operate in the ordinary course of business as a "debtor-in-possession" with the powers, duties and responsibilities of a "trustee" under the Bankruptcy Code.

The principal objective of a Chapter 11 case is the confirmation and subsequent consummation of a plan of reorganization. A plan of reorganization sets forth the treatment of claims against, and interests in, a debtor. Once the bankruptcy court confirms a plan of reorganization, the terms of that plan become binding upon the debtor and any creditor of, or interest holder in, the debtor. Generally, an order of the bankruptcy court confirming a plan of reorganization discharges the debtor from any debt that arose *prior to* the date of confirmation of the plan, and substitutes for that debt the *new* obligations specified in the confirmed plan vis-à-vis that creditor or interest-holder. The Debtor's Plan here provides for such a discharge.

In certain respects, approval, or "confirmation", of a Chapter 11 plan is a democratic process. Holders of "impaired" claims are generally entitled to vote to accept or reject a plan of reorganization. Generally speaking, a claim is "impaired" if the plan provides that such claim will not be repaid in full (with applicable interest) through the plan, or that the legal, equitable or contractual rights of the holder of such claim are changed in some manner by the plan.

Chapter 11 does not require that every holder of a claim vote in favor of that plan, or even that every *class* of claims "accept" the plan. However, in order for a bankruptcy court to confirm

a plan, it must meet a number of statutory tests—including a *minimum level* of voting acceptance. These standards are discussed in more detail in Article XI of this Disclosure Statement.

# ARTICLE IV.

## DESCRIPTION OF THE DEBTOR AND ITS PAST OPERATIONS

**Section 4.01        Corporate Organization and Qualification.**

Epworth Villa is an Oklahoma not-for-profit corporation.  Its sole shareholder is Epworth Living, Inc. ("Epworth Living").  The IRS has determined that Epworth Villa is qualified as an organization described in Section 501(c)(3) of the Tax Code.

**Section 4.02        Facility Mission and History of Epworth Villa.**

Epworth Villa was formed in 1986.  Affiliated with the Oklahoma Conference of the United Methodist Church, Epworth Villa is a continuing care retirement community (or CCRC), often referred to as a Life Plan Community (or LPC), for persons aged 62 and older, and is located at 14901 N. Pennsylvania Avenue, Oklahoma City, Oklahoma.  Presently, Epworth Villa includes 263 independent living units (cottages and apartment homes), 114 assisted living units, and 87 nursing care beds.

The construction, renovation and expansion of Epworth Villa's facilities have been financed through revenue bonds issued by the Oklahoma County Finance Authority. The Existing Bonds have been issued over time in various tranches. The obligations represented by the Existing Bonds, in the approximate aggregate principal amount of $76,500,000, are secured by a mortgage on the Facility and and security interest substantially all other assets of Epworth Villa.

Epworth Villa makes payments to its parent company, Epworth Living, Inc. (which is not an operating entity), for expenses incurred by Epworth Living, Inc. on behalf of both Epworth Villa and Epworth at Home, Inc., for the following purposes:  payroll, payroll taxes, payroll expenses, insurance premiums, employee benefits (such as 401k Plan).  Epworth Villa and Epworth at Home, Inc. each pay their proportionate share of these expenses.

**Section 4.03        Labor Force.**

As noted in Section 4.02, above, Epworth Villa's parent -- Epworth Living -- directly employs approximately 435 individuals involved in the operations of Epworth Villa and Epworth Home, Inc.  Epworth Villa reimburses Epworth Living in the ordinary course of its business for the payroll and other costs of such employees, including, without limitation, employee benefits (described below).  Epworth Villa and Epworth at Home, Inc. each pay their proportionate share of these expenses.  The referenced employees hold both hourly and salaried positions.

Epworth Living offers employees a wide range of benefits including medical, prescription, and short and long-term disability insurance.  Group dental and vision benefits are offered, but Epworth Living does not contribute.  Epworth Living also offers a 401-k program under which it

provides an employer "match" of 50% of the employee's contribution up to 4% of the employee's wage or salary.

In addition, Epworth Villa retains the services of a number of independent contractors that provide direct care and other services to and on behalf of Epworth Villa residents.

**Section 4.04**          **Management of the Debtor.**

Management of Epworth Villa's operations and business affairs is vested in its Board of Directors. The following persons currently serve on the Board of Directors:

<u>**Officers**</u>**:**

| | |
|---|---|
| Chairman: | Scott Davis |
| Vice Chairman: | Dr. Bob Spinks |
| Immediate Past Chair: | Dr. Glen Johnson |
| Secretary: | Dr. Steve Ford |
| Treasurer: | Randy Compton |
| President / CEO: | Ron Kelly (non-voting) |

<u>**Additional Members**</u>**:**

| | |
|---|---|
| Victoria Caldwell | Craig Knutson |
| Jacob Jean | Rev. Tish Malloy |
| Chris Papin | Barbara Perry |
| Rev. Valerie Steele | |

## ARTICLE V.

## RECENT FINANCIAL HISTORY

The financial statements of Epworth Villa for Fiscal Years 2021 and 2022, and the current Fiscal Year through September 2023, are attached hereto as <u>Group Exhibit "3"</u>.

# ARTICLE VI.

## EVENTS LEADING TO THE FILING OF THIS CHAPTER 11 CASE

Epworth Villa relies upon revenue generated by existing and new residents to, among other things, maintain its day-to-day operations, service its debt obligations and honor its resident refund obligations. However, as has become common in recent years within the senior living industry, and in particular among CCRCs, the inability to attract new residents during COVID-19 precipitated and exacerbated a severe liquidity crisis for the Debtor.

Under that strain, Epworth Villa ultimately defaulted under the terms of its Existing Bonds. As a result of this default and to preserve liquidity, Epworth Villa and the Existing Bond Trustee (acting at the direction of the Consenting Holders) entered into a series of forbearance agreements wherein, among other things, Epworth Villa's obligation to make the monthly debt service payments on the Existing Bonds was deferred and the Existing Bond Trustee agreed to forbear from exercising remedies under the Existing Bond Documents while the parties negotiated a consensual resolution. The proposed restructuring transaction embodied in the Plan is the result of those negotiations.

The Plan in this Case comprises, among other things, a permanent consensual restructuring of the Existing Bonds to permit Epworth Villa to return to normal operations with adequate liquidity.

# ARTICLE VII.

## THE PROGRESS OF EPWORTH VILLA'S CHAPTER 11 CASE

**Section 7.01          Early Motions in the Chapter 11 Case.**

Simultaneous with the filing of its Chapter 11 petition initiating this Case, Epworth Villa filed certain "first day" motions, described more fully below, seeking Orders from the Court authorizing the Debtor to, among other things: (i) retain professionals to prosecute this Case; (ii) preserve employee continuity by paying certain prepetition wages and salaries, and related payroll taxes; (iii) maintain necessary utility services by providing adequate assurance of payment to utility companies; (iv) maintain existing cash management systems; (v) use the "cash collateral" of the Existing Bond Trustee; and (vi) borrow additional short-term funds to provide the Debtor with sufficient liquidity to operate during the pendency of this Case.

The Court has authorized the Debtor and Debtor-in-Possession to employ Gable & Gotwals, P.C. as general and bankruptcy counsel, Raymond James (as Investment Bankers), Stretto (as Claims and Noticing Agent), and Hilborne & Weidman, P.C. (as Bond Counsel).

The Debtor has also filed an emergency motion for entry of interim and final orders authorizing it to continue to operate its existing cash management system, including maintaining its current escrow arrangement with respect to Resident entrance fees, and continuing to make

intercompany transfers in the ordinary course of business to its parent, Epworth Living for (i) payroll and associated taxes and benefits, (ii) reimbursement of employee expenses, and (iii) insurance premium finance payments.

The collateral securing repayment of the Existing Bonds consists of, among other things, all of Epworth Villa's cash, deposit accounts, and accounts receivable. In order to use this collateral -- known as "cash collateral" -- during this Case, Epworth Villa is required to provide special, so-called "adequate", protection to the Existing Bond Trustee under Section 363 of the Bankruptcy Code to guard against the dissipation of the value of such cash collateral.

In addition, Epworth Villa sought the Court's authority under Section 364(c) of the Bankruptcy Code to borrow up to $4 million from the DIP Lender to fund its additional cash needs during the pendency of this Case. Consequently, on the Petition Date, with the consent of the Existing Bond Trustee, Epworth Villa filed a motion seeking Court's authority to obtain post-Petition Date financing ("DIP Financing") and use cash collateral. That motion requested that the Court enter interim and final Orders authorizing Epworth Villa to, among other things, obtain the DIP Financing on a superpriority basis and to use its cash in the ordinary course of business, subject to certain terms and conditions, including operating within the constraints of periodic budgets submitted by Epworth Villa with the consent of the Existing Bond Trustee, the DIP Lender, and the DIP Bondholder Representative.

On October 6, 2023, the Court entered an Interim Order authorizing Epworth Villa to use cash collateral secured by liens of the Existing Bond Trustee, and authorized Epworth Villa to use up to $1.5 million of the $4 million DIP Financing amount. The Court has now entered a Final Order [Doc. No. 212] authorizing Epworth to use cash collateral during the pendency of the Case, and authorizing it to borrow up to the $4 million limit of the DIP Financing, to be repaid from the Entrance Fee Escrow upon confirmation of the Plan.

**Section 7.02        Post-Petition Operations.**

As authorized by the Bankruptcy Code, the operations of the Debtor have continued without interruption or material change despite the commencement of this Case. Epworth Villa is continuing to generate cash from fees for services, as well as entrance fees from new residents, use cash under the interim and final orders authorizing use of cash collateral, and requisition of bond proceeds held by the DIP Trustee under the DIP Financing, sufficient to sustain its operations and satisfy all post-Petition Date obligations.

The Debtor is determined to minimize, if not eliminate, the impact of this Case on Epworth Villa's Residents (and former residents), employees, vendors, and contractors. THE SOLE PURPOSE OF THIS CHAPTER 11 CASE IS TO RESTRUCTURE THE EXISTING BOND CLAIMS. Results of Epworth Villa's operations from the Petition Date through the Effective Date of the Plan will be reflected in Monthly Operating Report balance sheets and income statements that are required to be Filed periodically by the Debtor.

On October 17, 2023, the United States Trustee filed *Notice of the United States Trustee's Appointment of a Patient Care Ombudsman* [Dkt. No. 126], as required for a Health Care Business under Section 333 of the Bankruptcy Code, who is responsible for "monitoring the quality of

patient [resident] care provided to patients of the debtor". The Patient Care Ombudsman is as follows:

> Cori H. Loomis, OBA # 16266
> Christensen Law Group, PLLC
> The Parkway Building
> 3401 N.W. 63rd Street, Suite 600
> Oklahoma City, OK 73116
> (405) 232-2020 Telephone / (405) 236-1012 Fax
> Cori@Christensenlawgroup.com

On November 10, 2023, the Patient Care Ombudsman filed their Report [Doc. No. 211], which reflected favorably upon Epworth Villa's resident care during the pendency of this Case.

On October 20, 2023, the United States Trustee appointed an Official Committee of Unsecured Creditors ("Committee"), consisting of:

> Estate of Ila Mardell Lawhead
> c/o Terry Sparling
> 4625 Westcott Circle
> Edmond, OK 73034
> trsparling@aol.com
> Telephone: 713-703-4536
>
> Kirt Moelling
> c/o Richard Grasso
> 628 Signalman
> Yukon, OK 73099
> Kirt.moelling@gmail.com
> Telephone: 405-201-9381
>
> Alvan E. Porter, Trustee for Evangeline J. Porter
> c/o Ross Plourde
> 211 N. Robinson, 10th Floor
> Oklahoma City, OK 73102
> ross.plourde@mcafeetaft.com
> Telephone: 405-235-9621
>
> Select Rehabilitation, LLC
> c/o Diane Walker
> 1401 Branding Ave.
> Downers Grover, IL 60515
> dwalker@walkermortonllp.com

Estate of Harlene Bickford
c/o Mike Bickford (Chair)
201 Robert S. Kerr Ave., Ste. 1000
Oklahoma City, OK 73102
mabick@fullertubb.com
Telephone: 405-235-2575

The Committee is represented by Ross A. Plourde of McAfee & Taft, 8th Floor, Two Leadership Square, 211 N. Robinson, Oklahoma City, OK 73102-7130; 405.235.9621; ross.plourde@mcafeetaft.com

## ARTICLE VIII.

## CLASSIFICATION & IMPAIRMENT OF CLAIMS AND INTERESTS

**Section 8.01**          **Classification of Claims Under the Plan.**

Pursuant to Section 1122 of the Bankruptcy Code, most Claims against, and equity Interests in, a debtor must be "classified" (*i.e.* grouped into classes) under a plan of reorganization. All claims or interests within a particular class must be substantially similar to each other, and must receive the same treatment as each other, except to the extent that a particular creditor or interest holder agrees to less favorable treatment.

The Plan here divides the Claims against, and Interests in, the Debtor into five (5) Classes and sets forth the treatment offered each Class. The Debtor believes the classification of Claims and Interests under the Plan is proper under the Bankruptcy Code.

**Section 8.02**          **Unclassified Claims.**

Under the Bankruptcy Code, certain types of claims are not to be classified in a plan. Such unclassified claims receive the treatment required under, *inter alia*, Bankruptcy Code Section 1129(a)(9), and do not vote on a plan, but may file an objection to it. For that reason, the DIP Claim, Administrative Expense Claims, Accrued Professional Compensation Claims, and United States Trustee Statutory Fees have not been classified under the Debtor's Plan, and thus are excluded from the Classes of Claims and Interests set forth in the Plan.

**Section 8.03**          **Impairment of Claims: Impaired Classes.**

Under the Bankruptcy Code, classes of Claims and Interests are either "Impaired" or "Unimpaired". A Claim or Interest is "impaired" unless the Plan --

(i)      leaves unaltered the legal, equitable and contractual rights to which the Claim or Interest entitles the Holder thereof; or

(ii)     with certain exceptions, cures any default which occurred before or after the commencement of the chapter 11 case, reinstates the original maturity of the Claim or Interest, compensates the Holder for any damages resulting from any reasonable reliance by the Holder on a contractual provision or applicable law that permits

acceleration of the debt and does not otherwise alter the legal, equitable or contractual rights to which such Claim or Interest entitles the Holder of such Claim or Interest.

# ARTICLE IX.

## DESCRIPTION OF PROPOSED REORGANIZATION

**Section 9.01**           **Narrative Summary of Reorganization.**

The Plan is the product of (i) many hours of research and analysis by the Debtor's Board of Directors and Officers, its legal counsel and financial advisors, and (ii) input from, and agreements with, key creditor constituencies. That process has produced what is sincerely believed to be a fair balance between what is required for Epworth Villa to reorganize and what is appropriate satisfaction of the Claims of the various classes of its creditors.

The centerpiece of the Debtor's reorganization is a restructuring of the Existing Bonds. That Restructuring Transaction, including the issuance of new bonds to provide new funding to the Debtor after the Effective Date, are described in more detail herein.  The Restructuring Transaction will both ease the debt service terms prevailing under the Existing Bonds, and also provide fresh working capital through the issuance of a new series of bonds. Pursuant to the Restructuring Transaction, the Series 2023A Bonds will be issued in order to provide the Debtor with funding for capital expenditures.  In addition, eighty-five percent (85%) of the Existing Bonds plus accrued and unpaid interest through June 30, 2023 shall be exchanged for the Series 2023B Bonds, and the remaining fifteen percent (15%) of the outstanding principal of the Existing Bonds plus accrued and unpaid interest on the Existing Bonds through the Petition Date shall be exchanged for the Series 2023C Bonds. The Series 2023A Bonds shall be senior in priority to the Series 2023B and Series 2023C Bonds.

The Plan has the support of the Consenting Holders, who have participated in the negotiations which have culminated in the Plan and this Disclosure Statement, and, with the Debtor, have entered into the Plan Support Agreement -- under which they have committed to support the confirmation and implementation of the Plan.

The proposed reorganization of the Debtor will have minimal impact on creditors other than the Holders of the Existing Bonds.  Under the terms of the Plan, on the Effective Date the Residency Agreements of current Residents will be assumed and the Reorganized Debtor will pay in full all Administrative and General Unsecured Claims, along with all entrance fee refund Claims that are then due and owing. The Debtor's secured bond debt (consisting solely of the Existing Bonds) will be restructured so that upon emergence from bankruptcy the Debtor's liquidity will be enhanced and its debt service will be substantially reduced, as set forth more fully in Article X of this Disclosure Statement.  The balance of the Claims against the Debtor, and the Interests therein, shall be treated in the manner described in the Plan Outline presented in Section 9.02, immediately below.

**Section 9.02              Plan Outline**

The following outlined description more technically recapitulates the Plan's classification and treatment provisions with respect to all Claims and Interests.

*Unclassified Claims.*

*Administrative Expense Claims.*

Bankruptcy Code Section 1129(a)(9) requires that the administrative expenses of this Case (including so-called "20-day" claims under Bankruptcy Code Section 503(b)(9)) be paid in full. Section 503(b)(9) claims are for the "value of any goods received by the debtor within 20 days before the [Petition Date] . . . in which goods have been sold to the debtor in the ordinary course of the debtor's business."

Accordingly, in full satisfaction, release, settlement and discharge of such Claim, each Holder of an Allowed Administrative Expense Claim, shall -- (i) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Effective Date or as soon as reasonably practicable therafter; or (ii) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtor(s) and such Holder, or as may be due and owing under applicable non-bankruptcy law, unless otherwise agreed to by the parties.

*Classified Claims.*[3]

     **(a)**      ***Class 1 – Existing Bond Claims (Impaired, Entitled to Vote).***

Class 1 consists of the Existing Bond Claims against the Debtor.  Debtor has stipulated to Allowance of the Existing Bond Claims in the aggregate amount of at least $80,435,759.03. Unliquidated, accrued and unpaid fees and expenses of the Existing Bond Trustee and its professionals incurred through the Petition Date and not paid during the Chapter 11 Case are also part of, and shall be added to, the aggregate amount of the Existing Bond Claims.  Eighty-five percent (85%) of the Existing Bonds plus accrued and unpaid interest through June 30, 2023 shall be exchanged for the Series 2023B Bonds in the principal amount of $66,700,000, and the remaining fifteen percent (15%) of the outstanding principal of the Existing Bonds, plus remaining

---

[3] Classified claims in a Chapter 11 bankruptcy case often include certain types of claims held by taxing authorities. However, the Debtor does not believe any such claims exist in this Case. The Internal Revenue Service and the Oklahoma Tax Commission have filed proofs of claim, for allegedly unpaid taxes in the amount of $16,711,075.52 (priority) and $6,725.14 (general unsecured), and $300,391.34 (general unsecured), respectively.  The proofs of claim were filed under the mistaken belief that Epworth Villa had not filed payroll tax returns or paid the corresponding payroll taxes for the period from March 2021 to June 2023 (for the OTC) and from September 30, 2017 to September 30, 2023 (for the IRS).  Beginning January 1, 2017, the personnel of Epworth Villa became employees of its parent company, Epworth Living, which has filed all requisite payroll tax returns and paid the corresponding payroll taxes since that time.  The funds for paying the payroll taxes were paid proportionately by its subsidiaries, Epworth Villa and Epworth at Home, Inc.  Documentation establishing that the payroll tax returns were filed, and the payroll taxes were indeed paid by Epworth Living has been provided to the IRS and OTC with the expectation that the proofs of claim will be withdrawn.

accrued and unpaid interest on the Existing Bonds through the Petition Date shall be exchanged for the Series 2023C Bonds in the principal amount of $13,724,671.

Upon the terms, and subject to the conditions, set forth in the Plan, in full and final satisfaction, settlement, release, and discharge of the Existing Bond Claims, each Holder of an Existing Bond Claim shall receive its Pro Rata share of the Series 2023B Bonds and Series 2023C Bonds on the Effective Date or as soon as practicable thereafter. Accordingly, Class 1 Claims are Impaired.

### (b)    Class 2 – Insured Claims (Impaired; Entitled to Vote).

Class 2 consists of all unsecured Claims that arise from or relate to alleged conduct or circumstances occurring or existing prior to the Effective Date where a policy of liability or indemnity insurance provides coverage for the benefit of the Debtor. Holders of Insured Claims include, without limitation, the following named plaintiffs: Austin, Johnson, Lyle, and Porterfield, prosecuting actions as described:

Austin [Case No. CJ 2021-1581]: Petition was filed April 12, 2021. An Amended Scheduling Order and continuing Pretrial Conference was entered on October 2, 2023. Plaintiff seeks damages for wrongful death in excess of $75,000 plus punitive damages.

Johnston [Case No. CJ 2022-4112]: Petition was filed August 24, 2022. An Answer was filed on October 10, 2022. No Scheduling Order has been entered. Plaintiffs seek damages for wrongful death in excess of $75,000 plus punitive damages, based upon ordinary and gross negligence; negligence per se under Nursing Home Care Act; and negligence per se based upon violation of regulations under Nursing Home Care Act.

Lyle [Case No. CJ 2022-2344]: Petition was filed May 19, 2022. An Answer was filed November 23, 2022. No Scheduling Order has been entered. Plaintiffs seek damages in excess of $75,000 and punitive damages for wrongful death.

Porterfield [Case No. CJ 2022-5570]: Petition was filed November 15, 2022. An Answer was filed on February 28, 2023. On June 20, 2023 a Scheduling Order was entered. Plaintiff seeks damages for wrongful death

In full and final satisfaction of each Allowed Class 2 Claim, as of the Effective Date, the automatic stay and/or discharge injunction of Bankruptcy Code Sections 362 and/or 524(a), respectively, shall be deemed modified, as necessary, to permit each Holder of a Claim in Class 2 to (i) seek liquidation of such Claim by final judgment of a court of competent jurisdiction, or otherwise, and (ii) collect and satisfy such Claim (only) from an issuer of a policy of indemnity insurance that provides coverage for the Claim. Holders of Class 2 Claims shall receive no other consideration under the Plan on account of such Claims. Accordingly, Class 2 Claims are Impaired.

        **(c)**        ***Class 3 – General Unsecured Claims (Unimpaired, Not Entitled to Vote, Deemed to Accept).***

Class 3 consists of all General Unsecured Claims against the Debtor.

Except to the extent that a Holder of an Allowed General Unsecured Claim against the Debtor agrees to a different treatment of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, the Debtor will pay an amount equal to 100% of the Allowed Amount of such Class 3 Claim, in each case subject to all defenses or disputes the Debtor may assert as to the validity or amount of such claims.  Accordingly, Class 3 Claims are Unimpaired.

        **(d)**        ***Class 4 – Former Resident Refund Claims (Unimpaired, Not Entitled to Vote, Deemed to Accept).***

Class 4 consists of all claims for refunds of entrance fees pursuant to Residency Agreements of former Residents.[4]

In full satisfaction of an Allowed Former Resident Refund Claim, on the later of the Effective Date or the date on which the Former Resident Refund Claim becomes due and payable under the applicable Residency Agreement, each Holder thereof shall receive payment of 100% of the Allowed Amount of such Claim in accordance with the applicable Residency Agreement. To the extent the Former Resident Refund Claim is due and payable on the Effective Date, such Claim shall be satisfied from the Entrance Fee Escrow pursuant to Section 6.7 of the Plan.  Accordingly, Class 4 Claims are Unimpaired.

        **(e)**        ***Class 5 – Interests (Impaired; Entitled to Vote).***

Class 5 consists of all Interests in Epworth Villa.  The sole Interest Holder in Epworth Villa is Epworth Living.

The fate of the equity Interest in Epworth Villa, held by Epworth Living, will be determined by the actions of the Impaired classes of Claims, to-wit:  If any Class of Impaired Claims does not accept the Plan, then the Class 5 Interests shall be cancelled and extinguished under the Plan; if all

---

[4] Thirty-five (35) *former* residents are presently owed entrance fees for units that have been resold, representing Claims totaling $3,376,334.28. Nineteen (19) *former* residents occupied units that have not been resold, creating entrance fee refund claims totaling $2,473,234.20.  The Debtor asserts that such Claims are unmatured because the obligation to refund such entrance fee with respect to a particular unit is not due until such time as such unit has been resold and a new entrance fee has been paid.  However, at least some such former residents assert that the Debtor has been afforded a reasonable period of time to resell a vacated unit, that such time has expired, and that the refund of such fee is currently due and payable, notwithstanding the failure of the Debtor to resell such unit.  In addition, the total amount of entrance fee refunds attributable to *current* residents totals $16,606,223.96.

Classes of Impaired Claims accept the Plan, then the Class 5 Interest Holder shall retain its Interests. Accordingly, Class 5 Interests are Impaired.

## ARTICLE X.

## IMPLEMENTATION OF THE PLAN

**Section 10.01      Implementing Actions.**

The Confirmation Order shall authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

On the Effective Date, Epworth Villa, the Issuer, and the Holder(s) of Existing Bond Claim(s) shall undertake and consummate the Restructuring Transaction, under which, among other things, the Series 2023A Bonds shall be issued, and the Series 2023B Bonds and the Series 2023C Bonds shall be issued and exchanged for the Existing Bonds, upon the terms and conditions stated in and provided for in the Series 2023 Bond Documents. Eighty-five percent (85%) of the Existing Bonds shall be exchanged for the Series 2023B Bonds, and the remaining fifteen percent (15%) plus accrued and unpaid interest on the Existing Bonds shall be exchanged for the Series 2023C Bonds. The primary economic terms of the various Series of the Series 2023 Bonds are summarized below.[5]

### *Series 2023A Bonds*.

| | |
|---|---|
| **Principal:** | $6,000,000 on the terms and conditions set forth in the Series 2023 Bond Documents. |
| **Rate of Interest and Payment Terms**: | The Series 2023A Bonds (Tax Exempt) will bear interest at a fixed rate equal to the 7-year MMD rate (set at close of business 3 business days prior to closing) plus 400 basis points with a floor of 7.00% per annum. |
| | Payments on the Series 2023A Bonds shall be: (i) interest only for the first two (2) years due and payable semi-annually; and thereafter (ii) principal will be based on a fifteen (15) year amortization period and structured to level debt service. |
| | Subject to optional redemption prior to maturity commencing on the 4th year after the closing date at a redemption price of 101%. Bonds are also subject to |

---

[5] The information set forth in this outline is solely for summary purposes. To the extent there is any discrepancy between the information set forth in the chart and the Series 2023 Bond Documents, the Series 2023 Bond Documents, (copies of which will be attached to the Plan Supplement), shall control.

mandatory sinking fund payments at 101% and a premium of 1% at maturity.

Redeemable from 70 Day Excess Cash (defined below).

**Final Maturity Date:**   Seven (7) years from the date of issuance.

**Collateral:**   The Series 2023A Bonds will be secured by a first-priority lien on all assets of the Reorganized Debtor. as to collateral, payment, cash flow and enforcement of rights and remedies to the Series 2023B and Series 2023C Bonds, subject to the Series 2023 Bond Documents.

**_Series 2023B Bonds_.**

**Principal:**   $66,700,000, on the terms and conditions set forth in the Series 2023 Bond Documents.

**Rate of Interest and Payment Terms**:   The Series 2023B Bonds will bear interest at a fixed rate of 5.875% per annum.

Payments on the Series 2023B Bonds shall be: (i) interest only for the first 7 years due and payable semi-annually; and thereafter (ii) principal will be amortized over a seventeen (17) year period and structured to level debt service.

Subject to optional redemption prior to maturity commencing on the 6th year after the Effective Date at a redemption price of 104% in year 6, 103% in year 7, 102% in year 8, 101% in year 9 and at a price equal to par in year 10.

**Final Maturity Date**:   Twenty-four (24) years from issuance.

**Collateral**:   The Series 2023B Bonds will be secured by a lien on all assets of the Reorganized Debtor, junior only to the liens securing the Series 2023A Bonds, but senior to the liens securing the Series 2023C Bonds.

**_Series 2023C Bonds_.**

**Principal:**   $13,724,671, on the terms and conditions set forth in the Series 2023 Bond Documents.

**Rate of Interest and**
**Payment Terms:**    The Series 2023C Bonds will bear interest at a fixed rate of 2% per annum. Payments on the Series 2023C Bonds shall be made only from 90 Day Excess Cash (defined below) in the manner stated in the Distribution Waterfall (defined and described below).

Interest payable to the extent of Excess Cash with any additional Excess Cash otherwise available to pay interest on the Series 2023C Bonds to be used as partial redemption of the principal amount of the Series 2023C Bonds outstanding.

Redeemable from Excess Cash (defined below).

The Series 2023C Bonds are subject to redemption prior to maturity in the event the Series 2023B Bonds are optionally redeemed prior to maturity. The Series 2023C Bonds will be redeemed pro rata based upon the outstanding principal amounts of the Series 2023B Bonds and the Series 2023C Bonds at the time of redemption.

**Final Maturity Date:**    Twenty-four (24) years from issuance.

**Collateral:**    The Series 2023C Bonds will be secured by a lien on all assets of the Reorganized Debtor, junior to those to be held in connection with Series 2023A Bonds and Series 2023B Bonds.

**Distribution Waterfall under the Series 2023 Bond Documents.**[6]

(a)    The Reorganized Debtor shall deposit, or cause to be deposited to the Revenue Fund, upon receipt thereof, all Gross Receipts (including Entrance Fees transferred from the Entrance Fee Fund) in the form of cash, checks, or negotiable instruments.

(b)    On the first (1st) Business Day of each calendar month, amounts in the Revenue Fund shall be transferred or deposited, as applicable, so long as no Event of Default has occurred and is continuing by the Bond Trustee in the following order of priority (the "*Distribution Waterfall*"):

(i)    First, to the Reorganized Debtor for deposit to the Operating Fund the amounts necessary for the Reorganized Debtor to pay budgeted operating expenses for the upcoming month equal to one hundred fifty percent (150%) of the projected budgeted operating expenses for the upcoming month, including without

---

[6] Terms utilized in this description of the Distribution Waterfall, but not otherwise defined herein, shall have the meaning ascribed to them in the Series 2023 Bond Indenture, which is included in the Plan Supplement and attached to this Disclosure Statement.

limitation for costs of operating, managing, maintaining and improving the Facility, budgeted capital expenses (after funds in the Project Fund have been fully disbursed), including costs for the Project, and all Additional Payments due from the Reorganized Debtor to any Person pursuant to Section 4.3 of the Series 2023 Loan Agreement, including specifically all fees and expenses of the Authority, the Bond Trustee and the Bondholder Representative. The amount to be deposited from the Revenue Fund to the Operating Fund in any given month shall take into account any unapplied amount deposited in the Operating Fund from the Revenue Fund for such purpose in a prior month, but excluding from the calculation of the amount to be deposited in the Operating Fund from the Revenue Fund the amount of any Excess Cash released to the Reorganized Debtor pursuant to Section 407(b)(ix)(B) of the Series 2023 Loan Agreement that remains in the Operating Fund, as certified by the Reorganized Debtor (in a certificate setting forth in reasonable detail the projected application of the amount so certified) delivered to the Bond Trustee no later than seven (7) Business Days prior to the first (1st) Business Day of such month;

(ii)     Second, to the Series 2023A Interest Account of the Debt Service Fund, an amount equal to one-sixth (1/6th) of the interest due on the next Interest Payment Date for the Series 2023A Bonds (provided that the transfers for January 1, 2024 to and including May 1, 2024 shall equal one-fifth (1/5th) of the interest due on the June 1, 2024 Interest Payment Date for the Series 2023A Bonds);

(iii)     Third, commencing December 1, 2025, until the Series 2023A Bonds are satisfied in full, to the Series 2023A Principal Account of the Debt Service Fund, an amount equal to one-twelfth (1/12th) of the principal due on the next principal payment date for the Series 2023A Bonds;

(iv)     Fourth, to the Series 2023B Interest Account of the Debt Service Fund, an amount equal to one-sixth (1/6th) of the interest due on the next Interest Payment Date for the Series 2023B Bonds (provided that the transfers for January 1, 2024 to and including May 1, 2024 shall equal one-fifth (1/5th) of the interest due on the June 1, 2024 Interest Payment Date for the Series 2023B Bonds);

(v)     Fifth, commencing December 1, 2030, until the Series 2023B Bonds are satisfied in full, to the Series 2023B Principal Account of the Debt Service Fund, an amount equal to one-twelfth (1/12th) of the principal due on the next principal payment date for the Series 2023B Bonds;

(vi)     Sixth, while the Series 2023A Bonds are Outstanding, all remaining funds after application of paragraphs First through and including Fifth shall be distributed to the Operating Reserve Fund until the balance therein equals seventy (70) Days Cash on Hand;

(vii)     Seventh, to the Series 2023A Principal Account of the Debt Service Fund until $2,000,000 in principal amount of Series 2023A Bonds has been redeemed, and then as follows: (1) fifty-five percent (55%) to the Series 2023A

Principal Account of the Debt Service Fund, (2) twenty five percent (25%) to the Reorganized Debtor as unrestricted funds to be deposited in the Ancillary Operating Fund, and (3) twenty percent (20%) to the Series 2023B Account of the Debt Service Reserve Fund until the balance in such account equals the Debt Service Reserve Fund Requirement; provided that (a) if the Series 2023A Bonds are no longer Outstanding before the Series 2023B Account of the Debt Service Reserve Fund is fully funded, the fifty-five percent (55%) to be deposited to the Series 2023A Principal Account of the Debt Service Fund shall instead be deposited in the Series 2023B Account of the Debt Service Reserve Fund until the balance in such account equals the Debt Service Reserve Fund Requirement, and (b) if the deficiency in the Series 2023B Account of the Debt Service Reserve Fund is replenished before the Series 2023A Bonds are paid in full, the twenty percent (20%) otherwise attributable to the Series 2023B Account of the Debt Service Reserve Fund shall be distributed to the Reorganized Debtor as unrestricted funds to be deposited in the Ancillary Operating Fund;

(viii)    Eighth, after the Series 2023A Bonds are paid in full, to the Operating Reserve Fund until the amount on deposit therein equals ninety (90) Days Cash on Hand; and

(ix)    Ninth, any amount remaining after application of paragraphs First to Eighth above (disregarding any such paragraph pursuant to the provisions of which application has not yet commenced), (such remaining amounts referred to as "Excess Cash"), shall be distributed as follows:

(A)    fifty percent (50%) of the Excess Cash to the Series 2023C Account of the Debt Service Fund to pay interest due on the next Interest Payment Date and then to pay principal of the Series 2023C Bonds pursuant to Section 301(d) hereof until the Series 2023C Bonds are fully redeemed; and

(B)    fifty percent (50%) of the Excess Cash to the Reorganized Debtor as unrestricted funds to be deposited in the Ancillary Operating Fund.

**Additional Security for Series 2023 Bonds**.

The Series 2023 Bond Documents establish certain "Debt Service Reserve Funds" with the Series 2023 Bond Trustee, subject to its lien under the Series 2023 Bond Documents, to secure payment of the Series 2023A Bonds and the Series 2023B Bonds, respectively. The Series 2023A Debt Service Reserve Fund shall be funded from the proceeds of the Series 2023A Bonds. On the Effective Date, the Series 2023B Debt Service Reserve Fund requirement shall equal the Maximum Annual Debt Service (as defined below). The balance in the Existing Bond reserve account shall be deposited into the Series 2023B Debt Service Reserve Fund on the Effective Date with any shortfall from the Series 2023B Debt Service Reserve Fund requirement being supplemented pursuant to the Distribution Waterfall.

"Maximum Annual Debt Service" means, with respect to the Series 2023B Bonds, the maximum annual debt service payable during the term of the Series 2023B Bonds excluding the year 2047.

***Exemption from Registration Requirements; Trading of Securities***.    The offering, issuance, and distribution of Series 2023 Bonds issued under the Plan shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act under Section 3(a)(4) of the Securities Act of 1933, as amended ("Securities Act"), and under Section 1145(a)(1) of the Bankruptcy Code.  Any and all Series 2023 Bonds issued under the Plan will be freely tradable under the Securities Act by the recipients thereof, subject to the requirements of the Series 2023 Bond Indenture.

## Section 10.02        Cancellation of Agreements, Security Interests and Other Interests.

On the Effective Date, except to the extent otherwise specifically provided in the Plan, all notes, instruments, certificates, and other documents evidencing the Existing Bonds shall be cancelled and the obligations of the Debtor or the Reorganized Debtor, Epworth Villa, thereunder or in any way related thereto shall be discharged and the agents and the Existing Bond Trustee thereunder shall be automatically and fully discharged from all duties and obligations thereunder. Except to the extent certain security interests and Liens continue in existence pursuant to the Series 2023 Bond Documents, all existing security interests and/or Liens and/or any other Secured Claims shall also be automatically released, discharged, terminated, and of no further force and effect as of the Effective Date. Notwithstanding the foregoing, following confirmation of the Plan or the occurrence of the Effective Date, to the extent that the Existing Bond Documents do not otherwise remain in effect pursuant to the Series 2023 Bond Documents, any credit document or agreement that governs the rights of any Holder of an Existing Bond Claim shall continue in effect for purposes of (1) allowing Holders of such Allowed Claims to receive Distributions under the Plan; (2) allowing and preserving the rights of the agents or representative of Holders of such Claims to make Distributions on account of such Allowed Claims, as provided in the Plan; (3) preserving all exculpations in favor of the Existing Bond Trustee; (4) allowing the Existing Bond Trustee to enforce any rights and obligations owed to it under the Plan or the Confirmation Order, including the ability of the Existing Bond Trustee to be compensated for fees and reimbursed for expenses, including expenses of its professionals, to assert its charging lien, to enforce its indemnity and other rights and protections with respect to and pursuant to the Existing Bond Documents; and (5) permitting the Existing Bond Trustee to appear and be heard in the Case, or in any proceeding in the Court or any other court.

## Section 10.03        Entrance Fee Escrow.

As of the Petition Date, the Entrance Fee Escrow held approximately $14.8 million. On the Effective Date, funds in the Entrance Fee Escrow shall first be used to pay any refund obligations to Residents in accordance with the terms of the applicable Residency Agreement and the Escrow Agreement, second, to satisfy the DIP Claim, third, to pay Allowed Administrative Expense Claims and fourth to the Revenue Fund (as defined in the Series 2023 Bond Indenture).

**Section 10.04          Continued Corporate Existence.**

The Debtor, as Reorganized Debtor, shall continue to exist after the Effective Date as a non-profit corporate entity, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable state law.

The IRS has determined that the Debtor is qualified as an organization described in Section 501(c)(3) of the Tax Code; and such status shall be unaffected by the Plan.

**Section 10.05          Restated Corporate Documents.**

As a consequence of the potential treatment of Class 5 Interests under the Plan, the respective Certificates of Incorporation and By-Laws of the Debtor shall be amended and restated *if and as necessary* to implement the organizational changes effected by the Plan.

**Section 10.06          Board of Directors.**

The existing Board of Directors of the Debtor shall continue to serve in that capacity after confirmation of the Plan, until any such director(s) may resign, be removed, or have his/her term expire under applicable non-bankruptcy law. The Debtor believes that such incumbency is consistent with the interests of all parties-in-interest, and with public policy.

**Section 10.07          Officers.**

On the Effective Date, the following existing officers of the Debtor shall be retained as officers of Reorganized Debtor, and shall continue to serve until such time as they may resign or be removed and replaced. The Debtor believes that such incumbency is consistent with the interest of all parties-in-interest, and with public policy.

| | |
|---|---|
| Ron Kelly | President & Chief Executive Officer |
| Dave Ratliff | Interim Chief Financial Officer |
| Michelle Brown | Chief Operating Officer |

## ARTICLE XI.

## VOTING AND CONFIRMATION OF THE PLAN

**Section 11.01          Voting Classes.**

Only Holders of Allowed or Estimated Claims in Classes 1, 2 and 5 shall be entitled to vote to accept or reject the Plan.

**Section 11.02**          **Requirements for Class Acceptance.**

An Impaired Class of Claims is deemed to have accepted the Plan if (i) the Holders (other than those designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders (other than those designated under Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

The Bankruptcy Code provides that only Holders who actually vote on the Plan will be counted for purposes of determining whether the requisite acceptances of the Classes of Claims have been received to permit confirmation of the Plan.  Failure by a Holder of a Claim to deliver a duly completed and signed Ballot by the Voting Record Date will constitute an abstention by such Holder with respect to a vote on the Plan.  Abstentions will not be counted as votes to accept or reject the Plan and, therefore, will not be considered in the tabulation of votes.

**Section 11.03**          **Confirmation through Creditor Acceptance.**

As one available path to plan confirmation, Bankruptcy Code Section 1129(a) provides for a plan to be confirmed if, among other scenarios, *all* Classes of Claims have voted to "accept" the plan.

**Section 11.04**          **Non-Consensual Confirmation ("Cram-Down").**

As an alternative confirmation path, if all of the requirements of Bankruptcy Code Section 1129(a) are met *except for the requirement that **all** Classes of Impaired Claims or Interests accept the Plan*, the Court, on the request of the Debtor, may still confirm the Plan, pursuant to Section 1129(b) of the Bankruptcy Code, if the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Impaired Class that has not accepted the Plan.  Utilization of this alternative standard to achieve a non-consensual confirmation is often referred to as "Cram-Down".

The requirement that a plan not "discriminate unfairly" means, among other things, that the disparate treatment among classes of claims of equal rank must be fair given the differing character or circumstances attending such claims.  The Debtor believes that the Plan does not unfairly discriminate against any Class that may not accept or otherwise consent to the Plan.

Examples of "fair and equitable" treatment are contained in Bankruptcy Code Section 1129(b)(2).  For example, a plan is deemed fair and equitable with respect to an impaired class of unsecured claims or interests if no holder of a claim or interest that is junior to those of the rejecting class will receive or retain any value under the plan on account of such junior claims or interests. This test is sometimes referred to as the "absolute priority rule" because it entitles any rejecting class to have its claims/interests satisfied in full before junior classes receive or retain any value under the plan of reorganization.

If any Class of Claims or Interests entitled to vote on the Plan does not vote to accept the Plan, the Debtor shall either (i) amend or modify the Plan or (ii) seek Confirmation of the Plan by way of Cram-Down.

**Section 11.05**          **Other Material Confirmation Requirements**

Section 1129 of the Bankruptcy Code sets forth additional prerequisites for Confirmation of the Plan, requiring, among other things, findings by the Court that - (i) the Plan is "proposed in good faith" and not by any means forbidden by law; (ii) confirmation of the Plan is not likely to be followed by a liquidation, or the need for further financial reorganization ("Feasibility"); and (iii) the value of Distributions to non-accepting Holders of Claims within a particular Class under the Plan will not be less than the value of Distributions such Holders would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code (the "Best Interests Test").

The Feasibility of the Plan is discussed in more detail in Article XVIII of this Disclosure Statement.

An explanation and application of the Best Interest Test (i.e. a "Liquidation Analysis") comprises Exhibit 4 to this Disclosure Statement.

THE DEBTOR HAS NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. THE DEBTOR MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE ANY CLAIMS AND CAUSES OF ACTION AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIED ANY SUCH CLAIMS OR OBJECTIONS TO SUCH CLAIMS. HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, SECURITIES OR TAX ADVICE, AND SHOULD CONSULT THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

## ARTICLE XII.

## EFFECTS OF PLAN CONFIRMATION

**Section 12.01**          **Binding Effect.**

Upon Confirmation, the Plan shall be binding upon and inure to the benefit of the Debtor, all present and former Holders of Claims against and Interests in the Debtor, and all other parties-in-interest in this Case.

**Section 12.02**          **Successors and Assigns.**

The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the heir(s), executor(s), administrator(s), successor(s) or assign(s) of such entity.

**Section 12.03**          **Discharge**.

(a)     All consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtor or any of its assets or properties, and, except as otherwise provided in the Plan or in the Confirmation Order, including the rights arising under or related to the Series 2023 Bond Documents, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtor, shall be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based upon such debt is Filed or deemed Filed under Section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (iii) the Holder of a Claim based upon such debt accepted the Plan.

(b)     Except as otherwise expressly provided in the Plan or Confirmation Order, Confirmation of the Plan terminates all rights, powers and interests of Holders of Interests as of the Effective Date.

(c)     Except as otherwise provided in the Plan, upon the discharge of the Debtor, all entities shall be forever precluded and enjoined, pursuant to Section 524 of the Bankruptcy Code, from asserting against the Debtor, its successors or assigns (including, without limitation, the Reorganized Debtor), or its properties or interests in property, any Claim in connection with a discharged debt based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not the facts or legal bases therefor were known or existed prior to the Confirmation Date, whether or not a proof of Claim was Filed, whether the Holder thereof voted to accept or reject the Plan, or whether the Claim is an Allowed Claim.

**Section 12.04**          **Term of Injunctions or Stays.**

Unless otherwise provided herein, all injunctions or stays applicable in this Case pursuant to Section 105 or 362 of the Bankruptcy Code, or otherwise, and in effect on the Confirmation Date, shall remain in full force and effect until the latter of the Effective Date and the date provided for in any applicable Order or Bankruptcy Code provision.  In the case of the stay of Bankruptcy Code Section 362(a), such stay shall be supplanted by the discharge injunction of Section 524(a) of the Bankruptcy Code.

**Section 12.05**          **Vesting of Assets in Reorganized Debtor.**

Except as otherwise expressly provided in the Plan or Confirmation Order, on the Effective Date the Reorganized Debtor shall be vested with all of the property of the Debtor's Estate free and clear of all Claims, Liens, encumbrances, mortgages, charges and other interests of creditors, excepting only the mortgages, security interests and/or other Liens of the Holder of the Claims in Class 1 of the Plan.

The Debtor shall continue as Debtor-in-Possession until the Effective Date. Thereafter, the Debtor, as the Reorganized Debtor, may operate its business free of any restrictions imposed by the Bankruptcy Code except as specifically imposed by the Plan and/or Confirmation Order. Without limiting the generality of the foregoing, the Debtor may, without application to or approval by the Court, pay fees and expenses that they incur after the Effective Date for professional services.

**Section 12.06**      *Releases by the Debtor.*

Pursuant to Section 1123(b) of the Bankruptcy Code, notwithstanding anything contained in the Plan to the contrary, for good and valuable consideration, the adequacy of which is hereby confirmed, including the consummation of the transactions contemplated by the Plan, on and after the Effective Date, each Released Party shall be deemed to be conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtor, the Reorganized Debtor, and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor, the Reorganized Debtor, or the Estate, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, tort, contract, or otherwise, that the Debtor, the Reorganized Debtor, or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtor or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the Existing Bonds, the assertion or enforcement of rights and remedies against the Debtor, the Debtor's in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between the Debtor and any non-Debtor, the Case, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Plan Support Agreement, this Disclosure Statement, the Restructuring Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Order, or any other restructuring transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with this Disclosure Statement, the Plan Support Agreement, the Plan (including for the avoidance of doubt the plan supplement), or the Series 2023 Bond Documents, before or during the filing of the Case, the filing of the Case, the pursuit of Confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the Distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order of the Court. Notwithstanding anything to the

contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or entity under the Plan, the Confirmation Order, the Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Series 2023 Bond Documents, or any Claim or obligation arising under the Plan.

The foregoing release shall be effective as of the Effective Date without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any entity and the Confirmation Order will permanently enjoin the commencement or prosecution by any entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released under the foregoing release.  Notwithstanding the foregoing, nothing in Section 11 of the Plan shall or shall be deemed to prohibit the Debtor or the Reorganized Debtor from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtor or the Reorganized Debtor, unless otherwise expressly provided for in the Plan.

Entry of the Confirmation Order shall constitute the Court's approval, under Bankruptcy Rule 9019, of the foregoing Debtor release, which includes, by reference, each of the related provisions and definitions contained in the Plan, and further, shall constitute the Court's finding that the foregoing release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor's release; (iii) in the best interest of the Debtor and its Estate; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to the Debtor, the Reorganized Debtor, or the Debtor's Estate asserting any Claim or Cause of Action released pursuant to the Debtor's release.

**Section 12.07**       *Voluntary Releases by Holders of Claims and Interests.*

**For good and valuable consideration, including the service of the Released Parties to facilitate the administration of the Case, the implementation of the transactions contemplated by the Plan, the Distribution of funds under the Plan, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including those the Debtor or the Estate would have been legally entitled to assert in their own right or on behalf of the Holder of any Claim or Interest, or any other person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Estate, the conduct of the business of the Debtor, the Case, the purchase, sale or exchange of any bond or other debt instrument, the subject matter of, or the transactions or events giving rise to,**

**any Claim or Interest that is treated in the Plan, the administration of Claims and Interests prior to or during the Case, the negotiation, formulation or preparation of the Plan, the Plan Supplement, this Disclosure Statement or, in each case, related agreements, instruments or other documents, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted gross negligence, willful misconduct, fraud, or a criminal act.**

**Section 12.08        *Scope of Releases.***

Each entity providing releases under the Plan, including the Releasing Parties, shall be deemed to have granted the releases set forth in the Plan notwithstanding that such entity may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such entity expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those Claims or Causes of Action actually known or suspected to exist at the time of execution of such release.

**Section 12.09        *Exculpation.***

Notwithstanding anything herein to the contrary, as of the Effective Date, the Exculpated Parties will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including Section 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with the solicitation. The Exculpated Parties shall neither have nor incur any liability arising on or after the Petition Date to any entity for any act or omission in connection with the conduct of the Case, including (a) the operation of the Debtor's business during the pendency of the Case; (b) the administration of Claims and Interests during the Case; (c) formulating, negotiating, preparing, disseminating, implementing, administering, confirming and/or effecting this Disclosure Statement, the Plan, and the Plan Supplement, and any related contract, instrument, release or other agreement or document created or entered into in connection therewith (including the solicitation of votes for the Plan and other actions taken in furtherance of Confirmation and consummation of the Plan); (d) the offer and issuance of any securities under or in connection with the Plan; or (e) the administration and adjudication of Claims, other than liability resulting from any act or omission that is determined by Final Order to have constituted gross negligence, willful misconduct, fraud or a criminal act.

The Debtor believes that the Exculpated Parties have, and upon confirmation of the Plan should be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and Distribution of consideration pursuant to the Plan and, therefore, on account of such Distributions should not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such Distributions made pursuant to the Plan.

# ARTICLE XIII.

## TREATMENT OF EXECUTORY CONTRACTS

**Section 13.01**        **Assumption of Pre-Petition Executory Contracts and Unexpired Leases.**

Except as otherwise provided in the Plan or in a motion filed by the Debtor before the Effective Date, each of the Executory Contracts of the Debtor shall be deemed assumed as of the Effective Date, without the need for any further notice to or action, order, or approval of the Court, pursuant to Section 365 of the Bankruptcy Code. Among other Executory Contracts, all Residency Agreements of *existing* and *prospective* Residents as of the Effective Date shall be assumed. The Confirmation Order may constitute an order of the Court approving the assumption of each of the Executory Contracts, all pursuant to Sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date. Unless provided for otherwise in the Confirmation Order, confirmation of the Plan will constitute a determination that no defaults exist in the subject Executory Contracts.

Except to the extent different treatment is agreed to among the parties, any monetary amounts by which each Executory Contract to be assumed pursuant to the Plan is in default will be satisfied, under Section 365(b)(1) of the Bankruptcy Code, at the Debtor's option, by the payment of Cash or Distribution of other property on the Effective Date as necessary to cure any such defaults; provided however, that if there is a dispute regarding (i) the nature or amount of any default cure amount, (ii) the Debtor's ability or the ability of the Debtor's assignees to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code), or (iii) any other matter pertaining to assumption, then cure will occur immediately following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

**Section 13.02**        **Post-Petition Date Contracts and Leases.**

Contracts and/or leases entered into after the Petition Date will be performed by the Reorganized Debtor in the ordinary course of business.

Amendments, modifications, supplements, and restatements to pre-Petition Date Executory Contracts and unexpired leases that have been executed by the Debtor during its Case shall not be deemed to alter the pre-Petition Date nature of the Executory Contract or unexpired lease, or the validity, priority, or amount of any claims that may arise in connection therewith.

# ARTICLE XIV.

## PROCEDURES FOR RESOLVING CLAIMS & GOVERNING DISTRIBUTIONS

**Section 14.01**        **Assertion of Claims or Interests.**

The Court has established December 1, 2023 as the Claims Bar Date for Holders of Claims against and/or Interests in the Debtor, other than the Holders of Administrative Expense Claims

and Rejection Claims, to File proofs of Claims or Interests. The deadline for Holders of Administrative Expense Claims is established in Plan Section 2.

**Section 14.02          Objections to Claims or Interests**

Except as provided in Section 9.2 of the Plan, parties-in-interest may object to Claims and Interests. The Court has not yet established a general deadline for objection to Claims or Interests; however, under the terms of the Plan objections filed on or after the Effective Date will be moot, as thereafter, the Reorganized Debtor shall have the exclusive right to prosecute such objections.

The procedure for notice, objection, and opportunity for hearing with regard to requests of Allowance of Administrative Expense Claims is governed by Local Bankruptcy Rule 9013-1.

**Section 14.03          Distribution Timing**

Monetary Distributions. The Cash to be distributed under the Plan to each Holder of an Allowed Claim in Classes 3 and 4 shall be distributed to such Holder (i) on the Effective Date or as soon as practicable thereafter; or (ii) if such Claim is not an Allowed Claim on the Effective Date, then, to the extent thereafter Allowed, as soon as practicable after the Order of the Court allowing the Claim becomes a Final Order.

Other Payments or Distributions. The Cash, if any, to be paid in accordance with the Plan to each Holder of an Allowed Administrative Claim, or Claim in Class 1, shall be distributed to such Holder (i) on the date(s) provided by the Plan; or (ii) if such Claim is not an Allowed Claim on such date(s), then, to the extent thereafter Allowed, as soon as practicable after the Order of the Court allowing the Claim becomes a Final Order.

**Section 14.04          Payments and Distributions on Contested Claims.**

No Payment Pending Allowance. Notwithstanding any other provision hereof, no payment or other monetary Distribution provided for under the Plan shall be made to the Holder of a Claim on account of that Claim unless and until, and only to the extent that, such Claim becomes an Allowed Claim.

Contested Claims Reserve. Except as otherwise provided herein, and until such time as a Contested Claim has been Allowed by Final Order, the Reorganized Debtor shall reserve and hold any Cash otherwise distributable on account of each Contested Claim (together with any interest or other income attributable thereto) in escrow for the benefit of each Holder of a Contested Claim in an amount equal to Distributions which would have been made to the Holder of such Contested Claim if it were an Allowed Claim.

Distribution Mechanics. Any property reserved and held for the benefit of a Holder of a Contested Claim shall be treated as a payment and reduction on account of such Contested Claim for purposes of computing any additional amounts to be paid in Cash or other property in the event the Contested Claim ultimately becomes an Allowed Claim. At such time as a Contested Claim becomes, in whole or in part, an Allowed Claim, the Reorganized Debtor shall distribute to the Holder thereof the Distributions, if any, to which such Holder is then entitled under the Plan, together with a Pro Rata Share of any interest or other income that may have been earned on the

amount of Cash so reserved (net of any expenses, including any taxes on the escrow, relating thereto). In the event, and to the extent, that Contested Claims are not Allowed, in whole or in part, the Holders of Allowed Claims in the same Class as the Holders of the Claims that are not Allowed shall receive its Pro Rata Share of any property reserved on account of the Claims that are not Allowed.

Maintenance of Reserves. Reserved Cash, and any interest or income paid thereon, shall be either (i) held by the Reorganized Debtor in an interest-bearing account or (ii) invested in interest-bearing obligations issued by the United States government and guaranteed by the United States government, and having (in either case) a maturity of not more than thirty (30) days, for the benefit of such Holders pending determination of its entitlement thereto under the terms of the Plan.

## Section 14.05    Means of Cash Distribution.

Cash Distributions made pursuant to the Plan shall be by check, wire or ACH transfer in U.S. funds or by other means agreed to by the distributee and the Debtor or the Reorganized Debtor, as applicable, or, absent agreement, such commercially reasonable manner as the Debtor or the Reorganized Debtor, as applicable, determines in its sole discretion.

## Section 14.06    Delivery of Distributions.

Distributions to Holders of Allowed Claims shall be made by the Debtor or the Reorganized Debtor, as applicable, (a) at the addresses set forth on the proofs of Claim Filed by such Holders (or at the last known addresses of such Holders if no Proof of Claim is Filed or if the Debtor has been notified in writing of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Debtor or the Reorganized Debtor, as applicable, after the date of any related Proof of Claim, (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Debtor or the Reorganized Debtor, as applicable, has not received a written notice of a change of address, or (d) in the case of the Holder of a Claim that is governed by an agreement and is administered by an agent, at the addresses contained in the official records of such agent.

If any Holder of an Allowed Claim entitled to a Distribution under the Plan cannot be located by the Reorganized Debtor, property distributable to such Holder shall be reserved and maintained as provided herein. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Reorganized Debtor is notified of such Holder's then current address, at which time all missed Distributions shall be made to such Holder without interest. All claims for undeliverable Distributions must be made on or before the second (2nd) anniversary of the Effective Date, after which date all unclaimed property shall revert to the Reorganized Debtor free of any restrictions thereon and the claim of any Holder, or successor to such Holder, with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

**Section 14.07        Withholding and Reporting Requirements.**

In connection with the Plan and all Distributions thereunder, the Debtor or the Reorganized Debtor, as the case may be, shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. The Debtor or the Reorganized Debtor, as the case may be, shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

# ARTICLE XV.

## SUMMARY OF CERTAIN RISK FACTORS RELATING TO THE PLAN

The terms and provisions of the Plan are subject to a number of material risks, including those enumerated below. These risk factors do not include matters that could merely delay Plan confirmation. Prior to deciding whether and how to vote on the Plan, Holders of Claims and Interests should carefully consider all of the information contained in this Disclosure Statement, especially the factors mentioned in the following paragraphs.

**Section 15.01        Risks Associated with the Chapter 11 Case.**

Due to potential payment and other disruptions caused by preparation for, and conduct of, the Case, certain of the Debtor's relationships with customers, suppliers and/or vendors may have been negatively affected. Although the Debtor-in-Possession has planned its administration of the Case, and the Debtor structured its treatment of Claims in the Plan, to minimize any adverse impact, it is possible that the bankruptcy process and the resolution of Claims against the Debtor could have an adverse effect on the Reorganized Debtor's vendor/customer loyalty, and thus its financial and operating results.

Additionally, the Debtor may be party to various contracts under which the commencement of the Case could, subject to the Debtor's rights and powers under Sections 362 and 365 of the Bankruptcy Code, (a) result in a breach, violation, default or conflict, (b) give other parties thereto rights of termination or cancellation, and/or (c) have other adverse consequences for the Debtor or the Reorganized Debtor. The magnitude of any such adverse consequences may depend upon, among other factors, if, and the diligence and vigor with which, other parties to such contracts seek to assert rights and pursue remedies in respect of such matters, and the ability of the Debtor or the Reorganized Debtor to resolve such matters on acceptable terms through negotiations with such other parties or otherwise. Although the Debtor has structured its treatment of Claims in the Plan to minimize any adverse impact, there can be no assurances with respect thereto.

**Section 15.02        Risk of Non-Confirmation.**

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan. A non-accepting creditor of the Debtor might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code and/or Bankruptcy Rules. Even if the Court were to determine that this

Disclosure Statement and the balloting procedures and results were appropriate, the Court could still decline to confirm the Plan if it were to find that any of the statutory requirements for confirmation had not been met. While there can be no assurance that the Court will conclude that all confirmation requirements have been met, the Debtor believes the Plan, this Disclosure Statement and all attendant procedures fully comply with the requirements set forth in the Bankruptcy Code. See Article XI of this Disclosure Statement for a discussion of confirmation legal standards.

## ARTICLE XVI.

## TAX CONSEQUENCES

There may be federal, state and/or local tax consequences for the Debtor, its creditors and Interest Holder(s) as a result of the Plan. The tax consequences of the Plan may be complex and, in some instances, uncertain. Such consequences may vary based upon the individual circumstances of each Holder of a Claim or Interest. Accordingly, each Holder of a Claim or Interest is strongly urged to consult its own tax advisor regarding the federal, state, local and possibly foreign tax consequences of the Plan.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## ARTICLE XVII.

## AMENDMENTS AND MODIFICATIONS

The Debtor may alter, amend, or modify the Plan, or any exhibits thereto, under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to "substantial consummation" of the Plan, as defined in Section 1101(2) of the Bankruptcy Code, the Debtor may, under Section 1127(b) of the Bankruptcy Code, institute a matter in the Court to remedy any defect or omission, or reconcile any inconsistencies in the Plan, this Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, so long as such matters do not materially and adversely affect the treatment of Holders of Claims under the Plan; provided, however, that prior notice of such matters shall be served in accordance with the Bankruptcy Rules or Order of the Court.

## ARTICLE XVIII.

## FEASIBILITY

The Bankruptcy Code requires, for Plan confirmation, that the Court determine that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor.

Pursuant to Section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization, of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan.

For purposes of determining whether the Plan meets this requirement, the Debtor and its advisors have analyzed its ability to meet its treatment obligations under the Plan while retaining, and thereafter generating, a sufficient amount of Cash to carry on its operations indefinitely following reorganization without the need for further reorganization or liquidation.

The foregoing analysis is presented in Financial Projections attached to this Disclosure Statement as <u>Exhibit 5</u>.  The Financial Projections set forth the projected financial performance of the Reorganized Debtor over a defined period of time based upon a number of assumptions and factors. The Financial Projections are unaudited.

The Debtor believes that the Financial Projections credibly demonstrate that the Reorganized Debtor will be able to meet all its Plan treatment obligations, have a viable operation following the Case, and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

## ARTICLE XIX.

## VOTING PROCEDURES, BALLOTING AND CONFIRMATION HEARING

Holders of Claims and Interests in Classes 1, 2 and 5 are requested to complete an appropriate Ballot, in accordance with the instructions provided therewith.

**The Plan contains a release of certain claims that Holders of Claims and Interests may have against third parties - who are defined in the Plan and this Disclosure Statement as "Released Parties" (the "<u>Third-Party Release</u>"). The Ballots include a section permitting a Claim or Interest Holder to opt out of the Third-Party Release.  If a Holder does not submit a Ballot before the Voting Deadline with the opt-out box checked, or timely votes but does not check the opt-out box, it will be deemed to have consented to the Third-Party Release as a "Releasing Party".**

If any Ballots are damaged or lost, or if a Holder has any questions concerning the voting instructions, it may contact the Claims and Balloting Agent at the address or telephone number provided in the Ballot package.  A Holder may not split its vote within a Class of Claims.  Holders

of Claims and Interests may vote through a duly authorized proxy. Incomplete, unsigned, or otherwise irregular Ballots will be returned to the sender and not tabulated.

For purposes of voting on the Plan, the Holder of a Claim or Interest shall be a voting member of a particular Class only to the extent that it holds an Allowed or Estimated Claim in that Class, and has not been paid, released, or otherwise satisfied, before the Voting Record Date.

All votes to accept or reject the Plan must be cast using the Ballot received along with this Disclosure Statement. No other votes will be counted.

## ARTICLE XX.

## RETENTION OF JURISDICTION

Subject to the jurisdictional provisions of Title 28, United States Code, under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, other than rights and obligations arising under the Series 2023 Bond Documents, including any exhibits and schedules thereto, the Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction over the following:

(a)     entry and implementation of such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

(b)     consideration of any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any Order of the Court, including, without limitation, the Confirmation Order;

(c)     determination of any objections to proofs of Claim and/or Interests Filed, or to otherwise resolve any Contested Claims;

(d)     determination of requests for allowance and/or payment of Administrative Expense Claims, including, without limitation, requests for compensation of and reimbursement of expenses of professionals and other parties entitled thereto under sections 330, 331, and 503(b) of the Bankruptcy Code;

(e)     resolution of any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract to which the Debtor is a party or with respect to which the Debtor may be liable, and to determine any Claims arising from contract rejection;

(f)     determination of any and all adversary proceedings and/or contested matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Reorganized Debtor thereafter;

(g)     resolution of matters relating to determination and/or recovery of all assets of the Reorganized Debtor and property of the Estate, wherever located;

**(h)**      determination of the scope of the discharge of the Debtor under the Plan and/or the Bankruptcy Code;

**(i)**      accomplishment of Distributions to Holders of Allowed Claims as provided in the Plan;

**(j)**      issuance of injunctions, entry of other Orders, or other Court action as may be necessary or appropriate to restrain interference by any entity with the consummation, implementation, or enforcement of the terms of the Plan, the Confirmation Order, or any other Order of the Court;

**(k)**      entry of such Orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan;

**(l)**      entry of Orders in aid of execution and consummation of the Plan as provided by Section 1142 of the Bankruptcy Code;

**(m)**      determination of disputes arising in connection with or relating to the Plan or the interpretation, implementation, or enforcement of the Plan or the extent of any entity's obligations incurred in connection with or released under the Plan;

**(n)**      hearing of any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code; and

**(o)**      entry of a Final Decree closing the Case.

If the Court abstains from exercising, or declines to exercise, jurisdiction, or determines that it is without jurisdiction, over any matter or proceeding arising out of, related to, or otherwise connected with the Case, the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter shall not be limited or otherwise affected by the Plan.


## ARTICLE XXI.

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtor believes that the confirmation and consummation of the Plan is preferable to all other alternatives.


**CONSEQUENTLY, THE DEBTOR URGES ALL HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 1, 2 and 5 TO VOTE TO ACCEPT THE PLAN, AND TO COMPLETE AND RETURN THEIR BALLOTS SO THAT THEY ARE ACTUALLY RECEIVED BY THE BALLOTING AGENT ON OR BEFORE 4:00 P.M. PREVAILING CENTRAL TIME ON DECEMBER 12, 2023.**

**DATED** this 14th day of November, 2023.

CENTRAL OKLAHOMA UNITED
METHODIST RETIREMENT
FACILITY, INC. d/b/a Epworth Villa

By: _Ron Kelly_____
Ron Kelly, President

_/s/ Sidney K. Swinson_____
Graydon Dean Luthey, Jr., OBA No. 5568
Sidney K. Swinson, OBA No. 8804
Mark D.G. Sanders, OBA No. 22922
**Gable & Gotwals, P.C.**
110 N. Elgin Avenue, Suite 200
Tulsa, Oklahoma 74120-1495
Telephone: 918.595.4800
Facsimile: 918.595.4990
dluthey@gablelaw.com
sswinson@gablelaw.com
msanders@gablelaw.com

**_Attorneys for the Debtor_**

**<u>INDEX OF EXHIBITS</u>**

- <u>Exhibit "1"</u> – Plan

- <u>Exhibit "2"</u> – Disclosure Statement Order

- <u>Group Exhibit "3"</u> – Financial Statements:
    - o  <u>Exhibit "3-1"</u> – Financial Statements for 2021
    - o  <u>Exhibit "3-2"</u> – Financial Statements for 2022
    - o  <u>Exhibit "3-3"</u> – September 2023 Financial Statements

- <u>Exhibit "4"</u> – Liquidation Analysis

- <u>Exhibit "5"</u> – Feasibility Financial Projections

- <u>Exhibit "6"</u> – Plan Support Agreement

- <u>Group Exhibit "7"</u> – Selected Series 2023 Bond Documents
    - o  <u>Exhibit "7-1"</u> – Series 2023 Bond Indenture
    - o  <u>Exhibit "7-2"</u> – Series 2023 Loan Agreement
    - o  <u>Exhibit "7-3"</u> – Series 2023 Continuing Covenants Agreement