**<u>GROUP EXHIBIT 7</u>**

**(Selected Series 2023 Bond Documents)**

Exhibit 7-1

(Series 2023 Bond Indenture)

**BOND TRUST INDENTURE**

**Dated as of December 1, 2023**

**Between**

**OKLAHOMA COUNTY FINANCE AUTHORITY**

**And**

**BANCFIRST,**
**a state banking association**
**as Bond Trustee**

**Relating to**

**$6,000,000**
**Senior Living Facilities Revenue Bonds**
**(Epworth Villa Project)**
**Series 2023A**

**$66,700,000**
**Senior Living Facilities Revenue Bonds**
**(Epworth Villa Project)**
**Series 2023B**

**$13,724,671**
**Senior Living Facilities Capital Appreciation Revenue Bonds**
**(Epworth Villa Project)**
**Series 2023C**

130005.1

# BOND TRUST INDENTURE

## TABLE OF CONTENTS

**Page**

| | |
|---|---|
| Parties | 1 |
| Recitals | 1 |
| Granting Clauses | 3 |

## ARTICLE I
### DEFINITIONS, RULES OF CONSTRUCTION

| | | |
|---|---|---|
| Section 101. | Definitions of Words and Terms | 5 |
| Section 102. | Rules of Construction | 22 |

## ARTICLE II
### THE BONDS

| | | |
|---|---|---|
| Section 201. | Authorization and Terms of Bonds | 24 |
| Section 202. | Method and Place of Payment of Bonds | 27 |
| Section 203. | Form, Denomination and Numbering of Bonds | 28 |
| Section 204. | Execution and Authentication of Bonds | 28 |
| Section 205. | Registration, Transfer and Exchange of Bonds | 29 |
| Section 206. | Mutilated, Lost, Stolen or Destroyed Bonds | 30 |
| Section 207. | Cancellation and Destruction of Bonds Upon Payment | 30 |
| Section 208. | Book-Entry; Securities Depository | 30 |
| Section 209 | No Additional Bonds | 31 |

## ARTICLE III
### REDEMPTION OF BONDS

| | | |
|---|---|---|
| Section 301. | Redemption of Bonds Prior to Maturity | 32 |
| Section 302. | Election To Redeem | 35 |
| Section 303. | Selection of Bonds to be Redeemed | 35 |
| Section 304. | Notice of Redemption | 36 |
| Section 305. | Payment of Redemption Price | 37 |

## ARTICLE IV
### CREATION OF FUNDS AND ACCOUNTS;
### APPLICATION OF BOND PROCEEDS AND OTHER MONEYS

| | | |
|---|---|---|
| Section 401. | Creation of Funds and Accounts | 39 |
| Section 402. | Deposit of Bond Proceeds and Other Monies | 40 |
| Section 403. | Project Fund | 40 |
| Section 404. | Debt Service Fund | 41 |
| Section 405. | Debt Service Reserve Fund | 42 |

Section 406.    Rebate Fund                                                              43
Section 407.    Revenue Fund                                                             43
Section 408.    Payments Due on Saturdays, Sundays and Holidays                          45
Section 409.    Nonpresentment of Bonds                                                  45
Section 410.    Reports From Bond Trustee                                                46
Section 411.    Certain Verifications                                                    46
Section 412.    Operating Reserve Fund                                                   46
Section 4.13.   Entrance Fee Fund                                                        46

## ARTICLE V
## DEPOSITORIES OF MONEYS, SECURITY FOR DEPOSITS
## AND INVESTMENT OF FUNDS

Section 501.    Moneys to be Held in Trust                                               48
Section 502.    Investment of Moneys                                                     48
Section 503.    Record Keeping                                                           48

## ARTICLE VI
## PARTICULAR COVENANTS AND PROVISIONS

Section 601.    Limited Obligations                                                      49
Section 602.    Payment of Principal, Redemption Premium, if any, and Interest           49
Section 603.    Authority to Issue Bonds and Execute Bond Indenture                      49
Section 604.    Performance of Covenants                                                 50
Section 605.    Instruments of Further Assurance                                         50
Section 606.    Inspection of Books                                                      50
Section 607.    Enforcement of Rights                                                    50
Section 608.    Tax Covenants                                                            50
Section 609.    Bond Trustee to Provide Information to Authority                          51
Section 610     Continuing Disclosure                                                    51
Section 611     Recordation and Other Instruments                                        51

## ARTICLE VII
## DEFAULT AND REMEDIES

Section 701.    Events of Default                                                        53
Section 702.    Acceleration of Maturity; Rescission and Annulment                       54
Section 703.    Exercise of Remedies by the Bond Trustee                                 54
Section 704.    Limitation on Suits by Bondowners                                        56
Section 705.    Control of Proceedings by Bondowners                                     57
Section 706.    Application of Moneys Collected                                          59
Section 707.    Rights and Remedies Cumulative                                           58
Section 708     Advances by Bond Trustee                                                 59
Section 709.    Waivers of Events of Default                                             59

## ARTICLE VIII
## THE BOND TRUSTEE

| | | |
|---|---|---|
| Section 801. | Acceptance of Trusts; Certain Duties and Responsibilities | 61 |
| Section 802. | Certain Rights of Bond Trustee | 62 |
| Section 803. | Notice of Defaults | 63 |
| Section 804. | Compensation and Reimbursement | 64 |
| Section 805. | Corporate Trustee Required; Eligibility | 65 |
| Section 806. | Resignation and Removal of Bond Trustee | 65 |
| Section 807. | Appointment of Successor Bond Trustee | 66 |
| Section 808. | Acceptance of Appointment by Successor | 67 |
| Section 809. | Merger, Consolidation and Succession to Business | 68 |
| Section 810. | Co-Bond Trustees and Separate Bond Trustees | 68 |
| Section 811. | Designation of Paying Agents | 69 |
| Section 812. | Advances by Bond Trustee | 69 |
| Section 813. | Bond Trustee Acknowledgment and Agreement | 69 |

## ARTICLE IX
## SUPPLEMENTAL INDENTURES

| | | |
|---|---|---|
| Section 901. | Supplemental Indentures Not Requiring Consent of Bondowners | 71 |
| Section 902. | Supplemental Indentures Requiring Consent of Bondowners | 71 |
| Section 903. | Corporation's Consent to Supplemental Indentures | 73 |
| Section 904. | Opinion of Bond Counsel | 73 |
| Section 905. | Supplemental Bond Indenture by Direction Letter of Bondholder Representative | 73 |

## ARTICLE X
## SUPPLEMENTAL LOAN AGREEMENTS

| | | |
|---|---|---|
| Section 1001. | Supplemental Loan Agreements Not Requiring Consent of Bondowners | 74 |
| Section 1002. | Supplemental Loan Agreements Requiring Consent of Bondowners | 74 |
| Section 1003. | Opinion of Bond Counsel | 75 |
| Section 1004. | Supplemental Loan Agreement by Direction Letter of Bondholder Representative | 75 |

## ARTICLE XI
## SATISFACTION AND DISCHARGE OF BOND INDENTURE

| | | |
|---|---|---|
| | | 76 |
| Section 1101. | Bonds Deemed To Be Paid | 76 |
| Section 1102. | Satisfaction and Discharge of the Bond Indenture | 77 |
| Section 1103. | Payment of Bonds After Discharge | |

**ARTICLE XII**
**MISCELLANEOUS PROVISIONS**

Section 1201.  Consents and Other Instruments by Bondowners                78
Section 1202.  Limitation of Rights Under the Bond Indenture               78
Section 1203.  Notices                                                     79
Section 1204.  Suspension of Mail Service                                  80
Section 1205.  Immunity of Officers, Employees and Members of Authority    80
Section 1206.  Limitation on Authority Obligations                         80
Section 1207.  Severability                                                81
Section 1208.  Execution in Counterparts; Electronic Transactions          81
Section 1209.  Governing Law                                               81
Section 1210.  Fees, Charges and Expenses of the Bond Trustee, the Bond Registrar,
               the Bondholder Representative and the Authority              81
Section 1211.  Bondholder Deemed Owner                                     82
Section 1212.  Notice to Bondholder Representative                         82

Signatures and Seals

Exhibit A      Form of Series 2023A Bond
Exhibit B      Form of Series 2023B Bond
Exhibit C      Form of Series 2023C Bond
Exhibit D      Project Fund Project Description

## BOND TRUST INDENTURE

**THIS BOND TRUST INDENTURE**, is made and entered into as of December 1, 2023 (the "Bond Indenture"), by and between the **OKLAHOMA COUNTY FINANCE AUTHORITY**, acting by and through its Trustees (the "Authority"), a public trust duly organized and existing under the laws of the State of Oklahoma (the "State"), and **BANCFIRST**, a state banking association, Oklahoma City, Oklahoma organized and existing under the laws of the State, and authorized to accept and execute trusts of the character herein set forth, as trustee, together with any successor, as trustee (the "Bond Trustee"). All capitalized terms used herein shall have the meanings ascribed to them in Article I of this Indenture.

## W I T N E S S E T H :

**WHEREAS,** the Authority has been created by a Trust Indenture, dated as of May 9, 1983, as amended, for the use and benefit of Oklahoma County, Oklahoma, under authority of and pursuant to the provisions of Title 60, Oklahoma Statutes 2021, Section 176 to 180.3, inclusive, as amended and supplemented (the "Act"), the Oklahoma Trust Act and other applicable statutes of the State; and

**WHEREAS**, the Authority is authorized and empowered to issue revenue bonds or notes and loan the proceeds thereof to finance facilities for the implementation of the public welfare and protection and promotion of the public health and the provision of housing on behalf of 501(c)(3) organizations within Oklahoma County, Oklahoma; and

**WHEREAS**, pursuant to the Act the Authority previously issued $15,450,000 aggregate principal amount of Revenue Refunding Bonds (Epworth Villa Project), Series 2004 (the *"Series 2004 Bonds"*), $13,460,000 aggregate principal amount of Revenue Refunding Bonds (Epworth Villa Project), Series 2005 (the *"Series 2005 Bonds"*), and $72,765,000 aggregate principal amount of Revenue and Refunding Bonds (Epworth Villa Project) Series 2012A, $2,605,000 aggregate principal amount of Revenue Bonds (Epworth Villa Project) Series 2012B Tax-Exempt Mandatory Paydown Securities -80 and $3,265,000 aggregate principal amount of Revenue Bonds (Epworth Villa Project) Series 2012C Tax-Exempt Mandatory Paydown Securities -50 (collectively, the "Series 2012 Bonds") (the Series 2004 Bonds, the Series 2005 Bonds and the Series 2012 Bonds are sometimes referred to herein as the "Outstanding Existing Bonds"), each issued under a Bond Indenture dated as of March 15, 1997, as amended and supplemented by a Supplemental Bond Indenture dated as of December 1, 2000, a Second Supplemental Bond Indenture dated as of December 1, 2004, a Third Supplemental Bond Indenture dated as of December 1, 2005 and a Fourth Supplemental Bond Indenture dated as of December 1, 2012 (together, the *"Original Bond Indenture"*) between the Authority and the Bond Trustee for the purpose of making loans to Central Oklahoma United Methodist Retirement Facility, Inc. d/b/a Epworth Villa, an Oklahoma not-for-profit corporation (the *"Corporation"*), under and secured by a Mortgage and Security Agreement dated as of March 15, 1997, as amended and supplemented by a Supplemental Mortgage and Security Agreement dated as of December 1, 2000, a Second Supplemental Mortgage and Security Agreement dated as of December 1, 2004, a Third Supplemental Mortgage and Security Agreement dated as of December 1, 2005, and a Fourth Supplemental Mortgage and Security Agreement dated as of December 1, 2012 (together the *"Original Mortgage"*) from the Corporation, as mortgagor,

1

to the Authority, as mortgagee, to provide funds to (a) fund, finance, refinance and reimburse the costs of improvements and additions to certain facilities, furnishings and equipment of the Corporation, (b) refund certain outstanding bonds, (c) fund required debt service reserves, (d) fund interest on the Outstanding Existing Bonds, and (e) pay certain costs of issuance relating to the Outstanding Existing Bonds; and

**WHEREAS,** subsequent to the issuance of the Outstanding Existing Bonds, the Corporation defaulted on certain of its obligations in connection with the Outstanding Existing Bonds, including without limitation its obligations under the Original Bond Indenture and the Original Mortgage, and entered into negotiations with certain owners of a majority of principal amount of the Outstanding Existing Bonds to address the default issues. On September 29, 2023, the Corporation filed its voluntary petition under Chapter 11 of the Bankruptcy Code in the bankruptcy case styled In re: Central Oklahoma United Methodist Retirement Facility, Inc. d/b/a Epworth Villa Case No. 23-12607 (the "*Bankruptcy Proceedings*") in the United States Bankruptcy Court for the Western District of Oklahoma (the "*Bankruptcy Court*"). On _____, the Corporation filed its reorganization plan which included the restructuring of the Outstanding Existing Bonds (the "*Bankruptcy Plan*"). On _____, the Bankruptcy Court issued its order (the "*Order*") confirming the Bankruptcy Plan. The Order and the Bankruptcy Plan provide that all of the payment obligations of the Authority under the Outstanding Existing Bonds are to be restructured by having the owners of all of the Outstanding Existing Bonds exchange such Outstanding Existing Bonds for Series 2023B Bonds and Series 2023C Bonds (as defined below) (the "*Bond Exchange*"); and

**WHEREAS**, in order to effectuate the Bond Exchange and the Bankruptcy Plan, including funding additional costs of improvements to the Facilities of the Corporation, the Corporation has requested that the Authority issue: (a) $6,000,000 in aggregate principal amount of its Senior Living Facilities Revenue Bonds (Epworth Villa Project), Series 2023A (the "*Series 2023A Bonds*"), (b) $66,700,000 in aggregate principal amount of its Senior Living Facilities Revenue Bonds (Epworth Villa Project), Series 2023B (the "*Series 2023B Bonds*"), and (c) $13,724,671 in aggregate principal amount of its Senior Living Facilities Capital Appreciation Revenue Bonds (Epworth Villa Project) Series 2023C (the "*Series 2023C Bonds*" and, together with the Series 2023A Bonds and the Series 2023B Bonds, the "*Series 2023 Bonds*" or the "*Bonds*"), and exchange the Series 2023B Bonds and the Series 2023C Bonds for the Outstanding Existing Bonds, with each owner of Outstanding Existing Bonds to receive their ratable share of Series 2023B Bonds and Series 2023C Bonds as set forth in this Bond Indenture; and

**WHEREAS**, the Authority is authorized pursuant to the Act and a resolution adopted by the Authority (the "*Resolution*") to issue the Bonds under this Bond Indenture for the purpose of making a loan (the "*Loan*") to the Corporation under a Loan Agreement dated as of December 1, 2023 (the "*Loan Agreement*") between the Authority and the Corporation, to provide funds to (a) exchange the Outstanding Existing Bonds, (b) fund improvements to the Facilities of the Corporation, (c) fund interest and required debt service reserves, and (d) pay costs of issuance related to the Bonds; and

**WHEREAS,** the Corporation will issue its Series 2023A Bond Note in the principal amount of $6,000,000, its Series 2023B Bond Note in the principal amount of $66,700,000 and its Series 2023C Bond Note in the principal amount of $13,724,671 (collectively the "Series 2023 Bond Notes"), said notes to be issued under the Loan Agreement as evidence of and security for the loan

and to further provide for the payment of the principal of, redemption premium, if any, and interest on the Bonds; and

**WHEREAS**, all things necessary to make the Bonds, when authenticated by the Bond Trustee and issued as in this Bond Indenture provided, the valid, legal and binding obligations of the Authority, as limited by the provisions herein, and to constitute this Bond Indenture a valid, legal and binding pledge and assignment of the property, rights, interests and revenues herein made for the security of the payment of the principal of, redemption premium, if any, and interest on the Bonds have been done and performed, and the execution and delivery of this Bond Indenture and the execution and issuance of the Bonds, subject to the terms hereof, have in all respects been duly authorized;

## GRANTING CLAUSES

The Authority, in consideration of the premises, the acceptance by the Bond Trustee of the trusts hereby created, the purchase and acceptance of the Bonds by the Owners thereof, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to secure the payment of the principal of and redemption premium, if any, and interest on all of the Bonds issued and Outstanding under this Bond Indenture from time to time according to their tenor and effect and to secure the performance and observance by the Authority of all the covenants, agreements and conditions herein and in the Bonds contained, does hereby transfer, pledge and assign to the Bond Trustee and its successors and assigns in trust forever, and does hereby grant a security interest unto the Bond Trustee and its successors in trust and its assigns, in the property described in paragraphs (a), (b) and (c) below (said property being herein referred to as the "Trust Estate"), to wit:

(a)     All right, title and interest of the Authority (including the right to enforce any of the terms thereof) in, to and under (i) the Loan Agreement, and all payments derived by the Authority from the Corporation including Loan Payments and other amounts to be received by the Authority and paid by the Corporation under and pursuant to and subject to the Loan Agreement (but excluding the Authority's rights to payment of its fees and expenses and to indemnification (and the right to enforce such rights), to notice and as otherwise expressly set forth in the Loan Agreement and excluding any payments made by the Bond Trustee or the Corporation to meet the rebate requirements of Section 148(f) of the Internal Revenue Code), and including the pledge of the Gross Receipts by the Corporation thereunder; (ii) the Mortgage; (iii) the Series 2023 Bond Notes; and (iv) all financing statements or other instruments or documents evidencing, securing or otherwise relating to the loan of the proceeds of the Bonds;

(b)     All moneys and securities (except moneys and securities held in the Rebate Fund) from time to time held by the Bond Trustee in the funds and accounts under the terms of this Bond Indenture; *provided, however,* (i) that amounts held in the Series 2023A Account of the Debt Service Fund shall be pledged only to the Owners of the Series 2023A Bonds, (ii) that amounts held in the Series 2023B Account of the Debt Service Fund shall be pledged only to the Owners of the Series 2023B Bonds, (iii) that amounts held in the Series 2023C Account of the Debt Service Fund shall be pledged only to the Owners of the Series 2023C Bonds, (iv) that amounts held in the Series 2023A Account of the Debt Service Reserve Fund shall be pledged only to the Owners of the Series

2023A Bonds, and (v) that amounts held in the Series 2023B Account of the Debt Service Reserve Fund shall be pledged only to the Owners of the Series 2023B Bonds;

(c)    Any and all other property (real, personal or mixed) of every kind and nature from time to time hereafter, by delivery or by writing of any kind, pledged, assigned or transferred as and for additional security hereunder, to the Bond Trustee, which is hereby authorized to receive any and all such property at any and all times and to hold and apply the same subject to the terms hereof.

**TO HAVE AND TO HOLD,** with all rights and privileges hereby transferred, pledged, assigned and/or granted or agreed or intended so to be, to the Bond Trustee and its successors and assigns in trust forever in trust, nevertheless, upon the terms and conditions herein set forth for the equal and pro rata benefit and security of each and every Owner, without preference, priority or distinction as to participation in the lien, benefit and protection hereof of one Bond over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except that (i) the Series 2023C Bonds shall be subordinated to the Series 2023A Bonds and the Series 2023B Bonds, (ii) the Series 2023B Bonds shall be subordinated to the Series 2023A Bonds, and (iii) the Series 2023A Bonds will be senior to the Series 2023B Bonds and Series 2023C Bonds, all as provided herein.

**PROVIDED, NEVERTHELESS,** these presents are upon the express condition that, if the Authority or its successors or assigns shall well and truly pay or cause to be paid the principal of such Bonds with interest, according to the provisions set forth in the Bonds or shall provide for the payment or redemption of such Bonds by depositing or causing to be deposited with the Bond Trustee the entire amount of funds or securities requisite for payment or redemption thereof when and as authorized by the provisions hereof, and shall also pay or cause to be paid all other sums payable hereunder, then these presents and the estates and rights hereby granted shall cease, determine and become void, and thereupon the Bond Trustee, on payment of its lawful charges and disbursements then unpaid, on demand of the Corporation and upon the payment of the costs and expenses thereof, shall duly execute, acknowledge and deliver to the Authority such instruments of satisfaction or release as may be necessary or proper to discharge this Bond Indenture of record, and if necessary shall grant, reassign and deliver to the Authority, its successors or assigns, all the property, rights, privileges and interests by it hereby granted, conveyed and assigned, and all substitutes therefor, or any part thereof, not previously disposed of or released as herein provided; otherwise this Bond Indenture shall be and remain in full force.

**NOW, THEREFORE,** it is hereby expressly declared, covenanted and agreed by and between the parties hereto, that all Bonds issued and secured hereunder are to be issued, authenticated and delivered and that all the Trust Estate is to be held and applied under, upon and subject to the terms, conditions, stipulations, covenants, agreements, trusts, uses and purposes as hereinafter expressed, and the Authority does hereby agree and covenant with the Bond Trustee and with the respective Owners from time to time of the Bonds, as follows:

## ARTICLE I
## DEFINITIONS, RULES OF CONSTRUCTION

**Section 101.    Definitions of Words and Terms.**  In addition to words and terms elsewhere defined herein, the following words and terms as used in this Bond Indenture and in the Loan Agreement shall have the following meanings, unless some other meaning is plainly intended:

**"Accountant"** means an independent certified public accountant or a firm of independent certified public accountants that is a member of the American Institute of Certified Public Accountants (or its successor organization) and is licensed to practice in the State and is acceptable to the Bondholder Representative.

**"Additional Payments"** means those payments required to be made by the Corporation pursuant to Section 4.3 of the Loan Agreement.

**"Ancillary Operating Fund"** means the fund by that name created by Section 401 hereof and Section 5.14 of the Loan Agreement and held in a bank account established and controlled by the Corporation, which account shall be subject to a Deposit Account Control Agreement.

**"Authority"** means the Oklahoma County Finance Authority and its successors and assigns.

**"Authority Representative"** means the Chairman or Vice Chairman of the Authority, and such other person or persons at the time designated to act on behalf of the Authority in matters relating to the Loan Agreement and this Bond Indenture as evidenced by a written certificate furnished to the Corporation and the Bond Trustee containing the specimen signature of such person or persons and signed on behalf of the Authority by its Chairman or Vice Chairman. Such certificate may designate an alternate or alternates, each of whom shall be entitled to perform all duties of the Authority Representative.

**"Authorized Denominations"** means with respect to the Series 2023A Bonds, the denomination of $5,000 or any integral multiple of $5,000 in excess thereof and with respect to the Series 2023B Bonds and Series 2023C Bonds, $1 or any integral multiple thereof.

**"Balloon Long-Term Indebtedness"** means Long-Term Indebtedness 25% or more of the principal payments of which are due in a single year, which portion of the principal is not required by the documents pursuant to which such Indebtedness is incurred to be amortized by payment or redemption prior to such year.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the Western District of Oklahoma.

**"Bankruptcy Plan"** means the reorganization plan filed by the Corporation and approved by the Bankruptcy Court via the Order.

**"Bankruptcy Proceedings"** means In re: Central Oklahoma United Methodist Retirement Facility, Inc. d/b/a Epworth Villa Case No. 23-12607.

5

**"Bond Documents"** means this Bond Indenture, the Bonds, the Loan Agreement, the Mortgage, the Continuing Covenants Agreement, the Continuing Covenants Agreement Note, the Deposit Account Control Agreement, the Continuing Disclosure Agreement, the Tax Agreement, the Series 2023 Bond Notes, the Purchase Contract, and any and all future renewals and extensions or restatements of, or amendments or supplements to, any of the foregoing.

**"Bond Exchange"** means the restructuring of the Outstanding Existing Bonds by exchange thereof for ratable portions of the Series 2023B Bonds and Series 2023C Bonds.

**"Bond Indenture"** means this Bond Trust Indenture as originally executed by the Authority and the Bond Trustee, as from time to time amended and supplemented by Supplemental Bond Indentures.

**"Bond Register"** means the registration books of the Authority kept by the Bond Trustee to evidence the registration and transfer of Bonds.

**"Bond Registrar"** means the Bond Trustee when acting as such, and any other bank or trust company designated and at the time serving as bond registrar under this Bond Indenture.

**"Bond Trustee"** means BancFirst, and its successor or successors and any other corporation or association which at any time may be substituted in its place pursuant to and at the time serving as trustee under this Bond Indenture.

**"Bondholder Representative"** means (i) Hamlin Capital Management, LLC, so long as a majority in aggregate principal amount of the Outstanding Series 2023A Bonds are beneficially owned by persons for whom Hamlin Capital Management, LLC serves as investment advisor; and (ii) at any other time, the Owners of a majority in aggregate principal amount of the Outstanding Series 2023A Bonds or their designee and if no Series 2023A Bonds are then Outstanding, the Majority of Holders. Hamlin Capital Management, LLC will provide immediate written notice to the Bond Trustee, the Corporation and the Authority when clause (i) above is no longer applicable.

**"Bondowner," "Owner"** or "**Registered Owner**" means the Person in whose name a Bond is registered on the Bond Register, provided that for purposes of consents, waivers or directions, shall mean the beneficial owner of Bonds.

**"Bonds"** mean, collectively, the Series 2023A Bonds, the Series 2023B Bonds and the Series 2023C Bonds.

**"Book-Entry System"** means a system for holding beneficial ownership of the Bonds in book-entry form specified in Section 208.

**"Business Day"** means a day other than (a) a Saturday, Sunday or legal holiday, (b) a day on which banks located in any city in which the principal corporate trust office of the Bond Trustee or any Paying Agent is located are required or authorized by law to remain closed, or (c) a day on which the New York Stock Exchange is closed.

"**Cede & Co.**" means Cede & Co., as nominee name of The Depository Trust Company, New York, New York.

"**Certificate of Corporation Representative**" means a written certificate signed by a Corporation Representative, which certificate shall be deemed to constitute a representation of, and shall be binding upon, the Corporation with respect to matters set forth therein.

"**Closing Date**" means the date of delivery of and payment for the Bonds.

"**Continuing Covenants Agreement**" means the Continuing Covenants Agreement dated as of December 1, 2023 between the Corporation and the Bond Trustee.

"**Continuing Covenants Agreement Note**" means Oklahoma United Methodist Retirement Facility, Inc. Continuing Covenants Agreement Note issued to the Bond Trustee to secure the Corporation's obligations under the Continuing Covenants Agreement.

"**Continuing Disclosure Agreement**" means the Continuing Disclosure Agreement dated as of December 1, 2023, between the Corporation and BancFirst, Oklahoma City, Oklahoma as dissemination agent.

"**Controlling Holders**" means, with respect to the exercise of remedies from and after a default, for a period of 90 days after receipt of notice of the occurrence of the Event of Default, the Bondholder Representative and thereafter either the Bondholder Representative or the Majority of Holders.

"**Corporation**" means Central Oklahoma United Methodist Retirement Facility, Inc. d/b/a Epworth Villa, an Oklahoma not-for-profit corporation, its successors and assigns, and any surviving, resulting or transferee entity.

"**Corporation Representative**" means the President or the Chief Financial Officer of the Corporation or other person or persons at the time designated to act on behalf of the Corporation in matters relating to the Loan Agreement, the Continuing Covenants Agreement and this Bond Indenture as evidenced by a written certificate furnished to the Authority and the Bond Trustee containing the specimen signature of such person or persons and signed on behalf of the Corporation by its President or Chief Financial Officer.   Any such certificate may designate an alternate or alternates each of whom shall be entitled to perform all duties of the Corporation Representative.

"**Costs of Issuance**" means issuance costs with respect to the Bonds described in Section 147(g) of the Internal Revenue Code, as approved by the Corporation and designated by the Chairman of the Authority in a certificate delivered in connection with the purchase and sale or exchange of the Bonds.

"**Days Cash on Hand**" shall have the meaning set forth in the Continuing Covenants Agreement so long as the Series 2023A Bonds are Outstanding and all provisions related to Days Cash on Hand shall be governed exclusively by the Continuing Covenants Agreement.  At such time

as the Series 2023A Bonds are fully satisfied and are no longer Outstanding, "**Days Cash on Hand**" means, as of the last day of the Fiscal year or the last date of the period for which such calculation is made, the number obtained by dividing (a) the amount of Unrestricted Cash and Investments of the Corporation as of that date by (b) the quotient resulting from dividing (1) the sum of Total Expenses of the Corporation for the most recent Fiscal Year for which Financial Statements are available plus the interest expense of the Corporation for that Fiscal Year by (2) 365; provided, however, for purposes of any calculation of Days Cash On Hand required to be made on a monthly, quarterly or semi-annual basis the Total Expenses for the trailing 12 month period shall be used.

"**Debt Service Fund**" means the Fund by that name created by Section 401.

"**Debt Service Reserve Fund**" means the fund by that name created by Section 401.

"**Debt Service Reserve Requirement**" means:

(a)     with respect to the Series 2023A Bonds, as of any date of calculation, an amount equal to $_____; and

(b)     with respect to the Series 2023B Bonds, as of any date of calculation, an amount equal to the Maximum Annual Debt Service on all Series 2023B Bonds then Outstanding.

"**Default Rate**" means, with respect to the Series 2023A Bonds, the interest rate on such Series 2023A Bonds plus 3%.

"**Defaulted Interest**" means interest on any Bond which is payable but not paid on the date due.

"**Defeasance Obligations**" means

(a)     Government Obligations which are not subject to redemption in advance of their maturity dates; or

(b)     obligations of any state or political subdivision of any state, the interest on which is excluded from gross income for federal income tax purposes and which meet the following conditions:

(1)     the obligations are (i) not subject to redemption prior to maturity or (ii) the trustee for such obligations has been given irrevocable instructions concerning their calling and redemption and the issuer of such obligations has covenanted not to redeem such obligations other than as set forth in such instructions;

(2)     the obligations are secured by cash or Government Obligations that may be applied only to principal of, premium, if any, and interest payments on such obligations;

(3)     such cash and the principal of and interest on such Government Obligations (plus any cash in the escrow fund) are sufficient to meet the liabilities of the obligations;

(4)    such cash and Government Obligations serving as security for the obligations are held in an escrow fund by an escrow agent or a trustee irrevocably in trust;

(5)    such cash and Government Obligations are not available to satisfy any other claims, including those against the trustee or escrow agent; and

(6)    the obligations are rated in the highest rating category by Moody's (presently "Aaa"), S&P (presently "AAA") or Fitch (presently "AAA").

**"Deposit Account Control Agreement"** means one or more deposit account control agreements by and among the Bond Trustee, the Corporation and _____ perfecting a security interest in the Operating Fund and the Ancillary Operating Fund granted by the Corporation to the Trustee.

**"Determination of Taxability"** shall have the meaning set forth in the Continuing Covenants Agreement so long as the Series 2023A Bonds are Outstanding.  At such time as the Series 2023A Bonds are fully satisfied and are no longer Outstanding, "**Determination of Taxability**" means any determination, decision, or decree by the Commissioner of Internal Revenue or any court of competent jurisdiction, or an opinion obtained by the Bond Trustee of counsel qualified in such matters, that an Event of Taxability shall have occurred. A Determination of Taxability also shall be deemed to have occurred on the first to occur of the following:

(a)    the date when Corporation files any statement, supplemental statement, or other tax schedule, return, or document which discloses that an Event of Taxability shall have occurred; or

(b)    the effective date of any federal legislation enacted after the date of this Bond Indenture or promulgation of any income tax regulation or ruling by the Internal Revenue Service that causes an Event of Taxability after the date of this Bond Indenture; or

(c)    if upon sale, lease, or other deliberate action taken within the meaning of Treas. Reg. Sec. 1.141-2(d), the failure to receive an unqualified Opinion of Bond Counsel to the effect that such deliberate action will not cause interest payable by the Corporation hereunder or under any agreement to become includable in the gross income of the recipient.

**"Electronic Means"** means telecopy, telegraph, telex, internet, facsimile transmission, email or any other similar means of electronic communication.

**"EMMA"** means the Electronic Municipal Market Access system for municipal securities disclosures operated by the Municipal Securities Rulemaking Board, which can be accessed at www.emma.msrb.org.

**"Entrance Fee Escrow Account"** means the escrow account holding entrance fees received from certain residents, which account is maintained by The Trust Company of Oklahoma, on behalf of such residents pursuant to the escrow agreement created under the Bankruptcy Plan.

**"Entrance Fee Fund"** means the Fund by that name created by Section 401.

**"Entrance Fees"** means (a) fees, other than monthly rentals or monthly service charges, paid to the Corporation by residents of living units for the purpose of obtaining the right to reside in those living units, including any refundable resident deposits described in any lease or similar residency agreements with respect to those living units, but shall not include any such amounts held in escrow or otherwise set aside pursuant to the requirements of any such agreement prior to the occupancy of the living unit covered by such agreement (which amounts shall be included if and when occupancy occurs) and (b) all fees received pursuant to any agreement with respect to customized changes to any unit in Facilities that constitutes Mortgaged Property.

**"Equipment"** means those items constituting equipment as defined in the UCC used in connection with the Mortgaged Property, whether such equipment is now owned or hereafter acquired by the Corporation.

**"Event of Default"** means (a) with respect to this Bond Indenture any "Event of Default" as defined in Section 701, and (b) with respect to the Loan Agreement any "Event of Default" as defined in Section 7.1 of the Loan Agreement.

**"Event of Taxability"** means an event wherein the interest of the Bonds becomes includable in the Bondowner's gross income, including as the result of any act, failure to act, or use of the proceeds of the Bonds, use of the Facilities or any misrepresentation or inaccuracy in any of the representations, warranties or covenants contained in this Bond Indenture, the Loan Agreement or Tax Agreement by the Authority or the Corporation or the enactment of any federal legislation after the date of this Bond Indenture or the promulgation of any income tax regulation or ruling by the Internal Revenue Service after the date of this Bond Indenture.

**"Facilities"** means the continuing care retirement facilities and health care delivery or residential facilities designed to provide services to the elderly and all facilities necessary for the operation of such facilities that are wholly-owned or leased pursuant to a capital lease by the Corporation.

**"Financial Statements"** means consolidated financial statements of the Corporation for a Fiscal Year, or for such other period for which an audit has been performed, prepared in accordance with generally accepted accounting principles consistently applied and including such statements as are necessary for a fair presentation of financial position, activities and changes in net assets and cash flows as of the end of such period, which have been audited and reported upon by an Accountant.

**"Fiscal Year"** means the fiscal year of the Corporation, which period commences on January 1 of each year and ends on the following December 31.

**"Fitch"** means Fitch, Inc., a corporation organized and existing under the laws of the State of New York, its successors and assigns, and, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Fitch" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Corporation Representative with written notice to Bond Trustee.

"**Governing Body**" means, when used with respect to the Corporation, its board of directors, or other board or group of individuals in which the powers of the Corporation are vested.

"**Government Obligations**" means direct obligations of the United States of America or obligations the full and timely payment of the principal of and interest on which is unconditionally guaranteed by the United States of America.

"**Gross Receipts**" means all rents, revenues, income, receipts, Entrance Fees and money (other than proceeds of borrowing and moneys received from residents that are held in escrow) received in any period by or on behalf of the Corporation and any accounts receivable by the Corporation, including (a) revenues derived from its operations, (b) gifts, grants, bequests, donations and contributions and the income therefrom, exclusive of any gifts, grants, bequests, donations and contributions to the extent specifically restricted by the donor to a particular purpose inconsistent with their use for the payment of Series 2023 Bond Notes, (c) proceeds derived from (i) insurance, (ii) accounts (as defined in the UCC), (iii) securities, investment property and other investments, (iv) inventory and other tangible and intangible Property, (v) medical or health care insurance, indemnity or reimbursement programs or agreements and (vi) contract rights and other rights and assets now or hereafter owned, held or possessed by the Corporation, and (d) rentals received from the leasing of real or tangible personal property.

"**Guaranty**" means any obligation of the Corporation guaranteeing in any manner, directly or indirectly, any obligation of any Person which obligation of such other Person would, if such obligation were the obligation of the Corporation, constitute Indebtedness hereunder.

"**Income Available for Debt Service**" means for any period, the excess of Total Revenues over Total Expenses of the Person or group of Persons involved; provided that this calculation shall include net Entrance Fees (i.e. Entrance Fees received during the period minus Entrance Fee refunds due during such period) and shall exclude any capital expenditures.

"**Indebtedness**" shall have the meaning set forth in the Continuing Covenants Agreement so long as the Series 2023A Bonds are Outstanding. At such time as the Series 2023A Bonds are fully satisfied and are no longer Outstanding, "**Indebtedness**" shall mean (i) all indebtedness of the Corporation for borrowed money, (ii) all liabilities recorded or required to be recorded as such on the audited financial statements in accordance with generally accepted accounting principles, (iii) all installment sales, conditional sales and capital lease obligations, incurred or assumed by the Corporation, and (iv) all Guaranties, whether constituting Long-Term Indebtedness or Short-Term Indebtedness. Indebtedness shall not include obligations to refund Entrance Fees.

"**Insurance Consultant**" means a Person which is not, and no member, stockholder, director, officer or employee of which is, an officer or employee of the Corporation, which is qualified to survey risks and to recommend insurance coverage for continuing care facilities and services and organizations engaged in such operations and which is acceptable to the Bondholder Representative.

"**Interest Payment Date**" means June 1 and December 1 of each year, commencing on June 1, 2024.

11

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended, and, when appropriate, any statutory predecessor or successor thereto, and all applicable regulations (whether proposed, temporary or final) thereunder and any applicable official rulings, announcements, notices, procedures and judicial determinations relating to the foregoing.

"**Lien**" as applied to any Property or the income or profits therefrom, whether the same is consensual or non-consensual or arises by contract, operation of law, legal process or otherwise, means:  (a) any mortgage, lien, pledge, attachment, charge, lease, conditional sale or other title retention agreement, financing statement or encumbrance of any kind in respect of such Property (including without limitation any easement, covenant, restriction, reservation, encroachment, lease or other encumbrance of title) or upon the income or profits therefrom; or (b) any arrangement, expressed or implied, under which such Property is transferred, sequestered or otherwise identified for the purpose of making such Property available for the payment of debt or performance of any other obligation in priority to the payment of the general, unsecured creditors of the Corporation.

"**Liquidity Testing Date**" has the meaning given such term in Section 5.12 of the Loan Agreement.

"**Loan Agreement**" means the Loan Agreement dated as of December 1, 2023, between the Authority and the Corporation, as from time to time amended by Supplemental Loan Agreements.

"**Loan Payments**" means the payments referred to in Section 4.1 of the Loan Agreement.

"**Long-Term Debt Service Coverage Ratio**" shall have the meaning set forth in the Continuing Covenants Agreement so long as the Series 2023A Bonds are Outstanding.  At such time as the Series 2023A Bonds are fully satisfied and are no longer Outstanding, "**Long-Term Debt Service Coverage Ratio**" shall mean, (i) for each Fiscal Year or such other period for which such calculation is made, the ratio determined by dividing the Income Available for Debt Service for such Fiscal Year or such other period for which such calculation is made (e.g., rolling four (4) quarter period for quarterly testing) by Maximum Annual Debt Service.

"**Long-Term Debt Service Requirement**" means, for each Fiscal Year or such other period for which such calculation is made, the aggregate of the payments to be made in respect of the principal of and interest on Outstanding Long-Term Indebtedness of the Corporation during such Fiscal Year, *provided* that interest shall be excluded from the determination of Long-Term Debt Service Requirement to the extent the same is provided from the proceeds of the Long-Term Indebtedness; *provided, further* that notwithstanding the foregoing, the aggregate of payments to be made with respect to principal of and interest on Outstanding Long-Term Indebtedness shall not include principal and interest payable from funds available (without reinvestment) in a Qualified Escrow (other than principal and interest so payable solely by reason of the Corporation's failure to make payments from other sources); and *provided, further* that the method for calculating the principal of and interest on any Outstanding Long-Term Indebtedness may be applied to a portion of the principal of such Indebtedness and in combination with any treatment afforded by any other provision of this definition; and provided further, for purposes of calculating Long-Term Debt Service Requirement, principal shall be based on stated principal amortization schedules included in the instruments for such Long-Term Indebtedness, without regard to tender or put rights.  In

calculating the Long-Term Debt Service Requirement and the Long-Term Debt Service Coverage Ratio for any purpose under the Loan Agreement, there shall be excluded from the calculation of Long-Term Debt Service Requirement the portion of debt service for the Indebtedness incurred for the Series 2023C Bonds.

**"Long-Term Indebtedness"** means all obligations for borrowed money incurred or assumed by the Corporation, including (a) Guaranties, (b) Short-Term Indebtedness if there exists a commitment by an institutional lender whose long-term, unsecured debt obligations are rated not less than "A" (without regard to any rating refinement or gradation by numerical modifier or otherwise) by at least two Rating Agencies to provide financing to retire such Short-Term Indebtedness and such commitment provides (i) terms and conditions that can be reasonably met by the Corporation to incur such Indebtedness, as certified in an Officer's Certificate filed with the Bond Trustee, and (ii) for the repayment of principal on terms which would, if such commitment were implemented, constitute Long-Term Indebtedness, and (c) the current portion of Long-Term Indebtedness (this shall not be read to exclude any portion of Long-Term Indebtedness not constituting the current portion), for any of the following:

(i)    money borrowed for an original term, or renewable at the option of the borrower for a period from the date originally incurred, longer than one year;

(ii)    leases which are required to be capitalized in accordance with generally accepted accounting principles having an original term, or renewable at the option of the lessee for a period from the date originally incurred, longer than one year; and

(iii)    installment sale or conditional sale contracts having an original term in excess of one year;

*provided* that any Guaranty by the Corporation of any obligation of any Person which obligation would, if it were a direct obligation of the Corporation, constitute Short-Term Indebtedness (other than Short-Term Indebtedness described in subparagraph (b) of this definition) shall be excluded; and

*provided further* that Long-Term Indebtedness shall not include obligations that do not constitute Indebtedness (as defined herein) and shall not include obligations to refund Entrance Fees.

**"Majority of Holders"** means the Owners of a majority in the principal amount of the Outstanding Series 2023B Bonds and Series 2023C Bonds.

**"Management Company"** means any management company engaged by the Corporation to manage the Facilities and business owned and/or operated by the Corporation and acceptable to the Bondholder Representative and the Owners of the majority in aggregate principal amount of the Series 2023B Bonds then Outstanding.

"**Management Consultant**" means an independent management consulting firm of favorable repute for skill and experience in performing the duties imposed upon it by the Loan Agreement and which is acceptable to the Bondholder Representative and the Owners of the majority in aggregate principal amount of the Series 2023B Bonds then Outstanding.

"**Marketing Consultant**" means Solutions Advisors, or an independent marketing consulting firm of favorable repute for skill and experience in performing the duties imposed upon it by the Loan Agreement and which is acceptable to the Bondholder Representative and the Owners of the majority in aggregate principal amount of the Series 2023B Bonds then Outstanding.

"**Maximum Annual Debt Service**" means the highest Long-Term Debt Service Requirement for the current or any succeeding Fiscal Year (or such other current or succeeding period for which such calculation is made); *provided, however*, in calculating the Long-Term Debt Service Requirement the principal component of Long-Term Indebtedness shall be excluded to the extent such principal payment is the last maturing installment of principal of such Long-Term Indebtedness and is reasonably expected to be paid from the proceeds of moneys available in a debt service reserve fund and such debt service reserve fund is fully-funded; *provided, further, however*, any calculation of Maximum Annual Debt Service required to be made on a monthly, quarterly or semi-annual basis shall be calculated by using the trailing 12 month period.

"**Moody's**" means Moody's Investors Service, Inc., and its successors and assigns, and, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Moody's" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Corporation Representative with written notice to Bond Trustee.

"**Mortgage**" means the Mortgage and Security Agreement dated as of December _____ , 2023,  from the Corporation to the Authority and the Bond Trustee, covering the fee title in the Mortgaged Property and as amended or supplemented from time to time.

"**Mortgaged Property**" means the Property of the Corporation subject to the Mortgage.

"**Non-Recourse Indebtedness**" means any Indebtedness to finance the purchase, acquisition or construction of Property, Plant and Equipment, the payment of which is limited to and secured by a Lien on such Property, Plant and Equipment with no recourse, directly or indirectly, to any other Property of the Corporation.

"**Occupancy Target**" shall have the meaning set forth in the Continuing Covenants Agreement so long as the Series 2023A Bonds are Outstanding.  At such time as the Series 2023A Bonds are fully satisfied and are no longer Outstanding, "**Occupancy Target**" means (i) with respect to Independent Living Units, the target percentage for Occupied Independent Living Units listed in Section 5.11(a) of the Loan Agreement, (ii) with respect to Assisted Living/Memory Care Beds, the target percentage for Average Assisted Living/Memory Care Beds listed in Section 5.11(b) of the Loan Agreement, and (iii) with respect to Skilled Nursing Care Beds, the target percentage for Average Occupied Skilled Nursing Care Beds listed in Section 5.11(c) of the Loan Agreement.

"**Occupied**" means (i) with respect to Assisted Living/Memory Care Beds, a bed for which, (a) a Residency Agreement or admission agreement has been entered into, (b) the Corporation has received the necessary occupancy permits and licenses and (c) monthly service fees are accruing and have not been waived, and the Corporation expects payment thereof and will pursue appropriate collection steps to collect the same, if necessary; (ii) with respect to any Independent Living Unit, a unit for which, (x) a Residency Agreement has been entered into, (y) the total Entrance Fees for such Independent Living Unit have been paid, if applicable, without any discount or concession granted below the market rate; and (z) monthly service fees and/or rental fees, if applicable, are accruing and have not been waived, and the Corporation expects payment thereof and will pursue appropriate collection steps to collect the same, if necessary; and (iii) with respect to Skilled Nursing Facility Beds, a bed for which the Corporation has received the necessary occupancy permits and licenses and service fees are accruing and have not been waived, and the Corporation expects payment thereof and will pursue appropriate collection steps to collect the same, if necessary.

"**Officer's Certificate**" means a certificate signed by the chairman of the Governing Body, or the president or executive director, or the chief financial officer, or the chairman of the finance committee of the Governing Body of the Corporation or (ii) the Corporation Representative.

"**Operating Fund**" means the fund by that name created by Section 401 hereof and Section 5.14 of the Loan Agreement and held in a bank account established and controlled by the Corporation, which account shall be subject to a Deposit Account Control Agreement.

"**Opinion of Bond Counsel**" means an opinion in writing addressed to the Authority and the Bond Trustee and signed by legal counsel acceptable to the Authority, the Bondholder Representative and the Bond Trustee who shall be nationally recognized in matters pertaining to the validity of obligations of governmental issuers and the exemption from federal income taxation of interest on such obligations.

"**Opinion of Counsel**" means an opinion in writing signed by legal counsel acceptable to the Corporation, the Bondholder Representative and the Bond Trustee and, to the extent the Authority is asked to take action in reliance thereon, the Authority, who may be an employee of or counsel to the Corporation.

"**Order**" means the order of the Bankruptcy Court approving the Bankruptcy Plan.

"**Outstanding**" means, when used with reference to Bonds, as of a particular date, all Bonds theretofore authenticated and delivered, except:

(1)     Bonds theretofore canceled by the Bond Trustee or delivered to the Bond Trustee for cancellation pursuant to Section 207;

(2)     Bonds which are deemed to have been paid in accordance with Article XI; and

(3)     Bonds in exchange for or in lieu of which other Bonds have been authenticated and delivered pursuant to Article II.

15

**"Owner"** shall have the same meaning as the term "Bondowner."

**"Participants"** means those financial institutions for whom the Securities Depository effects book-entry transfers and pledges of securities deposited with the Securities Depository, as such listing exists at the time of such reference.

**"Paying Agent"** means the Bond Trustee and any other commercial bank or trust institution organized under the laws of any state of the United States of America or any national banking association designated by this Bond Indenture or any Supplemental Bond Indenture as paying agent for the Bonds at which the principal of and redemption premium, if any, and interest on such Bonds shall be payable.

**"Permitted Investments"** means, if and to the extent the same are at the time legal for investment of funds held under this Bond Indenture,

(a)      Government Obligations;

(b)      bonds, notes or other obligations of any state of the United States or any political subdivision of any state, which at the time of their purchase are rated in one of the two highest rating categories by a nationally recognized rating service;

(c)      certificates of deposit or time or demand deposits constituting direct obligations of any bank, bank holding company, savings and loan association, trust company or other financial institution organized under the laws of the United States or any state thereof (including the Bond Trustee or any of its affiliates), except that investments may be made only in certificates of deposit or time or demand deposits that are:

(1)      insured by the Bank Insurance Fund or the Savings Association Insurance Fund of the Federal Deposit Insurance Corporation, or any other similar United States Government deposit insurance program then in existence; or

(2)      continuously and fully secured by Government Obligations, which have a market value, exclusive of accrued interest, at all times at least equal to the principal amount of such certificates of deposit or time or demand deposits;

(d)      repurchase agreements with any bank, bank holding company, savings and loan association, trust company or other financial institution organized under the laws of the United States or any state thereof (including the Bond Trustee or any of its affiliates), that are continuously and fully secured by Government Obligations and that have a market value, exclusive of accrued interest, at all times at least equal to the principal amount of such repurchase agreements, provided that each such repurchase agreement conforms to current industry standards as to form and time, is in commercially reasonable form, is for a commercially reasonable period, results in transfer of legal title to identified Government Obligations that are segregated in a custodial or trust account for the benefit of the Bond Trustee, and further provided that Government Obligations acquired pursuant to such repurchase agreements shall be valued at the lower of the then current market value thereof or the repurchase price thereof set forth in the applicable repurchase agreement;

16

(e)     investment agreements constituting an obligation of a bank, bank holding company, savings and loan association, trust company, insurance company or other financial institution whose outstanding unsecured long-term debt is rated, at the time of execution of such agreement, in one of the two highest rating categories by a nationally recognized rating service;

(f)     short term discount obligations of the Federal National Mortgage Association and the Government National Mortgage Association; and

(g)     money market mutual funds (1) that invest in Government Obligations or that are registered with the federal Securities and Exchange Commission (SEC), meeting the requirements of Rule 2a-7 under the Investment Company Act of 1940, and (2) that at the time of investment are rated in one of the two highest categories by a nationally recognized rating service, including those for which the Bond Trustee or an affiliate performs services for a fee, whether as a custodian, transfer agent, investment advisor or otherwise.

The Bond Trustee shall be entitled to assume that any investment which at the time of purchase is a Permitted Investment remains a Permitted Investment thereafter, absent receipt of written notice or information to the contrary.  For the purposes of this definition, obligations issued or held in the name of the Bond Trustee in book-entry form on the books of the Department of Treasury of the United States shall be deemed to be deposited with the Bond Trustee.

**"Permitted Liens"** means those Liens described in Section 5.18(b) of the Loan Agreement.

**"Person"** means an individual, association, unincorporated organization, corporation, limited liability company, partnership, joint venture, business trust or a government or an agency or a political subdivision thereof, or any other entity.

**"Pledged Assets"** means all accounts, Gross Receipts, Equipment, Software, general intangibles, inventory, documents, instruments, chattel paper, deposit accounts, commercial tort claims, letter of credit rights and investment property of the Corporation, now owned or hereafter acquired, and all proceeds thereof, excluding, however, pledges, gifts, grants, bequests, donations and contributions to the Corporation that are specifically restricted by the donor, testator or grantor to a particular purpose that is inconsistent with their use for payments required under the Loan Agreement, the Continuing Covenants Agreement, the Continuing Covenants Agreement Note, the Mortgage or the Series 2023 Bond Notes, and, if also so restricted, the income and gains derived therefrom.  All terms used in this definition are used with the meanings given such terms, if any, in the UCC.

**"Prime Rate"** means the interest rate per annum publicly announced from time to time by the Bond Trustee as its "prime rate," such interest rate to change automatically as of the opening of business on the effective date of any change in the Prime Rate.

**"Principal Payment Date"** means each date on which a principal installment is due and payable on the Bonds, whether at maturity, or upon redemption or acceleration or otherwise.

**"Project"** means the funding of certain capital improvements to the Facility as more particularly described on Exhibit D attached hereto.

**"Project Fund"** means the fund by that name created by Section 401.

**"Property"** means any and all rights, titles and interests in and to any and all property whether real or personal, tangible or intangible and wherever situated, including, without limitation, all cash, cash equivalents and investments.

**"Property, Plant and Equipment"** means all Property of the Corporation which is property, plant and equipment under generally accepted accounting principles.

**"Purchase Contract"** means the Bond Purchase Agreement respecting the Series 2023A Bonds among the Authority, the Corporation and the Underwriter.

**"Qualified Escrow"** means a segregated escrow fund or other similar fund or account which (a) is irrevocably established as security for Long-Term Indebtedness previously incurred and then Outstanding (herein referred to as "Prior Indebtedness") or for Long-Term Indebtedness, if any, then to be incurred to refund Outstanding Prior Indebtedness (herein referred to as "Refunding Indebtedness"), (b) is held by the holder of the Prior Indebtedness or Refunding Indebtedness secured thereby or by a trustee or agent acting on behalf of such holder and is subject to a perfected security interest in favor of such holder, trustee or agent, (c) is held in cash or invested in obligations permitted to be used to defease such Prior Indebtedness or Refunding Indebtedness, and (d) is required by the documents establishing such fund or account to be applied toward the Corporation's payment obligations in respect of the Prior Indebtedness, provided that, if the fund or account is funded in whole or in part with the proceeds of Refunding Indebtedness, the documents establishing the same may require specified payments of principal or interest (or both) in respect of the Refunding Indebtedness to be made from the fund or account prior to the date on which the Prior Indebtedness is repaid in full.  For avoidance of doubt, the Debt Service Fund and the Debt Service Reserve Fund are not considered Qualified Escrows.

**"Qualified Financial Institution"** means a bank, trust company, national banking association, insurance company or other financial services company or entity, whose unsecured long term debt obligations (in the case of a bank, trust company, national banking association or other financial services company or entity) or whose claims paying abilities (in the case of an insurance company) are rated in either of the two highest categories by Moody's or S&P.

**"Rating Agency"** or **"Rating Agencies"** means Fitch, Moody's and/or S&P.

**"Rebate Fund"** means the fund by that name created by Section 401.

**"Record Date"** means the fifteenth day (whether or not a Business Day) of the calendar month next preceding the date on which an interest payment on any Bond is to be made.

**"Replacement Bonds"** means Bonds issued to the beneficial owners of the Bonds in accordance with Section 208.

"**Residency Agreement**" means an agreement entered into by the Corporation with respect to the granting of rights to the exclusive use of any unit (or any bedroom in a shared or semi-private unit) in the Facilities of the Corporation, as the same may be amended from time to time.

"**Resolution**" means the resolution of the Authority authorizing the execution and delivery of this Bond Indenture, the Loan Agreement and the Tax Agreement and the issuance of the Bonds.

"**Securities Depository**" means, initially, The Depository Trust Company, New York, New York, and its successors and assigns.

"**Series 2023 Bond Notes**" means collectively the Series 2023A Bond Note, the Series 2023B Bond Note, and the Series 2023C Bond Note.

"**Series 2023A Bond Note**" means the Central Oklahoma United Methodist Retirement Facility, Inc., Bond Note, Series 2023A, in the principal amount of $6,000,000, issued pursuant to the Loan Agreement.

"**Series 2023A Bonds**" means the Senior Living Facilities Revenue Bonds (Epworth Villa Project), Series 2023A, issued by the Authority aggregating the principal amount of $6,000,000, authenticated and delivered under this Bond Indenture.

"**Series 2023B Bond Note**" means the Central Oklahoma United Methodist Retirement Facility, Inc., Bond Note, Series 2023B, in the principal amount of $66,700,000.00, issued pursuant to the Loan Agreement.

"**Series 2023B Bonds**" means the Senior Living Facilities Revenue Bonds (Epworth Villa Project), Series 2023B, issued by the Authority aggregating the principal amount of $66,700,000.00, authenticated and delivered under this Bond Indenture.

"**Series 2023C Bond Note**" means the Central Oklahoma United Methodist Retirement Facility, Inc., Bond Note, Series 2023C, in the principal amount of $13,724,671, issued pursuant to the Loan Agreement.

"**Series 2023C Bonds**" means the Senior Living Facilities Capital Appreciation Revenue Bonds (Epworth Villa Project), Series 2023C, issued by the Authority aggregating the principal amount of $13,724,671, authenticated and delivered under this Bond Indenture.

"**Short-Term Indebtedness**" means all obligations, other than Non-Recourse Indebtedness, Subordinated Indebtedness and the current portion of Long-Term Indebtedness, incurred or assumed by the Corporation, for any of the following:

(i)    payments of principal and interest with respect to money borrowed for an original term, or renewable at the option of the borrower for a period from the date originally incurred, of one year or less;

(ii)     payments under leases which are capitalized in accordance with generally accepted accounting principles having an original term, or renewable at the option of the lessee for a period from the date originally incurred, of one year or less; and

(iii)     payments under installment purchase or conditional sale contracts having an original term of one year or less.

"**Skilled Nursing Care Beds**" means the skilled nursing care beds in the Facilities that are staffed, from time to time, which are currently sixty-five (65) staffed beds.

"**Software**" means those items constituting software as defined in the UCC used in connection with the Mortgaged Property, whether such software is now owned or hereafter acquired by the Corporation.

"**Special Record Date**" means the date fixed by the Bond Trustee pursuant to Section 202 for the payment of Defaulted Interest.

"**S&P**" means S&P Global Ratings, a corporation organized and existing under the laws of the State of New York, its successors and assigns, and, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "S&P" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Corporation Representative with written notice to Bond Trustee.

"**State**" means the State of Oklahoma.

"**Subordinated Indebtedness**" means Indebtedness of the Corporation that by the terms thereof is specifically junior and subordinate to the Series 2023 Bond Notes with respect to payment of principal and interest thereon.

"**Supplemental Bond Indenture**" means any indenture supplemental or amendatory to this Bond Indenture entered into by the Authority and the Bond Trustee pursuant to Article IX.

"**Supplemental Loan Agreement**" means any agreement supplemental or amendatory to the Loan Agreement entered into by the Authority and the Corporation pursuant to Section 9.1 of the Loan Agreement and Article X.

"**Tax Agreement**" means the Tax Compliance Agreement dated as of December 1, 2023, among the Authority, the Corporation and the Bond Trustee respecting the Bonds, as from time to time amended in accordance with the provisions thereof.

"**Taxable Rate**" means, as of any particular date of calculation, 1.40 times the interest rate that would have been borne by the Bonds if a Determination of Taxability with respect to such Bond had not occurred.

"**Tax-Exempt Bonds**" means the Series 2023A Bonds, the Series 2023B Bonds and the Series 2023C Bonds.

"**Tax-Exempt Organization**" means a (i) nonprofit organization, organized under the laws of the United States of America or any state thereof, that is an organization described in Section 501(c)(3) of the Internal Revenue Code and is exempt from federal income taxes under Section 501(a) of the Internal Revenue Code, or corresponding provisions of federal income tax laws from time to time in effect or (ii) limited liability company, the sole member of which is a nonprofit organization described in subsection (i) of this definition.

"**Total Expenses**" means, for any period for which calculated, the total of all operating and non-operating expenses or losses of the Corporation during such period, as stated in the financial statements for such period, other than (a) depreciation, amortization (including but not limited to any amortization of Entrance Fees, deferred marketing expenses or original issue discount) and interest expense, (b) gains or losses resulting from the early extinguishment of debt, the sale or other disposition of assets not in the ordinary course of business or any reappraisal, revaluation or write-down of assets, and any other extraordinary losses or expenses, (c) unrealized gains or losses (including those relating to hedging activities), (d) gains or losses associated with any refinancing, (e) any development, marketing, operating or other subordinated fees that have been deferred from the year in which they were originally due, and (f) bad debt expenses.

"**Total Revenues**" means, for any period for which calculated, the total revenues, gains and other support of the Corporation during such period, determined in accordance with generally accepted accounting principles, including (a) gross resident service revenues less contractual allowances, free care and discounted care, plus (b) other operating revenues, excluding amortization of deferred Entrance Fees, and less applicable allowances, plus (c) Entrance Fees received (net of refunds), plus (d) other non-operating revenues or gains, and excluding (1) income derived from Escrowed Obligations that are irrevocably deposited in escrow to pay the principal of or interest on Indebtedness or Related Bonds, (2) unrealized gains on investments, investment contracts or Interest Rate Agreements or changes in value of split interest gifts or adjustments of actuarial liabilities for annuity obligations, gains resulting from the early extinguishment of debt, the sale, exchange or other disposition of Property not in the ordinary course of business, or the reappraisal, reevaluation or write-up of assets, or any other extraordinary gains, (3) gifts, grants, bequests or donations restricted as to use by the donor or grantor for a purpose inconsistent with the payment of debt service on Indebtedness or operating expenses, (4) insurance (other than business interruption) and condemnation proceeds, (5) proceeds of borrowing, (6) payments or deposits under a Residency Agreement that by its terms or applicable law are required to be held in escrow or trust for the benefit of a resident until the conditions for the release of that payment or deposit have been satisfied, (7) all deposits and advance payments made in connection with Residency Agreements or leases respecting independent living units or other areas to be occupied by or leased to residents or tenants and received before receipt of any required occupancy certificates of those units or other areas, and (8) payments or deposits under a Residency Agreement that by its terms or applicable law are required to be held in escrow or trust for the benefit of a resident until the conditions for the release of that payment or deposit have been satisfied. For purposes of any calculation made with reference to both Total Revenues and Total Expenses, any deduction or reduction from revenues otherwise required by the preceding provisions of this definition may not be made if and to the extent that the amount of such deduction is included in Total Expenses.

"**Transfer**" means any act or occurrence the result of which is to convey title, possession or any right from any Person of any asset or interest therein, to another Person, including specifically the forgiveness of any debt.

"**Trust Estate**" means the Trust Estate described in the Granting Clauses of this Bond Indenture.

"**UCC**" means the Uniform Commercial Code as adopted in the State of Oklahoma, or any successor statutes.

"**Underwriter**" means Raymond James & Associates, Inc.

"**Unrestricted Cash and Investments**" means, as of the date of determination, the cash, cash equivalents, and marketable securities, and board designated or trustee held funds of the Corporation to the extent available for the payment of operating expenses and debt service on Indebtedness. The term "Unrestricted Cash and Investments" shall exclude the following items: (a) cash and investments held by a trustee or creditor in any debt service fund, debt service reserve fund, collateral account or similar account pledged to the payment of Indebtedness; (b) all cash and investments held by the Bond Trustee under this Bond Indenture, other than in the Operating Reserve Fund and in the Revenue Fund (but only to the extent the amounts in the Revenue Fund on the next Business Day will be deposited in the Operating Fund, the Ancillary Operating Fund or the Operating Reserve Fund); (c) any cash and investments required to be reserved by the Corporation under applicable state or federal regulations against the Corporation's obligation under Residency Agreements to provide nursing or other health care to residents; (d) cash and investments the use of which is restricted by a donor or grantor to a particular use or purpose inconsistent with their use for the payment of Indebtedness; (e) any funds held by a self-insurance plan trustee, or any funds held by a trustee or other custodian for any pension plan or other employee benefit plan; (f) any loans or investments for which there is no established readily available market price; and (f) any other cash or investments not legally available for the payment of Indebtedness (or the purchase thereof) when due.

"**Written Request**" means, with reference to the Authority, a request in writing signed by an Authority Representative and, with reference to the Corporation, a request in writing signed by the Corporation Representative, or any other officers designated by the Authority or the Corporation, as the case may be, to sign such Written Request.

**Section 102.  Rules of Construction.**  For all purposes of this Bond Indenture, except as otherwise expressly provided or unless the context otherwise requires, the following rules of construction apply in construing the provisions of this Bond Indenture:

(a)     The terms defined in this Article include the plural as well as the singular.

(b)     All accounting terms not otherwise defined herein shall have the meanings assigned to them, and all computations herein provided for shall be made, in accordance with generally accepted accounting principles to the extent applicable.

(c)     All references herein to "generally accepted accounting principles" refer to such principles in effect on the date of the determination, certification, computation or other action to be taken hereunder using or involving such terms, provided, as applied to any entity that operates a hospital, extended care facility or other discrete enterprise of a type with respect to which particular accounting principles from time to time shall have been generally adapted or modified, the term "generally accepted accounting principles" shall include the adaptations or modifications.

(d)     All references in this instrument to designated "Articles," "Sections" and other subdivisions are to be the designated Articles, Sections and other subdivisions of this instrument as originally executed.

(e)     The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Bond Indenture as a whole and not to any particular Article, Section or other subdivision.

(f)     The Article and section headings herein and in the Table of Contents are for convenience only and shall not affect the construction hereof.

(g)     Whenever an item or items are listed after the word "including," such listing is not intended to be a listing that excludes items not listed.

## ARTICLE II
## THE BONDS

**Section 201.    Authorization and Terms of Bonds.**  The Bonds shall be issued in accordance with this Article and shall have the terms set forth herein.  The total principal amount of Bonds to be issued or exchanged as provided in this Section 201 is expressly limited to $86,424,671 (exclusive of any accreted interest on the Series 2023C Bonds added to the principal thereof pursuant to Section 201(c)(ii) hereof) to be comprised of the following series of Bonds, which are authorized to be issued as follows:

(a)     **Series 2023A Bonds.**

(i)     **Designation and Date.**  The Series 2023A Bonds shall be designated "Oklahoma County Finance Authority Senior Living Facilities Revenue Bonds (Epworth Villa), Series 2023A." The Series 2023A Bonds shall be dated the date of their initial issuance and delivery.

(ii)     **Maturity, Principal Amount and Interest Rate**.  The Series 2023A Bonds shall be issued in the aggregate principal amount of $6,000,000 and shall bear interest from their date or from the most recent Interest Payment Date to which interest has been paid, payable on June 1, 2024, and thereafter semiannually on each Interest Payment Date of each year.  Upon maturity, the Series 2023A Bonds shall be payable at 100% of the stated principal amount thereof, plus an amount equal to 1.00% of the outstanding principal amount of the Series 2023A Bonds.

The Series 2023A Bonds shall bear interest (computed on the basis of a 360-day year of twelve 30-day months) at the rate of _____ % per annum and shall have principal payable and mature on December 1, 2030.

(iii)     If a Determination of Taxability with respect to any Series 2023A Bond occurs then such Series 2023A Bond shall bear interest at the Taxable Rate until the Series 2023A Bonds are redeemed in accordance with Section 301(c) of this Bond Indenture.

(iv)     Notwithstanding anything to the contrary in this Bond Indenture, upon an Event of Default, the Series 2023A Bonds shall bear interest at a rate equal to the Default Rate.

(b)     **Series 2023B Bonds.**

(i)     **Designation and Date.**  The Series 2023B Bonds shall be designated "Oklahoma County Finance Authority Senior Living Facilities Revenue Bonds (Epworth Villa), Series 2023B." The Series 2023B Bonds shall be dated the date of their initial issuance and delivery.

(ii)     **Maturity, Principal Amount and Interest Rate**.  The Series 2023B Bonds shall be issued in the aggregate principal amount of $66,700,000 and shall bear interest from their date or from the most recent Interest Payment Date to which interest has been paid, payable on June 1, 2024, and thereafter semiannually on each Interest Payment Date of each year.  The Series 2023B Bonds shall bear interest (computed on the basis of a 360-day year of twelve 30-day months) at the rate of 5.875 % per annum and shall have principal payable and mature on December 1, 2047 subject to

24

prior redemption as provided in Article III hereof.  If a Determination of Taxability with respect to any Series 2023B Bond occurs then such Series 2023B Bond shall bear interest at the Taxable Rate until the Series 2023B Bonds are redeemed in accordance with Section 301 (c) of this Bond Indenture.

(iii) **Subordination**.  The payment of the principal and redemption price of and interest on the Series 2023B Bonds shall be subordinate in all respects to the payment of the principal and redemption price of and interest on the Series 2023A Bonds.

(c)     **Series 2023C Bonds.**

(i)     *Designation and Date*.  The Series 2023C Bonds shall be designated "Oklahoma County Finance Authority Living Facilities Capital Appreciation Revenue Bonds (Epworth Villa Project), Series 2023C."  The Series 2023C Bonds shall be dated the date of their initial issuance and delivery.

(ii)     **Maturity, Principal Amount and Interest Rate.**  The Series 2023C Bonds shall be issued in the aggregate principal amount of $13,724,671 and shall bear interest from their date or from the most recent Interest Payment Date to which interest has been paid, payable on June 1, 2024, and thereafter semiannually on each Interest Payment Date of each year, but solely from Excess Cash as set forth in Section 407(b)(ix) hereof.  The Series 2023C Bonds shall bear interest (computed on the basis of a 360-day year of twelve 30-day months) at the rate of 2.00% per annum.  The Series 2023C Bonds shall mature on December 1, 2047 and all principal of the Series 2023C Bonds shall be payable on such maturity date (subject to prior redemption as provided in Article III hereof, including any mandatory redemption from Excess Cash available for payment of principal pursuant to Section 301(d) and Section 407(b)(ix)(A)).  To the extent available Excess Cash pursuant to Section 407(b)(ix) hereof is insufficient to pay interest on the Series 2023C Bonds on any scheduled Interest Payment Date, the amount of such unpaid interest shall accrete and be added to the principal amount of the Series 2023C Bonds on the applicable Interest Payment Date and thereafter shall bear interest at the interest rate due on the Series 2023C Bonds.  Notwithstanding any provision of this Bond Indenture to the contrary, any reference to the principal of the Series 2023C Bonds shall include any unpaid interest on such Series 2023C Bond which has accreted and been added to the principal amount thereof.  The Bond Trustee shall reflect any increase in the principal amount of the Series 2023C Bonds held in the DTC System by making an entry on Schedule A of the global Series 2023C Bond certificate, provided that the principal amount thereof shall increase in accordance with the provisions hereof irrespective of whether the Bond Trustee has reflected such increase on such Schedule A. If a Determination of Taxability with respect to any Series 2023C Bond occurs then such Series 2023C Bond shall bear interest at the Taxable Rate until the Series 2023C Bonds are redeemed in accordance with Section 301 (c) of this Bond Indenture.

(iii) **Subordination**.  The payment of the principal and redemption price of and interest on the Series 2023C Bonds shall be subordinate in all respects to the payment of the principal and redemption price of and interest on the Series 2023A Bonds and the Series 2023B Bonds.

(d)     *Delivery*.  The Bonds shall be executed in the manner set forth herein and delivered to the Bond Trustee for authentication, but prior to or simultaneously with the authentication and

delivery of the Bonds by the Bond Trustee the following documents shall be filed with the Bond Trustee:

(i)       A copy, certified by the Chairman and Secretary or Assistant Secretary or other authorized officer of the Authority, of the resolution adopted by the Authority authorizing the issuance of the Bonds and the execution of this Bond Indenture, the Loan Agreement, the Tax Agreement and the other Bond Documents to which it is a party.

(ii)      A copy, certified by the Secretary, Assistant Secretary or other authorized officer of the Corporation, of the resolutions adopted by the Corporation authorizing the execution and delivery of the Loan Agreement, the Series 2023 Bond Notes, the Tax Agreement, the Mortgage and the other Bond Documents to which it is a party, and approving this Bond Indenture, the issuance and sale of the Bonds and the transactions contemplated herein.

(iii)     Copies of executed counterparts of this Bond Indenture, the Loan Agreement, the Tax Agreement, the Continuing Disclosure Agreement, the Bonds, the Mortgage, the Continuing Covenants Agreement, the Continuing Covenants Agreement Note, the Deposit Account Control Agreement, the Series 2023 Bond Notes, and the Purchase Contract.

(iv)     The original executed and endorsed Series 2023 Bond Notes.

(v)      A request and authorization to the Bond Trustee on behalf of the Authority, executed by an Authority Representative, to authenticate the Bonds and deliver said Bonds to or upon the order of the Underwriter or the Owners, as applicable, upon payment or delivery of the Outstanding Existing Bonds to the Bond Trustee, for the account of the Authority, of the purchase price thereof. The Bond Trustee shall be entitled to rely conclusively upon such request and authorization as to the names of the purchasers and the amounts of such purchase price.

(vi)     An Opinion of Bond Counsel, dated the date of original issuance of the Bonds, in substantially the form required by the Bond Trustee, including without limitation, an opinion to the effect that the interest on the Series 2023A Bonds, Series 2023B Bonds and the Series 2023C Bonds is excludable from the gross income of the Owners thereof for federal tax purposes.

(vii)    The documents, certificates and opinions required by Section 7 of the Purchase Contract.

(viii)   The Confirmation Order in the Bankruptcy Proceedings.

(ix)     Such other opinions, certificates, statements, receipts and documents required by the Bond Documents or as the Bond Counsel shall reasonably require for the delivery of the Bonds.

When the documents specified above have been filed with the Bond Trustee, and when the Bonds shall have been executed and authenticated as required by this Bond Indenture, the Bond Trustee shall (A) deliver the Series 2023A Bonds to or upon the order of the Underwriter, but only upon payment to the Bond Trustee of the purchase price of the Series 2023A Bonds, and (B) exchange for the Outstanding Existing Bonds the Series 2023B Bonds and the Series 2023C Bonds.

The net proceeds of the sale of the Series 2023A Bonds shall be paid to the Bond Trustee and deposited and applied as provided in Article IV hereof.

(e)    **Exchange for Outstanding Existing Bonds.**  Owners tendering Outstanding Existing Bonds shall receive Series 2023B Bonds and Series 2023C Bonds as follows: (1) Series 2023B Bonds in a principal amount equal to _____% of the principal amount of the Outstanding Existing Bonds held by such owner, and (2) Series 2023C Bonds, in a principal amount equal to _____% of the principal amount of the Outstanding Existing Bonds held by such owner.  All Outstanding Existing Bonds exchanged on the date of issuance of the Bonds will no longer be Outstanding under the Original Bond Indenture. Upon the Effective Date of the Bankruptcy Plan, certain claims against the Released Parties, as defined in and under the conditions contained in the Bankruptcy Plan, will be released.

**Section 202.    Method and Place of Payment**.  The Bond Trustee shall act as paying agent for the purpose of effecting payment of the principal of, redemption premium, if any, and interest on the Bonds.  The principal of, redemption premium, if any, and interest on the Bonds shall be payable in any coin or currency of the United States of America which on the respective dates of payment thereof is legal tender for the payment of public and private debts.

The principal of and the redemption premium, if any, on all Bonds shall be payable by check or draft at maturity or upon earlier redemption to the Persons in whose names such Bonds are registered on the bond register maintained by the Bond Trustee at the maturity or redemption date thereof, upon the presentation and surrender of such Bonds at the principal corporate trust office or at such other office designated by the Bond Trustee for such purpose.

The interest payable on each Bond on any Interest Payment Date shall be paid by the Bond Trustee to the Registered Owner of such Bond as shown on the Bond Register at the close of business on the Record Date, (a) by check or draft mailed to such Registered Owner at the address as it appears on the Bond Register or at such other address as is furnished to the Bond Trustee in writing by such Owner, or (b) at the written request addressed to the Bond Trustee by any Owner of Bonds in the aggregate principal amount of at least $1,000,000, by electronic transfer to such Owner upon written notice to the Bond Trustee from such Owner containing the electronic transfer instructions for the financial institution (which shall be located in the continental United States) to which such Owner wishes to have such transfer directed, provided such written notice is given by such Owner to the Bond Trustee not less than five (5) Business Days before the applicable Record Date.  Any such written notice for electronic transfer shall be signed by such Owner and shall include the name of the bank, its address, its ABA routing number and the name, number and contact name related to such Owner's account at such bank to which the payment is to be credited.

Defaulted Interest with respect to any Bond shall cease to be payable to the Owner of such Bond on the relevant Record Date and shall be payable at the Default Rate to the Owner in whose name such Bond is registered at the close of business on the Special Record Date for the payment of such Defaulted Interest, which Special Record Date shall be fixed in the following manner.  The Corporation shall notify the Bond Trustee in writing of the amount of Defaulted Interest proposed to be paid on each Bond and the date of the proposed payment (which date shall be such as will enable the Bond Trustee to comply with the next sentence hereof), and shall deposit with the Bond

Trustee at the time of such notice an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Bond Trustee for such deposit prior to the date of the proposed payment; money deposited with the Bond Trustee shall be held in trust for the benefit of the Owners of the Bonds entitled to such Defaulted Interest as provided in this Section. Following receipt of such funds the Bond Trustee shall fix a Special Record Date for the payment of such Defaulted Interest which shall be not more than 15 nor less than 10 days prior to the date of the proposed payment and not less than 10 days after the receipt by the Bond Trustee of the notice of the proposed payment. The Bond Trustee shall promptly notify the Corporation and the Bondholder Representative of such Special Record Date and, in the name and at the expense of the Corporation, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first class postage prepaid, to each Owner of a Bond entitled to such notice at the address of such Owner as it appears on the Bond Register not less than 10 days prior to such Special Record Date.

**Section 203.    Form, Denomination and Numbering**. The Bonds issued under this Bond Indenture shall be in substantially the form set forth in Exhibit A, Exhibit B and Exhibit C hereto, with such necessary or appropriate variations, omissions and insertions as are permitted or required by this Bond Indenture. The Bonds may have endorsed thereon such legends or text as may be necessary or appropriate to conform to any applicable rules and regulations of any governmental authority or any custom, usage or requirement of law with respect thereto.

The Bonds shall be issuable in the form of fully registered bonds without coupons in Authorized Denominations.

The Bonds of each series shall be numbered from R-1 consecutively upward in order of issuance or in such other manner as the Bond Trustee shall designate, and shall bear appropriate "CUSIP" identification numbers (if then generally in use).

**Section 204.    Execution and Authentication of Bonds.** The Bonds shall be executed on behalf of the Authority by the manual or facsimile signature of its Chairman or Vice Chairman and attested by the manual or facsimile signature of its Secretary or Assistant Secretary, and shall have the manual or facsimile corporate seal of the Authority affixed thereto or imprinted thereon. In case any officer whose signature or facsimile thereof appears on any Bonds shall cease to be such officer before the delivery of such Bonds, such signature or facsimile thereof shall nevertheless be valid and sufficient for all purposes, the same as if such person had remained in office until delivery. Any Bond may be signed by such persons as at the actual time of the execution of such Bond shall be the proper officers to sign such Bond although at the date of such Bond such persons may not have been such officers.

The Bonds shall have endorsed thereon a Certificate of Authentication substantially in the form set forth in Exhibit A, Exhibit B and Exhibit C which shall be manually executed by the Bond Trustee. No Bond shall be entitled to any security or benefit under this Bond Indenture or shall be valid or obligatory for any purpose unless and until such Certificate of Authentication shall have been duly executed by the Bond Trustee. Such executed Certificate of Authentication upon any Bond shall be conclusive evidence that such Bond has been duly authenticated and delivered under this Bond Indenture. The Certificate of Authentication on any Bond shall be deemed to have been

28

duly executed if signed by any authorized officer or employee of the Bond Trustee, but it shall not be necessary that the same officer or employee sign the Certificate of Authentication on all of the Bonds that may be issued hereunder at any one time.

**Section 205.    Registration, Transfer and Exchange of Bonds.**  The Bond Trustee is hereby appointed Bond Registrar and as such shall keep the Bond Register at its designated corporate trust office.

Any Bond may be transferred only upon the Bond Register upon surrender thereof to the Bond Trustee duly endorsed for transfer or accompanied by an assignment duly executed by the Registered Owner or his attorney or legal representative in such form as shall be satisfactory to the Bond Trustee.  Upon any such transfer, the Authority shall execute and the Bond Trustee shall authenticate and deliver in exchange for such Bond a new Bond or Bonds, registered in the name of the transferee, of any denomination or denominations authorized by this Bond Indenture and of the same series and maturity and bearing interest at the same rate.

Any Bonds, upon surrender thereof at the designated corporate trust office of the Bond Trustee, together with an assignment duly executed by the Registered Owner or his attorney or legal representative in such form as shall be satisfactory to the Bond Trustee, may, at the option of the Registered Owner thereof, be exchanged for an equal aggregate principal amount of Bonds of the same series and maturity, of any denomination or denominations authorized by this Bond Indenture, and bearing interest at the same rate.

In all cases in which Bonds shall be exchanged or transferred hereunder, the Authority shall execute and the Bond Trustee shall authenticate and deliver at the earliest practicable time Bonds in accordance with this Bond Indenture.  All Bonds surrendered in any such exchange or transfer shall forthwith be canceled by the Bond Trustee.

The Authority, the Bond Trustee or the Securities Depository may make a charge against the Bondowner requesting the same for every such transfer or exchange of Bonds sufficient to reimburse it for any tax or other governmental charge required to be paid with respect to such transfer or exchange, and such charge shall be paid before any such new Bond shall be delivered.  The fees and charges of the Bond Trustee for making any transfer or exchange hereunder and the expense of any bond printing necessary to effect any such transfer or exchange shall be paid by the Corporation.

The Person in whose name any Bond shall be registered on the Bond Register shall be deemed and regarded as the absolute owner of such Bond for all purposes, and payment of or on account of the principal of and redemption premium, if any, and interest on any such Bond shall be made only to or upon the order of the Registered Owner thereof or his legal representative.  All such payments shall be valid and effectual to satisfy and discharge the liability upon such Bond, including the interest thereon, to the extent of the sum or sums so paid.

At reasonable times and under reasonable regulations established by the Bond Trustee, the Bond Register may be inspected and copied by the Corporation, the Authority, the Bondholder Representative or by the Owners (or a designated representative thereof) of 10% or more in principal

amount of Bonds then Outstanding, such ownership and the authority of any such designated representative to be evidenced to the satisfaction of the Bond Trustee.

**Section 206.    Mutilated, Lost, Stolen or Destroyed Bonds.**  In the event any Bond shall become mutilated, or be lost, stolen or destroyed, the Authority shall execute and the Bond Trustee shall authenticate and deliver a new Bond of like date and tenor as the Bond mutilated, lost, stolen or destroyed; provided that, in the case of any mutilated Bond, such mutilated Bond shall first be surrendered to the Bond Trustee, and in the case of any lost, stolen or destroyed Bond, there shall be first furnished to the Authority and the Bond Trustee evidence of such loss, theft or destruction satisfactory to the Authority and the Bond Trustee, together with indemnity satisfactory to them.  In the event any such Bond shall have matured or selected for redemption, instead of issuing a substitute Bond the Authority may pay or authorize the payment of the same without surrender thereof.  Upon the issuance of any substitute Bond, the Authority and the Bond Trustee may require the payment of an amount by the Bondowner sufficient to reimburse the Authority and the Bond Trustee for any tax or other governmental charge that may be imposed in relation thereto and any other reasonable fees and expenses incurred in connection therewith.

**Section 207.    Cancellation and Destruction of Bonds Upon Payment.**  All Bonds which have been paid or redeemed or which the Bond Trustee has purchased or which have otherwise been surrendered to the Bond Trustee under this Bond Indenture, either at or before maturity, shall be canceled and destroyed by the Bond Trustee in compliance with all applicable record retention requirements upon the payment, redemption or purchase of such Bonds and the surrender thereof to the Bond Trustee.

**Section 208.    Book-Entry; Securities Depository.**

(a)    The Bonds shall initially be registered to Cede & Co., the nominee for the Securities Depository, and no beneficial owner will receive certificates representing their respective interests in the Bonds, except in the event the Bond Trustee issues Replacement Bonds as provided in Subsection (b).  It is anticipated that during the term of the Bonds, the Securities Depository will make book-entry transfers among its Participants and receive and transmit payment of principal of, premium, if any, and interest on, the Bonds to the Participants until and unless the Bond Trustee authenticates and delivers Replacement Bonds to the beneficial owners as described in Subsection (b).

(b)    (i) If the Corporation determines (A) that the Securities Depository is unable to properly discharge its responsibilities, or (B) that the Securities Depository is no longer qualified to act as a securities depository and registered clearing agency under the Securities and Exchange Act of 1934, as amended, or (C) that the continuation of a Book-Entry System to the exclusion of any Bonds being issued to any Bondowner other than Cede & Co. is no longer in the best interests of the beneficial owners of the Bonds, or (ii) if the Bond Trustee receives written notice from Participants having interests in not less than 50% of the Bonds Outstanding, as shown on the records of the Securities Depository (and certified to such effect by the Securities Depository), that the continuation of a Book-Entry System to the exclusion of any Bonds being issued to any Bondowner other than Cede & Co. is no longer in the best interests of the beneficial owners of the Bonds, then the Bond Trustee shall notify the Bondowners of such determination or such notice and of the availability of

certificates to Owners requesting the same, and the Bond Trustee shall register in the name of and authenticate and deliver Replacement Bonds to the beneficial owners or their nominees in principal amounts representing the interest of each, making such adjustments as it may find necessary or appropriate as to accrued interest and previous calls for redemption; provided, that in the case of a determination under (i)(A) or (i)(B) of this Subsection (b), the Corporation, with the consent of the Bond Trustee and the Bondholder Representative, may select a successor securities depository to effect book-entry transfers.  In such event, all references to the Securities Depository herein shall relate to the period of time when the Securities Depository has possession of at least one Bond. Upon the issuance of Replacement Bonds, all references herein to obligations imposed upon or to be performed by the Securities Depository shall be deemed to be imposed upon and performed by the Bond Trustee, to the extent applicable with respect to such Replacement Bonds.  If the Securities Depository resigns and the Corporation, the Bond Trustee, the Bondholder Representative or Bondowners are unable to locate a qualified successor of the Securities Depository, then the Bond Trustee shall authenticate and cause delivery of Replacement Bonds to Bondowners, as provided herein.  The Bond Trustee may rely on information from the Securities Depository and its Participants as to the names of the beneficial owners of the Bonds.  The cost of printing Replacement Bonds shall be paid for by the Corporation.

(c)    In the event the Securities Depository resigns or is no longer qualified to act as a securities depository and registered clearing agency under the Securities and Exchange Act of 1934, as amended, the Corporation may appoint a successor Securities Depository provided the Bond Trustee receives written evidence satisfactory to the Bond Trustee with respect to the ability of the successor Securities Depository to discharge its responsibilities.  Any such successor Securities Depository shall be a securities depository which is a registered clearing agency under the Securities and Exchange Act of 1934, as amended, or other applicable statute or regulation that operates a securities depository upon reasonable and customary terms.  The Bond Trustee upon its receipt of a Bond or Bonds for cancellation shall cause the delivery of Bonds to the successor Securities Depository in appropriate denominations and form as provided herein.

**Section 209.   No Additional Bonds.**  No additional bonds may be issued under this Bond Indenture without the consent of (i) the Bondholder Representative while the Series 2023A Bonds are Outstanding and (ii) the Owners of a majority in aggregate principal amount of the Series 2023B Bonds Outstanding.

## ARTICLE III
## REDEMPTION OF BONDS

**Section 301.    Redemption of Bonds Prior to Maturity.**  The Bonds are subject to optional, extraordinary and mandatory redemption prior to maturity as follows:

(a)    **Optional Redemption of the Bonds.**

(i)    The Series 2023A Bonds are subject to optional redemption by the Authority, upon written direction from the Corporation, on any date on or after January 1, 2028 in whole or in part at any time, at a redemption price equal to 101% of the principal amount of the Series 2023A Bonds being redeemed, plus accrued interest thereon to the redemption date.

(ii)    Subject to the prior or simultaneous redemption in full of the Outstanding Series 2023A Bonds in accordance with subsection (a)(i) above, the Series 2023B Bonds are subject to optional redemption by the Authority, upon written direction from the Corporation, on any date on or after January 1, 2030 in whole or in part at any time, at a redemption price equal to the principal amount of the Series 2023B Bonds being redeemed, plus accrued interest thereon to the redemption date, plus a premium equal to the percentage of principal amount called for redemption as set forth in the following schedule:

| | |
|---|---|
| January 1, 2030 to December 31, 2030 | 4.00% |
| January 1, 2031 to December 31, 2031 | 3.00% |
| January 1, 2032 to December 31, 2032 | 2.00% |
| January 1, 2033 to December 31, 2033 | 1.00% |
| January 1, 2034 and thereafter | 0.00% |

(iii)    Upon the redemption of all or any portion of the Outstanding Series 2023B Bonds in accordance with subsection (a)(ii) above, the Series 2023C Bonds shall simultaneously be called for optional redemption by the Authority, in such amounts as shall be set forth in written directions from the Corporation (and in accordance with Section 4.1 (c) of the Loan Agreement),  on any date, in whole or in part at a redemption price equal to 100% of the principal amount of the Series 2023C Bonds being redeemed, plus accrued interest thereon to the redemption date, without premium.

(b)    **Extraordinary Optional Redemption of Bonds.**  The Bonds are subject to redemption and payment prior to the stated maturity thereof, upon direction from the Corporation provided in writing by the Corporation Representative, in whole or in part on any date, at a redemption price equal to 100% of the principal amount thereof, plus accrued interest thereon to the redemption date, without premium, upon the occurrence of any of the following events:

(i)    all or a substantial portion of the Mortgaged Property is damaged or destroyed by fire or other casualty, or title to, or the temporary use of, all or a substantial portion of the Mortgaged Property is condemned or taken for any public or quasi-public use by any authority exercising the power of eminent domain or title thereto is found to be deficient, to such extent that in the reasonable determination of the Corporation (A) such Mortgaged Property cannot be reasonably restored or replaced to the condition thereof preceding such event, or (B) the Corporation is thereby prevented

32

from carrying on its normal operations of such Mortgaged Property, or (C) the cost of restoration or replacement thereof would exceed the Net Proceeds of any casualty insurance, title insurance or condemnation awards with respect thereto; or

(ii)    as a result of any changes in the Constitution of the State or the Constitution of the United States of America or of legislative or administrative action (whether state or federal) or by final direction, judgment or order of any court or administrative body (whether state or federal) entered after the contest thereof by the Corporation in good faith, this Bond Indenture or the Loan Agreement becomes void or unenforceable or impossible of performance in accordance with the intent and purpose of the parties as expressed herein or therein, or unreasonable burdens or excessive liabilities are imposed upon the Corporation with respect to such facilities or the operation thereof.

(c)    **Mandatory Redemption of Bonds upon Determination of Taxability.**  Upon the occurrence of a Determination of Taxability, the Bonds are subject to mandatory redemption, in whole, on a date established by the Corporation no later than 90 days after such occurrence, at a redemption price equal to 105% of the principal amount thereof plus accrued interest to the redemption date.  Upon a Determination of Taxability with respect to the Bonds, the Bonds will bear interest from the date on which the Determination of Taxability occurs to the date of redemption of the Bonds at a rate equal to the Taxable Rate.

(d)    **Mandatory Redemption of Series 2023C Bonds from Excess Cash**.  The Series 2023C Bonds are subject to mandatory redemption from Excess Cash (as defined in Section 407(b)(ix)), to the extent of such Excess Cash available for the payment of principal of the Series 2023C Bonds pursuant to Section 407(b)(ix)(A), on the first Interest Payment Date that is at least 30 days after the date on which such Excess Cash is deposited into the Series 2023C Account of the Debt Service Fund for payment of principal, at a redemption price equal to 100% of the principal amount of the Series 2023C Bonds being redeemed, plus accrued interest thereon to the redemption date, without premium.

(e)    **Mandatory Redemption of Series 2023A Bonds from funds distributed from Section 4.07(b)(vii).**  The Series 2023A Bonds are subject to mandatory redemption in inverse order of sinking fund payments from payments made into the Series 2023A Principal Account of the Debt Service Fund from funds deposited therein pursuant to Section 4.07(b)(vii) hereof, on the first Interest Payment Date that is at least 30 days after the date on which such funds are deposited into the Series 2023A Principal Account of the Debt Service Fund pursuant to Section 4.07(b)(vii) hereof, at a redemption price equal to 101% of the principal amount of the Series 2023A Bonds being redeemed, plus accrued interest thereon to the redemption date.

(f)    **Mandatory Sinking Fund Redemption of Series 2023A Bonds**.  The Series 2023A Bonds are subject to mandatory sinking fund redemption at a price of 101% of the principal amount of such Series 2023A Bonds to be redeemed plus accrued interest thereon to the redemption date, on December 1 of the following years and in the following principal amounts.

| Year | Amount ** |
|------|-----------|
| 2026 | $  239,000 |
| 2027 | $  255,000 |

| | |
|---|---|
| 2028 | $  273,000 |
| 2029 | $  293,000 |
| 2030* | $4,940,000 |

_____
*Final Maturity
**Does not include premium due at maturity, see Section 2.01(a)(ii).

    (g)    **Mandatory Sinking Fund Redemption of Series 2023B Bonds**.  The Series 2023B Bonds are subject to mandatory sinking fund redemption at a price of 100% of the principal amount of such Series 2023B Bonds to be redeemed plus accrued interest thereon to the redemption date, on December 1 of the following years and in the following principal amounts.

| Year | Amount |
|---|---|
| 2031 | $  2,184,000 |
| 2032 | $  2,312,000 |
| 2033 | $  2,448,000 |
| 2034 | $  2,592,000 |
| 2035 | $  2,744,000 |
| 2036 | $  2,905,000 |
| 2037 | $  3,076,000 |
| 2038 | $  3,257,000 |
| 2039 | $  3,448,000 |
| 2040 | $  3,651,000 |
| 2041 | $  3,865,000 |
| 2042 | $  4,092,000 |
| 2043 | $  4,333,000 |
| 2044 | $  4,587,000 |
| 2045 | $  4,857,000 |
| 2046 | $  5,142,000 |
| 2047 * | $11,207,000 |

_____
*Final Maturity

    (h)    **Purchase in Lieu of Redemption**.  The Corporation shall have the option as set forth in this Section 301(h) to cause the Series 2023A Bonds to be purchased in lieu of redemption pursuant to this Article III.  Such option may be exercised by delivery to the Bond Trustee at least five (5) Business Days prior to the first date by which notice of redemption may be given for a particular redemption date of a written notice of the Corporation, with the written consent of the Bondholder Representative, specifying that the Series 2023A Bonds shall not be redeemed, but instead shall be subject to purchase pursuant to this Section 301(h).  Upon delivery of such notice, the Series 2023A Bonds shall not be redeemed but shall instead be subject to purchase by the Corporation in lieu of redemption at the Purchase Price (as defined below) on the date that would have been the redemption date.  For purposes of this Section 301(h), "Purchase Price" means the price negotiated with the Bondholder Representative or the Bondowner if not represented by the Bondholder Representative; provided that in no event shall the Purchase Price exceed 101% of the principal amount of the Series 2023A Bonds redeemed.

34

The purchase of the Series 2023A Bonds pursuant to this Section 301(h) shall extinguish the indebtedness of the Authority evidenced thereby and the Series 2023A Bonds so purchased shall be cancelled by the Bond Trustee.

In connection with any purchase in lieu of redemption of the Series 2023A Bonds, the Bondholder Representative shall be permitted to direct the Bond Trustee, and the Bond Trustee hereby agrees to follow such direction, to open a brokerage account or such other account as requested by the Bondholder Representative which such account may be funded with amounts on deposit in the Series 2023A Principal Account and the Series 2023A Interest Account of the Debt Service Fund held by the Bond Trustee under this Bond Indenture in order to effectuate such purchase in lieu of redemption. Expenses incurred in connection with purchase in lieu of redemption shall be an expense of the Corporation.

If an Event of Default in the payment of principal of or interest on the Series 2023A Bonds has occurred and is continuing, the Owners of the Series 2023B Bonds and the Series 2023C Bonds have the right (but not the obligation) to purchase the Series 2023A Bonds at the principal amount thereof plus accrued interest due thereon calculated at the Default Rate from and after the date of the Event of Default plus a 1% premium.

**Section 302.    Election to Redeem**.  In case of any optional redemption or extraordinary optional redemption, the Corporation shall, at least 35 days prior to the redemption date (unless a shorter notice shall be satisfactory to the Bond Trustee), give written notice to the Bond Trustee, with a copy to the Authority and the Bondholder Representative, directing the Bond Trustee to call Bonds of a series for redemption and give notice of redemption and specifying the redemption date, the principal amount and maturities of the series of Bonds to be called for redemption, the applicable redemption price or prices and the provision or provisions of this Bond Indenture pursuant to which such Bonds are to be called for redemption.  The Bond Trustee may in its discretion waive such notice period so long as the notice requirements set forth in Section 304 hereof are met.  For the avoidance of doubt, and notwithstanding anything to the contrary herein, no optional redemption or extraordinary optional redemption of the Series 2023B Bonds may occur so long as the Series 2023A Bonds are Outstanding under this Bond Indenture and no extraordinary optional redemption of the Series 2023C Bonds may occur so long as the Series 2023A Bonds and the Series 2023B Bonds are Outstanding under this Bond Indenture.  The Series 2023C Bonds are however subject to redemption from Excess Cash while the Series 2023B Bonds are Outstanding and in the event of optional redemption of the Series 2023B Bonds, a pro rata portion of the Series 2023C Bonds shall be redeemed simultaneously therewith.

The foregoing provisions of this Section shall not apply in the case of any mandatory redemption of Bonds under this Bond Indenture, and the Bond Trustee shall call Bonds for redemption and shall give notice of redemption pursuant to such mandatory redemption requirements without the necessity of any action by the Authority or the Corporation and whether or not the Bond Trustee shall hold in the Debt Service Fund moneys available and sufficient to effect the required redemption.

**Section 303.    Selection of Bonds to be Redeemed**.  Bonds may be redeemed only in Authorized Denominations.

35

If less than all Bonds of any maturity of a series are to be redeemed, the particular Bonds to be redeemed shall be selected by the Bond Trustee from the Bonds of such series and maturity which have not previously been called for redemption, by lot or such other equitable manner as the Bond Trustee may determine and which may provide for the selection for redemption of portions of the principal of Bonds of a denomination larger than $5,000.   In the event of any partial redemption of Series 2023A Bonds, the principal amount of such Series 2023A Bonds redeemed shall be credited against the sinking fund payments in inverse order of their due dates in Authorized Denominations unless otherwise approved by the Bondholder Representative.

Any Bond that is to be redeemed only in part shall be surrendered at the place of payment therefor (with, if the Bond Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Bond Trustee duly executed by, the Owner thereof or his attorney or legal representative duly authorized in writing), and the Bond Trustee shall authenticate and deliver to the Owner of such Bond, without service charge, a new Bond or Bonds of the applicable series and of any Authorized Denomination or Denominations as requested by such Owner in the aggregate principal amount equal to and in exchange for the unredeemed portion of the principal of the Bond so surrendered.  If the Owner of any such Bond shall fail to present such Bond to the Bond Trustee for payment and exchange as aforesaid, said Bond shall, nevertheless, become due and payable on the redemption date to the extent of the unit or units of principal amount called for redemption (and to that extent only).

In lieu of surrender under the preceding paragraph, payment of the redemption price of a portion of any Bond may be made directly to the Registered Owner thereof without surrender thereof, if there shall have been filed with the Bond Trustee a written agreement of such Owner satisfactory in form and substance to the Bond Trustee, and, if such Owner is a nominee, the Person for whom such Owner is a nominee, that payment shall be so made and that such Owner will not sell, transfer or otherwise dispose of such Bond unless prior to delivery thereof such Owner shall present such Bond to the Bond Trustee for notation thereon of the portion of the principal thereof redeemed or shall surrender such Bond in exchange for a new Bond or Bonds for the unredeemed balance of the principal of the surrendered Bond.

Notwithstanding the foregoing, in the event that the Securities Depository for the Bonds is DTC, the Bond Trustee shall follow the procedure for redemption and notice as set forth in DTC's operational arrangements, as in effect at the time.

**Section 304.  Notice of Redemption**.  Unless waived by any Owner of Bonds to be redeemed or its Bondholder Representative, official notice of any such redemption shall be given by the Bond Trustee by electronic notice, telecopy, first class mail or prepaid overnight delivery service, at least 20 days prior to the redemption date to the Bondholder Representative and each Registered Owner of the Bonds to be redeemed at the address shown on the Bond Register or such other address as is furnished in writing by such Registered Owner to the Bond Trustee.

All official notices of redemption shall be dated and shall state the following:

(a)        the redemption date;

(b)      the redemption price;

(c)      the series and principal amount (and, in the case of partial redemption, the respective principal amounts, CUSIP or other identification numbers and maturity dates) of the Bonds to be redeemed;

(d)      that on the redemption date the redemption price will become due and payable upon each such Bond or portion thereof called for redemption, and that interest thereon shall cease to accrue from and after said date; and

(e)      the place where the Bonds to be redeemed are to be surrendered for payment of the redemption price, which place of payment shall be a corporate trust office of the Bond Trustee.

With respect to optional redemptions, such notice may be conditioned upon moneys being on deposit with the Bond Trustee on or prior to the redemption date in an amount sufficient to pay the redemption price on the redemption date.  If such notice is conditional and either the Bond Trustee receives written notice from the Corporation that moneys sufficient to pay the redemption price will not be on deposit on the redemption date, or such moneys are not received on the redemption date, then such notice shall be of no force and effect, the Bond Trustee shall not redeem such Bonds and the Bond Trustee shall give notice, in the same manner in which the notice of redemption was given, that such moneys were not or will not be so received and that such Bonds will not be redeemed.

The failure of any Owner of Bonds to receive notice given as provided in this Section, or any defect therein, shall not affect the validity of any proceedings for the redemption of any Bonds.  Any notice mailed as provided in this Section shall be conclusively presumed to have been duly given and shall become effective upon mailing, whether or not any Owner receives such notice.

So long as the Securities Depository is effecting book-entry transfers of the Bonds, the Bond Trustee shall provide the notices specified in this Section only to the Securities Depository and the Bondholder Representative.  It is expected that the Securities Depository shall, in turn, notify its Participants and that the Participants, in turn, will notify or cause to be notified the beneficial owners.  Any failure on the part of the Securities Depository or a Participant, or failure on the part of a nominee of a beneficial owner of a Bond to notify the beneficial owner of the Bond so affected, shall not affect the validity of the redemption of such Bond.

**Section 305.    Payment of Redemption Price.**  On or prior to any redemption date, there shall be deposited with the Bond Trustee an amount of money sufficient to pay the redemption price of all the Bonds that are to be redeemed on that date.  Such money shall be held in trust for the benefit of the Persons entitled to such redemption price and shall not be deemed to be part of the Trust Estate.

Notice of redemption having been given as aforesaid, the Bonds to be redeemed shall, on the redemption date, become due and payable at the redemption price therein specified, and from and after such date (unless payment of the redemption price has not been made) such Bonds shall cease to bear interest or be entitled to any benefit or security under this Bond Indenture.  Upon surrender of any such Bond for redemption in accordance with said notice, the redemption price of such Bond

37

shall be paid by the Bond Trustee to the Registered Owner in immediately available funds by close of business on the redemption date.  Installments of interest with a due date on or prior to the redemption date shall be payable to the Owners of the Bonds registered as such on the Bond Register on the relevant Record Dates according to the terms of such Bonds and the provisions of Section 205 hereof.

Upon the payment of the redemption price of Bonds being redeemed, each check or other transfer of funds issued for such purpose shall bear or have enclosed the CUSIP number identifying, by issue, series and maturity, the Bonds being redeemed with the proceeds of such check or other transfer.

If any Bond called for redemption is not paid upon surrender thereof for redemption, or as otherwise provided under Section 303 hereof in lieu of surrender, the principal (and premium, if any) shall, until paid, bear interest from the redemption date at the rate prescribed therefor in the Bond.

**ARTICLE IV**
**CREATION OF FUNDS AND ACCOUNTS; APPLICATION OF**
**BOND PROCEEDS AND OTHER MONEYS**

**Section 401.    Creation of Funds and Accounts.**  There are hereby created and ordered to be established in the custody of the Bond Trustee the following special trust funds in the name of the Authority to be designated as follows:

(a)    Project Fund (the "Project Fund").

(b)    Debt Service Fund (the "Debt Service Fund") including the following accounts:

    (i) Series 2023A Interest Account;
    (ii) Series 2023A Principal Account;
    (iii) Series 2023B Interest Account;
    (iv) Series 2023B Principal Account; and
    (v) Series 2023C Account.

(c)    Debt Service Reserve Fund (the "Debt Service Reserve Fund") including the following accounts:

    (i) Series 2023A Account;
    (ii) Series 2023B Account.

(d)    Revenue Fund (the "Revenue Fund").

(e)    Operating Reserve Fund (the "Operating Reserve Fund").

(f)    Entrance Fee Fund (the "Entrance Fee Fund").

(g)    Rebate Fund (the "Rebate Fund").

The Bond Trustee is authorized to establish separate accounts or subaccounts within such funds or accounts or otherwise segregate moneys within such funds or accounts, on a book-entry basis or in such other manner as the Bond Trustee may deem necessary or convenient, or as the Bond Trustee shall be instructed by the Authority.

All moneys deposited with or paid to the Bond Trustee for the funds and accounts held under this Bond Indenture shall be held by the Bond Trustee in trust and shall be applied only in accordance with the provisions of this Bond Indenture and the Loan Agreement, and, until used or applied as herein provided (except for moneys in the Rebate Fund), shall constitute part of the Trust Estate and be subject to the lien, terms and provisions hereof and shall not be commingled with any other funds of the Authority or the Corporation except as provided under Section 502 hereof for investment purposes.

39

In addition to the accounts described above that are established and in the custody of the Bond Trustee, the Corporation, pursuant to Section 5.14 of the Loan Agreement, shall establish the "Operating Fund" (the "Operating Fund") and the "Ancillary Operating Fund" (the "Ancillary Operating Fund").

**Section 402.   Deposit of Bond Proceeds and Other Moneys**.

(a)      The proceeds of the Series 2023A Bonds in the amount of $5,940,000.00 shall be paid to the Bond Trustee, and the Bond Trustee shall deposit and apply such proceeds as follows:

(i)      Deposit to the credit of the Series 2023A Account of the Debt Service Reserve Fund the sum of $_____ from the proceeds of the Series 2023A Bonds, equal to the Debt Service Reserve Requirement for the Series 2023A Bonds; and

(ii)      Deposit to the credit of the Series 2023A Project Fund the sum of $_____ ____ from the proceeds of the Series 2023A Bonds in accordance with Section 403 hereof and apply $60,000.00 to the payment of Costs of Issuance  as approved by the Corporation and designated by the Chairman of the Authority in a certificate delivered in connection with the purchase and sale or exchange of the Bonds.

(b)      The amount of $_____ shall be transferred from the debt service reserve funds for the Outstanding Existing Bonds under the Original Bond Indenture to the Series 2023B Account of the Debt Service Reserve Fund, equal to a portion of the Debt Service Reserve Requirement for the Series 2023B Bonds.

(c)      The amount of $_____ shall be transferred from the Entrance Fee Escrow Account to the Entrance Fee Fund.

**Section 403.   Project Fund.**

(a)      Amounts on deposit in the Project Fund shall be applied to fund the Project and shall only be requisitioned to pay the costs associated with the items designated on the attached Exhibit D.

(b)      Moneys in the Project Fund shall be paid out from time to time by the Bond Trustee in order to pay or as reimbursement for payment made for the Costs of the Project (other than Costs of Issuance), in each case within five Business Days after receipt by the Bond Trustee of Written Requests of the Corporation, properly completed and executed by the Corporation and approved by the Bondholder Representative and directing the Bond Trustee to pay such invoices as directed.

(c)      In paying any Written Requests under this Section, the Bond Trustee may rely as to the completeness and accuracy of all statements in the Written Request and shall not be required to make any independent investigation in connection therewith.  If the Authority so requests, a copy of each Written Request submitted to the Bond Trustee for payment under this Section shall be promptly provided by the Bond Trustee to the Authority.

(d)      If after payment by the Bond Trustee of all Written Requests theretofore tendered to the Bond Trustee under Subsection (b) and completion of the Project set forth in Exhibit D, and after all rebatable earnings have been transferred to the Rebate Fund pursuant to Section 406, there shall remain any moneys in the Project Fund, such moneys shall be used to pay or redeem the Series 2023A Bonds at the earliest permissible date under Section 301(a).  In the event there are any moneys remaining in the Project Fund after the redemption, the remaining moneys shall be transferred to the Series 2023A Principal Account of the Debt Service Fund.

(e)      If an event of default specified in Section 701 hereof has occurred and is continuing and the Bonds have been declared due and payable pursuant to Section 702 hereof, any balance remaining in the Project Fund, other than amounts required to be transferred to the Rebate Fund pursuant to Section 406 hereof, shall without further authorization be deposited in the Series 2023A Principal Account of the Debt Service Fund by the Bond Trustee as provided in Section 404 hereof with notice to the Corporation, the Bondholder Representative and to the Authority of such action.

**Section 404.   Debt Service Fund.**

(a)      The Bond Trustee shall deposit and credit amounts to the Debt Service Fund, as and when received, as set forth below.

(i)      The amount required to be deposited therein under Section 407 hereof, and all Loan Payments made by the Corporation pursuant to Section 4.1 of the Loan Agreement.

(ii)      Any amount required to be transferred to an account of the Debt Service Fund from the Project Fund or an account of the Debt Service Reserve Fund pursuant to Section 403 or Section 405 hereof.

(iii)      Interest earnings and other income on Permitted Investments required to be deposited in the Debt Service Fund pursuant to Section 502 hereof.

(iv)      All other moneys received by the Bond Trustee under and pursuant to any of the provisions of this Bond Indenture or the Loan Agreement for deposit into the Debt Service Fund.

(b)      The Bond Trustee shall on each Interest Payment Date pay or cause to be paid out of (i) the Series 2023A Interest Account in the Debt Service Fund, the interest due on the Series 2023A Bonds, (ii) the Series 2023B Interest Account of the Debt Service Fund, the interest due on the Series 2023B Bonds, and (iii) the Series 2023C Account of the Debt Service Fund, the interest due on the Series 2023C Bonds.

(c)      The Bond Trustee shall on each principal payment or mandatory sinking fund payment date pay or cause to be paid to the Paying Agent upon presentation and surrender of the requisite Bonds (such presentation and surrender not being required if Cede & Co. is the holder of the applicable Bond) the following:

(i)      Out of the Series 2023A Principal Account of the Debt Service Fund, the principal amount or mandatory sinking fund payments due on the Series 2023A Bonds;

(ii)    Out of the Series 2023B Principal Account of the Debt Service Fund, the principal amount or mandatory sinking fund payments due on the Series 2023B Bonds; and

(iii)    Out of the Series 2023C Account of the Debt Service Fund, the principal amount, if any, due on the Series 2023C Bonds.

After payment in full of (w) the principal of, redemption premium, if any, and interest on the Bonds (or after provision has been made for the payment thereof as provided in this Bond Indenture), (x) all rebatable arbitrage to the United States, (y) the fees, charges and expenses of the Bond Trustee, the Bondholder Representative and the Authority, and (z) any other amounts required to be paid under this Bond Indenture, the Continuing Covenants Agreement and the Loan Agreement, all amounts remaining in the Debt Service Fund, subject to Section 7.13 of the Loan Agreement, shall be paid to the Corporation upon the expiration or sooner termination of the Loan Agreement, the Continuing Covenants Agreement and this Bond Indenture.

**Section 405.   Debt Service Reserve Fund.**  The Bond Trustee shall deposit and credit to the Debt Service Reserve Fund, as and when received, as follows:

(a)    The initial deposits and transfers required by Section 402 hereof.

(b)    Payments required to be made by the Corporation under Section 407(b) hereof or under the Loan Agreement or the Continuing Covenants Agreement to make up a deficiency in the Debt Service Reserve Fund.

(c)    Interest earnings and other income on Permitted Investments required to be deposited in the Debt Service Reserve Fund.

(d)    All other moneys received by the Bond Trustee under and pursuant to any of the provisions of the Loan Agreement or any other Bond Document, when accompanied by written directions from the Person depositing such moneys that such moneys are to be paid into the Debt Service Reserve Fund.

Except as otherwise herein provided, moneys in the Series 2023A Account (with the prior written consent of the Bondholder Representative) and the Series 2023B Account of the Debt Service Reserve Fund shall be disbursed and expended by the Bond Trustee solely for the payment of the principal of and redemption premium, if any, and interest on the Series 2023A Bonds and the Series 2023B Bonds, respectively, if sufficient moneys therefor are not available in the applicable account of the Debt Service Fund.  In the event the balance of moneys in the Debt Service Fund for the applicable series of Bonds is insufficient to pay principal of or interest on such series of Bonds when due and payable, moneys in the applicable account of the Debt Service Reserve Fund shall be transferred into the applicable account of the Debt Service Fund in an amount sufficient to make up such deficiency; provided that the Bondholder Representative's prior written consent is required for money to be transferred from the Series 2023A Account of the Debt Service Reserve Fund,  which consent may be withheld by the Bondholder Representative in its sole and absolute discretion and provided further that the prior written consent of the Owners of a majority in aggregate principal amount of the Series 2023B Bonds is required for money to be transferred from the Series 2023B

Account of the Debt Service Reserve Fund. The Bond Trustee may use moneys in the Debt Service Reserve Fund for such purpose whether or not the amount in the Debt Service Reserve Fund at that time equals the Debt Service Reserve Requirement. Moneys in the respective accounts of the Debt Service Reserve Fund shall also be used to pay the final maturity of the Series 2023A Bonds and the Series 2023B Bonds, as applicable, becoming due unless such Bonds and all interest thereon be otherwise paid, and thereafter, any remaining balance in the Debt Service Reserve Fund shall be deposited into the Series 2023C Debt Service Account of the Debt Service Fund and applied to redeem the Series 2023C Bonds.

Any deficiency of the Debt Service Reserve Fund as a result of a draw for the purposes described above must be replenished by the Corporation in 12 equal monthly installments, commencing with the month immediately succeeding the draw. Any deficiency of the Debt Service Reserve Fund as a result of a valuation of the funds in the Debt Service Reserve Fund being less that the applicable Debt Service Reserve Fund Requirement shall be replenished by the Corporation within 30 days of being notified by the Bond Trustee of such deficiency.

**Section 406. Rebate Fund.** There shall be deposited in the Rebate Fund such amounts as are required to be deposited therein pursuant to the Tax Agreement. All amounts on deposit at any time in the Rebate Fund shall be held by the Bond Trustee in trust to the extent required to pay rebatable arbitrage to the United States of America, and none of the Corporation, the Authority or the Owner of any Bonds shall have any rights in or claim to such money.

The Bond Trustee shall remit from moneys in the Rebate Fund all rebate installments and a final rebate payment to the United States required by the Tax Agreement. Neither the Bond Trustee nor the Authority shall have any obligation to pay any amounts required to be rebated pursuant to this Section and the Tax Agreement, other than from moneys held in the Rebate Fund as provided in this Bond Indenture or from other moneys provided to it by the Corporation. Any moneys remaining in the Rebate Fund after redemption and payment of all of the Bonds and payment and satisfaction of any rebatable arbitrage shall be withdrawn and paid to the Corporation.

The obligation to pay arbitrage rebate to the United States and to comply with all other requirements of this Section and the Tax Agreement shall survive the defeasance or payment in full of the Series 2023A Bonds, the Series 2023B Bonds and the Series 2023C Bonds until all rebatable arbitrage shall have been paid.

**Section 407. Revenue Fund.**

(a)     The Corporation shall deposit, or cause to be deposited to the Revenue Fund, upon receipt thereof, all Gross Receipts (including Entrance Fees transferred from the Entrance Fee Fund as described in Section 4.13) in the form of cash, checks, or negotiable instruments.

(b)     On the first (1st) Business Day of each calendar month, amounts in the Revenue Fund shall be transferred or deposited, as applicable, so long as no Event of Default has occurred and is continuing by the Bond Trustee in the following order of priority (the "*Distribution Waterfall*"):

(i)     First, to the Corporation for deposit to the Operating Fund the amounts necessary for the Corporation to pay budgeted operating expenses for the upcoming month equal to one hundred fifty percent (150%) of the projected budgeted operating expenses for the upcoming month, including without limitation for costs of operating, managing, maintaining and improving the Facilities, budgeted capital expenses (after funds in the Project Fund have been fully disbursed), including costs for the Project, and all Additional Payments due from the Corporation to any Person pursuant to Section 4.3 of the Loan Agreement, including specifically all fees and expenses of the Authority, the Bond Trustee and the Bondholder Representative. The amount to be deposited from the Revenue Fund to the Operating Fund in any given month shall take into account any unapplied amount deposited in the Operating Fund from the Revenue Fund for such purpose in a prior month, but excluding from the calculation of the amount to be deposited in the Operating Fund from the Revenue Fund the amount of any Excess Cash released to the Corporation pursuant to Section 407(b)(ix)(B) hereof that remains in the Operating Fund), as certified by the Corporation (in a certificate setting forth in reasonable detail the projected application of the amount so certified) delivered to the Bond Trustee no later than seven (7) Business Days prior to the first (1st) Business Day of such month;

(ii)    Second, to the Series 2023A Interest Account of the Debt Service Fund, an amount equal to one-sixth ($1/6^{th}$) of the interest due on the next Interest Payment Date for the Series 2023A Bonds (provided that the transfers for January 1, 2024 to and including May 1, 2024 shall equal one fifth ($1/5^{th}$) of the interest due on the June 1, 2024 Interest Payment Date for the Series 2023A Bonds);

(iii)   Third, commencing December 1, 2025 until the Series 2023A Bonds are satisfied in full, to the Series 2023A Principal Account of the Debt Service Fund, an amount equal to one-twelfth ($1/12^{th}$) of the principal due on the next principal payment date for the Series 2023A Bonds;

(iv)    Fourth, to the Series 2023B Interest Account of the Debt Service Fund, an amount equal to one-sixth ($1/6^{th}$) of the interest due on the next Interest Payment Date for the Series 2023B Bonds (provided that the transfers for January 1, 2024 to and including May 1, 2024 shall equal one fifth ($1/5^{th}$) of the interest due on the June 1, 2024 Interest Payment Date for the Series 2023B Bonds);

(v)     Fifth, commencing December 1, 2030 until the Series 2023B Bonds are satisfied in full, to the Series 2023B Principal Account of the Debt Service Fund, an amount equal to one-twelfth ($1/12^{th}$) of the principal due on the next principal payment date for the Series 2023B Bonds;

(vi)    Sixth, while the Series 2023A Bonds are Outstanding, all remaining funds after application of paragraphs First through and including Fifth shall be distributed to the Operating Reserve Fund until the balance therein equals seventy (70) Days Cash on Hand;

(vii)   Seventh, to the Series 2023A Principal Account of the Debt Service Fund until $2,000,000 in principal amount of Series 2023A Bonds has been redeemed, and then as follows: (1) fifty-five percent (55%) to the Series 2023A Principal Account of the Debt Service Fund, (2) twenty five percent (25%) to the Corporation as unrestricted funds to be deposited in the Ancillary Operating Fund, and (3) twenty percent (20%) to the Series 2023B Account of the Debt Service

Reserve Fund until the balance in such account equals the Debt Service Reserve Fund Requirement; provided that (a) if the Series 2023A Bonds are no longer Outstanding before the Series 2023B Account of the Debt Service Reserve Fund is fully funded, the fifty-five percent (55%) to be deposited to the Series 2023A Principal Account of the Debt Service Fund shall instead be deposited in the Series 2023B Account of the Debt Service Reserve Fund until the balance in such account equals the Debt Service Reserve Fund Requirement, and (b) if the deficiency in the Series 2023B Account of the Debt Service Reserve Fund is replenished before the Series 2023A Bonds are paid in full, the twenty percent (20%) otherwise attributable to the Series 2023B Account of the Debt Service Reserve Fund shall be distributed to the Corporation as unrestricted funds to be deposited in the Ancillary Operating Fund; and

(viii)    Eighth, after the Series 2023A Bonds are paid in full, to the Operating Reserve Fund until the amount on deposit therein equals ninety (90) Days Cash on Hand; and

(ix)    Ninth, any amount remaining after application of paragraphs First to Eighth above (disregarding any such paragraph pursuant to the provisions of which application has not yet commenced), (such remaining amounts referred to as "Excess Cash"), shall be distributed as follows:

(A)    fifty percent (50%) of the Excess Cash to the Series 2023C Account of the Debt Service Fund to pay interest due on the next Interest Payment Date and then to pay principal of the Series 2023C Bonds pursuant to Section 301(d) hereof until the Series 2023C Bonds are fully redeemed; and

(B)    fifty percent (50%) of the Excess Cash to the Corporation as unrestricted funds to be deposited in the Ancillary Operating Fund.

(c)    Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default, the provisions of Section 706 hereof shall apply with respect to the Revenue Fund unless otherwise directed by the Controlling Holders.

**Section 408.    Payments Due on Non-Business Days.**  In any case where the date of maturity of principal of, redemption premium, if any, or interest on the Bonds or the date fixed for redemption of any Bonds (each a *"Scheduled Payment Date"*) shall be a day other than a Business Day, then payment of principal, redemption premium, if any, or interest need not be made on such Scheduled Payment Date but may be made on the next succeeding Business Day with the same force and effect as if made on the Scheduled Payment Date, and no interest shall accrue for the period after the Scheduled Payment Date.

**Section 409.    Nonpresentment of Bonds.**  In the event any Bond shall not be presented for payment when the principal thereof becomes due, either at maturity or otherwise, or at the date fixed for redemption thereof, if funds sufficient to pay such Bond shall have been made available to the Bond Trustee, all liability to the Owner thereof for the payment of such Bond, shall forthwith cease, determine and be completely discharged, and thereupon it shall be the duty of the Bond Trustee to hold such funds in trust in a separate trust account, without liability for interest thereon, for the benefit of the Owner of such Bond, who shall thereafter be restricted exclusively to such funds for any claim of whatever nature on his part under this Bond Indenture or on or with respect to said

45

Bond.  If any Bond shall not be presented for payment within four years following the date when such Bond becomes due, whether by maturity or otherwise, the Bond Trustee shall repay to the Corporation the funds theretofore held by it for payment of such Bond, and such Bond shall, subject to the defense of any applicable statute of limitation, thereafter be an unsecured obligation of the Corporation, and the Owner thereof shall be entitled to look only to the Corporation for payment, and then only to the extent of the amount so repaid, and the Corporation shall not be liable for any interest thereon and shall not be regarded as a trustee of such money.

Section 410.   Reports From Bond Trustee.  The Bond Trustee shall furnish monthly to the Corporation and the Bondholder Representative, on or before the tenth Business Day of the month following the month in which the Bonds are delivered, and on or before the tenth Business Day of each month thereafter, a report on the status of each of the funds and accounts established under this Article which are held by the Bond Trustee, showing at least the balance in each such fund or account as of the first day of the preceding month, the total of deposits to and the total of disbursements from each such fund or account, the dates of such deposits and disbursements, and the balance in each such fund or account on the last day of the preceding month.

Section 411.   Certain Verifications.  The Bond Trustee from time to time may cause a firm of attorneys, consultants or independent accountants or an investment banking firm to supply the Authority or the Bond Trustee with such information as the Authority or the Bond Trustee may request in order to determine in a manner reasonably satisfactory to the Authority or the Bond Trustee all matters relating to (a) the actuarial yields on the Bonds as the same may relate to any data or conclusions necessary to verify that the Bonds are not "arbitrage bonds" within the meaning of Section 148 of the Internal Revenue Code, and (b) compliance with rebate requirements of Section 148(f) of the Internal Revenue Code.  Payment for costs and expenses incurred in connection with supplying the foregoing information shall be Additional Payments and shall be paid by the Corporation.

Section 4.12. Operating Reserve Fund.  The Operating Reserve Fund shall receive transfers from the Revenue Fund pursuant to Section 407(b).  The Operating Reserve Fund shall be used for Operating Expenses after all moneys in the Operating Fund and Ancillary Operating Fund have been expended.  Notwithstanding the foregoing, in the event amounts on deposit in the Debt Service Fund are insufficient to pay principal of or interest on the Bonds when due, the Bond Trustee may draw upon amounts on deposit in the Operating Reserve Fund to make such payments upon the direction of the Controlling Holders.

Section 4.13. Entrance Fee Fund.  The Corporation shall deposit all Entrance Fees received into the Entrance Fee Fund. Additionally on the Closing Date, Entrance Fees shall be deposited in the Entrance Fee Fund pursuant to Section 402(c).  The funds so deposited on the Closing Date to the Entrance Fee Fund shall be used as follows:

(a)     First, to pay any refunds of Entrance Fees contractually required;

(b)     Second, to satisfy all amounts owing pursuant to post-petition Debtor in Possession financing;

46

(c)    Third, to pay all bankruptcy estate professional fees and expenses in connection with the Bankruptcy Proceedings and in accordance with the Court-approved budget (including without limitation, all Costs of Issuance); and

(d)    Fourth, any remaining funds shall be paid to the Revenue Fund, and such funds shall be available to flow through the Revenue Fund as set forth in Section 407.

After the Closing Date the Entrance Fee Fund shall be used as follows:

(a)    First, to pay any refunds of Entrance Fees contractually required; and

(b)    Second, any remaining funds shall be paid to the Revenue Fund, and such funds shall be available to flow through the Revenue Fund as set forth in Section 407.

## ARTICLE V
## DEPOSITARIES OF MONEYS, SECURITY FOR DEPOSITS
## AND INVESTMENT OF FUNDS

**Section 501.    Moneys to be Held in Trust.** All moneys deposited with or paid to the Bond Trustee for the funds and accounts held under this Bond Indenture, and all moneys deposited with or paid to any Paying Agent under any provision of this Bond Indenture shall be held by the Bond Trustee or Paying Agent in trust and shall be applied only in accordance with this Bond Indenture, the Continuing Covenants Agreement and the Loan Agreement, and, until used or applied as herein provided, shall (except for moneys and securities held in the Rebate Fund) constitute part of the Trust Estate and be subject to the lien, terms and provisions hereof and shall not be commingled with any other funds of the Authority or the Corporation except as provided under Section 502 for investment purposes. Neither the Bond Trustee nor any Paying Agent shall be under any liability for interest on any moneys received hereunder except such as may be agreed upon in writing.

**Section 502.    Investment of Moneys.** Moneys held in each of the funds and accounts hereunder shall, pursuant to written direction of the Corporation Representative, be invested and reinvested by the Bond Trustee in accordance with the provisions hereof and the Tax Agreement in Permitted Investments which mature or are subject to redemption by the owner thereof prior to the date such funds are expected to be needed. Notwithstanding any other provision of this Bond Indenture, if the Bond Trustee fails to receive written directions of the Corporation regarding investment of funds pursuant to this Section, moneys held in any fund or account hereunder shall be invested or reinvested in Permitted Investments described in subparagraph (g) of the definition of Permitted Investments. The Bond Trustee may make any investments permitted by this Section through its own bond department or short-term investment department and may pool moneys for investment purposes, except moneys held in the yield restricted portion of any fund or account, which shall be invested separately. Any such Permitted Investments shall be held by or under the control of the Bond Trustee and shall be deemed at all times a part of the fund or account in which such moneys are originally held. The interest earned on and any profit realized from Permitted Investments held in the Project Fund shall remain in such fund and be used for the purposes set forth therein. The interest earned on and any profit realized from Permitted Investments held in any other fund, account or subaccount under this Indenture shall be deposited into the Revenue Fund. Any loss resulting from such Permitted Investments shall be charged to such fund, account or subaccount in which such Permitted Investments generating the loss are held. The Bond Trustee shall sell and reduce to cash a sufficient amount of such Permitted Investments whenever the cash balance in such fund or account is insufficient for the purposes of such fund or account. The Bond Trustee shall value all Permitted Investments at the lower of cost or market value.

**Section 503.    Record Keeping.** The Bond Trustee shall maintain records designed to show compliance with this Article and Article IV for at least six years after the payment of all of the Outstanding Bonds.

48

## ARTICLE VI
## PARTICULAR COVENANTS AND PROVISIONS

**Section 601.    Limited Obligations.**  No covenant, provision or agreement of the Authority herein or in the Bonds or in any other document executed by the Authority in connection with the issuance, sale, exchange and delivery of the Bonds or any obligation herein or therein imposed upon the Authority or breach thereof, shall give rise to a pecuniary liability of the Authority, its officers, employees or agents or a charge against the Authority's general credit or general fund or shall obligate the Authority, its officers, employees or agents financially in any way except with respect to this Bond Indenture and the application of revenues therefrom and the proceeds of the Bonds.  No failure of the Authority to comply with any term, condition, covenant or agreement therein shall subject the Authority, its officers, employees or agents to liability for any claim for damages, costs or other financial or pecuniary charges except to the extent that the same can be paid or recovered from this Bond Indenture or revenues therefrom or proceeds of the Bonds.  No execution on any claim, demand, cause of action or judgment shall be levied upon or collected from the general credit or general fund of the Authority.  In making the agreements, provisions and covenants set forth herein, the Authority has not obligated itself except with respect to this Bond Indenture and the application of revenues hereunder as hereinabove provided.  The Bonds constitute special obligations of the Authority, payable solely from the revenues pledged to the payment thereof pursuant to this Bond Indenture and the Loan Agreement, and do not now and shall never constitute an indebtedness or a loan of the credit of the Authority, the State or any political subdivision thereof or a charge against their general taxing powers within the meaning of any constitutional or statutory provision whatsoever.  The Authority has no taxing power.  It is further understood and agreed by the Corporation and the Owners of the Bonds that the Authority, its officers, employees or agents shall incur no pecuniary liability hereunder and shall not be liable for any expenses related hereto, all of which the Corporation agrees to pay.  If, notwithstanding the provisions of this Section, the Authority, its officers, employees or agents incur any expense, or suffer any losses, claims or damages or incurs any liabilities, the Corporation will indemnify and hold harmless the Authority, its officers, employees or agents from the same and will reimburse the Authority, its officers, employees or agents in relation thereto, and this covenant to indemnify, hold harmless and reimburse the Authority, its officers, employees or agents shall survive delivery of and payment for the Bonds.

**Section 602.    Payment of Principal, Redemption Premium, if any, and Interest.**  The Authority covenants and agrees that it will deposit in the Debt Service Fund all Loan Payments that it receives and any and all other payments and sums that it receives under the Loan Agreement and this Bond Indenture promptly to meet and pay the principal of, redemption premium, if any, and interest on the Bonds as the same become due and payable at the place, on the dates and in the manner provided herein and in the Bonds according to the true intent and meaning thereof.

**Section 603.    Authority to Issue Bonds and Execute Bond Indenture.**  The Authority covenants that it is duly authorized under the Constitution and laws of the State to execute this Bond Indenture, to issue the Bonds and to pledge and assign the Trust Estate in the manner and to the extent herein set forth; and that all action on its part for the execution and delivery of this Bond Indenture and the issuance of the Bonds has been duly and effectively taken.

49

**Section 604.    Performance of Covenants.**  The Authority covenants that it will (to the extent within its control) faithfully perform at all times any and all covenants, undertakings, stipulations and provisions contained in this Bond Indenture, in the Bonds and in all proceedings pertaining thereto.

**Section 605.    Instruments of Further Assurance.**  The Authority covenants that it will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, such Supplemental Bond Indentures and such further acts, instruments, financing statements and other documents as the Bond Trustee or the Bondholder Representative may reasonably require for the better assuring, transferring, pledging and assigning to the Bond Trustee, and granting a security interest unto the Bond Trustee in and to the Trust Estate and the other property and revenues herein described to the payment of the principal of, redemption premium, if any, and interest on the Bonds, all at the expense of the Corporation.  The Loan Agreement, all Supplemental Loan Agreements, the Series 2023 Bond Notes, and all other documents, instruments or policies of insurance required by the Bond Trustee or the Bondholder Representative shall be delivered to and held by the Bond Trustee.

**Section 606.    Inspection of Books.**  The Authority covenants and agrees that all books and documents in its possession relating to this Bond Indenture, the Loan Agreement, and any other Bond Documents and the transactions relating thereto shall at all times be open to inspection by such accountants or other agencies as the Bond Trustee, the Bondholder Representative or the Owners of 10% in aggregate principal amount of the Bonds then Outstanding may from time to time designate.

**Section 607.    Enforcement of Rights.**  The Authority agrees that the Bond Trustee, as assignee, transferee, pledgee, and owner of a security interest hereunder in its name or in the name of the Authority may enforce all rights of the Authority (other than the Authority's right to payment of its fees and expenses, to indemnification, to notice and as otherwise expressly set forth in the Loan Agreement) and/or the Bond Trustee and all obligations of the Corporation under and pursuant to the Loan Agreement and the Series 2023 Bond Notes for and on behalf of the Bondowners, whether or not the Authority is in default hereunder.

The Bond Trustee will promptly deposit all amounts received from the Corporation pursuant to the Loan Agreement, the Continuing Covenants Agreement and the other Bond Documents and subject to Article XI, shall perform all duties imposed upon it pursuant to the Loan Agreement and the other Bond Documents.

**Section 608.    Tax Covenants.**  The Authority (to the extent within its power or direction) shall not use any proceeds of Tax-Exempt Bonds in any manner, and shall not take any other action or actions, which would adversely affect the exclusion of the interest on any Tax-Exempt Bond from gross income for federal income tax purposes.

The Bond Trustee agrees to comply with the Tax Agreement, and upon receipt of the Tax Agreement and any Opinion of Bond Counsel which sets forth such requirements, and at the direction of the Corporation, to comply with any statute, regulation or ruling that may apply to it as Bond Trustee hereunder and relating to reporting requirements or other requirements necessary to preserve the exclusion from federal gross income of the interest on the Tax-Exempt Bonds.

The foregoing covenants of this Section shall remain in full force and effect notwithstanding the defeasance of the Bonds pursuant to Article XI or any other provision of this Bond Indenture, until the final maturity date of all Bonds Outstanding and payment thereof.

**Section 609.    Bond Trustee to Provide Information to Authority.**  The Bond Trustee shall provide to the Authority (unless otherwise provided to the Authority) and to the Bondholder Representative all Opinions of Bond Counsel furnished to the Bond Trustee pursuant to the Loan Agreement or this Bond Indenture.

The Bond Trustee agrees that it will annually on or before August 15 of each year furnish the Authority with a statement of the amount of the Outstanding Bonds as of the immediately preceding June 30.  In addition, the Bond Trustee and the Corporation shall provide the Authority and to the Bondholder Representative with any other information which may from time to time be requested concerning the Bonds according to the rules and interpretations of the Governmental Accounting Standards Board required to be disclosed concerning conduit debt obligations.  In addition, the Bond Trustee shall furnish to the Authority and to the Bondholder Representative upon the written request of the Authority or the Bondholder Representative any other reports, certificates, opinions, other documents or information furnished to or on file with the Bond Trustee pursuant to the Loan Agreement, this Bond Indenture or other document related thereto.

**Section 610.    Continuing Disclosure**.  Under the Continuing Disclosure Agreement, the Corporation has undertaken all responsibility for compliance with continuing disclosure requirements, and the Authority shall have no liability to the Owners of the Bonds or any other Person with respect to S.E.C. Rule 15c2-12.  Notwithstanding any other provision of this Bond Indenture, failure of the Corporation or the Dissemination Agent to comply with the Continuing Disclosure Agreement shall not be considered an Event of Default under this Bond Indenture, the Loan Agreement or any other Bond Document, and the sole remedy in the event of such failure shall be such actions as may be necessary and appropriate, including seeking mandamus or specific performance by court order, to cause the Corporation to comply with its obligations under the Loan Agreement or the Continuing Disclosure Agreement.

**Section 611.    Recordation and Other Instruments.**  In order to perfect the security interest of the Bond Trustee in the Trust Estate and to perfect the security interest in the Series 2023 Bond Notes, the Authority, to the extent required and permitted by law, will execute such security agreements or financing statements, naming the Bond Trustee as assignee and pledgee of the Trust Estate assigned and pledged under this Bond Indenture for the payment of the principal of, premium, if any, and interest on the Bonds and as otherwise provided herein, and the Corporation will cause the same to be duly filed and recorded, as the case may be, in the appropriate State and county offices as required by the provisions of the UCC or other similar law as adopted in the State, as from time to time amended.  To continue the security interest evidenced by such security agreements or financing statements, the Bond Trustee or the Corporation, as the case may be, shall file and record or cause to be filed and recorded such necessary continuation statements from time to time as may be required pursuant to the provisions of the said UCC or other similar law to fully preserve and protect the security interest of the Bond Trustee in the Trust Estate and the security interest in the Series 2023 Bond Notes.  The Authority, to the extent permitted by law, at the expense of the Corporation, shall execute and cause to be executed any and all further instruments as shall be

reasonably required by the Bond Trustee or the Bondholder Representative for such protection and perfection of the interests of the Bond Trustee and the Registered Owners, and the Corporation or its agent, as the case may be, shall file and refile or cause to be filed and refiled such instruments which shall be necessary to preserve and perfect the lien of this Bond Indenture upon the Trust Estate until the principal of, premium, if any, and interest on the Bonds issued hereunder shall have been paid or provision for their payment shall be made as herein provided.

Nothing herein shall require the Bond Trustee to initially file financing statements, or termination statements, or be responsible for maintaining the security interest purported to be created as described herein or in any of the other Bond Documents (except for the safe custody of any collateral in its possession and the accounting for moneys actually received by it hereunder or under any other Bond Document) and such responsibility shall be solely that of the Corporation. Notwithstanding the foregoing, the Bond Trustee shall be responsible for filing any UCC continuation statements with respect to each UCC financing statement filed on the date of issuance of the Bonds relating to the Trust Estate; provided that a copy of the filed initial financing statement is timely delivered to the Bond Trustee.  In addition, unless the Bond Trustee shall have been notified in writing by the Corporation that any such initial filing or description of collateral was or has become defective, the Bond Trustee shall be fully protected in (i) relying on such initial filing and descriptions and information therein in filing any financing or continuation statements or modifications thereto pursuant to this section and (ii) filing any continuation statements in the same filing offices as the initial filings were made.  The Corporation shall be responsible for the customary fees charged by the Bond Trustee for the preparation and filing of continuation statements and for the reasonable costs incurred by the Bond Trustee in the preparation and filing of all continuation statements hereunder, including attorneys' fees and expenses.

**ARTICLE VII**
**DEFAULT AND REMEDIES**

**Section 701.    Events of Default.**    The term "event of default", wherever used in this Bond Indenture, means any one of the following events (whatever the reason for such event and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)    default in the payment of any interest on any Bond when such interest becomes due and payable; provided that the payment of interest on the Series 2023C Bonds shall be due only upon the availability of Excess Cash, as set forth in Section 407(b)(ix)(A) herein and to the extent not available, principal of the Series 2023C Bonds shall be adjusted and interest shall accrue as set forth in Section 201(c)(ii) herein;

(b)    default in the payment of the principal of (or premium, if any, on) any Bond when the same becomes due and payable (whether at maturity, upon proceedings for redemption, by acceleration or otherwise); provided that the payment of accreted principal on the Series 2023C Bonds shall be due only upon the availability of Excess Cash, as set forth in Section 407(b)(ix)(A) herein and to the extent not available, principal of the Series 2023C Bonds shall be adjusted as set forth in Section 201(c)(ii) herein;

(c)    default in the performance, or breach, of any covenant or agreement of the Authority or Corporation in this Bond Indenture (other than a covenant or agreement a default in the performance or breach of which is specifically dealt with elsewhere in this Section), and continuance of such default or breach for a period of 60 days after there has been given to the Authority and the Corporation by the Bond Trustee or to the Authority, the Corporation and the Bond Trustee by the Controlling Holders, a written notice specifying such default or breach and requiring it to be remedied; provided, that if such default cannot be fully remedied within such 60-day period, but can reasonably be expected to be fully remedied, such default shall not constitute an event of default if corrective action is instituted by the Authority or Corporation within such period and diligently pursued until the default is corrected provided that such default or breach must be cured in 90 days;

(d)    any Event of Default under the Continuing Covenants Agreement shall have occurred and is continuing and has not been waived in accordance with the provisions of the Continuing Covenants Agreement;

(e)    any Event of Default under the Loan Agreement or Mortgage shall have occurred and is continuing and has not been waived in accordance with the provisions of the Loan Agreement or Mortgage; or

(f)    any draw on any account of the Debt Service Reserve Fund is made to pay principal of or interest on the Bonds other than in connection with a release for the payment of the final maturity of the Series 2023A Bonds or Series 2023B Bonds, as applicable, becoming due.

With regard to any alleged default concerning which notice is given to the Corporation under the provisions of this Section, the Authority hereby grants the Corporation full authority for the account of the Authority to perform any covenant or obligation, the nonperformance of which is alleged in said notice to constitute a default, in the name and stead of the Authority, with full power to do any and all things and acts to the same extent that the Authority could do and perform any such things and acts in order to remedy such default.

**Section 702.   Acceleration of Maturity; Rescission and Annulment.**  If an Event of Default occurs and is continuing, the Bond Trustee may, with consent of the Bondholder Representative during the first 90 days after notice or, upon the written request of the Controlling Holders, shall, by written notice to the Authority and the Corporation, declare the principal of all Bonds Outstanding and the interest accrued thereon to the date of acceleration to be due and payable, and upon any such declaration such principal and interest shall become immediately due and payable.

At any time after such a declaration of acceleration has been made, but before any judgment or decree for payment of money due on any Bonds has been obtained by the Bond Trustee as provided in this Article, the Controlling Holders may, by written notice to the Authority, the Corporation and the Bond Trustee, instruct the Bond Trustee to rescind and annul such declaration and its consequences if:

(a)     there is deposited with the Bond Trustee a sum sufficient to pay the following:

(1)     all overdue installments of interest on all Bonds;

(2)     the principal of (and premium, if any, on) any Bonds which have become due otherwise than by such declaration of acceleration and interest thereon at the rate or rates prescribed therefor in such Bonds; and

(3)     all sums paid or advanced by the Bond Trustee or the Bondholder Representative hereunder and the reasonable compensation, expenses, disbursements and advances of the Bond Trustee, the Bondholder Representative, their agents and counsel; and

(b)     all Events of Default, other than the non-payment of the principal of Bonds which have become due solely by such declaration of acceleration, have been cured or have been waived as provided in Section 709 hereof.

No such rescission and annulment shall affect any subsequent default or impair any right consequent thereon.

**Section 703.   Exercise of Remedies by the Bond Trustee.**  Upon the occurrence and continuance of any Event of Default under this Bond Indenture, unless the same is waived as provided in this Bond Indenture, the Bond Trustee may, with the consent of the Bondholder Representative during the first 90 days after notice of such Event of Default from any of the Authority, the Corporation, the Bond Trustee or the holders of a majority in the principal amount of the Series 2023B Bonds and shall, at the written direction of the Controlling Holders, have the

following rights and remedies, in addition to any other rights and remedies provided under this Bond Indenture or by law:

(a)    Right to Bring Suit, Etc.  Pursue any available remedy at law or in equity by suit, action, mandamus or other proceeding to enforce the payment of the principal of, premium, if any, and interest on the Bonds Outstanding, including interest on overdue principal (and premium, if any) and on overdue installments of interest, and any other sums due under this Bond Indenture, to realize on or to foreclose any of its interests or liens under this Bond Indenture or any other Bond Document, to enforce and compel the performance of the duties and obligations of the Authority as set forth in this Bond Indenture and to enforce or preserve any other rights or interests of the Bond Trustee under this Bond Indenture with respect to any of the Trust Estate or otherwise existing at law or in equity.

(b)    Exercise of Remedies at Direction of Bondowners.  If requested in writing to do so by the Controlling Holders, and if indemnified as provided in Section 802(e), the Bond Trustee shall be obligated to exercise such one or more of the rights and remedies conferred by this Article as the Bond Trustee, in consultation with the Controlling Holders, shall deem most expedient in the interests of the Owners.

(c)    Appointment of Receiver.  Upon the filing of a suit or other commencement of judicial proceedings to enforce the rights of the Bond Trustee and of the Owners under this Bond Indenture, the Bond Trustee shall be entitled, as a matter of right, to the appointment of a receiver or receivers of the Trust Estate, pending such proceedings, with such powers as the court making such appointment shall confer.

(d)    Suits to Protect the Trust Estate.  The Bond Trustee shall have power to institute and to maintain such proceedings as it may, in consultation with the Controlling Holders, deem expedient to prevent any impairment of the Trust Estate by any acts which may be unlawful or in violation of this Bond Indenture and to protect its interests and the interests of the Owners in the Trust Estate, including power to institute and maintain proceedings to restrain the enforcement of or compliance with any governmental enactment, rule or order that may be unconstitutional or otherwise invalid, if the enforcement of, or compliance with, such enactment, rule or order would impair the security under this Bond Indenture or be prejudicial to the interests of the Owners or the Bond Trustee, or to intervene (subject to the approval of the Controlling Holders and a court of competent jurisdiction) on behalf of the Owners in any judicial proceeding to which the Authority or the Corporation is a party and which in the judgment of the Bond Trustee or the Controlling Holders has a substantial bearing on the interests of the Owners.

(e)    Enforcement Without Possession of Bonds.  All rights of action under this Bond Indenture or any of the Bonds may be enforced and prosecuted by the Bond Trustee without the possession of any of the Bonds or the production thereof in any suit or other proceeding relating thereto, and any such suit or proceeding instituted by the Bond Trustee shall be brought in its own name as trustee of an express trust.  Any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Bond Trustee, the Bondholder Representative, their agents and counsel, and subject to Section 707, be for the equal and ratable benefit of the Owners of the Bonds in respect of which such judgment has been recovered, subject to the payment priority set forth in Section 706 hereof.

(f)    Restoration of Positions.  If the Bond Trustee, the Bondholder Representative or any Owner has instituted any proceeding to enforce any right or remedy under this Bond Indenture by suit, foreclosure, the appointment of a receiver, or otherwise, and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Bond Trustee, the Bondholder Representative or to such Owner, then and in every case the Authority, the Bond Trustee, the Bondholder Representative, the Corporation and the Owners shall, subject to any determination in such proceeding, be restored to their former positions and rights under this Bond Indenture, and thereafter all rights and remedies of the Bond Trustee, the Bondholder Representative and the Owners shall continue as though no such proceeding had been instituted.

(g)    Replacement of Management.  For the avoidance of doubt, the Owners of the Series 2023B Bonds and Series 2023C Bonds may not replace management for any reason without the consent of the Bondholder Representative while the Series 2023A Bonds remain Outstanding even after the 90 day period referenced in the definition of Controlling Holders.

**Section 704.    Limitation on Suits by Bondowners**.  No Owner of any Bond shall have any right to institute any proceeding, judicial or otherwise, under this Bond Indenture, or for the appointment of a receiver or trustee or for any other remedy under this Bond Indenture, unless:

(a)    such Owner has previously given written notice to the Bond Trustee of a continuing Event of Default;

(b)    the Controlling Holders shall have made written request to the Bond Trustee to institute proceedings in respect of such Event of Default in its own name as Bond Trustee under this Bond Indenture;

(c)    such Owner or Owners have offered to the Bond Trustee indemnity as provided in this Bond Indenture against the costs, expenses and liabilities to be incurred in compliance with such request;

(d)    the Bond Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(e)    no direction inconsistent with such written request has been given to the Bond Trustee during such 60-day period by the Controlling Holders;

it being understood and intended that no one or more Owners of Bonds shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Bond Indenture to affect, disturb or prejudice the lien of this Bond Indenture or the rights of any other Owners of Bonds, or to obtain or to seek to obtain priority or preference over any other Owners or to enforce any right under this Bond Indenture, except in the manner herein provided and for the equal and ratable benefit of all Outstanding Bonds subject to the (i) subordination of the Series 2023B Bonds to the Series 2023A Bonds and (ii) the subordination of the Series 2023C Bonds to the Series 2023A Bonds and the Series 2023B Bonds.

Notwithstanding the foregoing or any other provision in this Bond Indenture, however, the Owner of any Bond shall have the right which is absolute and unconditional to receive payment of the principal of (and premium, if any) and interest on such Bond on the respective stated maturity expressed in such Bond (or, in the case of redemption, on the redemption date) and nothing contained in this Bond Indenture shall affect or impair the right of any Owner to institute suit for the enforcement of any such payment.

**Section 705.   Control of Proceedings by Bondowners**.  The Controlling Holders shall have the right, during the continuance of an Event of Default upon the provision of indemnification to the Bond Trustee if required pursuant to Section 802 hereof,

(a)      to require the Bond Trustee to proceed to enforce this Bond Indenture, either by judicial proceedings for the enforcement of the payment of the Bonds and the foreclosure of this Bond Indenture, or otherwise; and

(b)      to direct the time, method and place of conducting any proceeding for any remedy available to the Bond Trustee, or exercising any trust or power conferred upon the Bond Trustee under this Bond Indenture, provided that:

(1)      such direction shall not be in conflict with any rule of law or this Bond Indenture; and

(2)      the Bond Trustee may take any other action deemed proper by the Bond Trustee which is not inconsistent with such direction.

**Section 706.   Application of Moneys Collected**.  Any moneys collected by the Bond Trustee pursuant to this Article (after the deductions for payment of costs and expenses of proceedings resulting in the collection of such moneys and costs and expenses of the Bondholder Representative), together with any other sums then held by the Bond Trustee as part of the Trust Estate, shall be applied, after the payment of all amounts due the Bond Trustee under Section 804 hereof and the Bondholder Representative, then in the following order, at the date or dates fixed by the Bond Trustee and, in case of the distribution of such money on account of principal (or premium, if any) or interest, upon presentation of the Bonds and the notation thereon of the payment if only partially paid and upon surrender thereof if fully paid:

**First:** To the payment of all installments of interest then due on the Series 2023A Bonds, in the order of the maturity of the installments of such interest and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment ratably, according to the amounts due on such installment, without any discrimination or privilege;

**Second:** To the payment of the unpaid principal or redemption price, if any, of any of the Series 2023A Bonds or principal installments which shall have become due (other than Series 2023A Bonds or principal installments called for redemption for the payment of which moneys are held pursuant to the provisions of this Bond Indenture), in the order of their due dates and, if the amount available shall not be sufficient to pay in full Series 2023A Bonds  or principal installments due on any particular date, then to the payment ratably, according to the amount of principal due on such date, to the Persons entitled thereto without any discrimination or privilege.

**Third:** To the payment of all installments of interest then due on the Series 2023B Bonds, in the order of the maturity of the installments of such interest and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment ratably, according to the amounts due on such installment, without any discrimination or privilege;

**Fourth:** To the payment of the unpaid principal or redemption price, if any, of any of the Series 2023B Bonds or principal installments which shall have become due (other than Series 2023B Bonds or principal installments called for redemption for the payment of which moneys are held pursuant to the provisions of this Bond Indenture), in the order of their due dates and, if the amount available shall not be sufficient to pay in full Series 2023B Bonds or principal installments due on any particular date, then to the payment ratably, according to the amount of principal due on such date, to the Persons entitled thereto without any discrimination or privilege;

**Fifth:** To the payment of all installments of interest then due on the Series 2023C Bonds, in the order of the maturity of the installments of such interest and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment ratably, according to the amounts due on such installment, without any discrimination or privilege;

**Sixth:** To the payment ratably of the unpaid principal of the Series 2023C Bonds without priority or preference of one maturity over another or one Series 2023C Bond over another Series 2023C Bond to the Persons entitled thereto, without any discrimination or privilege; and

**Seventh:** To the payment of the remainder, if any, to the Corporation or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

Notwithstanding anything above to the contrary, moneys in each of the Series 2023A Account of the Debt Service Reserve Fund shall be applied in the above manner solely for payments due on the Series 2023A Bonds and moneys in the Series 2023B Account of the Debt Service Reserve Fund shall be applied in the above manner solely for payments due on the Series 2023B Bonds.

Whenever moneys are to be applied by the Bond Trustee pursuant to the provisions of this Section, such moneys shall be applied by it at such times, and from time to time, as the Bond Trustee shall determine, in consultation with the Bondholder Representative, having due regard for the amount of such moneys available for application and the likelihood of additional moneys becoming available for such application in the future.  Whenever the Bond Trustee shall apply such moneys, it shall fix the date (which shall be an Interest Payment Date unless it shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue.  The Bond Trustee shall give such notice as it may deem appropriate of the deposit with it of any such moneys and of the fixing of any such date, and shall not be required to make payment to the Owner of any unpaid Bond until such Bond shall be presented to the Bond Trustee for appropriate endorsement or for cancellation if fully paid.

**Section 707.   Rights and Remedies Cumulative**.  No right or remedy herein conferred upon or reserved to the Bond Trustee, to the Bondholder Representative or to the Bondowners is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent

permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy. No delay or omission of the Bond Trustee, of the Bondholder Representative or of any Owner of any Bond to exercise any right or remedy accruing upon an Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article or by law to the Bond Trustee, to the Bondholder Representative or to the Bondowners may be exercised from time to time, and as often as may be deemed expedient, by the Bond Trustee, by the Bondholder Representative or by the Bondowners, as the case may be.

In case the Bond Trustee shall have proceeded to enforce any right under this Bond Indenture by the appointment of a receiver, by entry, or otherwise, and such proceedings shall have been discontinued or abandoned for any reason, or shall have been determined adversely, then and in every case the Authority, the Corporation, the Bond Trustee, the Bondholder Representative and the Bondowners shall be restored to their former positions and all rights hereunder, and all rights, remedies and powers of the Bond Trustee shall continue as if no such proceedings had been taken.

**Section 708.   Advances by Bond Trustee**.  If the Corporation shall fail to make any payment or perform any of its covenants in the Loan Agreement, the Bond Trustee may, at any time and from time to time, use and apply any moneys held by it under this Bond Indenture, or make advances, to effect payment or performance of any such covenant on behalf of the Corporation. All moneys so used or advanced by the Bond Trustee, together with interest at the Bond Trustee's announced prime rate per annum, shall be repaid by the Corporation upon demand and such advances shall be secured under this Bond Indenture prior to the Bonds. For the repayment of all such advances the Bond Trustee shall have the right to use and apply any moneys at any time held by the Bond Trustee under this Bond Indenture but no such use of moneys or advance shall relieve the Corporation from any default hereunder. The Bondholder Representative shall not make any advances under the provisions of this Bond Indenture or the Loan Agreement without the prior written consent of the Owners of a majority in aggregate principal amount of the Outstanding Series 2023B Bonds.

**Section 709.   Waivers of Events of Default.**  The Bond Trustee shall waive any Event of Default hereunder and its consequences and rescind any declaration of maturity of principal upon the written request of the Controlling Holders; provided that there shall not be waived without the consent of the Bondholder Representative with respect to the Series 2023A Bonds (or the Owners of at least 66 2/3% in aggregate principal amount of the Series 2023A Bonds Outstanding if there is no Bondholder Representative) or the Owners of at least 80% in aggregate principal amount of the Series 2023B Bonds or the Series 2023C Bonds, as applicable, Outstanding (a) an Event of Default in the payment of the principal of any Outstanding Bonds of such series at the date of maturity specified therein, or (b) any default in the payment when due of the interest on any such Bonds of such series unless, prior to such waiver or rescission of the Event of Default referred to in (a) or (b) above, all arrears of interest, with interest (to the extent permitted by law) at the rate borne by the applicable series of Bonds on overdue installments of interest in respect to which such default shall have occurred, and all arrears of payments of principal when due, as the case may be, and all expenses of the Bond Trustee and the Bondholder Representative, if applicable, in connection with

59

such default shall have been paid or provided for.  In case of any such waiver or rescission, or in case any proceeding taken by the Bond Trustee on account of any such default shall have been discontinued or abandoned or determined adversely, then and in every case the Authority, the Corporation, the Bond Trustee, the Bondholder Representative, and the Bondowners shall be restored to their former positions, rights and obligations hereunder, respectively, but no such waiver or rescission shall extend to any subsequent or other default, or impair any right consequent thereon.

# ARTICLE VIII
# THE BOND TRUSTEE

**Section 801.  Acceptance of Trusts; Certain Duties and Responsibilities.**  The Bond Trustee accepts and agrees to execute the trusts imposed upon it by this Bond Indenture, but only upon the following terms and conditions:

(a)    Except during the continuance of an Event of Default,

(i)    the Bond Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Bond Indenture, and no implied covenants or obligations shall be read into this Bond Indenture against the Bond Trustee; and

(ii)    in the absence of bad faith on its part, the Bond Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Bond Trustee and conforming to the requirements of this Bond Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Bond Trustee, the Bond Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Bond Indenture.

(b)    If an Event of Default has occurred and is continuing, the Bond Trustee shall exercise such of the rights and powers vested in it by this Bond Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances.

(c)    No provision of this Bond Indenture shall be construed to relieve the Bond Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that

(i)    this Subsection shall not be construed to limit the effect of Subsection (a);

(ii)    the Bond Trustee shall not be liable for any error of judgment made in good faith by an authorized officer of the Bond Trustee, unless it shall be proved that the Bond Trustee was negligent in ascertaining the pertinent facts;

(iii)    the Bond Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Controlling Holders relating to the time, method and place of conducting any proceeding for any remedy available to the Bond Trustee, or exercising any trust or power conferred upon the Bond Trustee, under this Bond Indenture; and

(iv)    no provision of this Bond Indenture shall require the Bond Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(d)      Whether or not therein expressly so provided, every provision of this Bond Indenture relating to the conduct or affecting the liability of or affording protection to the Bond Trustee shall be subject to the provisions of this Section.

**Section 802.    Certain Rights of Bond Trustee.**  Except as otherwise provided in Section 901:

(a)      The Bond Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b)      The Bond Trustee shall be entitled to rely upon a Certificate of Corporation Representative as to the sufficiency of any request or direction of the Corporation mentioned herein, the existence or non-existence of any fact or the sufficiency or validity of any instrument, paper or proceeding, or that a resolution in the form therein set forth has been adopted by the Governing Body of the Corporation has been duly adopted, and is in full force and effect.

(c)      Whenever in the administration of this Bond Indenture the Bond Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Bond Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon a Certificate of Corporation Representative.

(d)      The Bond Trustee may consult with counsel, and the written advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by the Bond Trustee hereunder in good faith and in reliance thereon.

(e)      Notwithstanding anything elsewhere in this Bond Indenture contained, before taking any action under this Bond Indenture, the Bond Trustee may require that satisfactory indemnity be furnished to it for the reimbursement of all reasonable costs and expenses to which it may be put and to protect it against all liability which it may incur in or by reason of such action, except liability which is adjudicated to have resulted from its negligence or willful misconduct by reason of any action so taken.

(f)      The Bond Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, or other paper or document, but the Bond Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Bond Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Corporation, personally or by agent or attorney.

(g)      The Bond Trustee assumes no responsibility for the correctness of the recitals contained in this Bond Indenture and in the Bonds, except the certificate of authentication on the Bonds. The Bond Trustee makes no representations as to the value or condition of the Trust Estate

or any part thereof, or as to the title thereto or as to the security afforded thereby or hereby, or as to the validity or sufficiency of this Bond Indenture or of the Bonds. The Bond Trustee shall not be accountable for the use or application by the Corporation of any of the Bonds or the proceeds thereof or of any money paid to or upon the order of the Corporation under any provision of this Bond Indenture.

(h)     The Bond Trustee, in its individual or any other capacity, may become the Owner or pledgee of Bonds and may otherwise deal with the Authority or the Corporation with the same rights it would have if it were not Bond Trustee.

(i)     All money received by the Bond Trustee shall, until used or applied or invested as herein provided, be held in trust for the purposes for which they were received. Money held by the Bond Trustee in trust hereunder need not be segregated from other funds except to the extent required by law or by this Bond Indenture. The Bond Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed with the Authority or the Corporation.

(j)     The Bond Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Bond Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

(k)     The Bond Trustee may elect not to proceed in accordance with the directions of the Owners without incurring any liability to the Owners if in the opinion of the Bond Trustee such direction may result in liability to the Bond Trustee, in its capacity as bond trustee or in an individual capacity, for which the Bond Trustee has not received indemnity pursuant to Section 802(e) from the Owners, and the Bond Trustee may rely upon an Opinion of Counsel addressed to the Authority and the Bond Trustee in determining whether any action directed by Owners or the Authority may result in such liability.

(l)     The permissive right of the Bond Trustee to do things enumerated in this Bond Indenture shall not be construed as a duty, and the Bond Trustee hall not be answerable for other than its negligence or willful misconduct.

(m)     Notwithstanding any other provision of this Bond Indenture to the contrary, any provision intended to provide authority to act, right to payment of fees and expenses, protection, immunity and indemnification to the Bond Trustee shall be interpreted to include any action of the Bond Trustee whether it is deemed to be in its capacity as Bond Trustee, Bond Registrar or Paying Agent.

**Section 803.  Notice of Defaults.**  The Bond Trustee shall not be required to take notice or be deemed to have notice of any default with respect to Bonds hereunder, except for (i) Events of Default specified in Section 701(a) or (b), (ii) the failure of the Corporation to make any payments due to the Bond Trustee under the Continuing Covenants Agreement or the Loan Agreement, (iii) the failure of the Corporation to file any financial statements, certificates or documents specifically required to be filed with the Bond Trustee by a certain date pursuant to the provisions of the Loan

Agreement or the Continuing Covenants Agreement, or (iv) any other event of which an officer of the Bond Trustee with responsibility for administration of this Bond Indenture has actual knowledge and which, with the giving of notice or lapse of time or both would constitute an Event of Default with respect to such Bonds under this Bond Indenture, the Continuing Covenants Agreement or the Loan Agreement, unless specifically notified by written direction (i) by the Authority or the Corporation or (ii) by the Bondholder Representative or the Owners of at least 10% in principal amount of all Bonds Outstanding, and in the absence of such notice so delivered, the Bond Trustee may conclusively assume there is no default except as aforesaid. Within 30 days after the occurrence of any default hereunder of which the Bond Trustee is required to take notice or has received notice as provided in this Section, the Bond Trustee shall give written notice of such default by first-class mail to the Bondholder Representative and the Owners of the Series 2023B Bonds and the Series 2023C Bonds, and if there is no Bondholder Representative, to all Owners of Bonds as shown on the Bond Register maintained by the Bond Trustee, unless such default shall have been cured or waived; provided that, except in the case of a default in the payment of the principal of (or premium, if any) or interest on any Bond, the Bond Trustee shall be protected in withholding such notice if and so long as the Bond Trustee in good faith determines in consultation with the Bondholder Representative, that the withholding of such notice is in the interests of the Bondowners. For the purpose of this Section, the term "default" means any event which is, or after notice or lapse of time or both would become, an Event of Default.

**Section 804.    Compensation and Reimbursement**. The Bond Trustee shall be entitled to payment or reimbursement from the Corporation:

(a)    from time to time for reasonable compensation for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(b)    except as otherwise expressly provided herein, upon its request, for all reasonable expenses, disbursements and advances incurred or made by the Bond Trustee in accordance with any provision of this Bond Indenture (including the reasonable compensation and the expenses and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to the Bond Trustee's negligence or bad faith; and

(c)    to indemnify the Bond Trustee for, and to hold it harmless against, any loss, liability or expense incurred without negligence or bad faith on its part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

All such payments and reimbursements shall be made by the Corporation with interest at the rate of interest per annum equal to the Prime Rate. As security for payment of its reasonable fees and reasonable expenses, the Trustee shall have a lien on all funds and accounts held hereunder, prior to the lien of the Owners.

The Bond Trustee shall promptly notify the Corporation in writing of any claim or action brought against the Bond Trustee in respect of which indemnity may be sought against the

Corporation, setting forth the particulars of such claim or action, and the Corporation will assume the defense thereof, including the employment of counsel satisfactory to the Bond Trustee and the payment of all expenses. The Bond Trustee may employ separate counsel in any such action and participate in the defense thereof, and the reasonable fees and expenses of such counsel shall not be payable by the Corporation unless such employment has been specifically authorized by the Corporation.

Pursuant to the Loan Agreement, the Corporation has agreed to pay to the Bond Trustee all reasonable fees, charges, advances and expenses of the Bond Trustee, and the Bond Trustee agrees to look only to the Corporation for the payment of all reasonable fees, charges, advances and expenses of the Bond Trustee and any Paying Agent as provided in the Loan Agreement. The Bond Trustee agrees that the Authority shall have no liability for any fees, charges and expenses of the Bond Trustee.

**Section 805.   Corporate Trustee Required; Eligibility.** There shall at all times be a Bond Trustee hereunder which shall be a bank or trust company organized and doing business under the laws of the United States of America or of any state thereof, authorized under such laws to exercise corporate trust powers, subject to supervision or examination by federal or state authority, having a corporate trust office located in the State and must have a combined capital and surplus of at least $50,000,000 or must provide a guaranty of the full and prompt performance by the Bond Trustee of its obligations under this Bond Indenture and any other agreements made in connection with the Bonds by a guarantor with such assets. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of such supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Bond Trustee shall cease to be eligible in accordance with this Section, it shall resign immediately in the manner and with the effect specified in this Article.

[    **Section 806.   Resignation and Removal of Bond Trustee.**

(a)     The Bond Trustee may resign at any time by giving written notice thereof to the Authority, the Bondholder Representative, the Corporation and each Owner of Bonds Outstanding as their names and addresses appear in the Bond Register maintained by the Bond Trustee. If an instrument of acceptance by a successor Bond Trustee shall not have been delivered to the Bond Trustee within 30 days after the giving of such notice of resignation, the resigning Bond Trustee may petition any court of competent jurisdiction for the appointment of a successor Bond Trustee.

(b)     If (i) an Event of Default exists and (ii) the Bond Trustee has any conflicting interest (as defined in the Trust Indenture Act of 1939, as amended), it shall, within 90 days after ascertaining that an Event of Default and such a conflicting interest exist, either eliminate such conflicting interest or resign in the manner and with the effect specified in Subsection (a).

(c)     The Bond Trustee may be removed at any time by an instrument or concurrent instruments in writing delivered to the Authority and the Bond Trustee and signed by the Bondholder Representative so long as the Series 2023A Bonds are Outstanding and thereafter by the Owners of a majority in principal amount of the Outstanding Series 2023B Bonds Outstanding. The Authority,

the Corporation, the Bondholder Representative or any Bondowner may at any time petition any court of competent jurisdiction for the removal for cause of the Bond Trustee.

(d)    If at any time:

(i)    the Bond Trustee shall fail to comply with Subsection (b) after written request therefor by the Corporation, the Bondholder Representative, the Authority or by any Bondowner, as applicable, or

(ii)    the Bond Trustee shall cease to be eligible under Section 805 and shall fail to resign after written request therefor by the Corporation, the Bondholder Representative, the Authority or by any such Bondowner, or

(iii)    the Bond Trustee shall become incapable of acting or shall be adjudged a bankrupt or insolvent or a receiver of the Bond Trustee or of its property shall be appointed or any public officer shall take charge or control of the Bond Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case, (A) the Authority, the Bondholder Representative so long as the Series 2023A Bonds are Outstanding , the Owners of a majority in the principal amount of the Series 2023B Bonds so long as the Series 2023A Bonds are no longer Outstanding or the Corporation may remove the Bond Trustee, or (B) the Corporation, the Bondholder Representative so long as the Series 2023A Bonds are Outstanding or any Owner so long as the Series 2023A Bonds are no longer Outstanding,  may petition any court of competent jurisdiction for the removal of the Bond Trustee and the appointment of a successor Bond Trustee.

(e)    The successor Bond Trustee shall give notice of such resignation or such removal of the Bond Trustee and such appointment of a successor Bond Trustee by mailing written notice of such event by first-class mail, postage prepaid, to the  Bondholder Representative and the Registered Owners of Bonds as their names and addresses appear in the Bond Register maintained by the Bond Trustee.  Each notice shall include the name of the successor Bond Trustee and the address of its principal corporate trust office.

(f)    No resignation or removal of the Bond Trustee and no appointment of a successor Bond Trustee pursuant to this Article shall become effective until the acceptance of appointment by the successor Bond Trustee under Section 807.

(g)    Notwithstanding any provision herein to the contrary, the Authority shall have no obligation to monitor the qualifications of the Bond Trustee or request the removal of the Bond Trustee.   ]

[    **Section 807.    Appointment of Successor Bond Trustee.**  If the Bond Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Bond Trustee for any cause, (a) the Corporation (so long as no Event of Default hereunder or under the Loan Agreement or the Continuing Covenants Agreement has occurred and is continuing), with the approval of the Bondholder Representative so long as the Series 2023A Bonds are Outstanding and

thereafter the Owners of a majority in principal amount of Series 2023B Bonds Outstanding or (b) the Bondholder Representative so long as the Series 2023A Bonds are Outstanding and thereafter the Owners of a majority in principal amount of Series 2023B Bonds Outstanding (if an Event of Default hereunder or under the Loan Agreement or the Continuing Covenants Agreement has occurred and is continuing), by an instrument or concurrent instruments in writing delivered to the Authority and the retiring Bond Trustee, shall promptly appoint a successor Bond Trustee. In case all or substantially all of the Trust Estate shall be in the possession of a receiver or trustee lawfully appointed, such receiver or trustee, by written instrument, with the approval of the Bondholder Representative so long as the Series 2023A Bonds are Outstanding may similarly appoint a temporary successor to fill such vacancy until a new Bond Trustee shall be so appointed by the Corporation, or by the Bondholder Representative so long as the Series 2023A Bonds are Outstanding and thereafter the Owners of a majority in principal amount of Series 2023B Bonds Outstanding as set forth above. If a successor Bond Trustee shall be appointed in the manner herein provided, the successor Bond Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Bond Trustee and supersede the retiring Bond Trustee and any temporary successor Bond Trustee appointed by such receiver or trustee. If, within 30 days after such resignation, removal or incapability or the occurrence of such vacancy, no successor Bond Trustee shall have been so appointed and accepted appointment in the manner herein provided, any Bondowner, the Bondholder Representative or the Bond Trustee may petition any court of competent jurisdiction for the appointment of a successor Bond Trustee, until a successor shall have been appointed as above provided. The successor so appointed by such court shall immediately and without further act be superseded by any successor appointed as above provided. Every such successor Bond Trustee appointed pursuant to this Section shall be a bank with trust powers or trust company in good standing under the law of the jurisdiction in which it was created and by which it exists, meeting the eligibility requirements of this Article and be acceptable to the Bondholder Representative so long as the Series 2023A Bonds are Outstanding. ]

**Section 808.    Acceptance of Appointment by Successor.** Every successor Bond Trustee appointed hereunder shall execute, acknowledge and deliver to the Authority and to the retiring Bond Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Bond Trustee shall become effective and such successor Bond Trustee, without any further act, deed or conveyance, shall become vested with all the estates, properties, rights, powers, trusts and duties of the retiring Bond Trustee; but, on request of the successor Bond Trustee, such retiring Bond Trustee shall, upon payment of its charges, execute and deliver an instrument conveying and transferring to such successor Bond Trustee upon the trusts herein expressed all the estates, properties, rights, powers and trusts of the retiring Bond Trustee, and shall duly assign, transfer and deliver to such successor Bond Trustee all property and money held by such retiring Bond Trustee hereunder, subject nevertheless to its lien, if any, provided for in Section 804. Upon request of any such successor Bond Trustee, the Authority shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Bond Trustee all such estates, properties, rights, powers and trusts.

No successor Bond Trustee shall accept its appointment unless at the time of such acceptance such successor Bond Trustee shall be qualified and eligible under this Article.

**Section 809.    Merger, Consolidation and Succession to Business.**  Any corporation or association into which the Bond Trustee may be merged or with which it may be consolidated, or any corporation or association resulting from any merger or consolidation to which the Bond Trustee shall be a party, or any corporation or association succeeding to all or substantially all of the corporate trust business of the Bond Trustee, shall be the successor of the Bond Trustee hereunder, provided such corporation or association shall be otherwise qualified and eligible under this Article, and shall be vested with all of the title to the whole property or Trust Estate and all the trusts, powers, discretions, immunities, privileges and all other matters as was its predecessor, without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case any Bonds shall have been authenticated, but not delivered, by the Bond Trustee then in office, any successor by merger or consolidation to such authenticating Bond Trustee may adopt such authentication and deliver the Bonds so authenticated with the same effect as if such successor Bond Trustee had itself authenticated such Bonds.

**Section 810.    Co-Bond Trustees and Separate Bond Trustees.**  At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any of the Trust Estate may at the time be located, or in the enforcement of any default or the exercise any of the powers, rights or remedies herein granted to the Bond Trustee, or any other action which may be desirable or necessary in connection therewith, the Bond Trustee shall have power to appoint, and upon the written request of the Bond Trustee, the Authority shall for such purpose join with the Bond Trustee in the execution, delivery and performance of all instruments and agreements reasonably necessary or proper to appoint, one or more Persons approved by the Bond Trustee either to act as co-trustee, jointly with the Bond Trustee, of all or any part of the Trust Estate, or to act as separate trustee of any such property, in either case with such powers as may be provided in the instrument of appointment, and to vest in such person or persons in the capacity aforesaid, any property, title, right or power deemed necessary or desirable, subject to the other provisions of this Section.  If the Authority does not join in such appointment within 15 days after the receipt by it of a request so to do, or in case an event of default has occurred and is continuing, the Bond Trustee alone shall have power to make such appointment. Any such appointment under this Section shall be acceptable to the Bondholder Representative so long as the Series 2023A Bonds are Outstanding.

Should any written instrument from the Authority be reasonably required by any co-trustee or separate trustee so appointed for more fully confirming to such co-trustee or separate trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Authority.

Every co-trustee or separate trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms, namely:

(a)    The Bonds shall be authenticated and delivered, and all rights, powers, duties and obligations hereunder in respect of the custody of securities, cash and other personal property held by, or required to be deposited or pledged with, the Bond Trustee hereunder, shall be exercised solely, by the Bond Trustee.

68

(b)        The rights, powers, duties and obligations hereby conferred or imposed upon the Bond Trustee in respect of any property covered by such appointment shall be conferred or imposed upon and exercised or performed by the Bond Trustee or by the Bond Trustee and such co-trustee or separate trustee jointly, as shall be provided in the instrument appointing such co-trustee or separate trustee, except to the extent that under any law of any jurisdiction in which any particular act is to be performed, the Bond Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by such co-trustee or separate trustee.

(c)        The Bond Trustee at any time, by an instrument in writing executed by it,  may accept the resignation of or remove any co-trustee or separate trustee appointed under this Section, and, in case an Event of Default has occurred and is continuing, the Bond Trustee shall have power to accept the resignation of, or remove, any such co-trustee or separate trustee without the concurrence of the Authority.  Upon the written request of the Bond Trustee, the Authority shall join with the Bond Trustee in the execution, delivery and performance of all instruments and agreements reasonably necessary or proper to effectuate such resignation or removal.  A successor to any co-trustee or separate trustee so resigned or removed may be appointed in the manner provided in this Section.

(d)        No co-trustee or separate trustee hereunder shall be personally liable by reason of any act or omission of the Bond Trustee, or any other such trustee hereunder.

(e)        Any request, demand, authorization, direction, notice, consent, waiver or other act of the Bondholder Representative or the Bondowners delivered to the Bond Trustee shall be deemed to have been delivered to each such co-trustee and separate trustee.

**Section 811.    Designation of Paying Agents.**  The Bond Trustee is hereby designated and agrees to act as principal Paying Agent for and in respect to the Bonds.  The Corporation may, in its discretion, cause the necessary arrangements to be made through the Bond Trustee and to be thereafter continued for the designation of alternate Paying Agents, if any, and for the making available of funds hereunder for the payment of the principal of, premium, if any, and interest on the Bonds of any series, or at the designated corporate trust office of said alternate Paying Agents.  In the event of a change in the office of Bond Trustee, the predecessor Bond Trustee which has resigned or been removed shall cease to be trustee of any funds provided hereunder and Paying Agent for principal of, premium, if any, and interest on the Bonds, and the successor Bond Trustee shall become such Bond Trustee and Paying Agent unless a separate Paying Agent or Agents are appointed by the Corporation in connection with the appointment of any successor Bond Trustee.

**Section 812.    Advances by Bond Trustee.**  If the Corporation shall fail to make any payment or perform any of its covenants in the Loan Agreement, or the Continuing Covenants Agreement, the Bond Trustee may, at any time and from time to time, use and apply any moneys held by it under the Bond Indenture, or make advances, to effect payment or performance of any such covenant on behalf of the Corporation.  All moneys so used or advanced by the Bond Trustee, together with interest at Prime Rate, shall be repaid by the Corporation upon demand and such advances shall be secured under the Bond Indenture prior to the Bonds.  For the repayment of all such advances the Bond Trustee shall have the right to use and apply any moneys at any time held by it under the Bond Indenture but no such use of moneys or advance shall relieve the Corporation

from any default hereunder. The Bondholder Representative shall not make any advances under the provisions of this Bond Indenture or the Loan Agreement without the prior written consent of the Owners of a majority in aggregate principal amount of the Outstanding Series 2023B Bonds.

      **Section 813.   Bond Trustee Acknowledgment and Agreement.**   For the avoidance of doubt, the Bond Trustee acknowledges and agrees that this Bond Indenture requires actions to be taken, including without limitation, the exercise of remedies and the entry into Supplemental Bond Indentures, at the direction of the Bondowners of any of a majority, 66 2/3% or 80% of the aggregate principal amount of the Outstanding Bonds or the Bondholder Representative (and in the case of the Bondholder Representative, even when it does not represent the Bondowners of 100% of the aggregate principal amount of the Outstanding Bonds). In the case that the Bond Trustee is directed by the Bondowners of the applicable percentage of Bonds or the Bondholder Representative and indemnified in accordance with Article VIII, the Bond Trustee acknowledges and agrees that it shall follow such direction without any requirement for (i) an order from any court pursuant to any state statute, and (ii) disclosure of the names of any clients of the initial Bondholder Representative, provided that the Bondholder Representative provides a certificate that it meets the definition of Bondholder Representative and provided further, any such direction or action is for the equal benefit of all Owners, subject to the subordination provisions set forth herein.

## ARTICLE IX
## SUPPLEMENTAL INDENTURES

**Section 901.  Supplemental Indentures Not Requiring Consent of Bondowners.** Without the consent of the Owners of any Bonds, but with the consent of the Bondholder Representative so long as the Series 2023A Bonds are Outstanding, the Authority and the Bond Trustee may from time to time enter into one or more Supplemental Bond Indentures for any of the following purposes:

(a)  to more precisely identify the Facilities financed or refinanced with proceeds of the Bonds, or to substitute or add additional property thereto as permitted by the Loan Agreement, or to correct or amplify the description of any property at any time subject to the lien of this Bond Indenture, or better to assure, convey and confirm unto the Bond Trustee any property subject or required to be subjected to the lien of this Bond Indenture, or to subject to the lien of this Bond Indenture additional property;

(b)  to add to the conditions, limitations and restrictions on the authorized amount, terms or purposes of issue, authentication and delivery of Bonds, as herein set forth, additional conditions, limitations and restrictions thereafter to be observed;

(c)  to evidence the appointment of a separate trustee or the succession of a new trustee under this Bond Indenture;

(d)  to add to the covenants of the Authority or to the rights, powers and remedies of the Bond Trustee for the benefit of the Owners of all of the Bonds or to surrender any right or power herein conferred upon the Authority;

(e)  to cure any ambiguity, to correct or supplement any provision in this Bond Indenture which may be inconsistent with any other provision herein; or

(f)  to modify, eliminate or add to the provisions of this Bond Indenture to such extent as shall be necessary to effect the qualification of this Bond Indenture under the Trust Indenture Act of 1939, as amended, or under any similar federal statute hereafter enacted, or to permit the qualification of the Bonds for sale under the securities laws of the United States or any state of the United States.

**Section 902.  Supplemental Indentures Requiring Consent of Bondowners.**  With the consent of (i) the Bondholder Representative so long as the Series 2023A Bonds are Outstanding (ii) and the Owners of not less than a majority in principal amount of the Series 2023B Bonds then Outstanding, the Authority and the Bond Trustee may enter into one or more Supplemental Bond Indentures for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Bond Indenture or of modifying in any manner the rights of the Owners of the Bonds under this Bond Indenture; provided, however, that no such Supplemental Bond Indenture shall, without the consent of the Owner of not less than 66 2/3% in principal amount of the Outstanding Series 2023A Bonds and the Owners of not less than 80% in principal amount of the Outstanding Series 2023B Bonds and Series 2023C Bonds, carry out any of the following:

(a)     change the stated maturity or mandatory redemption date of the principal of, or any installment of interest on, any Bond, or reduce the principal amount thereof or the interest thereon or any premium payable upon the redemption thereof, or change any place of payment where, or the coin or currency in which, any Bond, or the interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the stated maturity thereof (or, in the case of redemption, on or after the redemption date);

(b)     reduce the percentage in principal amount of the Outstanding Bonds, the consent of whose Owners is required for any such Supplemental Bond Indenture, or the consent of whose Owners is required for any waiver provided for in this Bond Indenture of compliance with certain provisions of this Bond Indenture or certain defaults hereunder and their consequences;

(c)     modify the obligation of the Authority to make payment on or provide funds for the payment of any Bond;

(d)     modify or alter the provisions of the proviso to the definition of the term "Outstanding";

(e)     modify any of the provisions of this Section or Section 709 hereof; or

(f)     except as provided in the Loan Agreement, permit the creation of any lien ranking prior to or on a parity with the lien of this Bond Indenture with respect to any of the Trust Estate or terminate the lien of this Bond Indenture on any property at any time subject hereto or deprive the Owner of any Bond of the security afforded by the lien of this Bond Indenture.

The Bond Trustee may in its discretion, in consultation with the Bondholder Representative while the Series 2023A Bonds are Outstanding, determine whether or not any Bonds would be affected by any Supplemental Bond Indenture and any such determination shall be conclusive upon the Owners of all Bonds, whether theretofore or thereafter authenticated and delivered hereunder. The Bond Trustee shall not be liable for any such determination made in good faith.

**Section 903.   Corporation's Consent to Supplemental Indentures.**  Anything herein to the contrary notwithstanding, so long as the Corporation is not in default under the Loan Agreement or the Continuing Covenants Agreement, a Supplemental Bond Indenture under this Article which affects any rights of the Corporation shall not become effective unless and until the Corporation shall have consented in writing to the execution and delivery of such Supplemental Bond Indenture.  In this regard, the Bond Trustee shall cause notice of the proposed execution and delivery of any such Supplemental Bond Indenture, together with a copy of the proposed Supplemental Bond Indenture, to be mailed by first-class mail to the Corporation at least 15 days prior to the proposed date of execution and delivery of any such Supplemental Bond Indenture.

**Section 904.   Opinion of Bond Counsel.**  Notwithstanding anything to the contrary in Sections 901 or 902, before the Authority and the Bond Trustee enter into any Supplemental Bond Indenture pursuant to Section 901 or 902, there shall have been delivered to the Authority and the Bond Trustee an Opinion of Bond Counsel stating that such Supplemental Bond Indenture is authorized or permitted by this Bond Indenture and the Act, complies with their respective terms,

will, upon the execution and delivery thereof, be valid and binding upon the Authority in accordance with its terms and will not adversely affect the validity of the Bonds or the exclusion from federal gross income of interest on the Tax-Exempt Bonds.  The Authority and the Bond Trustee may conclusively rely on such opinion when executing and consenting to such supplement.

**Section 905.    Supplemental Bond Indenture by Direction Letter of Bondholder Representative.**  So long as any Series 2023A Bonds are Outstanding, any Supplemental Bond Indenture or other amendment to this Bond Indenture may be accomplished solely by a direction letter from the Bondholder Representative and the requisite consent of Owners of the Series 2023B Bonds and, if required by Section 902, the requisite consent of Owners of the Series 2023C Bonds provided for herein, to the Authority, and with the written consent of the Corporation and Bond Trustee, setting forth the terms thereof; provided such Supplemental Bond Indenture or other amendment does not adversely affect the interests of the Authority (in the Authority's sole discretion).

## ARTICLE X
## SUPPLEMENTAL LOAN AGREEMENTS

**Section 1001.  Supplemental Loan Agreements Not Requiring Consent of Bondowners.** The Authority, at the request of the Corporation, and the Bond Trustee may, without the consent of or notice to the Bondowners, but with the consent of the Bondholder Representative so long as the Series 2023A Bonds are Outstanding, consent to the execution of any Supplemental Loan Agreements by the Authority and the Corporation as may be required:

       (a)      by the Loan Agreement and this Bond Indenture,

       (b)      for the purpose of curing any ambiguity or formal defect or omission in the Loan Agreement.

**Section 1002.  Supplemental Loan Agreements Requiring Consent of Bondowners.**  With the consent of (i) the Bondholder Representative so long as the Series 2023A Bonds are Outstanding and (ii) the Owners of not less than a majority in principal amount of the Series 2023B Bonds then Outstanding, the Bond Trustee may consent to the execution of any Supplemental Loan Agreements by the Authority, at the request of the Corporation, and the Corporation; provided that no such Supplemental Loan Agreement shall be entered into which permits the following without the consent of the Bondholder Representative so long as the Series 2023A Bonds are Outstanding and the Owners of not less than 80% in principal amount of the Outstanding Series 2023B Bonds and Series 2023C Bonds:

       (a)      an extension of the maturity of the principal of or the interest on the Series 2023 Bond Notes, or

       (b)      a reduction in the principal amount of the Series 2023 Bond Notes or the premium or rate of interest payable thereon.

If at any time the Corporation shall request the consent of the Bond Trustee to any such proposed Supplemental Loan Agreement, the Bond Trustee shall cause notice of such proposed Supplemental Loan Agreement to be mailed in the same manner as provided by Section 902 with respect to Supplemental Bond Indentures.  Such notice shall briefly set forth the nature of such proposed Supplemental Loan Agreement and shall state that copies of the same are on file at the principal corporate office of the Bond Trustee for inspection by all Bondowners.  If within 60 days following the mailing of such notice, the Bondholder Representative or the Owners of not less than the applicable percentage in aggregate principal amount of the Series 2023B Bonds Outstanding, as applicable, at the time of the execution of any such Supplemental Loan Agreement shall have consented to and approved the execution thereof as herein provided, no Owner of any Bond shall have any right to object to any of the terms and provisions contained therein, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Bond Trustee or the Authority from executing the same or from taking any action pursuant to the provisions thereof.  Upon the execution of any such Supplemental Loan Agreement as in this Section permitted and provided, the Loan Agreement shall be and be deemed to be modified and amended in accordance therewith.

**Section 1003. Opinion of Bond Counsel.** Anything to the contrary in Sections 1001 or 1002 notwithstanding, before the Authority executes and the Bond Trustee consents to any Supplemental Loan Agreement, there shall have been delivered to the Authority and the Bond Trustee an Opinion of Bond Counsel stating that such amendment is authorized or permitted by this Bond Indenture and the Act, complies with their respective terms, will, upon the execution and delivery thereof, be valid and binding upon the Authority (if the Authority is a party thereto) in accordance with its terms and will not adversely affect the validity of the Bonds or the exclusion from federal gross income of interest on the Tax-Exempt Bonds.

**Section 1004. Supplemental Loan Agreement by Direction Letter of Bondholder Representative.** So long as any Series 2023A Bonds are Outstanding, any Supplemental Loan Agreement or other amendment to the Loan Agreement may be accomplished solely by a direction letter from the Bondholder Representative and the requisite consent of Owners of the Series 2023B Bonds and, if required by Section 1002, the requisite consent of Owners of the Series 2023C Bonds provided for herein to the Corporation and the Authority, and with the written consent of the Bond Trustee, setting forth the terms thereof; provided such Supplemental Loan Agreement or other amendment does not adversely affect the interests of the Authority (in the Authority's sole discretion) and the Corporation.

# ARTICLE XI
## SATISFACTION AND DISCHARGE OF BOND INDENTURE

**Section 1101.  Bonds Deemed To Be Paid.**  Any Bond or Bonds or series of Bonds shall be deemed to be paid and no longer Outstanding under this Bond Indenture and shall cease to be entitled to any lien, benefit or security under this Bond Indenture if the Bonds are paid in full or provision for the payment of such Bond or Bonds has been made in any one or more of the following ways:

(a)       by paying or causing to be paid the principal of (including redemption premium, if any) and interest on such Bond or Bonds or series of Bonds, as and when the same become due and payable;

(b)       by delivering and surrendering to the Bond Trustee, for cancellation by it, such Bond or Bonds or series of Bonds; or

(c)       by depositing with the Bond Trustee, in trust, (i) moneys or Defeasance Obligations in such amounts and with maturities as the Bond Trustee shall determine will be, together with other moneys deposited therein and together with the income or increment to accrue thereon, without consideration of any reinvestment thereof, fully sufficient to pay or redeem (when redeemable) and discharge the indebtedness on such Bond or Bonds or series of Bonds at or before their respective maturity dates and to pay the interest thereon as it comes due, and (ii) in the case of Bonds which do not mature or will not be redeemed within 90 days of the deposit referred to in (i) above, a verification report of an independent certified public accounting firm as to the adequacy of the trust funds to fully pay the Bonds deemed to be paid.

Notwithstanding the foregoing, in the case of any Bonds which by their terms may be redeemed prior to the stated maturities thereof, no deposit under clause (c) of the immediately preceding paragraph shall be deemed a payment of such Bonds as aforesaid until, as to all such Bonds which are to be redeemed prior to their respective stated maturities, proper notice of such redemption shall have been given in accordance with Article III or irrevocable instructions shall have been given to the Bond Trustee to give such notice.

Notwithstanding any provisions of any other Section of this Bond Indenture which may be contrary to this Section, all moneys or Defeasance Obligations set aside and held in trust pursuant to this Section for the payment of Bonds (including redemption premium thereon, if any) shall be held irrevocably in trust for the Owners of such Bonds and applied to and used solely for the payment of the particular Bonds (including redemption premium thereon, if any) with respect to which such moneys and Defeasance Obligations have been so set aside in trust.

**Section 1102. Satisfaction and Discharge of the Bond Indenture.**  If the principal of, redemption premium, if any, and interest on all of the Bonds shall have been paid in accordance with their terms, or provision has been made for such payment as provided in Section 1101, and provision shall also be made for paying all other sums payable hereunder, including the payment of any rebatable arbitrage to the United States and the fees, charges and expenses of the Authority, the Bondholder Representative, the Bond Trustee and any Paying Agent to the date of retirement of the

Bonds, then the right, title and interest of the Bond Trustee in respect hereof shall thereupon cease, determine and be void, and thereupon the Bond Trustee, upon Written Request of the Corporation, and upon receipt by the Bond Trustee and the Authority of an Opinion of Bond Counsel to the effect that all conditions precedent to the satisfaction and discharge of this Bond Indenture have been complied with, shall cancel, discharge and release this Bond Indenture and shall execute, acknowledge and deliver to the Authority such instruments of satisfaction and discharge or release as shall be requisite to evidence such release and the satisfaction and discharge of this Bond Indenture, and shall assign and deliver to the Authority, the Corporation or other Person entitled thereto as their respective interests may appear, any property and revenues at the time subject to this Bond Indenture which may then be in its possession, other than moneys or obligations held by the Bond Trustee for the payment of the principal of and interest and redemption premium, if any, due or to become due on the Bonds.

The Authority is hereby authorized to accept a certificate by the Bond Trustee that the whole amount of the principal and interest and redemption premium, if any, so due and payable upon all of the Bonds then Outstanding and all other amounts required to be paid hereunder have been paid or such payment has been provided for in accordance with Section 1101 as evidence of satisfaction of this Bond Indenture, and upon receipt thereof shall cancel and erase the inscription of this Bond Indenture from its records.

Upon provision for the payment of all Outstanding Bonds in accordance with this Section, and compliance with the other payment requirements of Section 1101, and subject to this Section, the Bond Indenture may be discharged in accordance with the provisions hereof; provided that the Owners thereof shall thereafter be entitled to payment only out of the moneys or Defeasance Obligations deposited with the Bond Trustee as aforesaid.

Provision for payment of the Tax-Exempt Bonds Outstanding hereunder may not be made as aforesaid nor may this Bond Indenture be discharged if under any circumstances the interest on such Tax-Exempt Bonds is thereby made subject to federal income taxation. In determining the foregoing, the Bond Trustee may rely upon an Opinion of Bond Counsel (which opinion may be based upon a ruling or rulings of the Internal Revenue Service) to the effect that so providing for the payment of any Tax-Exempt Bonds will not cause the interest on the Tax-Exempt Bonds to be subject to federal income taxation under Section 103(a) of the Internal Revenue Code, notwithstanding the satisfaction and discharge of this Bond Indenture.

**Section 1103. Payment of Bonds After Discharge.** Notwithstanding the discharge of the lien hereof as in this Article provided, the Bond Trustee shall nevertheless retain such rights, powers and duties hereunder as may be necessary and convenient for the payment of amounts due or to become due on the Bonds and the registration, transfer, exchange and replacement of Bonds as provided herein. Nevertheless, any moneys held by the Bond Trustee or any Paying Agent for the payment of the principal of, redemption premium, if any, or interest on any Bond remaining unclaimed for four years after the principal of all Bonds has become due and payable, whether at maturity or upon proceedings for redemption or by declaration as provided herein, shall then be paid to the Corporation and the Owners of any Bonds not theretofore presented for payment shall thereafter be entitled to look only to the Corporation for payment thereof and all liability of the Bond Trustee, any Paying Agent or the Authority with respect to such moneys shall thereupon cease.

# ARTICLE XII
## MISCELLANEOUS PROVISIONS

**Section 1201. Consents and Other Instruments by Bondowners.** Any consent, request, direction, approval, objection or other instrument required by this Bond Indenture (other than the assignment of any Bond) to be signed and executed by the Bondowners may be in any number of concurrent writings of similar tenor and may be signed or executed by such Bondowners in person or by agent appointed in writing. Proof of the execution of any such instrument or of the writing appointing any such agent and of the ownership of Bonds, if made in the following manner, shall be sufficient for any of the purposes of this Bond Indenture, and shall be conclusive in favor of the Bond Trustee with regard to any action taken, suffered or omitted under any such instrument, namely:

(a)    The fact and date of the execution by any Person of any such instrument may be proved by the certificate of any officer in any jurisdiction who by law has power to take acknowledgments within such jurisdiction that the Person signing such instrument acknowledged before him the execution thereof, or by affidavit of any witness to such execution.

(b)    The fact of ownership of Bonds and the amount or amounts, numbers and other identification of such Bonds, and the date of holding the same shall be proved by the Bond Register.

In determining whether the Owners of the requisite principal amount of Bonds Outstanding have given any request, demand, authorization, direction, notice, consent or waiver under this Bond Indenture, Bonds owned by the Corporation or any affiliate shall be disregarded and deemed not to be Outstanding under this Bond Indenture, except that, in determining whether the Bond Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which the Bond Trustee knows to be so owned shall be so disregarded. Notwithstanding the foregoing, Bonds so owned which have been pledged in good faith shall not be disregarded as aforesaid if the pledgee establishes to the satisfaction of the Bond Trustee the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation or any affiliate.

Any action taken by the Bond Trustee pursuant to this Bond Indenture upon the request or authority or consent of any Person who at the time of making such request or giving such authority or consent is the Owner of any Bond shall be conclusive and binding upon all future Owners of the same Bond and upon Bonds issued in exchange therefor or in place thereof.

**Section 1202. Limitation of Rights Under the Bond Indenture.** With the exception of rights herein expressly conferred, nothing expressed or mentioned in or to be implied by this Bond Indenture or the Bonds is intended or shall be construed to give any Person other than the parties hereto, the Bondholder Representative and the Owners of the Bonds, any right, remedy or claim under or in respect to this Bond Indenture, and all of the covenants, conditions and provisions hereof being intended to be and being for the sole and exclusive benefit of the parties hereto, the Bondholder Representative and the Owners of the Bonds as herein provided.

**Section 1203. Notices.**  Except as otherwise provided herein, it shall be sufficient service of any notice, request, complaint, demand or other paper required by this Bond Indenture to be given to or filed with the Authority, the Bond Trustee, the Corporation, the Bondholder Representative or the Bondowners if the same shall be duly sent by prepaid overnight delivery service or duly mailed by certified, registered or first-class mail, postage prepaid, addressed:

(a)     To the Authority at:               Oklahoma County Finance Authority
105 N. Hudson, Suite 304
Oklahoma City, Oklahoma 73102
Attn: Chairman

(b)     To the Bond Trustee at:           BancFirst
100 N Broadway Avenue
Oklahoma City, Oklahoma 73102
Attn: Corporate Trust Department

(c)     To the Corporation at:            Central Oklahoma United Methodist
Retirement Facility, Inc.
14901 N. Pennsylvania Avenue
Oklahoma City, Oklahoma 73134
Attn: Chief Financial Officer

(d)     To the Bondowners:              Hamlin Capital Management, LLC
640 Fifth Avenue, 11th Floor
New York, New York 10019
Attention: Joseph J. Bridy

(e)     To the addresses of the Bondowners as shown on the Bond Register maintained by the Bond Trustee under this Bond Indenture.

(f)     To the Securities Depository:     The Depository Trust Company
55 Water Street, 50th Floor
New York, New York  10041-0099
Attention:  Supervisor,
Put Bonds Section/Reorganization Department
Telecopy:  (212) 855-5235

The Bond Trustee is hereby instructed to give notice to any Rating Agency then maintaining a rating on the Bonds if (i) the Bond Trustee resigns or is removed, or a new Bond Trustee or Co-Bond Trustee is appointed, (ii) there is a call for the redemption of all Bonds, (iii) all of the Bonds are defeased in accordance with Article XI, or (iv) any amendment is made to this Bond Indenture or the Loan Agreement.

A duplicate copy of each demand, notice, approval, request, consent, opinion or other communication given hereunder by either the Authority or the Bond Trustee to the other shall also be given to the Corporation and the Bondholder Representative.  The Authority, the Corporation, the

Bond Trustee and the Bondholder Representative may, by notice given hereunder, designate any further or different addresses to which subsequent demands, notices, approvals, consents, requests, opinions or other communications shall be sent or persons to whose attention the same shall be directed.

Any such communication also may be transmitted to the appropriate party by telephone, facsimile or other electronic transmission capable of producing a written record and shall be deemed given or made at the time of such transmission if, and only if, such transmission of notice shall be confirmed in writing sent as specified above.

**Section 1204. Suspension of Mail Service.** If, because of the temporary or permanent suspension of mail service or for any other reason, it is impossible or impractical to mail any notice in the manner herein provided, then such delivery of notice in lieu thereof as shall be made with the approval of the Bond Trustee shall constitute a sufficient notice.

**Section 1205. Immunity of Officers, Employees and Members of Authority.** No recourse shall be had for the payment of the principal of or redemption premium, if any, or interest on any of the Bonds or for any claim based thereon or upon any obligation, covenant or agreement in this Bond Indenture contained against any past, present or future officer, director, member, employee or agent of the Authority, or of any successor public corporation, as such, either directly or through the Authority or any successor public corporation, under any rule of law or equity, statute or constitution, or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such officers, directors, members, employees or agents as such is hereby expressly waived and released as a condition of and consideration for the execution of this Bond Indenture and the issuance of such Bonds.

**Section 1206. Limitation on Authority Obligations.** In addition to the provisions of Section 601 hereof and any other term or provision in this Bond Indenture, in the Bond Documents or elsewhere to the contrary notwithstanding:

(a) Any and all obligations (including fees, claims, demands, payments, damages, liabilities, penalties, assessments and the like) of or imposed upon the Authority or its members, officers, agents, employees, representatives, advisors or assigns, whether under this Bond Indenture or any of the Bond Documents or elsewhere and whether arising out of or based upon a claim or claims of tort, contract, misrepresentation, or any other or additional legal theory or theories whatsoever (collectively the "Obligations"), shall in all events be absolutely limited obligations and liabilities, payable solely out of the following, if any, available at the time the Obligation in question is asserted: (i) Bond proceeds and investments therefrom; and (ii) Payments derived from the Bonds, the Bond Indenture (including the Trust Estate to the extent provided in the Bond Indenture), the Loan Agreement (except for the fees and expenses of the Authority and the Authority's right to indemnification under the Loan Agreement) and the Series 2023 Bond Notes; the above provisions (i) and (ii) being collectively referred to as the "exclusive sources of the Obligations."

(b) In no event shall any member, officer, agent, employee, representative or advisor of the Authority, or any successor or assign of any such person or entity, be liable, personally or otherwise, for any Obligation.

(c)     In no event shall this Bond Indenture be construed as: (i) depriving the Authority of any right or privilege; or (ii) requiring the Authority or any member, officer, agent, employee, representative or advisor of the Authority to take or omit to take, or to permit or suffer the taking of, any action by itself or by anyone else; which deprivation or requirement would violate or result in the Authority's being in violation of the Act or any other applicable state or federal law.

(d)     The Authority shall not be required to take any action not expressly provided for herein.  In addition, the Authority shall have no obligation to review, control or oversee the activities of the Bond Trustee in (i) collecting any amounts payable under the Bond Documents or (ii) making any payments on the Bonds.  Furthermore, the Authority shall not be obligated to take any action which might in its reasonable judgment involve it in any expense or liability unless it shall have been furnished with assurance of payment or reimbursement for any expense and with reasonable indemnity for liability of the Authority, its officers, members, agents and employees.

**Section 1207.  Severability.**  If any provision of this Bond Indenture shall be held or deemed to be invalid, inoperative or unenforceable as applied in any particular case in any jurisdiction or jurisdictions or in all jurisdictions, or in all cases because it conflicts with any other provision or provisions hereof or any constitution or statute or rule of public policy, or for any other reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstances, or of rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to any extent whatever.  The invalidity of any one or more phrases, sentences, clauses or Sections in this Bond Indenture contained shall not affect the remaining portions of this Bond Indenture, or any part thereof.

**Section 1208.  Execution in Counterparts; Electronic Transactions.**  This Bond Indenture may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.  The transaction described herein may be conducted and related documents may be sent, received and stored by electronic means. Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

**Section 1209.  Governing Law.**  This Bond Indenture is governed by the laws of the State, without regard to the choice of law rules of the State.  Venue for any action under this Bond Indenture to which the Authority is a party shall lie within the district courts of the State, and the parties hereto consent to the jurisdiction and venue of any such court and hereby waive any argument that venue in such forums is not convenient.

**Section 1210.  Fees, Charges and Expenses of the Bond Trustee, the Bond Registrar, the Bondholder Representative and the Authority.**  The Bond Trustee, the Bond Registrar, the Bondholder Representative and the Authority shall be entitled to payment and reimbursement for reasonable fees for their respective services rendered hereunder and all advances, counsel fees and other expenses reasonably made or incurred by the Bond Trustee, the Bond Registrar, the Bondholder Representative and the Authority in connection with such services and in connection

with entering into this Bond Indenture, including any such fees and expenses incurred in connection with action taken hereunder.

**Section 1211. Bondholder Representative Deemed Owner.** For all purposes herein, so long as the Series 2023A Bondowners have designated a Bondholder Representative within the meaning of this Bond Indenture, such entity shall be deemed to be the Owner of such Series 2023A Bonds and entitled to provide all consents, directions, and waivers and control all remedies with respect thereto to the exclusion of such Bondowners so long as such Bondholder Representative is duly authorized and designated.

**Section 1212. Notice to Bondholder Representative.**

(a)    For so long as there is a Bondholder Representative, no notices shall be sent to the Registered Owner of the Series 2023A Bonds (except that the Bond Trustee may send routine balancing and payment processing notices to the Securities Depository (or its nominee) at such time as the Securities Depository (or its nominee) is the Registered Owner of the Series 2023A Bonds) or to any Beneficial Owner represented by the Bondholder Representative. The Bond Trustee may post any such notices on EMMA.

(b)    Copies of any consent, approval, direction, agreement or waiver given to or sent by the Bond Trustee shall also be provided to the Bondholder Representative and be posted on EMMA by the sending party. Notwithstanding the foregoing, the Bond Trustee has no responsibility for maintaining continuing disclosure compliance on behalf of the Corporation.

**IN WITNESS WHEREOF**, Oklahoma County Finance Authority has caused this Bond Indenture to be executed by its Chairman or Vice Chairman and its corporate seal to be hereunto affixed, attested by its Secretary or Assistant Secretary and BancFirst, as Trustee, has caused this Bond Indenture to be executed by one of its authorized officers and its seal to be hereunto affixed, attested by one of its authorized officers, all as of the day and year first above written.


**OKLAHOMA COUNTY FINANCE AUTHORITY**

**ATTEST:**

_____
**Assistant Secretary**

_____
**Chairman**

**(SEAL)**


**BANCFIRST**


_____
**Authorized Officer**


83

**EXHIBIT A**
**(FORM OF SERIES 2023A BOND)**

Unless this certificate is presented by an authorized representative of The Depository Trust Company to the issuer or its agent for registration of transfer, exchange or payment, and any certificate issued is registered in the name of Cede & Co., or such other name as requested by an authorized representative of The Depository Trust Company and any payment is made to Cede & Co., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL since the Registered Owner hereof, Cede & Co., has an interest herein.

No. R-                                                    Principal Amount:  $6,000,000

**UNITED STATES OF AMERICA**
**STATE OF OKLAHOMA**
**OKLAHOMA COUNTY FINANCE AUTHORITY**
**SENIOR LIVING FACILITIES REVENUE BOND,**
**(EPWORTH VILLA PROJECT)**
**SERIES 2023A**

| Maturity Date | Interest Rate | Dated Date | CUSIP |
|---|---|---|---|
| | | | |

Registered Owner:    CEDE & CO.

The **OKLAHOMA COUNTY FINANCE AUTHORITY** (hereinafter referred to as the **"Authority"**), a public trust created and existing under the laws of the State of Oklahoma and more particularly Title 60, Oklahoma Statutes 2021, Section 176 et seq., as amended, the Trustees of which are an agency of the State of Oklahoma and the regularly constituted authority of Oklahoma County, Oklahoma, the beneficiary of the Authority for the performance of the functions for which such trust was created, for value received, hereby promises to pay, but solely from the revenues, income and other monies of the Authority hereinafter specified and not otherwise, to the Registered Owner specified above, or registered assigns, the Principal Amount specified above on the Maturity Date specified above, except as the provisions hereinafter set forth with respect to redemption prior to maturity may become applicable hereto, and in like manner to pay interest on said Principal Amount at the Interest Rate per annum specified above (computed on the basis of a 360-day year of twelve 30-day months) from the Dated Date specified above or from the most recent Interest Payment Date to which interest has been paid or duly provided for, payable semiannually on June 1 and December 1 in each year, beginning June 1, 2024 (each an "Interest Payment Date"), until said Principal Amount is paid.

The principal of and interest on this Bond shall be payable in any coin or currency of the United States of America which on the respective dates of payment thereof is legal tender for the payment of public and private debts.  The principal of and redemption premium, if any, on this Bond shall be payable by check or draft to the Registered Owner at the maturity or redemption date hereof

A-1

upon presentation and surrender of this Bond at the designated corporate trust office of BancFirst, a state banking association, Oklahoma City, Oklahoma organized and existing under the laws of the State of Oklahoma, as trustee (the "Bond Trustee"). The interest payable on this Bond on any Interest Payment Date shall be paid by the Bond Trustee to the Registered Owner appearing on the registration books of the Authority maintained by the Bond Trustee, as Bond Registrar (the "Bond Register"), at the close of business on the Record Date for such interest, which shall be the fifteenth day (whether or not a Business Day) of the calendar month next preceding such Interest Payment Date, and shall be paid by check or draft of the Bond Trustee mailed to such Registered Owner at his address as it appears on such Bond Register or at such other address furnished in writing by such Registered Owner to the Bond Trustee.

This Bond is one of a duly authorized series of bonds of the Authority designated "Senior Living Facilities Revenue Bonds (Epworth Villa Project), Series 2023A," in the principal amount of $6,000,000, issued under the Bond Trust Indenture dated as of December 1, 2023 (said Bond Trust Indenture, as amended and supplemented from time to time in accordance with the provisions thereof, being herein called the "Bond Indenture"), between the Authority and the Bond Trustee. Simultaneously with the issuance of the Series 2023A Bonds, the Authority will also issue its Senior Living Facilities Revenue Bonds (Epworth Villa Project), Series 2023B in the principal amount of $66,700,000.00, and its Senior Living Facilities Capital Appreciation Revenue Bonds (Epworth Villa Project), Series 2023C in the principal amount of $13,724,671.

All rights and privileges transferred, pledged, assigned and/or granted to the Bond Trustee are for the equal and pro rata benefit and security of each and every Registered Owner, without preference, priority or distinction as to participation in the lien, benefit and protection hereof of one Bond over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except that the Series 2023C Bonds shall be subordinated to the Series 2023A Bonds and the Series 2023B Bonds; and except that the Series 2023B Bonds shall be subordinated to the Series 2023A Bonds, and the Series 2023A Bonds will be senior to the Series 2023B Bonds and Series 2023C Bonds, all as provided in the Bond Indenture. And provided further, (i) that amounts held in the Series 2023A Account of the Debt Service Fund shall be pledged only to the Owners of the Series 2023A Bonds, (ii) that amounts held in the Series 2023B Account of the Debt Service Fund shall be pledged only to the Owners of the Series 2023B Bonds, (iii) that amounts held in the Series 2023C Account of the Debt Service Fund shall be pledged only to the Owners of the Series 2023C Bonds, (iv) that amounts held in the Series 2023A Account of the Debt Service Reserve Fund shall be pledged only to the Owners of the Series 2023A Bonds, and (v) that amounts held in the Series 2023B Account of the Debt Service Reserve Fund shall be pledged only to the Owners of the Series 2023B Bonds.

Capitalized terms used herein and not defined herein are used with the meanings given to them in the Bond Indenture.

The Series 2023A Bonds are being issued for the purpose of making a loan to Central Oklahoma United Methodist Retirement Facility, Inc., an Oklahoma not-for-profit corporation (the "Corporation"), to provide funds, together with other funds, for the purposes set forth in the Bond Indenture, all by the authority of and in full compliance with the provisions, restrictions and limitations of the Constitution and statutes of the State of Oklahoma, including Title 60, Oklahoma

Statutes (2021) Sections 176-180.3, as amended, and pursuant to proceedings duly had by the Authority.  The loan will be made pursuant to the Loan Agreement dated as of December 1, 2023 (said Loan Agreement, as amended and supplemented from time to time in accordance with the provisions thereof, being herein called the "Loan Agreement"), between the Authority and the Corporation, and will be evidenced by, among other things a Central Oklahoma United Methodist Retirement Facility, Inc., Promissory Note, Series 2023A, of the Corporation issued in the principal amount of $6,000,000.00 (the "Series 2023A Bond Note") to be issued as provided in the Loan Agreement, and secured by the Mortgage and Security Agreement dated _____, 2023, each delivered to the Authority and pledged and assigned to the Bond Trustee .

The Series 2023A Bonds are issued under and are equally and ratably secured and entitled to the protection given by the Bond Indenture, pursuant to which Bond Indenture the rights of the Authority under the Loan Agreement and the Series 2023A Bond Note are pledged and assigned by the Authority to the Bond Trustee as security for the Series 2023A Bonds.

Reference is hereby made to the Bond Indenture for the definitions of those terms, a description of the property pledged and assigned thereunder, and the provisions, among others, with respect to the nature and extent of the security for the Bonds, and the rights, duties and obligations of the Authority, the Bond Trustee and the Owners of the Bonds, and a description of the terms upon which the Bonds are issued and secured, upon which provision for payment of the Bonds or portions thereof and defeasance of the lien of the Bond Indenture with respect thereto may be made and upon which the Bond Indenture may be deemed satisfied and discharged prior to payment of the Bonds.

Pursuant to the Loan Agreement, Loan Payments sufficient for the prompt payment when due of the principal of, redemption premium, if any, and interest on the Bonds are to be paid by the Corporation directly to the Bond Trustee for the account of the Authority and deposited in a special account created by the Bond Indenture and designated the Debt Service Fund and all Loan Payments under the Loan Agreement have been duly pledged and assigned to the Bond Trustee for that purpose.

This Bond is subject to redemption and payment prior to maturity as provided in the Bond Indenture.

This Bond is transferable, as provided in the Bond Indenture, only upon the Bond Register at the above-mentioned office of the Bond Trustee, as Bond Registrar, by the Registered Owner hereof in person or by his duly authorized attorney, upon surrender of this Bond together with a written instrument of transfer satisfactory to the Bond Registrar duly executed by the Registered Owner or his duly authorized attorney, and thereupon a new Bond or Bonds of the same series and in the same aggregate principal amount, shall be issued to the transferee in exchange therefor as provided in the Bond Indenture, and upon payment of the charges therein prescribed.  The Authority, the Bond Trustee and any paying agent may deem and treat the person in whose name this Bond is registered as the absolute owner hereof for the purpose of receiving payment of, or on account of, the principal or redemption price hereof and interest due hereon and for all other purposes.

The Series 2023A Bonds are issuable in the form of fully registered Bonds without coupons in the denominations of $5,000 or any $5,000 integral multiple in excess thereof.  Subject to the

A-3

conditions and upon the payment of the charges provided in the Bond Indenture, the Owner of this Bond may surrender the same (together with a written instrument of transfer satisfactory to the Bond Registrar duly executed by the Registered Owner or his duly authorized attorney), in exchange for an equal aggregate principal amount of Series 2023A Bonds, in any denomination authorized by the Bond Indenture.

The Owner of this Bond shall have no right to enforce the Bond Indenture or to institute action to enforce the covenants therein, or to take any action with respect to any event of default under the Bond Indenture, or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Bond Indenture. In certain events, on the conditions, in the manner and with the effect set forth in the Bond Indenture, the principal of all the Bonds issued under the Bond Indenture and then outstanding may become or may be declared due and payable before the stated maturity thereof, together with interest accrued thereon. Modifications or alterations of the Bonds or the Bond Indenture may be made only to the extent and in the circumstances permitted by the Bond Indenture.

This Bond and the issue of which it forms a part are not an indebtedness or other liability of the Authority, the State of Oklahoma or of any political subdivision of the State of Oklahoma and are special, limited obligations of the Authority, payable solely out of Bond proceeds, revenues and other amounts derived under the Loan Agreement, and the funds and accounts held under and pursuant to the Bond Indenture and pledged therefor. The Bonds, the interest thereon and any other payments or costs incident thereto do not constitute an indebtedness of the Authority, the State of Oklahoma or any political subdivision thereof within the meaning of any constitutional or statutory provisions. The Authority shall not pledge its faith or credit nor the faith or credit of the State of Oklahoma nor any political subdivision of the State of Oklahoma to the payment of the Bonds. The issuance of the Bonds by the Authority does not directly, indirectly or contingently obligate the Authority, the State of Oklahoma or a political subdivision of the State of Oklahoma to apply money from, or levy or pledge any form of taxation whatever to the payment of the Bonds. The Bonds and the interest payable thereon do not give rise to a pecuniary liability of the Authority or a charge against its general credit or taxing power of the Authority, the State of Oklahoma or any political subdivision thereof for the payment of the Bonds or the interest thereon or other payments or costs incident thereto. The Authority has no taxing power.

No recourse shall be had for the payment of the principal of or premium or interest on any of the Bonds of any series or for any claim based thereon or upon any obligation, covenant or agreement in the Bond Indenture contained, against any past, present or future officer, director, member, employee or agent of the Authority, or any incorporator, officer, director, member, trustee, employee or agent of any successor corporation or body politic, as such, either directly or through the Authority or any successor corporation or body politic, as such, either directly or through the Authority or any successor corporation or body politic, under any rule of law or equity, statute or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such incorporators, officers, directors, trustees, members, employees or agents, as such, is hereby expressly waived and released as a condition of and consideration for the execution of the Bond Indenture and the issuance of any of the Bonds.

A-4

This Bond shall not be valid or become obligatory for any purpose or be entitled to any security or benefit under the Bond Indenture until the Certificate of Authentication hereon shall have been executed by the Bond Trustee.

**IT IS HEREBY CERTIFIED AND DECLARED** that all acts, conditions and things required to exist, happen and be performed precedent to and in the execution and delivery of the Bond Indenture and the issuance of this Bond do exist, have happened and have been performed in due time, form and manner as required by law.

**IN WITNESS WHEREOF**, the Authority has caused this Bond to be signed by its Chairman of Trustees, either by his manual signature or a facsimile thereof, and has caused the seal of the Authority or a facsimile thereof to be impressed or imprinted hereon, attested by the Assistant Secretary of the Authority, either by his manual signature or a facsimile thereof, and has caused this Bond to be dated as of the date set forth above.

**OKLAHOMA COUNTY FINANCE AUTHORITY**

**ATTEST:**

_____
**Chairman of Trustees**

_____
**Assistant Secretary of Trustees**

**[SEAL]**

**CERTIFICATE OF AUTHENTICATION**

This Bond is one of an issue described in the Bond Indenture mentioned herein.

**BANCFIRST**
**Oklahoma City, Oklahoma**

_____
**Authorized Officer**

Date of Authentication: _____

A-5

## ASSIGNMENT

**ASSIGNMENT FOR VALUE RECEIVED**, the undersigned _____ _____ (the "Transferor"), hereby sells, assigns, and transfers unto _____ (Please print name, address, zip code and Social Security or Federal Employer Identification number of assignee) the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints _____(the "Transferee") as attorney to register the transfer of the within Bond on the books kept for registration thereof, with full power of substitution in the premises.

Date: _____

_____
Signature Guaranteed

**NOTICE**: Signature(s) must be guaranteed by an institution which is a participant in the Securities Transfer Agent Medallion Program (STAMP) or similar program.

**NOTICE**: No transfer will be registered and no new Bond will be issued in the name of the Transferee, unless the signature(s) to this assignment corresponds with the name as it appears upon the face of the within Bond in every particular, without alteration or enlargement or any change whatever and the Social Security or Federal Employer Identification Number of the Transferee is supplied.

The following abbreviations, when used in the inscription on the face of the within Bond, shall be construed as though they were written out in full according to applicable laws or regulations:

| | | | |
|---|---|---|---|
| **TEN COM** | - | as tenants in common | **UNIF TRANS MIN ACT** – |
| | | | _____ |
| | | | (Cust.) |
| **TEN ENT** | - | as tenants by the entireties | Custodian for - |
| | | | _____ |
| | | | (Minor) |
| **JT TEN** | - | as joint tenants with right of survivorship and not as tenants in common | under Uniform Transfers to Minors Act of – |
| | | | _____ |
| | | | (State) |

Additional abbreviations may also be used though not in list above.

A-6

**EXHIBIT B**
**(FORM OF SERIES 2023B BOND)**

Unless this certificate is presented by an authorized representative of The Depository Trust Company to the issuer or its agent for registration of transfer, exchange or payment, and any certificate issued is registered in the name of Cede & Co., or such other name as requested by an authorized representative of The Depository Trust Company and any payment is made to Cede & Co., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL since the Registered Owner hereof, Cede & Co., has an interest herein.

No. R-                                                    Principal Amount:  $66,700,000

**UNITED STATES OF AMERICA**
**STATE OF OKLAHOMA**
**OKLAHOMA COUNTY FINANCE AUTHORITY**
**SENIOR LIVING FACILITIES REVENUE BOND,**
**(EPWORTH VILLA PROJECT)**
**SERIES 2023B**

| Maturity Date | Interest Rate | Dated Date | CUSIP |
|---|---|---|---|
|  |  |  |  |

**Registered Owner:    CEDE & CO.**

The **OKLAHOMA COUNTY FINANCE AUTHORITY** (hereinafter referred to as the **"Authority"**), a public trust created and existing under the laws of the State of Oklahoma and more particularly Title 60, Oklahoma Statutes 2021, Section 176 et seq., as amended, the Trustees of which are an agency of the State of Oklahoma and the regularly constituted authority of Oklahoma County, Oklahoma, the beneficiary of the Authority for the performance of the functions for which such trust was created, for value received, hereby promises to pay, but solely from the revenues, income and other monies of the Authority hereinafter specified and not otherwise, to the Registered Owner specified above, or registered assigns, the Principal Amount specified above on the Maturity Date specified above, except as the provisions hereinafter set forth with respect to redemption prior to maturity may become applicable hereto, and in like manner to pay interest on said Principal Amount at the Interest Rate per annum specified above (computed on the basis of a 360-day year of twelve 30-day months) from the Dated Date specified above or from the most recent Interest Payment Date to which interest has been paid or duly provided for, payable semiannually on June 1 and December 1 in each year, beginning June 1, 2024 (each an "Interest Payment Date"), until said Principal Amount is paid.

The principal of and interest on this Bond shall be payable in any coin or currency of the United States of America which on the respective dates of payment thereof is legal tender for the payment of public and private debts.  The principal of and redemption premium, if any, on this Bond shall be payable by check or draft to the Registered Owner at the maturity or redemption date hereof

B-1

upon presentation and surrender of this Bond at the designated corporate trust office of BancFirst, a state banking association, Oklahoma City, Oklahoma organized and existing under the laws of the State of Oklahoma, as trustee (the "Bond Trustee"). The interest payable on this Bond on any Interest Payment Date shall be paid by the Bond Trustee to the Registered Owner appearing on the registration books of the Authority maintained by the Bond Trustee, as Bond Registrar (the "Bond Register"), at the close of business on the Record Date for such interest, which shall be the fifteenth day (whether or not a Business Day) of the calendar month next preceding such Interest Payment Date, and shall be paid by check or draft of the Bond Trustee mailed to such Registered Owner at his address as it appears on such Bond Register or at such other address furnished in writing by such Registered Owner to the Bond Trustee.

This Bond is one of a duly authorized series of bonds of the Authority designated "Senior Living Facilities Revenue Bonds (Epworth Villa Project), Series 2023B," in the principal amount of $66,700,000.00, issued under the Bond Trust Indenture dated as of December 1, 2023 (said Bond Trust Indenture, as amended and supplemented from time to time in accordance with the provisions thereof, being herein called the "Bond Indenture"), between the Authority and the Bond Trustee. Simultaneously with the issuance of the Series 2023B Bonds, the Authority will also issue its Senior Living Facilities Revenue Bonds (Epworth Villa Project), Series 2023A in the principal amount of $6,000,000, and its Senior Living Facilities Capital Appreciation Revenue Bonds (Epworth Villa Project), Series 2023C in the principal amount of $13,724,671.

All rights and privileges transferred, pledged, assigned and/or granted to the Bond Trustee are for the equal and pro rata benefit and security of each and every Registered Owner, without preference, priority or distinction as to participation in the lien, benefit and protection hereof of one Bond over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except that the Series 2023C Bonds shall be subordinated to the Series 2023A Bonds and the Series 2023B Bonds; and except that the Series 2023B Bonds shall be subordinated to the Series 2023A Bonds, and the Series 2023A Bonds will be senior to the Series 2023B Bonds and Series 2023C Bonds, all as provided in the Bond Indenture. And provided further, (i) that amounts held in the Series 2023A Account of the Debt Service Fund shall be pledged only to the Owners of the Series 2023A Bonds, (ii) that amounts held in the Series 2023B Account of the Debt Service Fund shall be pledged only to the Owners of the Series 2023B Bonds, (iii) that amounts held in the Series 2023C Account of the Debt Service Fund shall be pledged only to the Owners of the Series 2023C Bonds, (iv) that amounts held in the Series 2023A Account of the Debt Service Reserve Fund shall be pledged only to the Owners of the Series 2023A Bonds, and (v) that amounts held in the Series 2023B Account of the Debt Service Reserve Fund shall be pledged only to the Owners of the Series 2023B Bonds.

Capitalized terms used herein and not defined herein are used with the meanings given to them in the Bond Indenture.

The Series 2023B Bonds are being issued for the purpose of making a loan to Central Oklahoma United Methodist Retirement Facility, Inc., an Oklahoma not-for-profit corporation (the "Corporation"), to provide funds, together with other funds, for the purposes set forth in the Bond Indenture, all by the authority of and in full compliance with the provisions, restrictions and limitations of the Constitution and statutes of the State of Oklahoma, including Title 60, Oklahoma

Statutes (2021) Sections 176-180.3, as amended, and pursuant to proceedings duly had by the Authority. The loan will be made pursuant to the Loan Agreement dated as of December 1, 2023 (said Loan Agreement, as amended and supplemented from time to time in accordance with the provisions thereof, being herein called the "Loan Agreement"), between the Authority and the Corporation, and will be evidenced by, among other things a Central Oklahoma United Methodist Retirement Facility, Inc., Promissory Note, Series 2023B, of the Corporation issued in the principal amount of $66,700,000.00 (the "Series 2023B Bond Note") to be issued as provided in the Loan Agreement, and secured by the Mortgage and Security Agreement dated as of _____, 2023, each delivered to the Authority and pledged and assigned to the Bond Trustee .

The Series 2023B Bonds are issued under and are equally and ratably secured and entitled to the protection given by the Bond Indenture, pursuant to which Bond Indenture the rights of the Authority under the Loan Agreement and the Series 2023B Bond Note are pledged and assigned by the Authority to the Bond Trustee as security for the Series 2023B Bonds.

Reference is hereby made to the Bond Indenture for the definitions of those terms, a description of the property pledged and assigned thereunder, and the provisions, among others, with respect to the nature and extent of the security for the Bonds, and the rights, duties and obligations of the Authority, the Bond Trustee and the Owners of the Bonds, and a description of the terms upon which the Bonds are issued and secured, upon which provision for payment of the Bonds or portions thereof and defeasance of the lien of the Bond Indenture with respect thereto may be made and upon which the Bond Indenture may be deemed satisfied and discharged prior to payment of the Bonds.

Pursuant to the Loan Agreement, Loan Payments sufficient for the prompt payment when due of the principal of, redemption premium, if any, and interest on the Bonds are to be paid by the Corporation directly to the Bond Trustee for the account of the Authority and deposited in a special account created by the Bond Indenture and designated the Debt Service Fund and all Loan Payments under the Loan Agreement have been duly pledged and assigned to the Bond Trustee for that purpose.

This Bond is subject to redemption and payment prior to maturity as provided in the Bond Indenture.

This Bond is transferable, as provided in the Bond Indenture, only upon the Bond Register at the above-mentioned office of the Bond Trustee, as Bond Registrar, by the Registered Owner hereof in person or by his duly authorized attorney, upon surrender of this Bond together with a written instrument of transfer satisfactory to the Bond Registrar duly executed by the Registered Owner or his duly authorized attorney, and thereupon a new Bond or Bonds of the same series and in the same aggregate principal amount, shall be issued to the transferee in exchange therefor as provided in the Bond Indenture, and upon payment of the charges therein prescribed. The Authority, the Bond Trustee and any paying agent may deem and treat the person in whose name this Bond is registered as the absolute owner hereof for the purpose of receiving payment of, or on account of, the principal or redemption price hereof and interest due hereon and for all other purposes.

The Series 2023B Bonds are issuable in the form of fully registered Bonds without coupons in the denominations of $1.00 or any multiple in excess thereof. Subject to the conditions and upon

B-3

the payment of the charges provided in the Bond Indenture, the Owner of this Bond may surrender the same (together with a written instrument of transfer satisfactory to the Bond Registrar duly executed by the Registered Owner or his duly authorized attorney), in exchange for an equal aggregate principal amount of Series 2023B Bonds, any denomination authorized by the Bond Indenture.

The Owner of this Bond shall have no right to enforce the Bond Indenture or to institute action to enforce the covenants therein, or to take any action with respect to any event of default under the Bond Indenture, or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Bond Indenture. In certain events, on the conditions, in the manner and with the effect set forth in the Bond Indenture, the principal of all the Bonds issued under the Bond Indenture and then outstanding may become or may be declared due and payable before the stated maturity thereof, together with interest accrued thereon. Modifications or alterations of the Bonds or the Bond Indenture may be made only to the extent and in the circumstances permitted by the Bond Indenture.

This Bond and the issue of which it forms a part are not an indebtedness or other liability of the Authority, the State of Oklahoma or of any political subdivision of the State of Oklahoma and are special, limited obligations of the Authority, payable solely out of Bond proceeds, revenues and other amounts derived under the Loan Agreement, and the funds and accounts held under and pursuant to the Bond Indenture and pledged therefor. The Bonds, the interest thereon and any other payments or costs incident thereto do not constitute an indebtedness of the Authority, the State of Oklahoma or any political subdivision thereof within the meaning of any constitutional or statutory provisions. The Authority shall not pledge its faith or credit nor the faith or credit of the State of Oklahoma nor any political subdivision of the State of Oklahoma to the payment of the Bonds. The issuance of the Bonds by the Authority does not directly, indirectly or contingently obligate the Authority, the State of Oklahoma or a political subdivision of the State of Oklahoma to apply money from, or levy or pledge any form of taxation whatever to the payment of the Bonds. The Bonds and the interest payable thereon do not give rise to a pecuniary liability of the Authority or a charge against its general credit or taxing power of the Authority, the State of Oklahoma or any political subdivision thereof for the payment of the Bonds or the interest thereon or other payments or costs incident thereto. The Authority has no taxing power.

No recourse shall be had for the payment of the principal of or premium or interest on any of the Bonds of any series or for any claim based thereon or upon any obligation, covenant or agreement in the Bond Indenture contained, against any past, present or future officer, director, member, employee or agent of the Authority, or any incorporator, officer, director, member, trustee, employee or agent of any successor corporation or body politic, as such, either directly or through the Authority or any successor corporation or body politic, as such, either directly or through the Authority or any successor corporation or body politic, under any rule of law or equity, statute or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such incorporators, officers, directors, trustees, members, employees or agents, as such, is hereby expressly waived and released as a condition of and consideration for the execution of the Bond Indenture and the issuance of any of the Bonds.

B-4

This Bond shall not be valid or become obligatory for any purpose or be entitled to any security or benefit under the Bond Indenture until the Certificate of Authentication hereon shall have been executed by the Bond Trustee.

**IT IS HEREBY CERTIFIED AND DECLARED** that all acts, conditions and things required to exist, happen and be performed precedent to and in the execution and delivery of the Bond Indenture and the issuance of this Bond do exist, have happened and have been performed in due time, form and manner as required by law.

**IN WITNESS WHEREOF**, the Authority has caused this Bond to be signed by its Chairman of Trustees, either by his manual signature or a facsimile thereof, and has caused the seal of the Authority or a facsimile thereof to be impressed or imprinted hereon, attested by the Assistant Secretary of the Authority, either by his manual signature or a facsimile thereof, and has caused this Bond to be dated as of the date set forth above.

**OKLAHOMA COUNTY FINANCE AUTHORITY**

**ATTEST:**

_____
**Chairman of Trustees**

_____
**Assistant Secretary of Trustees**

**[SEAL]**

**CERTIFICATE OF AUTHENTICATION**

This Bond is one of an issue described in the Bond Indenture mentioned herein.

**BANCFIRST**
**Oklahoma City, Oklahoma**

_____
**Authorized Officer**

Date of Authentication: _____

## ASSIGNMENT

**ASSIGNMENT FOR VALUE RECEIVED**, the undersigned _____
_____ (the "Transferor"), hereby sells, assigns, and transfers
unto _____ (Please print name, address, zip code and Social
Security or Federal Employer Identification number of assignee) the within Bond and all rights
thereunder, and hereby irrevocably constitutes and appoints_____(the
"Transferee") as attorney to register the transfer of the within Bond on the books kept for registration
thereof, with full power of substitution in the premises.

Date: _____                _____
                                            Signature Guaranteed

            **NOTICE**: Signature(s) must be guaranteed by
            an institution which is a participant in the Securities
            Transfer Agent Medallion Program (STAMP) or
            similar program.

            **NOTICE**: No transfer will be registered and
            no new Bond will be issued in the name of the
            Transferee, unless the signature(s) to this assignment
            corresponds with the name as it appears upon the face
            of the within Bond in every particular, without
            alteration or enlargement or any change whatever and
            the Social Security or Federal Employer Identification
            Number of the Transferee is supplied.

        The following abbreviations, when used in the inscription on the face of the within Bond,
shall be construed as though they were written out in full according to applicable laws or regulations:

| | | | | |
|---|---|---|---|---|
| **TEN COM** | - | as tenants in common | **UNIF TRANS MIN ACT** – | |
| | | | _____ | |
| | | | (Cust.) | |
| **TEN ENT** | - | as tenants by the entireties | Custodian for - | |
| | | | _____ | |
| | | | (Minor) | |
| **JT TEN** | - | as joint tenants with right of survivorship and not as tenants in common | under Uniform Transfers to Minors Act of – | |
| | | | _____ | |
| | | | (State) | |

Additional abbreviations may also be used though not in list above.

B-6

**EXHIBIT C**
**(FORM OF SERIES 2023C BOND)**

Unless this certificate is presented by an authorized representative of The Depository Trust Company to the issuer or its agent for registration of transfer, exchange or payment, and any certificate issued is registered in the name of Cede & Co., or such other name as requested by an authorized representative of The Depository Trust Company and any payment is made to Cede & Co., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL since the Registered Owner hereof, Cede & Co., has an interest herein.

No. R-                                      Principal Amount:  **$13,724,671**

**UNITED STATES OF AMERICA**
**STATE OF OKLAHOMA**
**OKLAHOMA COUNTY FINANCE AUTHORITY**
**SENIOR LIVING FACILITIES CAPITAL APPRECIATION REVENUE BOND,**
**(EPWORTH VILLA PROJECT)**
**SERIES 2023C**

| Maturity Date | Interest Rate | Dated Date | CUSIP |
|---|---|---|---|
| | | | |

**Registered Owner:   CEDE & CO.**

The **OKLAHOMA COUNTY FINANCE AUTHORITY** (hereinafter referred to as the **"Authority"**), a public trust created and existing under the laws of the State of Oklahoma and more particularly Title 60, Oklahoma Statutes 2021, Section 176 et seq., as amended, the Trustees of which are an agency of the State of Oklahoma and the regularly constituted authority of Oklahoma County, Oklahoma, the beneficiary of the Authority for the performance of the functions for which such trust was created, for value received, hereby promises to pay, but solely from the revenues, income and other monies of the Authority hereinafter specified and not otherwise, to the Registered Owner specified above, or registered assigns, the Principal Amount specified above on the Maturity Date specified above, and shall bear interest from its date or from the most recent Interest Payment Date to which interest has been paid, payable on June 1, 2024, and thereafter semiannually on each Interest Payment Date of each year, but such interest shall be paid solely from Excess Cash as set forth in the Bond Indenture. This Bond shall bear interest (computed on the basis of a 360-day year of twelve 30-day months) at the rate set forth above. All principal of this Bond shall be payable on such maturity date (subject to prior redemption, including any mandatory redemption from Excess Cash available for payment of principal). To the extent available Excess Cash is insufficient to pay interest on this  Bond on any scheduled Interest Payment Date, the amount of such unpaid interest shall accrete and be added to the principal amount of this Bond on the applicable Interest Payment Date and thereafter shall bear interest at the interest rate due on this Bond. Notwithstanding any provision of the Bond Indenture to the contrary, any reference to the principal of this Bond shall include any unpaid interest on such Bond which has accreted and been added to the principal amount thereof. The Bond Trustee shall reflect any increase in the principal amount of this Bond held in the DTC System by making an entry on Schedule A of the global Bond certificate, provided that the

principal amount thereof shall increase in accordance with the provisions hereof irrespective of whether the Bond Trustee has reflected such increase on such Schedule A.

The principal of and interest on this Bond shall be payable in any coin or currency of the United States of America which on the respective dates of payment thereof is legal tender for the payment of public and private debts. The principal of and redemption premium, if any, on this Bond shall be payable by check or draft to the Registered Owner at the maturity or redemption date hereof upon presentation and surrender of this Bond at the designated corporate trust office of BancFirst, a state banking association, Oklahoma City, Oklahoma organized and existing under the laws of the State of Oklahoma, as trustee (the "Bond Trustee"). The interest payable on this Bond on any Interest Payment Date shall be paid by the Bond Trustee to the Registered Owner appearing on the registration books of the Authority maintained by the Bond Trustee, as Bond Registrar (the "Bond Register"), at the close of business on the Record Date for such interest, which shall be the fifteenth day (whether or not a Business Day) of the calendar month next preceding such Interest Payment Date, and shall be paid by check or draft of the Bond Trustee mailed to such Registered Owner at his address as it appears on such Bond Register or at such other address furnished in writing by such Registered Owner to the Bond Trustee.

This Bond is one of a duly authorized series of bonds of the Authority designated "Senior Living Facilities Capital Appreciation Revenue Bonds (Epworth Villa Project), Series 2023C," in the principal amount of $13,724,671, issued under the Bond Trust Indenture dated as of December 1, 2023 (said Bond Trust Indenture, as amended and supplemented from time to time in accordance with the provisions thereof, being herein called the "Bond Indenture"), between the Authority and the Bond Trustee. Simultaneously with the issuance of the Series 2023C Bonds, the Authority will also issue its Senior Living Facilities Revenue Bonds (Epworth Villa Project), Series 2023A in the principal amount of $6,000,000, and its Senior Living Facilities Revenue Bonds (Epworth Villa Project), Series 2023B in the principal amount of $66,700,000.00.

All rights and privileges transferred, pledged, assigned and/or granted to the Bond Trustee are for the equal and pro rata benefit and security of each and every Registered Owner, without preference, priority or distinction as to participation in the lien, benefit and protection hereof of one Bond over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except that the Series 2023C Bonds shall be subordinated to the Series 2023A Bonds and the Series 2023B Bonds; and except that the Series 2023B Bonds shall be subordinated to the Series 2023A Bonds, and the Series 2023A Bonds will be senior to the Series 2023B Bonds and Series 2023C Bonds, all as provided in the Bond Indenture. And provided further, (i) that amounts held in the Series 2023A Account of the Debt Service Fund shall be pledged only to the Owners of the Series 2023A Bonds, (ii) that amounts held in the Series 2023B Account of the Debt Service Fund shall be pledged only to the Owners of the Series 2023B Bonds, (iii) that amounts held in the Series 2023C Account of the Debt Service Fund shall be pledged only to the Owners of the Series 2023C Bonds, (iv) that amounts held in the Series 2023A Account of the Debt Service Reserve Fund shall be pledged only to the Owners of the Series 2023A Bonds, and (v) that amounts held in the Series 2023B Account of the Debt Service Reserve Fund shall be pledged only to the Owners of the Series 2023B Bonds.

Capitalized terms used herein and not defined herein are used with the meanings given to them in the Bond Indenture.

The Series 2023C Bonds are being issued for the purpose of making a loan to Central Oklahoma United Methodist Retirement Facility, Inc., an Oklahoma not-for-profit corporation (the "Corporation"), to provide funds, together with other funds, for the purposes set forth in the Bond Indenture, all by the authority of and in full compliance with the provisions, restrictions and limitations of the Constitution and statutes of the State of Oklahoma, including Title 60, Oklahoma Statutes (2021) Sections 176-180.3, as amended, and pursuant to proceedings duly had by the Authority.  The loan will be made pursuant to the Loan Agreement dated as of December 1, 2023 (said Loan Agreement, as amended and supplemented from time to time in accordance with the provisions thereof, being herein called the "Loan Agreement"), between the Authority and the Corporation, and will be evidenced by, among other things a Central Oklahoma United Methodist Retirement Facility, Inc.,  Promissory Note, Series 2023C, of the Corporation issued in the principal amount of $13,724,671 (the "Series 2023C Bond Note") to be issued as provided in the Loan Agreement, and secured by the Mortgage and Security Agreement dated as of _____, 2023, each delivered to the Authority and pledged and assigned to the Bond Trustee .

The Series 2023C Bonds are issued under and are equally and ratably secured and entitled to the protection given by the Bond Indenture, pursuant to which Bond Indenture the rights of the Authority under the Loan Agreement and the Series 2023C Bond Note are pledged and assigned by the Authority to the Bond Trustee as security for the Series 2023C Bonds.

Reference is hereby made to the Bond Indenture for the definitions of those terms, a description of the property pledged and assigned thereunder, and the provisions, among others, with respect to the nature and extent of the security for the Bonds, and the rights, duties and obligations of the Authority, the Bond Trustee and the Owners of the Bonds, and a description of the terms upon which the Bonds are issued and secured, upon which provision for payment of the Bonds or portions thereof and defeasance of the lien of the Bond Indenture with respect thereto may be made and upon which the Bond Indenture may be deemed satisfied and discharged prior to payment of the Bonds.

Pursuant to the Loan Agreement, Loan Payments sufficient for the prompt payment when due of the principal of, redemption premium, if any, and interest on the Bonds are to be paid by the Corporation directly to the Bond Trustee for the account of the Authority and deposited in a special account created by the Bond Indenture and designated the Debt Service Fund and all Loan Payments under the Loan Agreement have been duly pledged and assigned to the Bond Trustee for that purpose.

This Bond is subject to redemption and payment prior to maturity as provided in the Bond Indenture.

This Bond is transferable, as provided in the Bond Indenture, only upon the Bond Register at the above-mentioned office of the Bond Trustee, as Bond Registrar, by the Registered Owner hereof in person or by his duly authorized attorney, upon surrender of this Bond together with a written instrument of transfer satisfactory to the Bond Registrar duly executed by the Registered Owner or his duly authorized attorney, and thereupon a new  Bond or Bonds of the same series and in the same aggregate principal amount, shall be issued to the transferee in exchange therefor as provided in the Bond Indenture, and upon payment of the charges therein prescribed.  The Authority, the Bond Trustee and any paying agent may deem and treat the person in whose name this Bond is

registered as the absolute owner hereof for the purpose of receiving payment of, or on account of, the principal or redemption price hereof and interest due hereon and for all other purposes.

The Series 2023C Bonds are issuable in the form of fully registered Bonds without coupons in the denominations of $1.00 or any multiple in excess thereof. Subject to the conditions and upon the payment of the charges provided in the Bond Indenture, the Owner of this Bond may surrender the same (together with a written instrument of transfer satisfactory to the Bond Registrar duly executed by the Registered Owner or his duly authorized attorney), in exchange for an equal aggregate principal amount of Series 2023C Bonds, in any denomination authorized by the Bond Indenture.

The Owner of this Bond shall have no right to enforce the Bond Indenture or to institute action to enforce the covenants therein, or to take any action with respect to any event of default under the Bond Indenture, or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Bond Indenture. In certain events, on the conditions, in the manner and with the effect set forth in the Bond Indenture, the principal of all the Bonds issued under the Bond Indenture and then outstanding may become or may be declared due and payable before the stated maturity thereof, together with interest accrued thereon. Modifications or alterations of the Bonds or the Bond Indenture may be made only to the extent and in the circumstances permitted by the Bond Indenture.

This Bond and the issue of which it forms a part are not an indebtedness or other liability of the Authority, the State of Oklahoma or of any political subdivision of the State of Oklahoma and are special, limited obligations of the Authority, payable solely out of Bond proceeds, revenues and other amounts derived under the Loan Agreement, and the funds and accounts held under and pursuant to the Bond Indenture and pledged therefor. The Bonds, the interest thereon and any other payments or costs incident thereto do not constitute an indebtedness of the Authority, the State of Oklahoma or any political subdivision thereof within the meaning of any constitutional or statutory provisions. The Authority shall not pledge its faith or credit nor the faith or credit of the State of Oklahoma nor any political subdivision of the State of Oklahoma to the payment of the Bonds. The issuance of the Bonds by the Authority does not directly, indirectly or contingently obligate the Authority, the State of Oklahoma or a political subdivision of the State of Oklahoma to apply money from, or levy or pledge any form of taxation whatever to the payment of the Bonds. The Bonds and the interest payable thereon do not give rise to a pecuniary liability of the Authority or a charge against its general credit or taxing power of the Authority, the State of Oklahoma or any political subdivision thereof for the payment of the Bonds or the interest thereon or other payments or costs incident thereto. The Authority has no taxing power.

No recourse shall be had for the payment of the principal of or premium or interest on any of the Bonds of any series or for any claim based thereon or upon any obligation, covenant or agreement in the Bond Indenture contained, against any past, present or future officer, director, member, employee or agent of the Authority, or any incorporator, officer, director, member, trustee, employee or agent of any successor corporation or body politic, as such, either directly or through the Authority or any successor corporation or body politic, as such, either directly or through the Authority or any successor corporation or body politic, under any rule of law or equity, statute or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such incorporators, officers, directors, trustees, members, employees or agents, as such, is

hereby expressly waived and released as a condition of and consideration for the execution of the Bond Indenture and the issuance of any of the Bonds.

This Bond shall not be valid or become obligatory for any purpose or be entitled to any security or benefit under the Bond Indenture until the Certificate of Authentication hereon shall have been executed by the Bond Trustee.

**IT IS HEREBY CERTIFIED AND DECLARED** that all acts, conditions and things required to exist, happen and be performed precedent to and in the execution and delivery of the Bond Indenture and the issuance of this Bond do exist, have happened and have been performed in due time, form and manner as required by law.

**IN WITNESS WHEREOF**, the Authority has caused this Bond to be signed by its Chairman of Trustees, either by his manual signature or a facsimile thereof, and has caused the seal of the Authority or a facsimile thereof to be impressed or imprinted hereon, attested by the Assistant Secretary of the Authority, either by his manual signature or a facsimile thereof, and has caused this Bond to be dated as of the date set forth above.

**OKLAHOMA COUNTY FINANCE AUTHORITY**

**ATTEST:**

_____
**Chairman of Trustees**

_____
**Assistant Secretary of Trustees**

**[SEAL]**

## CERTIFICATE OF AUTHENTICATION

This Bond is one of an issue described in the Bond Indenture mentioned herein.

**BANCFIRST**
**Oklahoma City, Oklahoma**

_____
**Authorized Officer**

Date of Authentication: _____

## ASSIGNMENT

**ASSIGNMENT FOR VALUE RECEIVED**, the undersigned _____ _____ (the "Transferor"), hereby sells, assigns, and transfers unto _____ (Please print name, address, zip code and Social Security or Federal Employer Identification number of assignee) the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints _____ (the "Transferee") as attorney to register the transfer of the within Bond on the books kept for registration thereof, with full power of substitution in the premises.

Date: _____

_____
Signature Guaranteed

**NOTICE**: Signature(s) must be guaranteed by an institution which is a participant in the Securities Transfer Agent Medallion Program (STAMP) or similar program.

**NOTICE**: No transfer will be registered and no new Bond will be issued in the name of the Transferee, unless the signature(s) to this assignment corresponds with the name as it appears upon the face of the within Bond in every particular, without alteration or enlargement or any change whatever and the Social Security or Federal Employer Identification Number of the Transferee is supplied.

The following abbreviations, when used in the inscription on the face of the within Bond, shall be construed as though they were written out in full according to applicable laws or regulations:

| | | | |
|---|---|---|---|
| **TEN COM** | - | as tenants in common | **UNIF TRANS MIN ACT** – |
| | | | _____ |
| | | | (Cust.) |
| **TEN ENT** | - | as tenants by the entireties | Custodian for - |
| | | | _____ |
| | | | (Minor) |
| **JT TEN** | - | as joint tenants with right of survivorship and not as tenants in common | under Uniform Transfers to Minors Act of – |
| | | | _____ |
| | | | (State) |

Additional abbreviations may also be used though not in list above.

**EXHIBIT D**

**PROJECT FUND PROJECT DESCRIPTION**

The Project includes the following Facilities of the Corporation, the costs of which will be paid in whole or in part, or for which the Corporation will be reimbursed or which will be refinanced, in whole or in part, from the proceeds of the sale of the Series 2023A Bonds, as further described in the Tax Agreement.

A detailed list of the expected Project components will be set forth in the Tax Agreement with the total costs thereof and expected timing of expenditure therefor consistent with the following general categories and periods with any balance expended on the Project before December 1, 2027:

| Project Description | Project Cost |
|---|---|
| Exterior Paint and Caulk | $ 191,100.00 |
| Kitchen Equipment | 200,310.00 |
| Information Technology | 215,711.00 |
| Plumbing and Plumbing Fixtures | 340,577.00 |
| Vertical Circulation (Elevators) | 564,529.00 |
| HVAC | 965,494.00 |
| Total Independent Living Apartment Refurbishment Cost | 2,595,700.00 |
| Independent Living Elevator | $ 983,000.00 |
| | |
| Total | $ 6,056,421.00 |

To be funded with proceeds of the Series 2023A Bonds and investment earnings thereon contained in the Project Fund and additional funds of the Corporation.

D-2

<u>Exhibit 7-2</u>

(Series 2023 Loan Agreement)

{2706834;2}

**LOAN AGREEMENT**

**Dated as of December 1, 2023**

**Between the**

**OKLAHOMA COUNTY FINANCE AUTHORITY**

**And**

**CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC.
d/b/a EPWORTH VILLA**

**Relating to**

**$6,000,000
Senior Living Facilities Revenue Bonds
(Epworth Villa Project)
Series 2023A**

**$66,700,000
Senior Living Facilities Revenue Bonds
(Epworth Villa Project)
Series 2023B**

**$13,724,671
Senior Living Facilities Capital Appreciation Revenue Bonds
(Epworth Villa Project)
Series 2023C**

Certain of the rights, title and interest of the Oklahoma County Finance Authority in this Loan Agreement have been pledged and assigned to BancFirst, as Bond Trustee under a Bond Trust Indenture dated as of December 1, 2023, between the Authority and the Bond Trustee.

130005.2

# LOAN AGREEMENT
## TABLE OF CONTENTS

**Page**

Parties   1
Recitals   1

### ARTICLE I
### DEFINITIONS; RULES OF CONSTRUCTION

| | | |
|---|---|---|
| Section 1.1. | Definitions of Words and Terms | 4 |
| Section 1.2. | Rules of Construction | 4 |

### ARTICLE II
### REPRESENTATIONS

| | | |
|---|---|---|
| Section 2.1. | Representations by the Authority | 5 |
| Section 2.2. | Representations by the Corporation | 5 |

### ARTICLE III
### LOAN TO THE CORPORATION; SECURITY FOR LOAN
### CONDITIONS PRECEDENT

| | | |
|---|---|---|
| Section 3.1. | Loan of Funds to the Corporation | 8 |
| Section 3.2. | Security for Loan | 8 |
| Section 3.3. | Additional Documentation | 9 |
| Section 3.4. | Conditions Precedent to Loan | 9 |
| Section 3.5. | Completion of Project | 11 |

### ARTICLE IV
### LOAN PAYMENTS AND OTHER PAYMENTS

| | | |
|---|---|---|
| Section 4.1. | Loan Payments | 12 |
| Section 4.2 | Credits on Loan Payments | 12 |
| Section 4.3. | Additional Payments | 13 |
| Section 4.4 | Prepayment of the Loan | 15 |
| Section 4.5. | Obligations Absolute and Unconditional | 15 |
| Section 4.6. | Assignment of Authority's Rights | 16 |

### ARTICLE V
### COVENANTS OF THE CORPORATION

| | | |
|---|---|---|
| Section 5.1. | Corporate Existence and Tax-Exempt Status | 17 |
| Section 5.2. | Maintenance and Use of Property, Plant and Equipment | 17 |
| Section 5.3 | Compliance with Laws and Regulations | 17 |
| Section 5.4 | Payment of Taxes and Other Charges | 18 |

i

Section 5.5.   Indemnity                                                                          18
Section 5.6.   Tax Covenants                                                                    19
Section 5.7.   Continuing Disclosure                                                        19
Section 5.8    Assignment by the Corporation                                          19
Section 5.9    Covenants under Bond Indenture and Other Bond Documents    19
Section 5.10   Long-Term Debt Service Coverage Ratio                            20
Section 5.11   Covenants Concerning Occupancy                                     21
Section 5.12   Liquidity Covenant                                                            23
Section 5.13   Covenant Concerning Entrance Fees                                  24
Section 5.14   Operating Fund and Ancillary Operating Fund                    24
Section 5.15   Application of Excess Cash                                               25
Section 5.16   Insurance                                                                         25
Section 5. 17  Insurance and Condemnation Proceeds                             26
Section 5.18   Limitations on Creation of Liens                                       27
Section 5.19   Limitations on Incurrence of Indebtedness                       28
Section 5.20   Transfers of Property, Plant and Equipment; Transfers of Unrestricted
                      Cash and Investments                                                      29
Section 5.21   Consolidation, Merger, Sale or Conveyance                     30
Section 5.22   Financial Statements, Certificate of No Default and Other Information    31
Section 5.23   Recording and Filing of Security Interest                         32
Section 5.24   Trade Payables Covenant                                               32
Section 5.25.  Management Reports and Plans; Retention of New Manager
                      or Marketing Agent                                                         33

## ARTICLE VI
## TERM AND TERMINATION OF LOAN AGREEMENT

Section 6.1.   Term of Loan Agreement                                               35
Section 6.2.   Defeasance                                                                    35

## ARTICLE VII
## DEFAULT AND REMEDIES

Section 7.1.   Events of Default                                                            36
Section 7.2.   Acceleration of Maturity; Rescission and Annulment        37
Section 7.3.   Exercise of Remedies by the Bond Trustee                      38
Section 7.4    Application of Moneys Collected                                      39
Section 7.5.   Rights and Remedies Cumulative                                     39
Section 7.6.   Delay or Omission Not Waiver                                         39
Section 7.7    Waiver of Past Defaults                                                   39
Section 7.8    Advances by Bond Trustee                                             39
Section 7.9.   Right of Bond Trustee to Enforce the Series 2023 Bond Note
                      and this Loan Agreement                                                 40
Section 7.10   No Additional Waiver Implied by One Waiver                  40
Section 7.11   No Waiver of Event of Default Without Consent of Controlling Holders    40

ii

Section 7.12   Confession of Judgment                                                        40
Section 7.13   Treatment of Fund in Bankruptcy                                     42
Section 7.14   Legal/Workout Costs of the Bondowners                          42
Section 7.15   Notices to and Effect of Actions by Representative of
               Majority Bondowners of Series 2023A Bonds                     42

# ARTICLE VIII
## ASSIGNMENTS

Section 8.1.   Consent to Assignment of the Loan Agreement and the
               Series 2023 Bond Note                                                      43

# ARTICLE IX
## SUPPLEMENTAL LOAN AGREEMENTS

Section 9.1.   Supplemental Loan Agreements without Consent of Bondowners   44
Section 9.2.   Supplemental Loan Agreements with Consent of Bondowners      44
Section 9.3.   Execution of Supplemental Loan Agreements                      45
Section 9.4.   Effect of Supplemental Loan Agreements                         45
Section 9.5.   Reference in Bonds to Supplemental Loan Agreements            45
Section 9.6    Supplemental Loan Agreement by Direction Letter                45

# ARTICLE IX
## MISCELLANEOUS PROVISIONS

Section 10.1.   Further Assurances                                                         46
Section 10.2.   Payments Due on Saturdays, Sundays and Holidays            46
Section 10.3.   Notices                                                                     46
Section 10.4.   The Authority and the Corporation                                   46
Section 10.5.   Immunity of Officers, Employees and Members of the Authority
                and the Corporation                                                      46
Section 10.6    No Violations of Law                                                      47
Section 10.7.   Authority Not Liable                                                      47
Section 10.8    Bond Indenture Provisions                                             47
Section 10.9    Amendments to the Mortgage                                        48
Section 10.10   Benefit of Loan Agreement                                            48
Section 10.11.  Severability                                                                48
Section 10.12.  Execution Counterparts; Electronic Transactions             48
Section 10.13.  Governing Law                                                           48
Section 10.14.  Binding Effect                                                            48
Section 10.15.  Limited Obligations                                                     48
Section 10.16   Actions Related to Purchase in Lieu of Redemption of
                Series 2023A Bonds                                                       49

Signatures

# LOAN AGREEMENT

**THIS LOAN AGREEMENT** (the "Loan Agreement"), dated as of the 1st day of December, 2023, by and between the **OKLAHOMA COUNTY FINANCE AUTHORITY** (the "Authority"), a public trust created and existing under the laws of the State of Oklahoma, and **CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC. d/b/a EPWORTH VILLA** (the "Corporation"), a not-for-profit corporation organized and existing under the laws of the State of Oklahoma (the "State");

**WHEREAS,** the Authority has been created by a Trust Indenture, dated as of May 9, 1983, as amended, for the use and benefit of Oklahoma County, Oklahoma, under authority of and pursuant to the provisions of Title 60, Oklahoma Statutes 2021, Section 176 to 180.3, inclusive, as amended and supplemented (the "Act"), the Oklahoma Trust Act and other applicable statutes of the State; and

**WHEREAS**, the Authority is authorized and empowered to issue revenue bonds or notes and loan the proceeds thereof to finance facilities for the implementation of the public welfare and protection and promotion of the public health and the provision of housing on behalf of 501(c)(3) organizations within Oklahoma County, Oklahoma; and

**WHEREAS**, pursuant to the Act the Authority issued $15,450,000 aggregate principal amount of Revenue Refunding Bonds (Epworth Villa Project), Series 2004 (the *"Series 2004 Bonds"*), $13,460,000 aggregate principal amount of Revenue Refunding Bonds (Epworth Villa Project), Series 2005 (the *"Series 2005 Bonds"*), and $72,765,000 aggregate principal amount of Revenue Refunding Bonds (Epworth Villa Project) Series 2012A, $2,605,000 aggregate principal amount of Revenue Bonds Series 2012B Tax-Exempt Mandatory Paydown Securities -80 and $3,265,000 aggregate principal amount of Revenue Bonds Series 2012C Tax-Exempt Mandatory Paydown Securities -50 (collectively the "Series 2012 Bonds") (the Series 2004 Bonds, the Series 2005 Bonds and the Series 2012 Bonds are sometimes referred to as the "Outstanding Existing Bonds"), each under a Bond Indenture dated as of March 15, 1997, as amended and supplemented by a Supplemental Bond Indenture dated as of December 1, 2000, a Second Supplemental Bond Indenture dated as of December 1, 2004, a Third Supplemental Bond Indenture dated as of December 1, 2005 and a Fourth Supplemental Bond Indenture dated as of December 1, 2012 (together the *"Original Bond Indenture"*) between the Authority and the Bond Trustee for the purpose of making loans to the Corporation, under and secured by a Mortgage and Security Agreement dated as of March 15, 1997, as amended and supplemented by a Supplemental Mortgage and Security Agreement dated as of December 1, 2000, a Second Supplemental Mortgage and Security Agreement dated as of December 1, 2004, a Third Supplemental Mortgage and Security Agreement dated as of December 1, 2005, and a Fourth Supplemental Mortgage and Security Agreement dated as of December 1, 2012 (together the *"Original Mortgage"*) from the Corporation, as mortgagor to the Authority as mortgagee, to provide funds to (a) finance, refinance and reimburse the costs of certain facilities of the Corporation, (b) refund certain outstanding bonds, (c) fund required debt service reserves, (d) fund interest on the Outstanding Existing Bonds, and (e) pay certain costs of issuance relating to the Outstanding Existing Bonds; and

1

**WHEREAS,** subsequent to the issuance of the Outstanding Existing Bonds, the Corporation defaulted on certain of its obligations in connection with the Outstanding Existing Bonds, including without limitation its obligations under the Original Bond Indenture and the Original Mortgage, and entered into negotiations with certain owners of a majority of principal amount of the Outstanding Existing Bonds to address the default issues. On September 29, 2023, the Corporation filed its voluntary petition under Chapter 11 of the Bankruptcy Code in the bankruptcy case styled In re: Central Oklahoma United Methodist Retirement Facility, Inc. d/b/a Epworth Villa Case No. 23-12607 (the "*Bankruptcy Proceedings*") in the United States Bankruptcy Court for the Western District of Oklahoma (the "*Bankruptcy Court*"). On _____, the Corporation filed its reorganization plan which included the restructuring of the Outstanding Existing Bonds (the "*Bankruptcy Plan*"). On _____, the Bankruptcy Court issued its order (the "*Order*") confirming the Bankruptcy Plan. The Order and the Bankruptcy Plan provide that all of the payment obligations of the Authority under the Outstanding Existing Bonds are to be restructured by having the owners of all of the Outstanding Existing Bonds exchange such Outstanding Bonds for Series 2023B Bonds and Series 2023C Bonds (as defined below) (the "*Bond Exchange*"); and

**WHEREAS**, in order to effectuate the Bond Exchange and the Bankruptcy Plan, including funding additional costs of the Project and Facilities of the Corporation, the Corporation has requested that the Authority issue: (a) $6,000,000 in aggregate principal amount of its Senior Living Facilities Revenue Bonds (Epworth Villa Project), Series 2023A (the "*Series 2023A Bonds*"), (b) $66,700,000 in aggregate principal amount of its Senior Living Facilities Revenue Bonds (Epworth Villa Project), Series 2023B (the "*Series 2023B Bonds*"), and (c) $13,724,671 in aggregate principal amount of its Senior Living Facilities Capital Appreciation Revenue Bonds (Epworth Villa Project) Series 2023C (the "*Series 2023C Bonds*" and, together with the Series 2023A Bonds and the Series 2023B Bonds, the "*Series 2023 Bonds*" or the "*Bonds*")), and exchange the Series 2023B Bonds and the Series 2023C Bonds for the Outstanding Existing Bonds, with each owner of Outstanding Existing Bonds to receive their ratable share of Series 2023B Bonds and Series 2023C Bonds as set forth in the Bond Indenture. The Bonds will be issued for the Authority to make a loan (the "Loan") of the proceeds of the Bonds to the Corporation under this Loan Agreement for the purposes described herein, including, without limitation, the Project and the Bond Exchange; and

**WHEREAS**, the Order and Bankruptcy Plan also provide for the termination of the Original Mortgage and the cancellation of the Series 1997 Notes, Series 2000 Notes, Series 2004 Notes, Series 2005 Notes and Series 2012 Notes issued under the Original Mortgage to evidence and secure the obligations of the Corporation under the Original Mortgage for the Outstanding Existing Bonds, each in exchange for the execution of this Loan Agreement, the Mortgage and Security Agreement dated as of December _____, 2023 by and between the Corporation as mortgagor and the Authority and the Bond Trustee as mortgagees (the "Mortgage"), and the issuance and delivery under this Loan Agreement, to evidence and secure the Loan, of (i) the Promissory Note, Series 2023A (the "Series 2023A Bond Note"), in the principal amount of $6,000,000, (ii) the Promissory Note, Series 2023B (the "Series 2023B Bond Note"), in the principal amount of $66,700,000, and (iii) the Promissory Note, Series 2023C (the "Series 2023C Bond Note"), in the principal amount of $13,724,671 (the Series 2023A Bond Note, the Series 2023B Bond Note and the Series 2023C Bond Note are referred to herein collectively as the "Series 2023 Bond Notes"); and

**WHEREAS**, the Authority and the Corporation are entering into this Loan Agreement to provide for the Loan of the proceeds of the Bonds to the Corporation and the repayment of said Loan.

**NOW, THEREFORE,** in consideration of the premises and the mutual representations, covenants and agreements herein set forth, the Authority and the Corporation do hereby covenant and agree as follows:

## ARTICLE I
## DEFINITIONS; RULES OF CONSTRUCTION

**Section 1.1.    Definitions of Words and Terms.**  Capitalized words and terms used in this Loan Agreement, unless the context requires otherwise, shall have the same meanings as set forth in Section 101 of the Bond Indenture.

**Section 1.2.    Rules of Construction.**

(a)    The defined terms referred to in this Article include the plural as well as the singular.

(b)    All accounting terms not otherwise defined herein or in the Bond Indenture shall have the meanings assigned to them, and all computations herein provided for shall be made, in accordance with generally accepted accounting principles to the extent applicable.

(c)    All references herein to "generally accepted accounting principles" refer to such principles in effect on the date of the determination, certification, computation or other action to be taken hereunder using or involving such terms; provided, as applied to any entity that operates a hospital, extended care facility or other discrete enterprise of a type with respect to which particular accounting principles from time to time shall have been generally adapted or modified, the term "generally accepted accounting principles" shall include the adaptations or modifications.

(d)    All references in this instrument to designated "Articles," "Sections" and other subdivisions are to be the designated Articles, Sections and other subdivisions of this Loan Agreement.

(e)    The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Loan Agreement as a whole and not to any particular Article, Section or other subdivision.

(f)    The Article and section headings herein and in the Table of Contents are for convenience only and shall not affect the construction hereof.

(g)    Whenever an item or items are listed after the word "including," such listing is not intended to be a listing that excludes items not listed.

## ARTICLE II
## REPRESENTATIONS

**Section 2.1.    Representations by the Authority.**    The Authority represents to the Corporation and the Bond Trustee that:

(a)    Organization and Authority.  The Authority (1) is a public trust duly organized and existing under the laws of the State, (2) has lawful power and authority to issue the Bonds for the purposes set forth in the Bond Indenture, to enter into, execute and deliver the Bond Indenture and this Loan Agreement and to carry out its obligations thereunder and hereunder, and to pledge and assign the Series 2023 Bond Notes, and (3) by all necessary official action has been duly authorized to execute and deliver the Bond Indenture and this Loan Agreement and any other Bond Documents required to be executed and delivered by it in connection with the issuance of the Bonds, acting by and through its duly authorized officers.

(b)    No Defaults or Violations of Law.  The execution and delivery by the Authority of the Bond Documents in which it is named as a party will not result in a breach of any of the terms of, or constitute a default under, any indenture, mortgage, deed of trust, lease or other agreement or instrument to which the Authority is a party or by which it or any of its property is bound or its bylaws or any of the constitutional or statutory rules or regulations applicable to the Authority or its property.

(c)    Absence of Litigation.  No litigation, proceedings or investigations are pending or, to the knowledge of the Authority, threatened against the Authority at law or in equity before any court, tribunal, governmental authority or arbitration board seeking to restrain, enjoin or in any way limit the approval or issuance and delivery of the Bonds, the Bond Indenture, this Loan Agreement or any other Bond Documents to which the Authority is a party, or which challenges the existence or powers of the Authority to enter into and carry out the transactions contemplated by this Loan Agreement or any other Bond Documents to which it is a party, or wherein an unfavorable determination could materially and adversely affect the validity or enforceability of the Bonds, this Loan Agreement, or any other Bond Document to which the Authority is a party or its ability to perform its obligations thereunder.

**Section 2.2.    Representations by the Corporation.**    The Corporation represents to the Authority and the Bond Trustee that:

(a)    Organization, Tax-Exempt Status and Authority.  The Corporation (1) is an Oklahoma not-for-profit corporation, (2) is authorized by law to provide or operate independent living, assisted living and nursing facilities in the State, (3) has not declared and has not been determined to have any "unrelated business taxable income" as defined in Section 512 of the Internal Revenue Code which could have a material adverse effect on its status as a Tax-Exempt Organization or which, if such income were subject to federal income taxation, could have a material adverse effect on the condition, financial or otherwise, of the Corporation, and (4) has lawful power and authority to enter into, execute and deliver the Bond Documents in which it is named as a party and to carry out its obligations hereunder and thereunder, and by all necessary corporate action has

5

been duly authorized to execute and deliver the Bond Documents in which it is named as a party, acting by and through its duly authorized officers.

(b)    No Defaults or Violations of Law.  Except as addressed by the Order and Bankruptcy Plan, the execution and delivery of this Loan Agreement and the other Bond Documents by the Corporation in which it is named as a party will not conflict with or result in a breach of any of the terms of, or constitute a default under, any indenture, mortgage, deed of trust, lease or other agreement or instrument to which the Corporation is a party or by which it or any of its property is bound or its articles of incorporation, bylaws, or any of the rules or regulations applicable to the Corporation or its property of any court or other governmental body.

(c)    Licenses, Permits and Governmental Approvals.  The Corporation is duly authorized and has all licenses and permits to occupy and operate its senior living facilities under the laws, rulings, regulations and ordinances of the State and the departments, agencies and political subdivisions thereof, and the Corporation has obtained all requisite approvals of federal, State and local governmental bodies necessary for the operation of its Facilities.  The Corporation's Facilities are being operated in all material respects in compliance with applicable federal, State and local zoning, subdivision, environmental, pollution control and other laws, rules, regulations, codes and ordinances.

(d)    Use of Proceeds.  The proceeds of the Bonds will be used by the Corporation to finance or refinance (i) the costs of the Project as described in the Bond Indenture; (b) to fund a debt service reserve fund and (c) to pay a portion of the costs of issuing the Bonds.

(e)    Pending Litigation.  Other than the Order and Bankruptcy Plan, no litigation, proceedings or investigations are pending or, to the knowledge of the Corporation, threatened against the Corporation, except: (1) litigation involving claims for professional liability, the probable recoveries in which and the estimated costs and expenses of defense of which, in the opinion of counsel to the Corporation, will be entirely within the Corporation's applicable insurance policy limits (subject to applicable deductibles) or are not in excess of the total of the available reserves held under the Corporation's applicable self-insurance program, and (2) litigation involving other types of claims which if adversely determined will not, in the opinion of counsel to the Corporation, materially and adversely affect the financial condition or operations of the Corporation.  In addition, no litigation, proceedings or investigations are pending or, to the knowledge of the Corporation, threatened against the Corporation seeking to restrain, enjoin or in any way limit the approval or issuance and delivery of any Bond Document by the Authority or the Corporation, or which would in any manner challenge or adversely affect the corporate existence or powers of the Corporation to enter into and carry out the transactions described in or contemplated by or the execution, delivery, validity or performance by the Corporation of the terms and provisions of the Bond Documents in which it is named as a party.

(f)    Financial Statements and Other Information.  The unaudited financial statements of the Corporation for the fiscal year ended December 31, 20____ correctly and fairly present the financial condition of the Corporation as of the dates and for the periods stated therein, and the results of the operations of the Corporation for each of such periods, respectively, all in accordance with generally accepted accounting principles except as stated in the notes thereto, and, except as addressed by the Order and Bankruptcy Plan, there has been no material adverse change in the

financial condition of the Corporation from that set forth in said financial statements, except as may be disclosed in the Limited Offering Memorandum. The financial statements and other information of the Corporation included in the Limited Offering Memorandum relating to the Series 2023A Bonds do not, nor do the representations and warranties of the Corporation in this Loan Agreement or in any other Bond Documents to which the Corporation is a party or any written statement (including the Limited Offering Memorandum relating to the Series 2023A Bonds) furnished by the Corporation to the Authority and the Bond Trustee, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained herein or therein not misleading. There is no fact of which the Corporation has actual knowledge which the Corporation has not disclosed to the Authority and Bondowners in writing which materially adversely affects or, so far as the Corporation can now foresee, will materially adversely affects the financial condition or operations of the Corporation, its status as a Tax-Exempt Organization, its ability to own and operate its properties or its ability to make the payments under this Loan Agreement when and as the same become due and payable.

(g)      Environmental Laws. The Corporation is, in all material respects, in compliance with all federal, State and local environmental laws, ordinances, regulations and rulings (collectively, "Environmental Laws"); the Corporation has received no notice of any alleged violation of any Environmental Laws; and the Corporation will continue to comply, in all material respects, with all Environmental Laws.

(h)      Employee Pension Benefits Plan. The Corporation has not heretofore engaged in, and the consummation of the transactions herein provided for, and compliance by the Corporation with the Bond Documents will not involve, any prohibited transactions within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Internal Revenue Code. No "employee pension benefit plans," as defined in ERISA (the "Plans"), maintained by the Corporation, nor any trusts created thereunder, have incurred, at the end of any plan year, an "accumulated funding deficiency" as defined in Section 302 of ERISA nor does the present value of all benefits vested under all Plans exceed, as of the last annual valuation date, the value of the assets of the Plans allocable to such vested benefits.

## ARTICLE III
## LOAN TO THE CORPORATION; SECURITY FOR LOAN;
## CONDITIONS PRECEDENT

**Section 3.1.    Loan of Funds to the Corporation.**

(a)    The Authority hereby agrees that, simultaneously with the execution and delivery of this Loan Agreement, it will make a Loan to the Corporation, using the proceeds of the sale of the Bonds, and the Corporation agrees to receive the Loan from the Authority, for the purposes set forth herein and in the Bond Indenture.  Upon the terms and conditions of this Loan Agreement and the Bond Indenture, the Authority shall make a Loan to the Corporation by loaning to the Corporation the proceeds of the sale of the Series 2023A Bonds and depositing or transferring the Series 2023A Bond proceeds as provided in Section 402 of the Bond Indenture and by exchanging the Series 2023B Bonds and the Series 2023C Bonds with the Outstanding Existing Bonds as required by the Bond Indenture.

(b)    As an inducement for the Authority to issue the Bonds and make the Loan to the Corporation, and as evidence of and security for the Corporation's obligations to make Loan Payments, and to further provide for the Loan Payments hereunder and the payment of the principal of and redemption premium, if any, and interest on the Bonds, the Corporation shall cause the Series 2023 Bond Notes to be issued to the Authority and pledged and assigned to the Bond Trustee in substantially the form attached hereto as Exhibit "A".  The Corporation covenants promptly to pay or cause to be paid the principal of, redemption premium, if any, and interest on the Series 2023 Bond Notes delivered hereunder, at the place, on the dates and in the manner provided herein and in the Series 2023 Bond Notes according to the terms thereof whether at maturity, upon proceedings for redemption, by acceleration or otherwise.

(c)    The Corporation pledges to the Authority all its right, title and interest in and to the proceeds of the Loan, including any securities purchased with those proceeds and any earnings thereon, to secure the payment of the Bonds, such pledge to be effected by the deposit of such proceeds in accordance with Section 402 of the Bond Indenture.  Such pledge shall continue so long as such proceeds are held by the Bond Trustee, it being understood that the Bond Trustee shall be authorized to apply and disburse such proceeds as provided in the Bond Indenture and Article IV. The Corporation consents to the Authority assigning and pledging its interest in such proceeds to the Bond Trustee to secure the payment of the Bonds as set forth in the Bond Indenture.

(d)    In addition, the Corporation agrees to pay the costs of issuing the Bonds which are not being paid with the proceeds of the sale of the Bonds either by paying any or all of such costs directly or by depositing the same with the Bond Trustee.  Any money so deposited with the Bond Trustee shall be disbursed by the Bond Trustee in accordance with written instructions from the Authority.

**Section 3.2.    Security for Loan.**  To declare the terms and conditions upon which the Series 2023 Bond Notes are to be issued and delivered and to secure the payment of the Series 2023 Bond Notes and the performance and observance of all the covenants and conditions in this Loan Agreement and the Series 2023 Bond Notes, and to secure the payment of the Bonds, the

8

Corporation by these presents grants a security interest in, pledges, assigns and transfers in trust to the Authority, subject to Permitted Liens (herein defined), upon the terms set forth in this Loan Agreement, the following property:

(a)    Gross Receipts and Pledged Assets.  All Gross Receipts and Pledged Assets of the Corporation; and

(b)    Indenture Funds and Accounts.  All moneys and securities, if any, at any time held by the Bond Trustee under the terms of the Bond Indenture, including the Mortgaged Property; and

(c)    Other.  Any and all other real or personal property of every kind and nature from time to time by delivery or by writing of any kind conveyed, mortgaged, pledged, assigned or transferred, as and for additional security under this Loan Agreement by the Corporation, or by anyone on its behalf and with its written consent, to the Authority or the Bond Trustee.

In addition, the Corporation shall grant the Authority and the Bond Trustee a mortgage lien and security interest covering the Mortgaged Property, which mortgage lien and security interest are to be evidenced by a Mortgage and Security Agreement (hereinafter called the "Mortgage") in the form of Exhibit "B" attached hereto and which security interests are perfected by the financing statements (the "Financing Statements") in the form of Exhibit "C" attached hereto.

**Section 3.3    Additional Documentation.**  The Corporation, at its expense, shall promptly and diligently take all action necessary to maintain and preserve the security interest herein granted and either shall cause to be timely filed, together with the payment of all necessary filing fees and taxes, such Financing Statements and continuation statements in such offices of public record, or shall cause to be promptly delivered to the Authority such statements, instruments, assignments, documents or papers, as may be necessary to keep the security interest herein granted continuously perfected, and shall execute and acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all and every such further act, deed, conveyance, financing statement, continuation statement, transfer and assurances the Authority, the Bond Trustee or the Bondholder Representative may from time to time request for the better assuring, conveying, transferring and confirming unto the Authority the security interest that is now and thereafter constituted. Notwithstanding the above, the Authority is hereby irrevocably appointed the Corporation's attorney-in-fact, coupled with an interest, to do, at the Authority's, the Bond Trustee's or the Bondholder Representative's option and at Corporation's expense, all acts and things which the Authority, the Bond Trustee or the Bondholder Representative may deem reasonably necessary to perfect and continue perfecting the security interest referred to or created by this Agreement and to protect the Collateral.

**Section 3.4**.    **Conditions Precedent to Loan.**  On or prior to the Closing Date, or at any other time herein provided, the Corporation shall deliver or cause to be delivered to the Authority, the Bond Trustee and the Bondholder Representative the following items, all of which are to be in form and substance satisfactory to the Authority, the Bond Trustee and the Bondholder Representative, and, where deemed necessary by the Authority or required for recording, duly executed and acknowledged.

(a)    Closing Documents.  This Loan Agreement, the Series 2023 Bond Notes, the Mortgage, the Purchase Contract, the Deposit Account Control Agreement, the Tax Agreement and the Financing Statements shall be duly authorized, executed and delivered to the Authority.

(b)    Mortgage Title Insurance.  An ALTA Form Loan Title Policy in favor of the Authority and the Bond Trustee, in an amount equal to or exceeding the principal amount of the Series 2023 Bonds issued on the Closing Date, shall be issued by a title insurance company acceptable to the Authority, the Bond Trustee and the Bondholder Representative and shall show that the Mortgage constitutes a first and paramount valid lien on the Mortgaged Property subject only to those matters waived in writing by the Authority, the Bond Trustee and the Bondholder Representative and set out on Exhibit "B" to the Mortgage.  The "pending disbursement" language set forth in said policy must be satisfactory to the Authority and the Bondholder Representative in their sole discretion.  The premiums for the title policy shall be paid by Corporation and the Corporation will provide the Authority and the Bondholder Representative with evidence that the title insurer issuing the Loan Title Policy is aware of any work commenced on or materials delivered to the Mortgaged Property prior to recording of the Mortgage and that such title policy will include affirmative coverage against any mechanic's or materialman's liens.

(c)    Insurance.  The Corporation will deposit and maintain for the benefit of the Authority and the Bond Trustee throughout the term of the Loan, policies of insurance, premiums prepaid (or certificates thereof), as required by Section 5.16 of this Loan Agreement.

(d)    Existence and Authority.  The Corporation shall provide to the Authority, the Bond Trustee and the Bondholder Representative: (i) a certified copy of the Certificate of Incorporation of the Corporation and Bylaws of the Corporation, and appropriately executed Resolutions of the Governing Body of the Corporation authorizing the execution of the Bond Documents, (ii) evidence that the Corporation is authorized to do business in the State as a not-for-profit corporation; and (iii) copies of all Determination Letters from the Internal Revenue Service evidencing the Corporation's status as an entity recognized as a charitable entity under Section 501(c)(3) of the Internal Revenue Code.

(e)    Recording of Security Documents.  The Mortgage and the Financing Statements shall be filed in the appropriate recording offices.

(f)    Survey.  The Corporation will furnish the Authority, the Bondholder Representative and the Bond Trustee with an ALTA survey of the Mortgaged Property prepared and duly certified to the Bond Trustee and the Bondholder Representative by a qualified surveyor, which survey shall delineate the property lines, locate all improvements, water, gas, electric and sewer lines, easements affecting the Mortgaged Property, identified by book and page where recorded, adjoining streets, encroachments, if any, and show other physical matters affecting the title and use of the Mortgaged Property.

(g)    Opinion of Corporation's Counsel.  The Corporation shall deliver an opinion of its counsel addressed to those entities and covering such matters as may be set forth in the Bond Purchase Agreement among the Authority, the Corporation and the purchaser of the Series 2023A

Bonds and with respect to the Series 2023B Bonds and Series 2023C Bonds, covering those matters as requested by the Bond Trustee.

(h)    Opinion of Bond Counsel.  The Corporation shall cause there to be delivered to the holders of the Bonds and the Bond Trustee, the legal opinion of Hilborne & Weidman, a professional corporation, in form satisfactory to the Bondholder Representative and the Bond Trustee.

**Section 3.5.    Completion of the Project.**  The Corporation will cause the Project to be diligently and continuously prosecuted and to be completed with reasonable dispatch, and to provide (from its own funds if required) all moneys necessary to complete the Project.

## ARTICLE IV
## LOAN PAYMENTS AND OTHER PAYMENTS

**Section 4.1.    Loan Payments.**  The Corporation shall make the following payments ("Loan Payments") in repayment of the Loan and to provide for payment of the principal of, redemption premium, if any, and interest on the Bonds, directly to the Bond Trustee, in immediately available funds, for deposit in the applicable accounts in the Debt Service Fund, on the following dates, and otherwise as set out below:

(a)    Debt Service Fund-Interest: On or before the first day of each month from [January 1], 2024 through [May 1], 2024, one-[fifth (1/5th)] of the amount of interest which will become due and payable on the Outstanding Bonds on the first Interest Payment Date, and thereafter, one-sixth (1/6th) of the amount of interest which will become due and payable on the Outstanding Bonds on the next succeeding Interest Payment Date, or such lesser amount as shall be required to make the amount on deposit in the applicable Interest Account of the Debt Service Fund sufficient to pay interest on such Bonds on the next succeeding Interest Payment Date.

(b)    Debt Service Fund-Principal: On the first day of each month beginning [December 1], 2025 and on or before any other dates required by the Bond Indenture, an amount equal to 1/12th of the principal payable and any amount required to effect any mandatory sinking fund redemption of Bonds on the next succeeding principal payment date.

(c)    Debt Service Fund-Redemption:  On or before the date required by this Loan Agreement or the Bond Indenture, the amount required to redeem Bonds then Outstanding if the Corporation exercises its right to redeem Bonds under any provision of the Bond Indenture or if any Bonds are required to be redeemed (other than pursuant to mandatory sinking fund redemption provisions) under any provision of the Bond Indenture; provided that the Corporation agrees that from and after the date that the Series 2023A Bonds are paid in full and are no longer Outstanding under the Indenture, it shall not optionally redeem Series 2023B Bonds unless a pro rata principal amount of Series 2023C Bonds (based upon the Outstanding principal amount of Series 2023B and Series 2023C Bonds at the time of redemption) is also simultaneously redeemed therewith.

The Corporation shall receive a credit against its obligations to make the Loan Payments from transfers from the Revenue Fund as set forth in Section 407 of the Bond Indenture and the obligation of the Corporation to make any such payment hereunder shall be deemed satisfied and discharged to the extent provided in Section 4.2 of this Loan Agreement.

If the Corporation fails to make any of the payments required in this Section, the item or installment so in default shall continue as an obligation of the Corporation until the amount in default shall have been fully paid, and the Corporation agrees to pay the same with interest thereon at the Default Rate from the date when such payment was due until paid in full.

**Section 4.2.    Credits on Loan Payments**.  Notwithstanding any provision contained in this Loan Agreement or in the Bond Indenture to the contrary, in addition to any credits on the Loan resulting from the payment or prepayment of Loan Payments from other sources:

(a)      any moneys deposited by the Bond Trustee or the Corporation in any account in the Debt Service Fund as interest (including moneys received as accrued interest from the sale of Bonds and any initial deposit made from the proceeds of the sale of any Bonds, but explicitly excluding any transfers made from the Debt Service Reserve Fund) shall be credited against the obligation of the Corporation to pay interest on the Loan as the same becomes due;

(b)      any moneys deposited by the Bond Trustee or the Corporation in any account in the Debt Service Fund as principal (but explicitly excluding any transfers made from the Debt Service Reserve Fund) shall be credited against the obligation of the Corporation to pay the principal of the Loan as the same becomes due in the order of maturity thereof, except that prepayments for purposes of making an optional deposit into the Debt Service Fund for the redemption of Bonds shall be applied to the principal corresponding to the maturities of the Bonds to be redeemed or purchased, delivered and cancelled from the proceeds of such optional deposit;

(c)      the principal amount of any Bonds of any maturity purchased by the Corporation and delivered to the Bond Trustee, or purchased by the Bond Trustee and cancelled, in accordance with the Bond Indenture shall be credited against the obligation of the Corporation to pay principal on the Loan so purchased; provided, however, that deposit of a Bond of one maturity of a Series may not be credited against a payment that would be used, in the normal course, to retire a Bond of another maturity of such Series or of another Series; and

(d)      the investment income accruing to any account in the Debt Service Fund and the amount of any moneys transferred by the Bond Trustee from any other fund held under the Bond Indenture and deposited in the Debt Service Fund as interest or principal shall be credited against the obligation of the Corporation to pay interest or principal, as the case may be, as the same become due.

**Section 4.3.    Additional Payments.**  The Corporation will make the following additional payments to the following persons:

(a)      Authority Fees.  To the Authority annually on the 1st day of January of each year, beginning January 1, 2025 an administrative fee.  The annual administrative fee to be paid by the Corporation to the Authority shall be payable in arrears on January 1st, and shall be one-tenth (1/10) of one percent (1%) calculated based on the then Outstanding principal amount of the Series 2023 Bonds.  Additionally to the Authority its pro rata share of the annual audit cost of the Authority, also due on January 1st of each year, beginning January 1, 2025.

To the Authority upon demand its fees and charges and all reasonable expenses incurred by the Authority (including reasonable fees and expenses of counsel to the Authority) in relation to the Bonds and the transactions contemplated by this Loan Agreement, the Bond Indenture and any of the Bond Documents which are not otherwise required to be paid by the Corporation under the terms of this Loan Agreement, including all fees and charges of the Authority as provided for under the Act.

(b)      Bond Trustee Fees, Bondholder Representative Fees, and Professional Fees.  The Corporation shall cause to be paid to the Bond Trustee, the Bondholder Representative, the Dissemination Agent, authenticating agents, paying agents, registrars, counsel, accountants, rebate

13

analysts and other Persons when due, all reasonable fees, charges and expenses of such Persons for services rendered under the Bond Indenture and under any of the Bond Documents and expenses incurred in the performance of such services under the Bond Indenture and any of the Bond Documents for which such Persons are entitled to payment or reimbursement, including expenses of compliance with the Tax Agreement and the Continuing Disclosure Agreement.

(c)    Advances by Bond Trustee and the Bondholder Representative.  The Corporation shall cause to be paid to the Bond Trustee and the Bondholder Representative the amount of all advances of funds made by the Bond Trustee or the Bondholder Representative under the provisions of this Loan Agreement or the Bond Indenture, with interest thereon at the prime rate announced from time to time by the Bond Trustee.  The Bondholder Representative shall not make any advances under the provisions of this Loan Agreement or the Bond Indenture without the prior written consent of the Owners of a majority in the principal amount of the Outstanding Series 2023B Bonds.

(d)    Arbitrage Rebate Payments.  The Corporation shall cause to be paid to the United States Government or the Bond Trustee for deposit in the Rebate Fund all rebate payments required under the Tax Agreement and Section 148(f) of the Internal Revenue Code, to the extent such amounts are not available to the Bond Trustee in the Rebate Fund held under the Bond Indenture.

(e)    Debt Service Reserve Fund.  The Corporation shall cause to be paid to the Bond Trustee for deposit in the Debt Service Reserve Fund the amounts at the times as required by the Bond Indenture.

(f)    Costs of Enforcement.  In the event the Corporation defaults under any of the provisions of this Loan Agreement and Bond Trustee and/or the Bondholder Representative employs attorneys or incurs other fees, charges and expenses for the collection of required payments or the enforcement of performance or observance of any obligation or agreement on the part of the Corporation contained in this Loan Agreement or the Bond Indenture, the Corporation on demand therefor shall cause to be paid to the Bond Trustee and/or the Bondholder Representative, as applicable, the reasonable fees and expenses of such attorneys and such other expenses so incurred by the Bond Trustee and/or the Bondholder Representative, as applicable.  The Corporation also shall cause to be paid, and shall indemnify the Authority, the Bondholder Representative and the Bond Trustee and their respective members, directors, officers, employees and agents from and against, all costs, expenses and charges, including reasonable counsel fees and expenses, incurred for the collection of payments due or for the enforcement or performance or observance of any covenant or agreement of the Corporation under this Loan Agreement or under the Bond Indenture or any other Bond Document.  In addition, the Corporation agrees to pay the legal and work out costs of the Bondholder Representative and Hamlin Capital Advisors, LLC upon an Event of Default.

(g)    Taxes and Assessments.  The Corporation shall cause to be paid all taxes and assessments of any type or character charged to the Authority or to the Bond Trustee affecting the amount available to the Authority or the Bond Trustee from payments to be received hereunder or in any way arising due to the transactions contemplated hereby (including property and other taxes and assessments assessed or levied by any public agency or governmental authority of whatsoever character having power to levy taxes or assessments) but excluding any taxes based upon the capital and/or income of the Bond Trustee or any other Person other than the Corporation; provided, however, that the Corporation shall have the right to protest any such taxes or assessments and to

14

require the Authority or the Bond Trustee, as the case may be, at the Corporation's expense, to protest and contest any such taxes or assessments assessed or levied upon them and that the Corporation shall have the right to withhold payment of any such taxes or assessments pending disposition of any such protest or contest unless such withholding, protest, or contest would materially adversely affect the rights or interests of the Authority or the Bond Trustee.

(h)     Indemnification of Authority, Bondholder Representative and Bond Trustee.  The Corporation will, at its expense, pay and indemnify the Authority, the Bondholder Representative and the Bond Trustee and their respective current, former and future members, directors, officers and employees and agents from and against, all costs, expenses and charges, including reasonable counsel fees, incurred in enforcing any covenant or agreement of the Corporation contained in any Bond Document.  Such indemnification of the Authority shall be in addition to and not in lieu of the indemnification provisions contained in Section 5.5 or in any other provision of this Loan Agreement.   In addition, the Corporation agrees to indemnify and hold harmless the Bondholder Representative for providing directions, consents, approval, waivers, etc. and for exercising its fiduciary responsibilities including, but not limited to, acceleration and foreclosure.

(i)     Other Amounts Payable.  The Corporation shall cause to be paid to the Person or Persons entitled thereto, any other amounts which the Corporation has agreed to pay under this Loan Agreement or which the Corporation is required to pay under the Bond Indenture or the Mortgage.

**Section 4.4.    Prepayment of the Loan.**  The Corporation may prepay from time to time the amounts payable under this Loan Agreement in sums sufficient to redeem or to pay or cause to be paid all or part of the Bonds in accordance with the provisions of the Bond Indenture.  Upon written notice and direction by the Corporation to the Bond Trustee to redeem Bonds subject to optional redemption under the Bond Indenture, the Bond Trustee shall forthwith take all steps (other than the payment of the money required for such redemption) necessary under the applicable redemption provisions of the Bond Indenture to effect redemption of all or part of the then Outstanding Bonds, as may be specified by the Corporation, on the date established for such redemption.  Whenever any Bonds shall have been called for optional redemption under any provision of the Bond Indenture, the Corporation shall cause to be deposited with the Bond Trustee moneys in such amounts and at such times required to redeem such Bonds, including the principal, redemption premium, if any, and accrued interest thereon to the redemption date.  The Corporation further agrees that in the event the payment of principal of and interest on the Loan is accelerated upon the occurrence of an event of default under this Loan Agreement, all Loan Payments payable for the remainder of the term of this Loan Agreement shall be accelerated and prepayment shall be made on the Loan in such amounts.  Any such prepayments shall be deposited in the Debt Service Fund, and applied by the Bond Trustee in accordance with the provisions of the Bond Indenture.

**Section 4.5.    Obligations Absolute and Unconditional**.   The obligations of the Corporation under this Loan Agreement are general obligations of the Corporation, and the full faith and credit of the Corporation is pledged to the payment of all amounts due and payable by the Corporation under this Loan Agreement.  The Corporation shall pay all such amounts due and payable under this Loan Agreement using any and all available resources of the Corporation, as necessary.  The Corporation shall pay all Loan Payments and other payments due under this Loan Agreement and perform its obligations, covenants and agreements under this Loan Agreement, without notice or demand, and without abatement, deduction, set-off, counterclaim, recoupment, discrimination or defense or any right of termination or cancellation arising from any circumstances

whatsoever, and regardless of the invalidity of any portion of this Loan Agreement, and, to the extent permitted by law, the Corporation waives the provisions of any statute or other law now or hereafter in effect contrary to any of its obligations, covenants or agreements under this Loan Agreement or which releases or purports to release the Corporation therefrom. Nothing in this Loan Agreement shall be construed as a waiver by the Corporation of any rights or claims the Corporation may have against the Authority under this Loan Agreement or otherwise, but any recovery upon such rights or claims shall be had from the Authority separately, it being the intent of this Loan Agreement that the Corporation shall be unconditionally and absolutely obligated to perform fully all of its obligations, agreements and covenants under this Loan Agreement for the benefit of the owners of the Bonds.

Section 4.6.    **Assignment of Authority's Rights**.  Under the Bond Indenture, the Authority has pledged, assigned, transferred in trust and granted a security interest to the Bond Trustee in all of the Authority's rights, title and interest under this Loan Agreement (except for the Authority's rights to payment of its fees and expenses and the Authority's right to indemnification in certain circumstances and as otherwise expressly set forth in this Loan Agreement) as security for the Bonds, and such rights, title and interest may be exercised, protected and enforced for or on behalf of the owners of the Bonds in conformity with this Loan Agreement and the Bond Indenture. The Bond Trustee is hereby given the right to enforce, as assignee of the Authority, the performance of the obligations of the Corporation under this Loan Agreement, and the Corporation hereby consents to the same and agrees that the Bond Trustee may enforce such rights as provided in this Loan Agreement and in the Bond Indenture. The Authority and the Corporation recognize that the Bond Trustee and the Bondholder Representative are each a third party beneficiary of this Loan Agreement.

## ARTICLE V
## COVENANTS OF THE CORPORATION

**Section 5.1.    Corporate Existence and Tax-Exempt Status.**    Except as otherwise expressly provided in this Loan Agreement or the Bond Documents, the Corporation shall (a) preserve and keep in full force and effect its corporate or other separate legal existence, (b) remain qualified to do business and conduct its affairs in each jurisdiction where ownership of its property or the conduct of its business or affairs requires such qualification, and (c) maintain its status as a Tax-Exempt Organization.

**Section 5.2.    Maintenance and Use of Property, Plant and Equipment.** The Corporation shall cause all of its Property, Plant and Equipment used or useful in the conduct of its business and operations to be maintained, preserved and kept in good repair and working order and condition and in as safe condition as its operations will permit and shall make all repairs, renewals, replacements and improvements thereof necessary for the efficient conduct of its business and operations. Nothing in this Section shall obligate the Corporation to preserve, repair, renew or replace any Property, Plant and Equipment no longer used or no longer useful in the conduct of its business, or prevent the Corporation from discontinuing the operation of any of its Property, Plant and Equipment or from removing or demolishing any building or buildings, if in its judgment (evidenced, in the case of such a cessation other than in the ordinary course of business, by a determination by its Governing Board) such discontinuance is desirable in the conduct of its business. The Corporation may make additions, alterations and changes to its Property, Plant and Equipment so long as such additions, alterations and changes are made in compliance with the provisions of this Loan Agreement and will not result in a violation of the provisions of this Loan Agreement, and the Corporation may dispose of any Property, Plant and Equipment as permitted by this Loan Agreement.

Subject to the provisions of this Article, the Corporation shall have the right to use its Property, Plant and Equipment for any purpose allowed by law. Except as provided in this Loan Agreement, the Authority reserves no power or authority with respect to the operation of the Property, Plant and Equipment by the Corporation and activities incident thereto, it being the intention of the parties to this Loan Agreement that so long as the Corporation shall duly and faithfully observe and perform all of the terms, covenants, provisions and agreements of this Loan Agreement, the Corporation shall manage, administer and govern the Property, Plant and Equipment of the Corporation in its activities and affairs on a continuing day-to-day basis.

The Corporation agrees that it will not use or permit the use of any of the properties financed or refinanced, or for which it is reimbursed, in whole or in part, out of the proceeds of the Bonds in a manner which is prohibited by the Establishment of Religion Clause of the First Amendment to the Constitution of the United States of America and the decisions of the United States Supreme Court interpreting the same or by any comparable provisions of the Constitution of the State and the decisions of the Oklahoma Supreme Court interpreting the same.

**Section 5.3.    Compliance with Laws and Regulations.**    The Corporation shall conduct its affairs and carry on its business and operations in such manner as to comply with any and all applicable laws of the United States of America and the several states thereof and observe and conform to all valid orders, regulations or requirements of any governmental authority applicable

17

to the conduct of its business and operations and the ownership of its Property, Plant and Equipment, including without limitation environmental laws, orders or regulations; provided, however, that nothing contained in this Loan Agreement shall require the Corporation to comply with, observe and conform to any such law, order, regulation or requirement of any governmental authority so long as the validity thereof shall be contested by the Corporation in good faith by appropriate proceedings, provided that the Corporation shall have set aside on its books adequate reserves with respect to such contest and such contest shall not materially impair the ability of the Corporation to meet its obligations under this Loan Agreement.

       **Section 5.4.    Payment of Taxes and Other Charges.**  The Corporation shall pay or cause to be paid as they become due and payable all taxes, assessments and other governmental charges lawfully levied or assessed or imposed upon the Corporation or its Property, Plant and Equipment or any part thereof or upon any income therefrom; provided, however, that the Corporation shall not be required to pay and discharge or cause to be paid and discharged any such tax, assessment or governmental charge to the extent that the amount, applicability or validity thereof shall currently be contested in good faith by appropriate proceedings and the Corporation shall have established and shall maintain adequate reserves on its books for the payment of the same.

       **Section 5.5.    Indemnity.**  The Corporation shall pay and indemnify and save the Authority, the Bondholder Representative and the Bond Trustee and their respective members, directors, officers, employees and agents harmless from and against all loss, liability, damage or expense (including, without limitation, reasonable attorneys' fees and expenses) arising out of the issuance of the Bonds and the execution of this Loan Agreement and the other Bond Documents, including, but not limited to, claims for loss or damage to any property or injury to or death of any person, asserted by or on behalf of any Person or governmental authority arising out of or in any way connected with any property of the Corporation, or the conditions, occupancy, use, possession, conduct or management of, or any work done in or about such property.  The Corporation shall also pay and indemnify and save the Authority, the Bondholder Representative and the Bond Trustee and their respective members, directors, officers, employees and agents harmless of, from and against, all costs, reasonable counsel fees, expenses and liabilities incurred by them in any action or proceeding brought by reason of any such claim, demand, expense, penalty, fine or tax.  If any action or proceeding is brought against the Authority, the Bondholder Representative or the Bond Trustee or their respective members, directors, officers, employees or agents by reason of any such claim or demand, the Corporation, upon notice from the Authority, the Bondholder Representative or the Bond Trustee, covenants to resist and defend such action or proceeding on demand of the Authority, the Bondholder Representative or the Bond Trustee or their respective members, directors, officers, employees or agents. If the Corporation fails to employ counsel or such counsel shall fail to actively defend such actions, or to protect the Authority, the Bondholder Representative or the Bond Trustee, or all, or if there exists a conflict of interest, the Authority, the Bondholder Representative and the Bond Trustee may employ counsel at the expense of the Corporation to defend such action. Notwithstanding the foregoing, none of the Authority, the Bondholder Representative or the Bond Trustee nor their respective members, directors, officers, employees and agents shall be indemnified against liability for damage arising out of bodily injury to persons or damage to property caused by their own negligent, willful and malicious acts or omissions or negligent, willful and malicious acts or omissions of their own members, directors, officers, employees or agents.  The Corporation shall also pay and indemnify the Authority, the Bondholder Representative and the Bond Trustee from and

against all fees, costs, expenses and charges, including reasonable counsel fees and expenses, incurred after default of the Corporation in enforcing any covenant or agreement of the Corporation contained in this Loan Agreement, the Bond Indenture or the other Bond Documents. In addition, the Corporation agrees to indemnify and hold harmless the Bondholder Representative for providing directions, consents, approval, waivers, etc. and for exercising its fiduciary responsibilities including, but not limited to, acceleration and foreclosure. The foregoing indemnification shall survive the termination of the Bond Indenture or the resignation or removal of the Bond Trustee.

Section 5.6.    **Tax Covenants.**  The Corporation covenants and agrees that it will not take any action or permit any action to be taken that would adversely affect the exclusion from gross income for federal income tax purposes of the interest on the Series 2023A Bonds, the Series 2023B Bonds and the Series 2023C Bonds and will take whatever action, or refrain from whatever action, necessary to comply with the requirements of the Internal Revenue Code to maintain the exclusion from gross income for federal income tax purposes of the interest on such series of the Bonds, and the Corporation shall comply with the Tax Agreement and will pay or provide for payment to the United States Government or the Bond Trustee, all rebate payments required under Section 148(f) of the Internal Revenue Code and the Tax Agreement, to the extent such amounts are not available to the Bond Trustee in the Rebate Fund held under the Bond Indenture.  This covenant shall survive payment in full or defeasance of the Bonds.

Section 5.7.    **Continuing Disclosure.**  The Corporation acknowledges that the Corporation is the only "obligated persons" with responsibility for continuing disclosure under the Continuing Disclosure Agreement, and the Authority has undertaken no responsibility with respect to any reports, notices or disclosures provided or required under this Section, and has no liability to any Person, including any Beneficial Owner of the Bonds, with respect to SEC Rule 15c2-12. Notwithstanding any other provision of this Loan Agreement, failure of the Corporation to comply with the Continuing Disclosure Agreement shall not be considered an event of default under this Loan Agreement or any other Bond Document; however, the Dissemination Agent may (and, at the request of any Participating Underwriter or the owners of at least 25% aggregate principal amount in Outstanding Bonds, shall) or any Bondowner or Beneficial Owner may take such actions as may be necessary and appropriate, including seeking specific performance by court order, to cause the Corporation to comply with its obligations under this Section.  For purposes of this Section, *"Beneficial Owner"* means any person which (a) has the power, directly or indirectly, to vote or consent with respect to, or to dispose of ownership of, any Bonds (including persons holding Bonds through nominees, depositories or other intermediaries), or (b) is treated as the owner of any Bonds for federal income tax purposes, and *"Dissemination Agent"* and *"Participating Underwriter"* shall have the meaning ascribed thereto in the Continuing Disclosure Agreement.

Section 5.8.    **Assignment by the Corporation.**  The Corporation shall not assign this Loan Agreement, as a whole or in part, without the prior written consent of the Authority, the Bondholder Representative and the Bond Trustee.

Section 5.9.    **Covenants under Bond Indenture and Other Bond Documents.**  The Corporation shall perform or cause to be performed all covenants and agreements required on the part of the Corporation under the Bond Indenture and the other Bond Documents, and shall deliver to the Bond Trustee and the Bondholder Representative all reports, opinions and other documents

required by the Bond Indenture and all other Bond Documents to be submitted to the Bond Trustee and the Bondholder Representative at the times required by the Bond Indenture and all other Bond Documents.

**Section 5.10. Long-Term Debt Service Coverage Ratio.** For so long as any of the Series 2023A Bonds are Outstanding, the Corporation shall comply with the provision of the Continuing Covenants Agreement pertaining to the Long-Term Debt Service Coverage Ratio. Once the Series 2023A Bonds have been paid in full, the Corporation shall comply with the following:

(a)    The Corporation shall operate its Facilities on a revenue producing basis and shall charge such rates, fees and charges for its Facilities and services and shall exercise such skill and diligence as to provide income from its Facilities together with other available funds sufficient for the Corporation to maintain the Long-Term Debt Service Coverage Ratio set forth below (the "DSCR Requirement") for each March 31, June 30, September 30 and December 31, commencing on the first such date after the Series 2023A Bonds have been paid in full (each, a "DSCR Testing Date"):

| DSCR Testing Date | Long-Term Debt Service Coverage Ratio |
|---|---|
| Commencing with the DSCR Testing Date immediately succeeding the date on which the Series 2023A Bonds are paid in full | 1.20 |

(b)    Commencing with the first fiscal quarter for which testing is required, compliance with the Long-Term Debt Service Coverage Ratio covenant shall be tested by the Corporation quarterly on the basis of the unaudited financial reports required by Section 5.22 of this Loan Agreement for the preceding rolling 12-month period, except for the fourth quarter, which shall be done on the basis of the Corporation's audited financial statements required pursuant to Section 5.22 hereof. If the Long-Term Debt Service Coverage Ratio on any DSCR Testing Date is less than the applicable DSCR Requirement, the Corporation shall, at the direction of the Majority of Holders, engage a Management Consultant in accordance with Section 5.25 hereof, within 30 days of the Corporation's receipt of such direction of the Majority of Holders, to make recommendations with respect to the rates, fees and charges of the Corporation and the Corporation's methods of operation and other factors affecting its financial condition in order to increase the Long-Term Debt Service Coverage Ratio for future DSCR Testing Dates to at least the DSRC Requirement. A copy of such Management Consultant report and recommendations (the "Management Consultant's DSCR Report") shall be filed with the Bond Trustee within 60 days after the date the Management Consultant is retained by the Corporation. The Corporation shall adopt a specific plan setting forth the steps designed to achieve the required Long-Term Debt Service Coverage Ratio and implement the recommendations set forth in the Management Consultant's DSRC Report to the extent permitted by law, by the end of the second fiscal quarter following the date the Management Consultant's DSCR Report is due.

(c)    If the Corporation fails to meet the required Long-Term Debt Service Coverage Ratio following the end of the second fiscal quarter after the Management Consultant's DSCR Report is

due, the Corporation shall, at the direction of a Majority of Holders, engage a new third party manager (or if a third party manager is then managing the Facility, engage a new third party manager) in accordance with Section 5.25 of this Loan Agreement, within 30 days of receipt of such direction from the Majority of Holders.

(d)     It shall constitute an Event of Default hereunder if (i) the Long-Term Debt Service Coverage Ratio is 1.0 or below on any DSCR Testing Date, or (ii) the Corporation fails to meet the Long-Term Debt Service Coverage Ratio for two consecutive Testing Dates, or (iii) the Corporation fails to engage a Management Consultant as required above or fails to implement the recommendations of the Management Consultant, to the extent permitted by law, or (iv) the Corporation fails to engage a new third party manager (or if a third party manager is then managing the Facility, engage a new third party manager) as required above.

**Section 5.11.   Covenants Concerning Occupancy**.  For so long as any of the Series 2023A Bonds are Outstanding, the Corporation shall comply with the provision of the Continuing Covenants Agreement pertaining to the covenants concerning occupancy.  Once the Series 2023A Bonds have been paid in full, the Corporation shall comply with the following:

The Corporation shall continue to employ Solutions Advisors, LLC to provide the expanded services set forth on Exhibit D hereto until the later of (i) **[insert date that is two years after the Closing Date]** or (ii) the date that the Corporation is in full compliance with the covenants set forth in paragraphs (a), (b), and (c) of this Section 5.11 as of a particular Occupancy Testing Date.  If at any time after the Marketing Consultant is no longer engaged pursuant to the preceding sentence, the Corporation has not satisfied that the IL Occupancy Requirement or the AL/MC Occupancy Requirement as of any Occupancy Testing Date, the Bond Trustee retains all rights and remedies provided herein, including retaining a Marketing Consultant.

(a)     Independent Living Occupancy. The Corporation covenants and agrees that it will execute and maintain Residency Agreements so that the percentage of Occupied Independent Living Units are at least equal to the following percentages of total Independent Living Units (the "IL Occupancy Requirement") as of the later of (i) after the Series 2023A Bonds are paid in full or (ii) last day of each of the following Fiscal Quarters:

| Fiscal Quarter Ending | Percentage |
| --- | --- |
| March 31, 2024 | 67.50% |
| June 30, 2024 | 67.50% |
| September 30, 2024 | 68.50% |
| December 31, 2024 | 68.50% |
| March 31, 2025 | 69.50% |
| June 30, 2025 | 69.50% |
| September 30, 2025 | 70.50% |
| December 31, 2025 | 70.50% |
| March 31, 2026 | 72.00% |
| June 30, 2026 | 72.00% |
| September 30, 2026 | 73.50% |

| | |
|---|---|
| December 31, 2026 | 73.50% |
| March 31, 2027 | 75.00% |
| June 30, 2027 | 75.00% |
| September 30, 2027 | 76.50% |
| December 31, 2027 and the last day of each fiscal quarter thereafter | 76.50% |

(b)     Assisted Living/Memory Care Occupancy. The Corporation covenants and agrees that the percentage of Average Occupied Assisted Living/Memory Care Beds are at least equal to [85%] of total Assisted Living/Memory Care Beds (the "AL/MC Occupancy Requirement") for each Fiscal Quarter, commencing with the later of (i) after the Series 2023A Bonds are paid in full or (ii) the Fiscal Quarter ended March 30, 2024.

(c)     Skilled Nursing Care Occupancy. The Corporation covenants and agrees that the percentages of Average Occupied Skilled Nursing Care Beds are at least equal to [70%] of total Skilled Nursing Care Beds (the "SNF Occupancy Requirement") for each Fiscal Quarter, commencing with the later of (i) after the Series 2023A Bonds are paid in full or (ii) the Fiscal Quarter ended March 30, 2024.

(d)     If at the end of any Fiscal Quarter (commencing with the first Fiscal Quarter ending after the Series 2023A Bonds are paid in full), the Corporation fails to comply with the IL Occupancy Requirement set forth in Section 5.11(a), as reflected in the quarterly report delivered pursuant to Section 5.22 hereof, the Corporation shall, at the direction of the Majority of Holders, engage a Marketing Consultant in accordance with Section 5.25 hereof, within 30 days of the Corporation's receipt of such direction of the Majority of Holders, to make recommendations to achieve the IL Occupancy Requirement set forth in Section 5.11(a) by the end of the next Fiscal Quarter. A copy of the report of such Marketing Consultant's recommendations (the "Marketing Consultant's IL Report") shall be filed with the Bond Trustee within 60 days after the date the Marketing Consultant is retained by the Corporation. The Corporation shall adopt a specific plan setting forth the steps designed to achieve the required IL Occupancy Requirement and implement the recommendations set forth in the Marketing Consultant's IL Report to the extent permitted by law by the end of the second fiscal quarter following the date the Marketing Consultant's IL Report is due. If the Corporation fails to meet the required IL Occupancy Requirement following the end of the second Fiscal Quarter after the Marketing Consultant's IL Report is due, the Corporation shall, at the direction of a Majority of Holders, replace the existing marketing agent in accordance with Section 5.25 of this Loan Agreement or if no marketing agent is then engaged, appoint a new marketing agent in accordance with Section 5.25 of this Loan Agreement, within 30 days of receipt of such direction from the Majority of Holders. It shall constitute an Event of Default hereunder if (i) the Corporation fails to engage a Marketing Consultant as required above or fails to implement the recommendations of the Marketing Consultant, to the extent permitted by law, or (ii) the Corporation fails to engage a new marketing agent or replace an existing marketing agent as required above.

(e)     If at the end of any Fiscal Quarter (commencing with the first Fiscal Quarter ending after the Series 2023A Bonds are paid in full), the Corporation fails to comply with the AL/MC

Occupancy Requirement set forth in Section 5.11(b) or the SNF Occupancy Requirement set forth in Section 5.11(c) hereof, as reflected in the quarterly report delivered pursuant to Section 5.22 hereof, the Corporation shall, at the direction of the Majority of Holders, engage a Management Consultant in accordance with Section 5.25 hereof, within 30 days of the Corporation's receipt of such direction of the Majority of Holders, to make recommendations to achieve the AL/MC Occupancy Requirement set forth in Section 5.11(b) hereof or the SNF Occupancy Requirement set forth in Section 5.11(c) hereof, as applicable, by the end of the next Fiscal Quarter. A copy of the report of such Management Consultant's recommendations (the "Management Consultant's Occupancy Report") shall be filed with the Bond Trustee within 60 days after the date the Management Consultant is retained by the Corporation. The Corporation shall adopt a specific plan setting forth the steps designed to achieve the required AL/MC Occupancy Requirement or SNF Occupancy Requirement and implement the recommendations set forth in the Management Consultant's Occupancy Report to the extent permitted by law by the end of the second fiscal quarter following the date the Management Consultant's Occupancy Report is due. If the Corporation fails to meet the required AL/MC Occupancy Requirement or SNF Occupancy Requirement, as applicable, following the end of the second Fiscal Quarter after the Management Consultant's Occupancy Report is due, the Corporation shall, at the direction of a Majority of Holders, engage a new third party manager (or if a third party manager is then managing the Facility, engage a new third party manager) in accordance with Section 5.25 of this Loan Agreement, within 30 days of receipt of such direction from the Majority of Holders. It shall constitute an Event of Default hereunder if (i) the Corporation fails to engage a Management Consultant as required above or fails to implement the recommendations of the Management Consultant, to the extent permitted by law, or (ii) the Corporation fails to engage a new third party manager (or if a third party manager is then managing the Facility, engage a new third party manager) as required above.

**Section 5.12. Liquidity Covenant.** For so long as any of the Series 2023A Bonds are Outstanding, the Corporation shall comply with the provision of the Continuing Covenants Agreement pertaining to the Liquidity Covenant. Once the Series 2023A Bonds have been paid in full, the Corporation shall comply with the following:

(a)    The Corporation agrees to conduct its business so that the Corporation on June 30 and December 31 of each year (each, a "**Liquidity Testing Date**"), commencing the later of (I) after the Series 2023A Bonds are paid in full and (ii) December 31, 2025, has Days Cash on Hand equal to 60 Days Cash on Hand.

(b)    The Corporation covenants that it will calculate the Days Cash on Hand of the Corporation as of each Liquidity Testing Date and deliver an Officer's Certificate to the Bond Trustee and the Owners setting forth the calculation for such Liquidity Testing Date as set forth in Section 5.22 hereof.  The Corporation will also report the Days Cash on Hand on each Fiscal Quarter, commencing March 31, 2026.

(c)    If the Days Cash on Hand on any Liquidity Testing Date is less than the required Days Cash on Hand for such Liquidity Test Date set forth in Section 5.12(a) above, as set forth in the Officer's Certificate delivered pursuant to Section 5.22 hereof above, the Corporation shall, at the direction of the Majority of Holders, engage a Management Consultant in accordance with Section 5.25 hereof, within 30 days of the Corporation's receipt of such direction of the Majority of Holders,

to make recommendations in order to increase the Days Cash on Hand to meet the required Days Cash on Hand for future Liquidity Test Dates set forth in Section 5.12(a) above. A copy of such Management Consultant report and recommendations (the "Management Consultant's Liquidity Report") shall be filed with the Bond Trustee within 60 days after the date the Management Consultant is retained by the Corporation. The Corporation shall adopt a specific plan setting forth the steps designed to achieve the required Days Cash on Hand and implement the recommendations set forth in the Management Consultant's Liquidity Report to the extent permitted by law, by the end of the second fiscal quarter following the date the Management Consultant's Liquidity Report is due.

(d)    If the Corporation fails to meet the required Day Cash on Hand following the end of the second fiscal quarter after the Management Consultant's Liquidity Report is due, the Corporation shall, at the direction of a Majority of Holders, engage a new third party manager (or if a third party manager is then managing the Facility, engage a new third party manager) in accordance with Section 5.25 of this Loan Agreement, within 30 days of receipt of such direction from the Majority of Holders.

(e)    It shall constitute an Event of Default hereunder if (i) the Days Cash on Hand on any Liquidity Test Date is less than 45 Days Cash on Hand, or (ii) the Corporation fails to engage a Management Consultant as required above or fails to implement the recommendations of the Management Consultant, to the extent permitted by law, or (iii) the Corporation fails to engage a new third party manager (or if a third party manager is then managing the Facility, engage a new third party manager) as required above.

Section 5.13.  Covenant Concerning Entrance Fees.  Notwithstanding anything to the contrary contained herein or in any of the Bond Documents, the Corporation shall not, without the consent of (i) so long as the Series 2023A Bonds are Outstanding, the Bondholder Representative and (ii) the Owners of a majority in the principal amount of the Outstanding Series 2023B Bonds and Series 2023C Bonds, reduce the amount of any Entrance Fees or offer any new discounts to Entrance Fee pricing which reduces the effective amounts of current gross Entrance Fees received by greater than ten percent 10% in the aggregate from the pricing schedule attached hereto as Exhibit "E" (based on a rolling 12 month basis), to be tested quarterly each March 31, June 30, September 30 and December 31, beginning with the Fiscal Quarter ending December 31, 2023. If the Corporation fails to meet the covenant set forth in this Section 5.13 it shall be an Event of Default hereunder only upon notice by the Bond Trustee, at the direction of either the Bondholder Representative or the Majority of Holders.

Section 5.14.  Operating Fund and Ancillary Operating Fund.  The Corporation will establish or designate bank accounts under the control of the Corporation, on behalf of the Corporation, to fund operating expenses of the Facilities and designated as the "Operating Fund" and "Ancillary Operating Fund" under the Bond Indenture.  The Corporation shall provide to the Bond Trustee instructions on transferring amounts to the Operating Fund and Ancillary Operating Fund in accordance with Section 407(b) of the Bond Indenture.

The Operating Fund and Ancillary Operating Fund shall be subject to draws and direction by the Bond Trustee pursuant to the Deposit Account Control Agreements acceptable to the Bond Trustee and the Bondholder Representative.  In the event the Corporation wishes to change its

banking relationship from the initial depository bank to another banking institution for either the Operating Fund or Ancillary Operating Fund, then the Corporation may do so, so long as (i) no Event of Default shall have occurred or be continuing at the time of such change and (ii) the Corporation otherwise complies with this Section 5.14. In order to implement this change of banking relationship to a new depository bank, the Corporation shall (x) first provide the Bond Trustee and the Bondholder Representative thirty (30) days' written notice of such intent to change banking relationships, with the proposed effective date of such change and the name and contact information for the proposed new depository bank, and (y) execute a new deposit account control agreement with the new depository bank in a form substantially similar to the Deposit Account Control Agreement, as approved by the Bond Trustee and the Bondholder Representative with the advice of counsel.

**Section 5.15. Application of Excess Cash.** The Corporation will apply, at the Corporation's discretion, any Excess Cash received pursuant to Section 407(b)(vii) (2) and Section 407(b)(ix)(B) of the Bond Indenture which is deposited in the Ancillary Operating Fund solely on: (i) expenses directly related to the operation, management, maintenance or improvement of the Facilities; (ii) expenses for repair, improvement and/or replacement of the Facilities; (iii) the refund of Entrance Fees; (iv) other operating expenses, including budgeted capital expenses after funds in the Project Fund have been fully disbursed or capital expenses that are not reflected on Exhibit "D" to the Bond Indenture and costs and expenses for the refurbishment of Independent Living Units as is necessary for occupancy or reoccupancy of the Independent Living Units; (v) payments of Indebtedness permitted under this Loan Agreement, the Mortgage, the Bond Indenture or any Supplemental Loan Agreement or Supplemental Bond Indenture, including scheduled debt service on or redemption of the Series 2023 Bonds; (vi) costs and expenses related to the fulfilment of the Corporation's charitable purposes, including the cost and expense of providing charitable care and community benefits to Residents who are no long able to pay these costs; and/or (vii) costs and expenses related to the maintenance of the Corporation's non-profit status.

**Section 5.16.  Insurance.**

(a)      The Corporation shall maintain insurance with respect to its property and operations covering such risks that are of an insurable nature and of the character customarily insured against by organizations operating similar properties and engaged in similar operations (including but not limited to property and casualty, business interruption, worker's compensation, general and professional liability cyber insurance, terrorism and employee dishonesty) and in such amounts as, in its judgment, are adequate to protect the Corporation and its property and operations. Each policy or other contract for such insurance shall contain an agreement by the insurer that, notwithstanding any right of cancellation reserved to such insurer, such policy or contract shall continue in force for at least 30 days after written notice of cancellation to the Corporation and the Bond Trustee.

In addition to the foregoing, insurance coverage shall specifically include a full replacement cost casualty policy on the Mortgaged Property with the Bond Trustee named as Mortgagee/Loss Payee. The Bond Trustee shall be named an additional insured on each public liability policy.

(b)      The Corporation shall retain an Insurance Consultant to review the coverages required by subsection (a) and the insurance requirements of the Corporation from time to time (but not less frequently than annually and initially not later than December 31, 2023). If the Insurance Consultant

makes recommendations for the increase of any coverage required by subsection (a), the Corporation shall increase, or cause to be increased, such coverage in accordance with such recommendations. Notwithstanding the above provisions, the Corporation shall have the right, with the consent of the Bondholder Representative while the Series 2023A Bonds are outstanding, and with the consent of the Owners of a majority in the principal amount of Outstanding Series 2023B Bonds, (i) to maintain insurance coverage below that most recently recommended by the Insurance Consultant, if the Corporation Representative furnishes to the Bond Trustee and the Bondholder Representative a report of the Insurance Consultant to the effect that the insurance so provided affords either the greatest amount of coverage available for the risk being insured against at rates which in the judgment of the Insurance Consultant are reasonable in connection with reasonable and appropriate risk management, or the greatest amount of coverage necessary by reason of state or federal laws now or hereafter in existence limiting medical and malpractice liability, or (ii) to adopt alternative risk management programs which the Insurance Consultant determines to be reasonable, including to participate with other institutions in mutual or other cooperative insurance or other risk management programs, to participate in state or federal insurance programs, to take advantage of state or federal laws now or hereafter in existence limiting medical and malpractice liability, or to establish or participate in other alternative risk management programs; all as may be approved by the Insurance Consultant and the Bondholder Representative while the Series 2023A Bonds are outstanding and the Owners of a majority in the principal amount of the Outstanding Series 2023B Bonds, as reasonable and appropriate risk management by the Corporation.

(c)     In the event that the Corporation fails to maintain the insurance coverage or retain an Insurance Consultant required by this Loan Agreement, the Bond Trustee may purchase insurance or retain an Insurance Consultant, at the expense of the Corporation, to protect the interests of the Bond Trustee and the Owners.  If insurance is purchased, the insurance may, but need not, protect the interests of the Corporation.  The coverage that the Bond Trustee purchases may not pay any claim that the Corporation may make or that is made against the Corporation in connection with the property of the Corporation.  The Corporation may later cancel or cause to be cancelled any insurance purchased by the Bond Trustee, but only after providing evidence to the Bond Trustee that the Corporation has obtained insurance as required by this Loan Agreement.  The Corporation will be responsible for all costs and expenses, including the insurance premium, interest and any other charges that the Bond Trustee may impose in connection with the placement of the insurance and the retention of an Insurance Consultant.  The costs of the insurance and the retention of an Insurance Consultant may be added to the total balance or obligation due hereunder.  The costs of the insurance and the retention of an Insurance Consultant may be more than the cost that the Corporation may incur on its own.  The Bondholder Representative may, with the consent of the Owners of a majority in the principal amount of the Outstanding Series 2023B Bonds, make any advance permitted pursuant to this provision to be made by the Bond Trustee.

**Section 5.17.  Insurance and Condemnation Proceeds.**  Proceeds received by the Corporation for casualty losses or condemnation awards may be used for such lawful corporate purposes as the Corporation determines, including the replacement or repair of the damaged or taken Property, Plant and Equipment and the application of such proceeds to the payment or repayment of any Indebtedness in accordance with the terms thereof; provided that if the amount received exceeds $75,000, the Corporation Representative shall immediately notify the Bond Trustee and the Bondholder Representative and deposit the amount received with the Bond Trustee, and, within 12

months after the casualty loss or taking and prior to expending such funds, deliver to the Bond Trustee and the Bondholder Representative (a) an Officer's Certificate certifying that the projected Long-Term Debt Service Coverage Ratio for each of the two full Fiscal Years following the expected date of application of such proceeds will be not less than 1.30 as shown by pro forma financial statements for each such period and a statement of relevant assumptions, including assumptions as to the use of such proceeds or awards, upon which such pro forma statements are based, and a written report of a Management Consultant confirming such certification; or (b) a written Management Consultant's report stating the Management Consultant's recommendations, including recommendations as to the use of such proceeds or awards, to cause the Long-Term Debt Service Coverage Ratio for each of the periods described in clause (a) above to be not less than 1.20. The Corporation agrees that it will use such proceeds or awards, for any purpose that is permitted by law and is not contrary to the requirements of the Bond Indenture only in accordance with the assumptions referred to in clause (a) above or the recommendations referred to in clause (b) above as evidenced by an Officer's Certificate submitted to the Bond Trustee requesting the disbursement of such funds for such use and approved by the Bondholder Representative. In the event the Corporation Representative shall be unable to deliver an Officer's Certificate or report of a Management Consultant as provided in clause (a) or (b) of this Section, such proceeds shall be applied to the payment or repayment of Series 2023 Bond Notes in accordance with the terms thereof.

### Section 5.18.   Limitations on Creation of Liens.

(a)      The Corporation agrees that it will not create or suffer to be created or permit the existence of any Lien upon Pledged Assets, Mortgaged Property or any other Property now owned or hereafter acquired by it other than Permitted Liens.

(b)      Permitted Liens shall consist of the following:

(i)      Liens on Pledged Assets, Mortgaged Property or other Property created by this Loan Agreement or the Mortgage;

(ii)      Any Lien on the Property of the Corporation which existed on the date of authentication and delivery of the Series 2023 Bond Notes, was disclosed to the Bond Trustee and the Bondholder Representative in the Mortgage, the title insurance policy insuring the Mortgage or in an Officer's Certificate delivered to the Bond Trustee and the Bondholder Representative on that date; provided that no such Lien may be increased, extended, renewed or modified to apply to any Property of the Corporation not subject to such Lien on such date or to secure Indebtedness not Outstanding as of the date of delivery of the Series 2023 Bond Notes, unless such Lien as so extended, renewed or modified otherwise qualifies as a Permitted Lien;

(iii)      Liens arising by reason of good faith deposits by the Corporation in connection with leases of real estate, bids or contracts (other than contracts for the payment of money), deposits by the Corporation to secure public or statutory obligations, or to secure, or in lieu of, surety, stay or appeal bonds, and deposits as security for the payment of taxes or assessments or other similar charges;

(iv)　Any Lien arising by reason of deposits with, or the giving of any form of security to, any governmental agency or any body created or approved by law or governmental regulation for any purpose at any time as required by law or governmental regulation as a condition to the transaction of any business or the exercise of any privilege or license, or to enable the Corporation to maintain self-insurance or to participate in any funds established to cover any insurance risks or in connection with workers' compensation, unemployment insurance, pension or profit sharing plans or other social security, or to share in the privileges or benefits required for companies participating in such arrangements;

(v)　Any judgment Lien against the Corporation so long as such judgment is being contested in good faith and execution thereon is stayed or the liability of the Corporation under such judgment is fully covered by insurance;

(vi)　(A) Rights reserved to or vested in any municipality or public authority by the terms of any right, power, franchise, grant, license, permit or provision of law, affecting any Property; (B) any Liens on any Property for taxes, assessments, levies, fees, water and sewer rents, and other governmental and similar charges; and (C) any Liens of mechanics, materialmen, laborers, suppliers or vendors for work or services performed or materials furnished in connection with such Property, which in the case of (B) or (C) are not due and payable or which are not delinquent or which, or the amount or validity of which, are being contested and execution thereon is stayed and adequate reserves for payment maintained or, with respect to Liens of mechanics, materialmen, laborers, suppliers or vendors have been due for fewer than 90 days; (D) easements, rights-of-way, servitudes, restrictions, oil, gas or other mineral reservations and other minor defects, encumbrances, and irregularities in the title to any Property which, if such Lien arises after the Corporation has acquired such Property, do not materially impair the use of such Property or materially and adversely affect the value thereof; and (E) landlord's liens;

(vii)　Liens on Property received by the Corporation through gifts, grants or bequests, such Liens being due to restrictions on such gifts, grants or bequests of Property or the income thereon;

(viii)　Any Lien on pledges, gifts or grants to be received in the future, such liens being due to restrictions on such pledges, gifts or grants, including any income derived from the investment thereof; and

(ix)　Liens on moneys deposited by residents, patients or others with the Corporation as security for or as prepayment for the cost of care.

**Section 5.19.　Limitations on Incurrence of Indebtedness.**　The Corporation covenants and agrees that it will not incur any Indebtedness without the prior written consent of (i) while the Series 2023A Bonds are Outstanding, the Bondholder Representative and (ii) the Majority of Holders except as set forth in subsection (a) below relating to Non-Recourse Indebtedness. For avoidance of doubt, this provision shall apply while any of the Bonds are Outstanding, including the Series 2023A Bonds, notwithstanding anything in the Continuing Covenants Agreement to the contrary.

(a)     Non-Recourse Indebtedness.  Non-Recourse Indebtedness may be incurred (i) for a term not in excess of three (3) years and in an amount up to but not in excess of (A) $250,000.00 while the Series 2023A Bonds are Outstanding and (B) $300,000.00 thereafter.

(b)     Series 2023 Bond Notes.  Indebtedness may be incurred as evidenced by the Series 2023 Bond Notes and the Indebtedness under the Loan Agreement relating to the Series 2023 Bonds.

The Corporation shall, prior to the incurrence of any Indebtedness, deliver to the Bond Trustee and the Bondholder Representative an Officer's Certificate which identifies the Indebtedness to be incurred, identifies the subsection pursuant to which such Indebtedness was incurred and demonstrates compliance with such subsection.

**Section 5.20.   Transfers of Property, Plant and Equipment; Transfers of Unrestricted Cash and Investments.**

(a)     The Corporation covenants and agrees that it will not Transfer in any Fiscal Year, Property, Plant and Equipment while the Series 2023A Bonds are Outstanding without the prior consent of the Bondholder Representative.  Upon repayment of the Series 2023A Bond in full, the Corporation agrees that it will not Transfer in any Fiscal Year, Property, Plant and Equipment except for Transfers permitted by any one of the following clauses:

(i)     to any Person if, in the reasonable judgment of the Corporation, such Property, Plant and Equipment has, or within the next succeeding 24 calendar months is reasonably expected to, become inadequate, obsolete or worn out, or otherwise unsuitable, unprofitable, undesirable or unnecessary for the operation of the Corporation's primary business; or

(ii)     to any Person, if such Property, Plant and Equipment consists solely of assets which are specifically restricted by the donor or grantor to a particular purpose which is inconsistent with their use for payment on Long-Term Indebtedness of the Corporation or operating expenses of the Corporation.

(b)     The Corporation agrees that it will not Transfer any cash, cash equivalents or marketable securities except for Transfers permitted by any one of the following clauses;

(i)     to pay all reasonable and customary operating expenses of the Corporation and to invest in marketable securities;

(ii)     to refund Entrance Fees, but solely from the Entrance Fee Fund; or

(iii)     to pay (only from Excess Cash) costs and expenses allowed under the provisions of Section 5.15 of this Loan Agreement.

**Section 5.21.   Consolidation, Merger, Sale or Conveyance.**

(a)     The Corporation covenants that it will not merge or consolidate with, or sell or convey all or substantially all of its assets to any Person unless:

(i)        either the Corporation will be the successor entity, or if the successor entity is not the Corporation such successor entity shall execute and deliver to the Bond Trustee an appropriate instrument containing the agreement of such successor corporation (A) to become subject to compliance with this Loan Agreement, including the security interest provided for in Section 3.2 and the performance and observance of all covenants and obligations of the Corporation hereunder, and (B) all Series 2023 Bond Notes issued and then Outstanding hereunder shall be general, joint and several obligations of such successor entity;

(ii)       the successor entity has met all licensing requirements necessary for the operation of any Facilities and shall be qualified to do business in the State or shall consent to service of process in the State;

(iii)      the Corporation Representative has delivered to the Bond Trustee a report of a Management Consultant, dated not more than 90 days prior to such consolidation, merger or transfer, to the effect that (i) the Projected Long-Term Debt Service Coverage Ratio for each of the two full Fiscal Years immediately following such merger, consolidation or transfer will be not less than 1.20 or greater than it would have been if such merger, consolidation or transfer had not taken place and (ii) upon completion of such consolidation, merger or transfer, the Corporation will not be in violation of any of the limitations on the incurrence of Indebtedness contained in Section 5.19; provided that if capital improvements consisting, in whole or in part, of independent or assisted living units or health care beds are under construction or available for initial occupancy on the date of such merger, consolidation or transfer, such forecast shall be for the earlier to occur of (x) the first full Fiscal Year next succeeding the Fiscal Year in which the occupancy of such independent or assisted living units or health care beds is forecasted to reach 90% or (y) the first full Fiscal Year following the Fiscal Year in which occurs that date which is 18 months from the date set forth in the forecast upon which substantially all of such independent or assisted living units or health care beds are forecasted to be placed in service;

(iv)      if all amounts due or to become due on the Series 2023 Bonds, the interest on which is not includable in the gross income of the registered owner thereof for purposes of federal income taxation, have not been fully paid to the registered owner thereof, there shall have been delivered to the Bond Trustee an Opinion of Bond Counsel to the effect that under then existing law the consummation of such merger, consolidation, sale or conveyance would not adversely affect the exclusion from gross income for purposes of federal income taxation of interest payable on such Series 2023 Bonds;

(v)       so long as the Series 2023A Bonds are Outstanding, the Bondholder Representative has consented to such merger, consolidation, sale or conveyance;

(vi)      the Corporation has obtained the prior written consent of the Majority of Holders; and

(vii)     the Corporation Representative has delivered to the Bond Trustee an Officer's Certificate and an Opinion of Counsel, each of which shall state that such consolidation, merger, conveyance or transfer and such instrument comply with this Article and the other provisions of this Loan Agreement, and that all conditions precedent provided in this Loan Agreement relating to such transaction have been satisfied.

30

(b)    In case of any such consolidation, merger, sale or conveyance such changes in phraseology and form (but not in substance) may be made in the Series 2023 Bonds thereafter to be issued as may be appropriate.

(c)    The Borrower shall not undertake, or agree or consent to undertake, an Change of Control without the prior written consent of the Bondholder Representative and Majority of Holders. "Change of Control" means one or more transactions resulting in (i) a majority of the membership or other interests in the Borrower being held by a Person or a group of Persons other than the Borrower (whether by merger, reorganization, consolidation or otherwise), (ii) any Person having the right to appoint a majority of the Governing Body of the Borrower or (iii) the sale or other transfer of all or substantially all of the assets of the Borrower.

**Section 5.22.    Financial Statements, Certificate of No Default and Other Information.** The Corporation will:

(a)    As soon as practicable after they are available but in no event more than 25 days after the end of each month, commencing with the month ending January 31, 2024, deliver to the Bond Trustee and the Bondholder Representative and, post electronically on EMMA, the unaudited combined or consolidated financial statements of the Corporation for such period, including a combined or consolidated statement of revenues and expenses and statement of cash flows of the Corporation during such period, together with a comparison to budget (and explanation of any variances of more than 10% from budgeted amounts), and a combined or consolidated balance sheet as of the end of such period, an analysis of Entrance Fees, including information about any Entrance Fee discounts and compliance with Section 5.13 hereof, a calculation of Days Cash on Hand as of the end of such monthly period, the Long-Term Debt Service Coverage Ratio for the rolling twelve-month period ending at the end of such month, and the information required to be provided by the Corporation under Section 5.11(d) of this Loan Agreement, all in reasonable detail and certified, subject to year-end adjustment, by the chief financial officer or other authorized financial officer of the Corporation.  Following the repayment in full of the Series 2023A Bonds and only so long as there is no Event of Default under any Bond Document, the Corporation may deliver the financial information described in this subsection on a quarterly basis within 20 days of the end of each Fiscal Quarter and shall include a certificate of the chief financial officer or other authorized financial officer of the Corporation with respect to compliance with the covenants set forth herein and/or in the Continuing Covenants Agreement, as applicable, for such Fiscal Quarter.

(b)    As soon as possible but in no event later than 120 days after the end of each Fiscal Year (commencing with the Fiscal Year ending December 31, 2023) deliver by first-class mail, postage prepaid, or Electronic Means to the Bond Trustee and the Bondholder Representative, and, post electronically on EMMA, a copy of the Financial Statements as of the end of such Fiscal Year or other period accompanied by the report of an Accountant.

(c)    Simultaneously with filing the Financial Statements for a Fiscal Year (commencing with the Fiscal Year ending December 31, 2023) under subsection (b) above or the filing of the information required under subsection (a) above, deliver by first-class mail, postage prepaid, or Electronic Means to the Bond Trustee, and the Bondholder Representative and posted electronically on EMMA, an Officer's Certificate certifying as to (i) the Long-Term Debt Service Coverage Ratio,

the Days Cash on Hand as of the end of the Fiscal Year, the IL Occupancy Covenant, the AL/ML Occupancy Covenant, the SNF Occupancy Covenant, and compliance with AP Covenant and Section 5.13 hereof and (ii) whether, to the best of the knowledge of the signer of such Officer's Certificate, the Corporation is not in compliance with any covenant contained in this Loan Agreement and/or the Continuing Covenants Agreement, as applicable, and, if so, specifying each such failure to comply of which the signers may have knowledge and the steps that are being taken by the Corporation to cure such non-compliance.

(d)     If an Event of Default shall have occurred and be continuing, (i) file with the Bond Trustee and the Bondholder Representative such other financial statements and information concerning the Corporation's operations and financial affairs, as the Bond Trustee or the Bondholder Representative may from time to time reasonably request, excluding, specifically, donor records, patient records, personnel records and records subject to attorney-client privilege or otherwise restricted by the provisions of the Health Insurance Portability and Accountability Act, and (ii) provide access to the Facilities, the Pledged Assets and the Mortgaged Property for the purpose of inspection by the Bond Trustee, any Owner of Bonds and the Bondholder Representative during regular business hours or at such other times as the Bond Trustee, any Owner of Bonds or the Bondholder Representative may reasonably request.

(e)     Unless required to be delivered at an earlier time, promptly upon its receipt by the Corporation, file with the Bond Trustee and the Bondholder Representative a copy of each report which any provision of this Loan Agreement or the Continuing Covenants Agreement requires to be prepared by a Management Consultant, Marketing Consultant or an Insurance Consultant.

(f)     Any calculation required to be made under this Loan Agreement for a period other than a full Fiscal Year may be made using unaudited financial results of the Corporation.

(g)     Once per Fiscal Quarter while the Series 2023A Bonds remain Outstanding, commencing with the Fiscal Quarter ended March 31, 2024, the Corporation Representative will hold quarterly update calls for the Owners of Series 2023 Bonds, *provided* however, that upon the redemption of the Series 2023A Bonds, such calls shall be held semi-annually; provided further however that upon occurrence of a covenant default, the Corporation shall hold monthly calls for Owners of the Series 2023 Bonds.

**Section 5.23.   Recording and Filing of Security Interest.** The Corporation will, forthwith after the execution and delivery of this Loan Agreement, the Mortgage and the Bond Indenture and thereafter from time to time, cause this Loan Agreement, the Mortgage and the Bond Indenture, including any amendments thereof and supplements thereto, and any financing statements in respect thereof to be filed, registered or recorded in such manner and in such places as may be required by law in order to publish notice of and fully to perfect and protect the lien and security interest therein granted to the Bond Trustee and from time to time will perform or cause to be performed any other act as provided by law and will execute or cause to be executed any and all continuation statements and further instruments necessary for such publication, perfection and protection.

**Section 5.24.  Trade Payables Covenant.** Upon the payment in full of the Series 2023A Bonds, the Corporation shall not permit (i) fifty percent (50%) or more of its accounts payable to age

more than sixty (60) days and (ii) the remaining fifty percent (50%) of its accounts payable to age more than ninety (90) days; provided, however, that any accounts payable that are the subject of a good faith dispute by the Corporation shall be excluded from this calculation.

**Section 5.25. Management Reports and Plans; Retention of New Manager or Marketing Agent**.    The following sub-sections shall become applicable upon the payment in full of the Outstanding Series 2023A Bonds (provided that while the Series 2023A Bonds are Outstanding, the consent of the majority of the Owners of the Series 2023B Bonds shall be obtained for a replacement Manager, a Management Consultant, or Marketing Consultant under the Continuing Covenants Agreement):

(a)    Bond Trustee Duties   Upon receipt of a certificate from the Corporation pursuant to Section 5.22 hereof or upon notice of the Majority of Holders that the Corporation has failed to meet the Long-Term Debt Service Coverage Ratio, the Days Cash on Hand requirement, the IL Occupancy Requirement, the AL/MC Occupancy Requirement or the IL Occupancy, the Bond Trustee shall post notice on EMMA within ten (10) days of receipt of the certificate or notice, regarding the Corporation's failure to comply with the applicable covenant and shall request direction from the Owners of the Bonds as to whether to direct the Corporation to engage a Management Consultant, Marketing Consultant, a New Manager or a New Marketing Agent, as applicable.  Upon receipt by the Bond Trustee of direction by the Majority of Holders, the Bond Trustee shall within one (1) Business Day of receipt of such direction, direct the Corporation to take the required action.

(b)    Approval of Management Consultant or Marketing Consultant. Any Management Consultant or Marketing Consultant required to be engaged by the Corporation pursuant to this Loan Agreement must be approved by prior written consent by the Majority of Holders (which approval shall not be unreasonably withheld).  If the Corporation is required to engage a Management Consultant or Marketing Consultant pursuant to any provision of this Loan Agreement, the Corporation shall, within ten (10) days of the event requiring appointment of a Management Consultant or Marketing Consultant, submit to the Bond Trustee the name of the entity the Corporation desires to engagement.  The Bond Trustee shall send notice to the Owners of the Bonds of the requested approval of the Management Consultant or Marketing Consultant.  If the Bond Trustee does not receive the consent of the Majority of Holders within fourteen (14) days of sending such notice, the candidate shall be deemed not approved by the Majority of Holders and the Corporation shall submit another candidate to the Bond Trustee to be approved pursuant to this process set forth in this provision.

(c)    Management Reports and Plans.  Whenever the Corporation is required to engage a Management Consultant or Marketing Consultant to complete a report and plan for correcting a deficiency with respect to any covenant contained herein, the Corporation shall cause such report and plan to be prepared and shall consider and adopt such report as soon as practicable.  Each such report and plan shall be prepared by the Management Consultant or Marketing Consultant pursuant to an engagement letter or contract acceptable to the Bond Trustee.  Each such report and plan must be in writing and contain sufficient detail to support the conclusions made concerning the reasons for the deficiency and the steps to be taken for its correction.  For a Management Consultant's report and plan required under Sections 5.10 hereof, the Management Consultant's report and plan shall state whether the failure to meet the Long-Term Debt Service Coverage Ratio was primarily due to the

operations of the independent living units, the assisted living units or the skilled nursing. Each such report and plan shall be presented, as soon as practicable, to the Corporation board for adoption and implemented immediately upon its adoption, except to the extent limited by law. Each such report and plan of a Management Consultant shall take into account the Corporation's current budget and state the extent to which prior recommendations (if any) of the Management Consultant or Marketing Consultant may not have been complied with by the Corporation. Copies of each such report and plan shall, as soon as possible, be sent to the Bond Trustee and posted electronically on EMMA. The Bond Trustee may, but shall not be obligated to, reasonably request any Management Consultant or Marketing Consultant to update its reports and to file such additional reports as may reasonably be requested by it and to send copies thereof to the Bond Trustee.

(d) Appointment of New Manager or New Marketing Agent. Whenever the Corporation is required to retain a new third party manager (or replace the then current manager) (a "New Manager") or a new marketing agent (or replace the then current marketing agent) (a "New Marketing Agent") pursuant to Sections 5.10, 5.11 or 5.12 hereof, the Corporation shall, within ten (10) days of the event requiring appointment of a New Manager or New Marketing Agent, submit to the Bond Trustee a list of at least two (2) or more persons experienced in the management or marketing, as the case maybe, of continuing care facilities of a type and size similar to the Facility. The Corporation shall retain as New Manager or New Marketing Agent any person, nominated by the Corporation, which is approved by the Bond Trustee (acting at the direction of a Majority of Holders), pursuant to a management or marketing agreement in form and substance acceptable to the Bond Trustee. The Corporation shall also deliver an opinion of Bond Counsel prior to entering any contract with such New Manager or New Marketing Agent to the effect that entering into such contract will not adversely affect the exclusion from gross income for federal income tax purposes of interest on the Bonds. In the event that a Manager or New Marketing Agent is appointed by the Corporation at any time when the Liquidity Covenant, Long-Term Debt Service Coverage Ratio, or Occupancy Target is not in compliance with the level required pursuant to this Loan Agreement the provisions of this Loan Agreement shall not be applied to require the further appointment of a New Manager or New Marketing Agent until the New Manager or New Marketing Agent has been employed for at least twelve (12) months. The Borrower shall not engage a new Manager or a new management agreement except with the consent of the Bondholder Representative and after the Series 2023A Bonds are paid in full, the Majority of Holders.

## ARTICLE VI
## TERM AND TERMINATION OF LOAN AGREEMENT

**Section 6.1.    Term of Loan Agreement.**  This Loan Agreement shall be effective concurrently with the initial delivery of the Bonds and shall continue in force and effect until the principal of and redemption premium, if any, and interest on the Bonds have been fully paid (or provision for their payment shall have been made in accordance with Article XI of the Bond Indenture) together with all sums to which the Authority, the Bondholder Representative and the Bond Trustee are entitled from the Corporation under this Loan Agreement and the Series 2023 Bond Notes.

**Section 6.2.    Defeasance.**  If the Corporation shall pay and discharge or provide for the payment or redemption and discharge of the whole amount of the principal of and redemption premium, if any, and interest on the Series 2023 Bond Notes and Bonds at the time Outstanding as provided in the Bond Indenture, and shall pay or cause to be paid all rebate amounts required under Section 148(f) of the Internal Revenue Code and all other sums payable hereunder, or shall make arrangements satisfactory to the Authority and the Bond Trustee for such payment or redemption and discharge, then and in that case such Series 2023 Bond Notes and Bonds shall cease to be entitled to any lien, benefit or security under this Loan Agreement, the Mortgage or any other Bond Document, and all covenants, agreements and obligations of the Corporation contained herein (except as otherwise specifically provided herein) shall thereupon cease, terminate and become void; provided that the Owners of the Bonds shall be entitled to payment thereof at the times and in the manner stipulated therein and in the Bond Indenture from the sources provided for such payment, and all property, rights and interest hereby assigned or pledged shall revert to the Corporation (subject to Section 7.13 hereof), and the right, title and interest of the Authority therein shall thereupon cease, terminate and become void, and this Loan Agreement, and the covenants of the Corporation contained herein, shall be discharged and the Authority, in such case on demand of the Corporation and at its cost and expense, shall execute and deliver to the Corporation a proper instrument or proper instruments acknowledging the satisfaction and termination of this Loan Agreement, and shall assign and transfer or cause to be assigned or transferred, and shall deliver or cause to be delivered to the Corporation, all property, including money, then held by the Authority or the Bond Trustee with respect to the Bonds, other than moneys and Defeasance Obligations deposited with the Bond Trustee for the payment of the principal of and redemption premium, if any, or interest on the Bonds, together with the Series 2023 Bond Notes marked paid or cancelled.

## ARTICLE VII
## DEFAULT AND REMEDIES

**Section 7.1.    Events of Default.**  The occurrence and continuance of any of the following events shall constitute an "Event of Default" hereunder:

(a)      failure of the Corporation to pay the Loan Payments or any installment of interest or principal, or any premium, on the Series 2023 Bond Notes when the same shall become due and payable, whether at maturity or upon any date fixed for prepayment or redemption or by acceleration or otherwise; or

(b)      default in the performance, or breach, of any covenant or agreement of the Corporation in this Loan Agreement or the Tax Agreement (other than a covenant or agreement a default in the performance or breach of which is specifically dealt with elsewhere in this Section), and continuance of such default or breach for a period of 60 days after there has been given to the Corporation by the Authority, the Bondholder Representative, the Majority of Holders or the Bond Trustee or to the Corporation and the Bond Trustee by the Bondholder Representative or the Majority of Holders, a written notice specifying such default or breach and requiring it to be remedied or such longer period as shall be required to remedy such default if such default cannot be fully remedied within such 60-day period, but can reasonably be expected to be fully remedied, and the Corporation has immediately upon receipt of such notice commenced the curing of such default and is pursuing such cure with due diligence and dispatch, provided that in no instance shall such longer period to remedy such default exceed 90 days; or

(c)      any representation or warranty made by the Corporation in this Loan Agreement or any other Bond Document or in any written statement or certificate furnished by the Corporation to the Authority, the Bondholder Representative or the Bond Trustee or the Original Purchasers of any Bonds in connection with the sale of any Bonds, or furnished by the Corporation pursuant hereto proves untrue in any material respect as of the date of the issuance or making thereof and, if the same may be corrected or brought into compliance so that the interests of the Bond Trustee, the Authority, the Bondholder Representative and the Bondowners are not materially adversely affected by such untruth, shall not be corrected or brought into compliance within 60 days after there has been given to the Corporation by the Authority, the Bondholder Representative, the Majority of Holders or the Bond Trustee or to the Corporation and the Bond Trustee by the Bondholder Representative or the Majority of Holders, a written notice specifying such untruth and requiring it to be remedied or such longer period as is required to remedy such untruth if such untruth cannot be fully remedied within such 60-day period, but can reasonably be expected to be fully remedied and the Corporation has immediately upon receipt of such notice commenced the curing of such untruth and is pursuing such cure with due diligence and dispatch, provided that in no instance shall such longer period to remedy such default exceed 90 days; or

(d)      the entry of a decree or order by a court having jurisdiction in the premises for relief in respect of the Corporation, or adjudging the Corporation a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, adjustment or composition of or in respect of the Corporation under the United States Bankruptcy Code or any other applicable federal or state law,

or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of or for the Corporation or any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order remains unstayed and in effect for a period of 90 consecutive days; or

(e)    the commencement by the Corporation of a voluntary case, or the institution by the Corporation of proceedings to be adjudicated a bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization, arrangement or relief under the United States Bankruptcy Code or any other applicable federal or state law, or the consent or acquiescence by it to the filing of any such petition or the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Corporation or any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability or its failure to pay its debts generally as they become due, or the taking of corporate action by the Corporation or in furtherance of any such action; or

(f)    An Event of Default has occurred pursuant to Sections 5.10, 5.11, 5.12, 5.13 or 5.24 of this Loan Agreement; or

(g)    any "Event of Default" specified in the Bond Indenture, the Mortgage or the Continuing Covenants Agreement that has not been waived.

Promptly after any officer of the Corporation may reasonably be deemed to have knowledge of a default hereunder, the Corporation will deliver to the Bond Trustee and the Bondholder Representative a written notice specifying the nature and period of existence thereof and the action the Corporation is taking and proposes to take with respect thereto.

**Section 7.2.    Acceleration of Maturity; Rescission and Annulment**.  If an event of default under this Loan Agreement occurs and is continuing, the Bond Trustee, as assignee of the Authority, may, with the consent of the Bondholder Representative so long as the Series 2023A Bonds are Outstanding, and shall at the direction of the Controlling Holders, (a) by written notice to the Corporation and the Authority, declare the principal of the Loan and the interest accrued thereon to be due and payable, and upon any such declaration such principal and interest shall become immediately due and payable, or (b) upon notice to the Corporation and the Authority declare the principal of the Series 2023 Bond Notes (if not then due and payable) to be due and payable immediately, anything in this Loan Agreement contained to the contrary notwithstanding.

At any time after such a declaration of acceleration has been made, but before any judgment or decree for payment of money due on the Loan has been obtained by the Bond Trustee as hereinafter in this Article provided, the Bond Trustee may, with the consent of the Bondholder Representative so long as the Series 2023A Bonds are Outstanding and the Owners of a majority in the principal amount of the Outstanding Series 2023B Bonds, by written notice to the Corporation, rescind and annul such declaration and its consequences if:

(a)      the Corporation has deposited with the Bond Trustee a sum sufficient to pay (1) all overdue installments of interest on the Loan, (2) the principal of (and premium, if any, on) the Loan which have become due otherwise than by such declaration of acceleration and interest thereon at the rate or rates prescribed therefor, and (3) all sums paid or advanced by the Bond Trustee or the Bondholder Representative hereunder and the reasonable compensation, expenses, disbursements and advances of the Bond Trustee, the Bondholder Representative, their agents and counsel; and

(b)      all events of default, other than the non-payment of the principal installments of the Loan which have become due solely by such declaration of acceleration, have been cured or have been waived as provided in Section 7.7 of this Loan Agreement.

No such rescission and annulment shall affect any subsequent default or impair any right consequent thereon.

**Section 7.3.    Exercise of Remedies by the Bond Trustee**.   Upon the occurrence and continuance of any event of default under this Loan Agreement and the Bond Indenture, unless the same is waived as provided in this Loan Agreement, the Bond Trustee, as assignee of the Authority, shall have the following rights and remedies, in addition to any other rights and remedies provided under this Loan Agreement or by law:

(a)      Right to Bring Suit, Etc.  The Bond Trustee may, with the consent of the Bondholder Representative so long as the Series 2023A Bonds are Outstanding, and shall at the direction of the Controlling Holders, pursue any available remedy at law or in equity by suit, action, mandamus or other proceeding to enforce the payment of the principal of, premium, if any, and interest on the Loan, including interest on overdue principal (and premium, if any) and on overdue installments of interest, and any other sums due under this Loan Agreement, to realize on or to foreclose any of its interests or liens under this Loan Agreement and the Mortgage, to appoint a receiver pursuant to the Mortgage,  to enforce and compel the performance of the duties and obligations of the Corporation as set forth in this Loan Agreement and to enforce or preserve any other rights or interests of the Bond Trustee under this Loan Agreement existing at law or in equity.

(b)      Exercise of Remedies at Direction of Bondowners.  If requested in writing to do so by the Controlling Holders, and if indemnified as provided in the Bond Indenture, the Bond Trustee shall be obligated to exercise such one or more of the rights and remedies conferred by this Article as the Bond Trustee shall deem most expedient in the interests of the Bondowners.  Provided, for the avoidance of doubt, the Owners of the Series 2023B Bonds and Series 2023C Bonds may not replace management for any reason without the consent of the Bondholder Representative even after the 90 day period referenced in the definition of Controlling Holders.

(c)      Restoration of Positions.  If the Bond Trustee has instituted any proceeding to enforce any right or remedy under this Loan Agreement by suit, foreclosure, the appointment of a receiver, or otherwise, and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Bond Trustee, then and in every case the Authority, the Corporation, the Bond Trustee, the Bondholder Representative and the Bondowners shall, subject to any determination in such proceeding, be restored to their former positions and rights hereunder, and

thereafter all rights and remedies of the Bond Trustee shall continue as though no such proceeding had been instituted.

**Section 7.4.    Application of Moneys Collected**.  Any moneys collected by the Bond Trustee pursuant to this Article (after the deductions for payment of costs and expenses of proceedings resulting in the collection of such moneys) together with any other sums then held by the Bond Trustee as part of the Trust Estate, shall be applied as provided in the Bond Indenture and, in case of the distribution of such money on account of principal (or premium, if any) or interest on the Bonds, shall be credited against amounts due on the Loan.

**Section 7.5.    Rights and Remedies Cumulative**.  No right or remedy herein conferred upon or reserved to the Bond Trustee is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

**Section 7.6.    Delay or Omission Not Waiver**.  No delay or omission of the Bond Trustee, the Bondholder Representative to exercise any right or remedy accruing upon an event of default shall impair any such right or remedy or constitute a waiver of any such event of default or an acquiescence therein.  Every right and remedy given by this Article or by law to the Bond Trustee, the Bondholder Representative or to the Bondowners may be exercised from time to time and as often as may be deemed expedient.

**Section 7.7.    Waiver of Past Defaults**.  Before any judgment or decree for payment of money due has been obtained by the Bond Trustee as provided in this Article, the Controlling Holders may, by written notice delivered to the Bond Trustee and the Corporation, on behalf of the owners of all the Bonds waive any past default hereunder and its consequences, except a default (a) in the payment of the principal of (or premium, if any) or interest on any Bond, or (b) in respect of a covenant or provision hereof which under Article IX of this Loan Agreement cannot be modified or amended without the consent of (i) with respect to the Series 2023A Bonds, the Owners of not less than 66 2/3% in the principal amount of Outstanding Series 2023A Bonds affected thereby; and (ii) with respect to the Series 2023B Bonds and Series 2023C Bonds, the Owners of not less than [80%] in principal amount of the Outstanding Series 2023B Bonds and Series 2023C Bonds affected thereby.

Upon any such waiver, such default shall cease to exist, and any event of default arising therefrom shall be deemed to have been cured, for every purpose of this Loan Agreement; but no such waiver shall extend to or affect any subsequent or other default or impair any right or remedy consequent thereon.

**Section 7.8.    Advances by Bond Trustee.**  If the Corporation fails to make any payment or perform any of its covenants in this Loan Agreement, the Bond Trustee may, at any time and from time to time, use and apply any moneys held by it under the Bond Indenture, or make advances, to effect payment or performance of any such covenant on behalf of the Corporation.  All moneys so

39

used or advanced by the Bond Trustee, together with interest at the Bond Trustee's announced prime rate per annum, shall be repaid by the Corporation upon demand and such advances shall be secured under the Bond Indenture prior to the Bonds.  For the repayment of all such advances the Bond Trustee shall have the right to use and apply any moneys at any time held by it under the Bond Indenture but no such use of moneys or advance shall relieve the Corporation from any default hereunder.  The Bondholder Representative, with the prior written consent of the Owners of a majority in the principal amount of the Outstanding Series 2023B Bonds, may advance such funds as the Bond Trustee is permitted to advance as set forth herein.

**Section 7.9.    Right of Bond Trustee to Enforce the Series 2023 Bond Notes and this Loan Agreement.**  The Series 2023 Bond Notes, this Loan Agreement, and all of the rights, interests, powers, privileges and benefits accruing to or vested in the Authority hereunder and thereunder may be protected and enforced in conformity with the Bond Indenture and (except for Authority fees and expenses and the Authority's right to indemnification and notice in certain circumstances) may be thereby assigned by the Authority to the Bond Trustee as additional security for the Bonds and may be exercised, protected and enforced for or on behalf of the Bondowners in conformity with the provisions of this Loan Agreement and the Bond Indenture.

**Section 7.10    No Additional Waiver Implied by One Waiver.**  If the Authority, Bond Trustee or Bondholder Representative or their assignees waives a default of the Corporation under any covenant, condition or agreement herein, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other default hereunder.

**Section 7.11    No Waiver of Event of Default Without Consent of Controlling Holders.** Neither the Authority nor the Bond Trustee may waive any Event of Default under this Loan Agreement without the prior written consent of the Controlling Holders.

**Section 7.12    Confession of Judgment.**  To the extent permitted by law, in the event that the Corporation fails to pay when due any amount required to be paid under Section 4.1 or any other amounts due under this Loan Agreement, the 2023 Bond Notes, the Bond Indenture or the other Related Documents (as defined in the Continuing Covenants Agreement), for a period of 15 days, except in the case of a failure to pay principal and interest hereunder, in which case there is no additional grace period, after notice in writing (unless the Corporation and the Bond Trustee shall agree in writing, with the consent of the Bondholder Representative, to an extension of such time prior to its expiration), specifying such failure and requesting that it be remedied, given by the Authority, the Bond Trustee or the Bondholder Representative to the Corporation, **THE CORPORATION, WITHOUT FURTHER CONSENT OF OR NOTICE THERETO, HEREBY IRREVOCABLY AND UNCONDITIONALLY AUTHORIZES ANY ATTORNEY OF ANY COURT OF RECORD IN THE STATE, OR ANY OTHER JURISDICTION, AS ATTORNEY FOR THE CORPORATION TO APPEAR FOR THE CORPORATION IN SUCH COURT AND, WITH OR WITHOUT ONE OR MORE COMPLAINTS FILED, CONFESS JUDGMENT OR JUDGMENTS AGAINST THE CORPORATION IN FAVOR OF THE BOND TRUSTEE, THE BONDHOLDER REPRESENTATIVE AND THEIR SUCCESSORS AND ASSIGNS, AT ANY TIME FOLLOWING THE OCCURRENCE OF ANY EVENT OF DEFAULT FOR ALL OR ANY PORTION OF SUMS DUE UNDER THIS**

**LOAN AGREEMENT, THE BOND INDENTURE OR THE OTHER RELATED DOCUMENTS, TOGETHER WITH COSTS OF SUIT AND ATTORNEY'S COMMISSION OF THE GREATER OF FIFTEEN PERCENT (15%) OF SUCH SUMS FOR COLLECTION OR $1,000, AS A REASONABLE ATTORNEYS' FEE, WITH RELEASE OF ALL PROCEDURAL ERRORS AND WAIVER OF ANY RIGHT TO A STAY OF EXECUTION, FOR WHICH THIS LOAN AGREEMENT AND THE BONDS OR A VERIFIED COPY HEREOF AND THEREOF SHALL BE SUFFICIENT WARRANT. THE AUTHORITY TO ENTER JUDGMENT SHALL NOT BE EXHAUSTED BY ONE EXERCISE HEREOF, BUT, TO THE EXTENT PERMITTED BY LAW, SHALL CONTINUE FROM TIME TO TIME UNTIL FULL PAYMENT OF ALL AMOUNTS HEREUNDER. THE FOREGOING RIGHT AND REMEDY IS IN ADDITION TO AND NOT IN LIEU OF ANY OTHER RIGHT OR REMEDY AVAILABLE TO THE BOND TRUSTEE AND/OR THE BONDHOLDER REPRESENTATIVE UNDER THIS LOAN AGREEMENT OR OTHERWISE.**

**THE CORPORATION, BEING FULLY AWARE OF THE RIGHT TO PRIOR NOTICE AND A HEARING CONCERNING THE VALIDITY OF ANY AND ALL CLAIMS THAT MAY BE ASSERTED AGAINST THE CORPORATION BY THE BOND TRUSTEE AND/OR THE BONDHOLDER REPRESENTATIVE BEFORE A JUDGMENT CAN BE RENDERED HEREUNDER OR BEFORE EXECUTION MAY BE LEVIED ON SUCH JUDGMENT AGAINST ANY AND ALL PROPERTY OF THE CORPORATION, HEREBY WAIVES THESE RIGHTS AND AGREES AND CONSENTS TO JUDGMENT BEING ENTERED BY CONFESSION IN ACCORDANCE WITH THE TERMS HEREOF WITHOUT FIRST GIVING NOTICE AND THE OPPORTUNITY TO BE HEARD ON THE VALIDITY OF THE CLAIM OR CLAIMS UPON WHICH SUCH JUDGMENT IS ENTERED.**

**THE BOND TRUSTEE AND/OR THE BONDHOLDER REPRESENTATIVE MAY CONFESS ONE OR MORE JUDGMENTS IN THE SAME OR DIFFERENT JURISDICTIONS FOR ALL OR ANY PART OF THE AMOUNT OWING HEREUNDER, WITHOUT REGARD TO WHETHER JUDGMENT HAS THERETOFORE BEEN CONFESSED ON MORE THAN ONE OCCASION FOR THE SAME AMOUNT. IN THE EVENT ANY JUDGMENT CONFESSED AGAINST THE CORPORATION IS STRICKEN OR OPENED UPON APPLICATION BY OR ON THE CORPORATION'S BEHALF FOR ANY REASON, THE BOND TRUSTEE AND/OR THE BONDHOLDER REPRESENTATIVE ARE HEREBY AUTHORIZED AND EMPOWERED TO AGAIN APPEAR FOR AND CONFESS JUDGMENT AGAINST THE CORPORATION FOR ANY PART OR ALL OF THE AMOUNTS OWING HEREUNDER OR UNDER THE BOND INDENTURE OR ANY OTHER RELATED DOCUMENT, AS PROVIDED FOR HEREIN, IF DOING SO WILL CURE ANY PROCEDURAL ERRORS OR DEFECTS IN SUCH PRIOR PROCEEDINGS.**

**THE CORPORATION ACKNOWLEDGES AND AGREES THAT THE BOND TRUSTEE MAY, AFTER ENTRY OF JUDGMENT, FORECLOSE UPON, ATTACH, LEVY, TAKE POSSESSION OF OR OTHERWISE SEIZE PROPERTY OF THE CORPORATION IN FULL OR PARTIAL PAYMENT OF THE JUDGMENT. BEING**

**FULLY AWARE OF ITS RIGHTS AFTER JUDGMENT IS ENTERED (INCLUDING THE RIGHT TO MOVE OR OPEN OR STRIKE THE JUDGMENT), THE CORPORATION HEREBY FREELY, KNOWINGLY AND INTELLIGENTLY WAIVES THESE RIGHTS AND EXPRESSLY AGREES AND CONSENTS TO THE BOND TRUSTEE TAKING SUCH ACTIONS AS MAY BE PERMITTED UNDER APPLICABLE STATE AND FEDERAL LAW WITHOUT PRIOR NOTICE TO THE CORPORATION.**

Any invoice furnished to the Corporation by the Bond Trustee, the Bondholder Representative or the Authority pursuant to this Loan Agreement or the Continuing Covenants Agreement shall be deemed to constitute a written notice under this Section 7.12 sufficient to cause the 15-day period specified herein to commence.

**Section 7.13   Treatment of Funds in Bankruptcy.** The Corporation acknowledges and agrees that in the event the Corporation commences a case under the United States Bankruptcy Code located at 11 U.S.C. § 101 et. seq. (the "Bankruptcy Code") or is the subject of an involuntary case that results in an order for relief under the Bankruptcy Code: (i) amounts on deposit in any of the Funds are not, nor shall they be deemed to be, property of the Corporation's bankruptcy estate as defined by § 541 of the Bankruptcy Code; (ii) that in no event shall the Corporation assert, claim or contend that amounts on deposit in any of the Funds are property of the Corporation's bankruptcy estate; and (iii) that amounts on deposit in any of the Funds are held in trust solely for the benefit of the Registered Owners and the Beneficial Owners, shall be applied only in accordance with the provisions of the Bond Indenture and the Corporation has no legal, equitable nor reversionary interest in, or right to, such amounts.

**Section 7.14   Legal/Workout Costs of the Bondowners.** In addition to all amounts owed by the Corporation under this Loan Agreement, upon the occurrence and continuance of an Event of Default described in Section 7.1(a) hereof, the Corporation shall pay all reasonable legal and workout costs incurred by the Bondowners or their representatives, including without limitation, the Bondholder Representative.

**Section 7.15   Notices to and Effect of Actions by Representative of Majority Bondowners of Series 2023A Bonds**. On the date of issuance of the Series 2023A Bonds, Hamlin Capital Management, LLC ("Hamlin") represents the Owners of at least a majority in aggregate principal amount of the Series 2023A Bonds. Notwithstanding any provision to the contrary contained herein, any notice, request, consent, direction, waiver, approval, agreement, or other action of Hamlin in such capacity shall constitute and have the same effect as a notice, request, consent, direction, waiver, approval, agreement, or other action of the Beneficial Owners of the Series 2023A Bonds, as represented by Hamlin, and, so long as Hamlin acts in such capacity with respect to a Series 2023A Bond, notices shall be given to Hamlin and not to the Owners of the Series 2023A Bonds (except that the Bond Trustee may send routine balancing and payment processing notices to DTC at such time as DTC is the Owner of the Series 2023A Bonds) or to the Beneficial Owners represented by Hamlin, but the Bond Trustee shall post any such notices to the EMMA System. A copy of any notice given to or sent by the Bond Trustee shall also be provided to Hamlin while Hamlin acts in such capacity.

## ARTICLE VIII
## ASSIGNMENTS

**Section 8.1.    Consent to Assignment of the Loan Agreement and the Series 2023 Bond Notes.**  The Corporation acknowledges and consents to the pledge and assignment of the Loan Payments and the Authority's rights under this Loan Agreement and the Series 2023 Bond Notes (excluding the payment of fees and expenses payable to the Authority, the Authority's right to indemnification and notice in certain circumstances and as otherwise expressly set forth in this Loan Agreement) to the Bond Trustee, pursuant to the Bond Indenture, to secure payment of the Bonds, and agrees that the Bond Trustee may enforce the rights, remedies and privileges granted to the Authority hereunder, other than the rights of the Authority to decline to execute and deliver supplements and amendments to this Loan Agreement pursuant to Section 9.1.  The Bond Trustee and the Bondholder Representative are third party beneficiaries of this Loan Agreement.

## ARTICLE IX
## SUPPLEMENTAL LOAN AGREEMENTS

**Section 9.1.    Supplemental Loan Agreements without Consent of Bondowners.** Without the consent of the owners of any Bonds, but with consent of the Bondholder Representative so long as the Series 2023A Bonds are Outstanding, the Authority and the Corporation may from time to time enter into one or more Supplemental Loan Agreements, for any of the following purposes:

(a)    to correct or amplify the description of any property of the Corporation at any time subject to this Loan Agreement, or to subject to this Loan Agreement additional property or to more precisely identify any project financed or refinanced out of the proceeds of any Bonds, or to substitute or add additional property thereto;

(b)    to add to the conditions, limitations and restrictions on the authorized amount, terms or purposes of the Loan, as herein set forth, additional conditions, limitations and restrictions thereafter to be observed;

(c)    to evidence the succession of another corporation to the Corporation and the assumption by any such successor of the covenants of the Corporation herein contained; or

(d)    to add to the covenants of the Corporation or to the rights, powers and remedies of the Bond Trustee for the benefit of the owners of all Bonds or to surrender any right or power herein conferred upon the Corporation.

**Section 9.2.    Supplemental Loan Agreements with Consent of Bondowners**. With the written consent of (i) the Bondholder Representative for so long as the Series 2023A Bonds are Outstanding, and (ii) or the Owners of a majority in the principal amount of the Outstanding Series 2023B Bonds (and if no Series 2023B Bonds are Outstanding, the majority in the principal amount of the Outstanding Series 2023C Bonds), the Authority and the Corporation may enter into Supplemental Loan Agreements, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Loan Agreement or of modifying in any manner the rights of the Bond Trustee and the owners of the Bonds under this Loan Agreement; provided that no such Supplemental Loan Agreement shall be entered into which permits the following without the consent of (i) the Bondholder Representative so long as the Series 2023A Bonds are Outstanding and (ii) the Owner of not less than 80% in principal amount of the Outstanding Series 2023B Bonds and Series 2023C Bonds:

(a)    change the stated maturity of the principal of, or any installment of interest on, the Loan, or reduce the principal amount thereof or the interest thereon or any premium payable upon the redemption thereof, or change any place of payment where, or the coin or currency in which, the Loan, or the interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the stated maturity thereof (or, in the case of redemption, on or after the redemption date);

44

(b)    reduce the percentage in principal amount of the Outstanding Bonds, the consent of whose owners is required for any such Supplemental Loan Agreement, or the consent of whose owners is required for any waiver provided for in this Loan Agreement of compliance with certain provisions of this Loan Agreement or certain defaults hereunder and their consequences; or

(c)    modify any of the provisions of this Section or Section 7.7 of this Loan Agreement, except to increase any percentage provided thereby or to provide that certain other provisions of this Loan Agreement cannot be modified or waived without the consent of a higher percentage of the owners of the Bonds affected thereby.

It shall not be necessary for the required percentage of owners of Bonds under this Section to approve the particular form of any proposed Supplemental Loan Agreement, but it shall be sufficient if such act shall approve the substance thereof.

**Section 9.3.    Execution of Supplemental Loan Agreements**.  In executing or consenting to any Supplemental Loan Agreement permitted by this Article, the Authority and the Bond Trustee shall receive, and shall be fully protected in relying upon, an Opinion of Bond Counsel addressed to the Bond Trustee and the Authority stating that the execution of such Supplemental Loan Agreement is authorized or permitted by this Loan Agreement, and that the execution and delivery thereof will not adversely affect the exclusion from federal gross income of interest on the Bonds. The Bond Trustee may, but shall not be obligated to, consent to any such Supplemental Loan Agreement which affects the Bond Trustee's own rights, duties or immunities under this Loan Agreement or otherwise.

**Section 9.4.    Effect of Supplemental Loan Agreements**.  Upon the execution of any Supplemental Loan Agreement under this Article, this Loan Agreement shall be modified in accordance therewith and such Supplemental Loan Agreement shall form a part of this Loan Agreement for all purposes; and the Corporation, the Authority, the Bond Trustee, the Bondholder Representative and every Owner of Bonds theretofore or thereafter authenticated and delivered under the Bond Indenture shall be bound thereby.

**Section 9.5.    Reference in Bonds to Supplemental Loan Agreements**.  Bonds authenticated and delivered after the execution of any Supplemental Loan Agreement pursuant to this Article may bear a notation in form approved by the Bond Trustee as to any matter provided for in such Supplemental Loan Agreement.  New Bonds so modified as to conform to any such Supplemental Loan Agreement may be prepared and executed by the Authority and authenticated and delivered by the Bond Trustee in exchange for Outstanding Bonds.

**Section 9.6.    Supplemental Loan Agreement by Direction Letter.**  So long as any Series 2023A Bonds are Outstanding, any Supplemental Loan Agreement or any amendment to this Loan Agreement may be accomplished solely by a direction letter from the Bondholder Representative and the requisite consent of Owners of the Series 2023B Bonds and, if required by Section 902 of the Indenture, the requisite consent of Owners of the Series 2023C Bonds provided for therein to the Corporation, and the Authority, and with the written consent of the Bond Trustee, setting forth the terms thereof; provided such Supplemental Loan Agreement or other amendment does not adversely affect the interests of the Authority (in the Authority's sole discretion) and the Corporation.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

**Section 10.1.  Further Assurances.**  The Corporation will do, execute, acknowledge and deliver such further acts, instruments, financing statements and assurances as the Bond Trustee or the Bondholder Representative may reasonably require for accomplishing the purposes of the Bond Indenture and this Loan Agreement.

**Section 10.2.  Payments Due on Saturdays, Sundays and Holidays.**  In any case where the day for any payment due under this Loan Agreement shall be a Saturday, a Sunday or a legal holiday or a day on which banking institutions in the city of payment are authorized by law to close, then payment need not be made on such date but may be made on the next succeeding business day not a Saturday, a Sunday or a legal holiday or a day upon which banking institutions are authorized by law to close with the same force and effect as if made on the date fixed for payment, and no interest shall accrue for the period after such date.

**Section 10.3.  Notices.**  It shall be sufficient service of any notice, request, complaint, demand or other paper required by this Loan Agreement to be given to or filed with the Authority, the Bond Trustee, the Bondholder Representative or the Corporation if the same is given or filed in the manner and at the addresses specified in the Bond Indenture.

A duplicate copy of each demand, notice, approval, consent, request, opinion or other communication given hereunder by either the Authority or the Corporation to the other shall also be given to the Bond Trustee, the Bondholder Representative and the Underwriter.  The Corporation, the Bond Trustee, the Authority, the Bondholder Representative or the Underwriter may, by notice given hereunder, designate any further or different addresses to which subsequent demands, notices, approvals, consents, requests, opinions or other communications shall be sent or persons to whose attention they shall be directed.

No written notices shall be sent to Owners of the Series 2023A Bonds without the consent of the Bondholder Representative, including without limitation notices of failure to comply with covenants and Events of Default, provided, that, for the avoidance of doubt, such restriction shall not apply to, nor affect the Authority's right to make information relating to the Series 2023A Bonds available via the Municipal Securities Rulemaking Board's Electronic Municipal Market Access system.

**Section 10.4.  The Authority and the Corporation.**  Whenever under the provisions of this Loan Agreement the approval of the Authority or the Corporation is required or the Authority or the Corporation are required to take some action at the request of the other, such approval or such request shall be given for the Authority by the Authority Representative and for the Corporation by a Corporation Representative, the Bond Trustee and any party hereto shall be authorized to act on any such approval or request.

**Section 10.5.  Immunity of Officers, Employees and Members of the Authority and the Corporation.**  No recourse shall be had for the payment of the principal of or premium or interest on the Series 2023 Bond Notes or for any claim based thereon or upon any representation, obligation,

covenant or agreement in this Loan Agreement contained against any past, present or future officer, member, employee, director or agent of the Authority or the Corporation, or, respectively, of any successor public or private entity thereto, as such, either directly or through the Authority, the Corporation, or respectively, any successor public or private entity thereto, under any rule of law or equity, statute or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such officers, members, employees, directors or agents as such is hereby expressly waived and released as a condition of and consideration for the execution of this Loan Agreement and the issuance of the Series 2023 Bond Notes.

**Section 10.6.   No Violations of Law.**   Any other term or provision in this Loan Agreement to the contrary notwithstanding:

(a)      In no event shall this Loan Agreement be construed as: (1) depriving the Authority of any right or privilege; or (2) requiring the Authority or any member, agent, employee, representative or advisor of the Authority to take or omit to take, or to permit or suffer the taking of, any action by itself or by anyone else, which deprivation or requirement would violate, or result in the Authority's being in violation of the Act or any other applicable state or federal law; and

(b)      At no time and in no event will the Corporation permit, suffer or allow any of the proceeds of the Bonds or the Series 2023 Bond Note, to be transferred to any Person in violation of, or to be used in any manner which is prohibited by, the Act or any other state or federal law.

**Section 10.7.   Authority Not Liable**.   Notwithstanding any other provision of this Loan Agreement or any other Bond Document, (a) the Authority shall not be required to take action under this Loan Agreement unless the Authority (i) is requested in writing by an appropriate Person to take such action and (ii) is assured of payment of or reimbursement for any expense incurred in taking such action, and (b) except with respect to any action for specific performance or any action in the nature of a prohibitory or mandatory injunction, neither the Authority nor any official, officer, member, director, agent, employee or servant of the Authority shall be liable to the Corporation, any other Member of the Obligated Group, the Bond Trustee or any other Person for any action taken by the Authority or by its officials, officers, members, directors, agents, employees or servants, or for any failure to take action under this Loan Agreement or any other Bond Document.  In acting under this Loan Agreement, or in refraining from acting under any other Bond Document, the Authority may conclusively rely on the advice of its counsel.

**Section 10.8.   Bond Indenture Provisions**.   The Bond Indenture provisions concerning the Bonds and other matters therein are an integral part of the terms and conditions of the Loan made by the Authority to the Corporation pursuant to this Loan Agreement and the execution of this Loan Agreement shall constitute conclusive evidence of approval of the Bond Indenture by the Corporation to the extent it relates to the Corporation.  Additionally, the Corporation agrees that, whenever the Bond Indenture by its terms imposes a duty or obligation upon the Corporation, such duty or obligation shall be binding upon the Corporation to the same extent as if the Corporation were an express party to the Bond Indenture, and the Corporation hereby agrees to carry out and perform all of its obligations under the Bond Indenture as fully as if the Corporation were a party to the Bond Indenture.

**Section 10.09. Amendments to the Mortgage.** The Bond Trustee may, without the consent of or notice to any of the Owners, but with consent of the Bondholder Representative so long as the Series 2023A Bonds are Outstanding consent to one or more amendments or supplements to the Mortgage for one or more of the following purposes: (a) to grant or confer to the Bond Trustee any additional rights, remedies, powers or authority that may lawfully be granted or conferred upon them; or (b) to subject additional property to the Lien of the Mortgage. In addition to the foregoing amendments and supplements, the Bond Trustee may enter into other amendments or supplements to the Mortgage with the prior written consent of (i) the Bondholder Representative so long as the Series 2023A Bonds are Outstanding and (ii) the Majority of Holders.

**Section 10.10. Benefit of Loan Agreement**. This Loan Agreement shall inure to the benefit of and shall be binding upon the Authority, the Corporation, the Bond Trustee, the Bondholder Representative and the owners of the Bonds and their respective successors and assigns. Nothing in this Loan Agreement or in the Bond Indenture or the Bonds, express or implied, shall give to any Person, other than such parties and the Bondholder Representative, any benefit or any legal or equitable right, remedy or claim under this Loan Agreement.

**Section 10.11. Severability.** In the event that any provision of this Loan Agreement shall be held invalid or unenforceable by any court or competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

**Section 10.12. Execution Counterparts; Electronic Transactions.** This Loan Agreement is being executed in any number of counterparts, each of which is an original and all of which are identical. Each counterpart of this Loan Agreement is to be deemed an original hereof and all counterparts collectively are to be deemed but one instrument. In addition, the transaction described herein may be conducted and related documents may be stored by electronic means. Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

**Section 10.13. Governing Law.** This Loan Agreement is governed by the laws of the State, without regard to the choice of law rules of the State. Venue for any action under this Loan Agreement to which the Authority is a party shall lie within the district courts of the State, and the parties hereto consent to the jurisdiction and venue of any such court and hereby waive any argument that venue in such forums is not convenient.

**Section 10.14. Binding Effect.** The covenants, agreements and conditions herein contained shall be binding upon and inure to the benefit of the parties hereto, the Bond Trustee, the Bondholder Representative and the Owners of the Bonds and their respective successors and assigns. The Bond Trustee, the Bondholder Representative and the Owners of the Bonds are third-party beneficiaries of this Loan Agreement to the extent of their rights hereunder.

**Section 10.15. Limited Obligations.** It is understood and agreed by the Corporation and the Bondowners that no covenant, provision or agreement of the Authority herein or in the Bonds or in any other document executed by the Authority in connection with the issuance, sale and delivery of the Bonds, or any obligation herein or therein imposed upon the Authority or breach thereof, shall

give rise to a pecuniary liability of the Authority or a charge against its general credit or general fund or shall obligate the Authority financially in any way except with respect to the application of revenues under this Loan Agreement, and the proceeds of the Bonds.  No failure of the Authority to comply with any term, condition, covenant or agreement therein shall subject the Authority to liability for any claim for damages, costs or other financial or pecuniary charges except to the extent that the same can be paid or recovered from this Loan Agreement or revenues therefrom or proceeds of the Bonds.  No execution on any claim, demand, cause of action or judgment shall be levied upon or collected from the general credit or general funds of the Authority.  In making the agreements, provisions and covenants set forth herein, the Authority has not obligated itself except with respect to this Loan Agreement and the application of revenues hereunder as hereinabove provided.  The Bonds constitute special obligations of the Authority, payable solely from the revenues pledged to the payment thereof pursuant to this Loan Agreement and the Bond Indenture, and do not now and shall never constitute an indebtedness or a loan of the credit of the Authority, the State or any political subdivision thereof within the meaning of any constitutional or statutory provision whatsoever.  The Authority has no taxing power.  It is further understood and agreed by the Corporation and the Owners that the Authority shall incur no pecuniary liability hereunder and shall not be liable for any expenses related hereto.  If, notwithstanding the provisions of this Section, the Authority incurs any expense, or suffers any losses, claims or damages or incurs any liabilities, the Corporation will indemnify and hold harmless the Authority from the same and will reimburse the Authority for any legal or other expenses incurred by the Authority in relation thereto, and this covenant to indemnify, hold harmless and reimburse the Authority shall survive delivery of and payment for the Bonds.

**Section 10.16 Actions Related to Purchase in Lieu of Redemption of Series 2023A Bonds.**  In connection with any purchase in lieu of redemption of the Series 2023A Bonds, the Corporation hereby consents to the Bond Trustee opening a brokerage account or such other account as requested by the Owners of at least a majority in principal amount of the Series 2023A Bonds or the Bondholder Representative as further described in Section 301(h) of the Bond Indenture.

49

**IN WITNESS WHEREOF,** the Oklahoma County Finance Authority has caused this Loan Agreement to be executed in its name and in its behalf by its Chairman and its official seal to be affixed hereunto and attested by its Secretary of Trustees, and Central Oklahoma United Methodist Retirement Facility, Inc., d/b/a Epworth Villa has caused this Loan Agreement to be executed in its name and in its behalf by its President and Chief Executive Officer, and attested by its Secretary, all as of the day and year first above written.

**OKLAHOMA COUNTY FINANCE AUTHORITY**

Attest:

_____          _____
Secretary                                                      Chairman

(SEAL)

**CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACIILITY, INC. d/b/a Epworth Villa**

ATTEST:                                          By:_____
                                                           Name: Ron Kelly
                                                           Title:  President and Chief Executive Officer

By:_____
        Name: _____
        Title: Secretary

**EXHIBIT A**

**FORM OF SERIES 2023 BOND NOTES**

**THIS NOTE HAS NOT BEEN REGISTERED UNDER
THE SECURITIES ACT OF 1933, AS AMENDED**

**No. R-1**                                                                                        **$6,000,000**

**CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC.
PROMISSORY NOTE
SERIES 2023A**

| Final Maturity Date | Dated Date |
|---|---|
| December 1, 2030 | December _____ , 2023 |

**HOLDER:     OKLAHOMA COUNTY FINANCE AUTHORITY**

**PRINCIPAL AMOUNT:     SIX MILLION AND NO/100S DOLLARS**

**CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC.**, an Oklahoma not for profit corporation (the "Corporation"), for value received, hereby promises to pay to the holder shown above, or assigns, the principal amount shown above on and prior to the final maturity date shown above, in installments in the amounts and on the dates that are the same as and correspond with the principal amounts of the Oklahoma County Finance Authority Senior Living Facilities Revenue Bonds (Epworth Villa Project) Series 2023A Bonds (the "Series 2023A Bonds"), issued pursuant to the Bond Trust Indenture dated as of December 1, 2023 (as amended or supplemented from time to time in accordance with its terms, the "Bond Indenture") between the Oklahoma County Finance Authority (the "Authority") and BancFirst, Oklahoma City, Oklahoma, as Bond Trustee (the "Bond Trustee") coming due (and the dates on which those amounts come due) whether at maturity or by scheduled mandatory redemption, and earlier upon any other redemption in whole or in part of the Series 2023A Bonds described herein, all as set forth in the Bond Indenture, and to pay to the holder hereof  (i) interest on the unpaid principal balance hereof from the date of this Series 2023A Bond Note shown above to the final maturity date shown above at the rate of interest on the Series 2023A Bonds so that the interest coming due on this Series 2023A Bond Note on any date corresponds with the interest component on the Series 2023A Bonds on that date, until this Series 2023A Bond Note is paid and (ii) such redemption premiums and other amounts as are required to be paid by the Corporation to the Authority as part of the Loan Payments as provided in the Loan Agreement, dated as of December 1, 2023 (as amended and supplemented from time to time in accordance with its terms, the "Loan Agreement"), between the Authority and the Corporation, which is incorporated herein by reference and made a part hereof. Capitalized terms used herein and not otherwise defined shall have the meanings given such terms in the Bond Indenture.

**Time, Method and Place of Payment**.  The principal hereof, redemption premium, if any, and interest hereon shall be payable at the times and in the amounts as provided in the Bond Indenture described herein.  The last such installment shall be in an amount sufficient to discharge all unpaid principal of, redemption premium, if any, and accrued interest on this Series 2023A Bond Note in full.  The principal of, redemption premium, if any, and interest on this Series 2023A Bond Note are payable in any coin or currency of the United States of America which, at the respective times of payment, is legal tender for the payment of public and private debts.  The principal hereof and redemption premium, if any, and interest hereon shall be paid by means of the Loan Payments which shall be due and payable as set forth in the Loan Agreement.   The obligation evidenced by this Series 2023A Bond Note shall terminate only when payment in full of the principal hereof and redemption premium, if any, and interest hereon has been made.

This Series 2023A Bond Note is issued for the purpose of evidencing and securing the indebtedness of the Corporation resulting from the making available to the Corporation of the proceeds of the issuance and sale of the Series 2023A Bonds.  If and when the Series 2023A Bonds are no longer Outstanding under the Bond Indenture, this Series 2023A Bond Note shall be deemed to have been paid and to be no longer Outstanding.

**Credits on the Series 2023A Bond Note.**  The Corporation shall receive certain credits against its required payments on this Series 2023A Bond Note as specified in the Loan Ageement.

**Security for Series 2023A Bond Note.**  This Series 2023A Bond Note and the indebtedness evidenced hereby is secured by (a) the Mortgage and Security Agreement of even date herewith (as may be amended from time to time, the "Mortgage") between the Corporation, as mortgagor, in favor of the Authority, as mortgagee, which covers the real property described on Exhibit "A" attached thereto, together with all buildings and improvements now or hereafter placed thereon and the appurtenances, hereditaments and all other rights thereunto belonging, together with a pledge of the Gross Receipts, rents, issues and profits thereof (the "Mortgaged Property"), all as more fully set forth in the Mortgage, (b) the Loan Agreement, (c) Pledged Assets and (d) all other documents providing security herefor, which documents are incorporated herein by reference.
.

Copies of the Loan Agreement and the Bond Indenture are on file at the principal corporate trust office of the Bond Trustee and reference is hereby made to the Loan Agreement and the Bond Indenture for the provisions, among others, with respect to the nature and extent of the security for and the rights of the holders of this Series 2023A Bond Note, the terms and conditions on which, and purposes for which, this Series 2023A Bond Note is issued and the rights, duties and obligations of the Corporation under the Loan Agreement, to all of which the holder hereof, by acceptance of this Series 2023A Bond Note, assents.   The Loan Agreement may be modified, amended or supplemented only to the extent and under the circumstances permitted by, and subject to the terms and conditions of, the Loan Agreement.

**Redemption Prior to Maturity**.  The principal of this Series 2023A Bond Note is subject to redemption from time to time in the manner, under the circumstances, upon such notice and at the prices set forth in the Loan Agreement and as set forth for redemption of the Series 2023A Bonds in the Bond Indenture.

Upon the call for redemption of any Series 2023A Bonds pursuant to the Bond Indenture, the same principal amount of this Series 2023A Bond Note shall be deemed to have been called for redemption on the same redemption date and at the same redemption price (plus accrued interest to the redemption date) as such Series 2023A Bonds so called for redemption. Mailing of notice to the registered Owners of the Series 2023A Bonds in accordance with the terms of the Bond Indenture shall, without further notice or action by the Bond Trustee or the Corporation Representative, constitute notice of redemption of the corresponding amount of principal on this Series 2023A Bond Note and the same shall thereby become due and payable on the date specified for the redemption of such Series 2023A Bonds and at a redemption price (plus accrued interest to the redemption date) equal to the redemption price payable with respect to such Series 2023A Bonds.

This Series 2023A Bond Note may also be redeemed in whole or in part by paying the amount necessary to provide for the payment, prepayment, redemption, refunding, defeasance or refunding of the Series 2023A Bonds or any portion of the Series 2023A Bonds. In the event this Series 2023A Bond Note is to be redeemed as set forth in the preceding sentence, notice thereof identifying the portion of this Series 2023A Bond Note to be redeemed, unless waived, will be given by mailing a copy of the redemption notice to the holder hereof, at the address shown on the registration books, at the times and in the manner provided in the Loan Agreement.

This Series 2023A Bond Note or the portion hereof called for redemption will cease to bear interest on the specified redemption date, provided funds for its redemption are on deposit at the place of payment at that time, and this Series 2023A Bond Note or such portion will not be deemed to be Outstanding.

**Acceleration of Series 2023A Bond Note**. In certain events (including the occurrence of an "Event of Default" as defined in the Loan Agreement), on the conditions, in the manner and with the effect set forth in the Loan Agreement, the Authority or the Bond Trustee may declare the outstanding principal of this Series 2023A Bond Note due and payable before the stated maturity thereof, together with interest accrued thereon.

**Waiver of Presentment or Notice**. The Corporation waives grace, presentment for payment, notice of non-payment, demand of payment, protest and notice of protest, notice of dishonor and diligence in the collection of this Series 2023A Bond Note and in filing suit hereon and consents and agrees that their liability for the payment hereof shall not be affected or impaired by any release or change in the security for the payment of this Series 2023A Bond Note, or as set forth above, by any extension of the time of payment, or the addition of any parties hereto, which extension and addition may be made without notice to any party hereto and without affecting their liability hereunder.

The holder hereof shall not be liable for failure to collect or for lack of diligence in bringing suit on this Series 2023A Bond Note or on any renewal or extension hereof or upon or with respect to any security or to foreclose the Mortgage, given to secure the payment hereof or for failure to make demand or presentment for payment or to protest or give notice of protest, dishonor or non-payment or any other notice, or generally for any act of omission or commission.

**No Waiver by Holder.** The failure of the holder hereof to exercise any of the remedies or options set forth in this Series 2023A Bond Note, the Loan Agreement, or in any instrument securing

payment hereof, upon the occurrence of one or more of the events of default shall not constitute a waiver of the right to exercise the same or any other remedy at any subsequent time in respect to the same or any other event of default. The acceptance by the holder hereof of any payment which is less than the total of all amounts due and payable at the time of such payment shall not constitute a waiver of the right to exercise any of the foregoing remedies or options at that time or at any subsequent time, or nullify any prior exercise otherwise provided by law.

**Attorney Fees**. It is further agreed by the Corporation that if this Series 2023A Bond Note is not paid promptly in accordance with its terms and is placed in the hands of an attorney for collection or if suit be instituted hereon or to foreclose the Mortgage given as security herefor and as often as this Series 2023A Bond Note is placed in the hands of an attorney for collection and as often as suit is filed to collect this Series 2023A Bond Note or to foreclose the Mortgage, the Corporation agrees to pay in addition to the unpaid principal balance hereof and any and all interest accrued and due hereon but then unpaid, all costs of collection, including, without limitation, a reasonable attorneys' fee.

**Oklahoma Law.** This Series 2023A Bond Note shall be construed and enforced in accordance with the laws of the State of Oklahoma and shall be conclusively deemed for all purposes to have been executed and delivered in the State of Oklahoma for performance therein.

**Payments on Holidays.** If the prescribed date of payment of any of the principal hereof or interest thereon is a Saturday, Sunday or legal holiday as prescribed by the laws of the United States of America or the State of Oklahoma, such payment shall be due on the next following business day.

**Provisions Severable.** If any provision of this Series 2023A Bond Note or the application thereof to any party or circumstance is held invalid or unenforceable, the remainder of this Series 2023A Bond Note and the application of such provision to other parties or circumstance shall not be affected thereby, the provisions of this Series 2023A Bond Note being severable in any such instance.

**Consent to Assignment.** The Corporation hereby consents to the assignment of this Series 2023A Bond Note by the Authority to the Bond Trustee.

To the extent permitted by law, in the event that the Corporation fails to pay when due any amount required to be paid under the Loan Agreement, the Bond Indenture or the other Related Documents, the Corporation without further consent or notice thereto irrevocably and unconditionally authorizes any attorney, as attorney for the Corporation to Confess Judgment against the Corporation in favor of the Bond Trustee and the Bondholder Representative and their successors and assigns as set forth more fully in the Loan Agreement.

**IT IS HEREBY CERTIFIED** that all conditions, acts and things required to exist, happen and be performed precedent to and in the issuance of this Series 2023A Bond Note, exist, have happened and have been performed, in regular and due form and time as required by the laws of the State of Oklahoma and by the terms of the Corporation's governing instruments and other governing instruments, rules and regulations and that the issuance, authentication and delivery of this Series 2023A Bond Note have been duly authorized by resolutions of the Corporation duly adopted.

**IN WITNESS WHEREOF, CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC.** has caused this Series 2023A Bond Note to be executed by the manual signature of its President, and attested by the manual signature of its Secretary, and this Series 2023A Bond Note to be dated as of the Dated Date shown above.

> **CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC.**
>
>
> _____
> President

ATTEST



_____
Secretary

A-5

## ASSIGNMENT

      The undersigned pledges and assigns all of its right, title and interest in and to the above Series 2023A Bond Note to BancFirst, the Bond Trustee under the Bond Trust Indenture dated as of December 1, 2023, between the undersigned and said bank, as trustee, or to its successor or successors as Bond Trustee under that Bond Trust Indenture, for the benefit and security of the Owners of the Bonds secured by said Bond Trust Indenture.  This assignment is without recourse against or warranty of any nature or description by the undersigned.

      Dated: _____, 2023.

**OKLAHOMA COUNTY FINANCE AUTHORITY**

_____
**Chairman**

**ATTEST:**


_____
**Secretary**

**(SEAL)**

**THIS NOTE HAS NOT BEEN REGISTERED UNDER
THE SECURITIES ACT OF 1933, AS AMENDED**

**No. R-1**                                                                                         **$66,700,000.00**

## CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC.
## PROMISSORY NOTE
## SERIES 2023B

| **Final Maturity Date** | **Dated Date** |
|---|---|
| December 1, 2047 | December ____, 2023 |

**HOLDER:    OKLAHOMA COUNTY FINANCE AUTHORITY**

**PRINCIPAL AMOUNT:    SIXTY SIX MILLION SEVEN HUNDRED THOUSAND AND NO 100s DOLLARS**

      **CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC.**, an Oklahoma not for profit corporation (the "Corporation"), for value received, hereby promises to pay to the holder shown above, or assigns, the principal amount shown above on and prior to the final maturity date shown above, in installments in the amounts and on the dates that are the same as and correspond with the principal amounts of the Oklahoma County Finance Authority Senior Living Facilities Revenue Bonds (Epworth Villa Project) Series 2023B Bonds (the "Series 2023B Bonds"), issued pursuant to the Bond Trust Indenture dated as of December 1, 2023 (as amended or supplemented from time to time in accordance with its terms, the "Bond Indenture") between the Oklahoma County Finance Authority (the "Authority") and BancFirst, Oklahoma City, Oklahoma, as Bond Trustee (the "Bond Trustee") coming due (and the dates on which those amounts come due) whether at maturity or by scheduled mandatory redemption, and earlier upon any other redemption in whole or in part of the Series 2023B Bonds described herein, all as set forth in the Bond Indenture, and to pay to the holder hereof (i) interest on the unpaid principal balance hereof from the date of this Series 2023B Bond Note shown above to the final maturity date shown above at the rate of interest on the Series 2023B Bonds so that the interest coming due on this Series 2023B Bond Note on any date corresponds with the interest component on the Series 2023B Bonds on that date, until this Series 2023B Bond Note is paid and (ii) such redemption premiums and other amounts as are required to be paid by the Corporation to the Authority as part of the Loan Payments as provided in the Loan Agreement, dated as of December 1, 2023 (as amended and supplemented from time to time in accordance with its terms, the "Loan Agreement"), between the Authority and the Corporation, which is incorporated herein by reference and made a part hereof. Capitalized terms used herein and not otherwise defined shall have the meanings given such terms in the Bond Indenture.

      **Time, Method and Place of Payment**.  The principal hereof, redemption premium, if any, and interest hereon shall be payable at the times and in the amounts as provided in the Bond

Indenture described herein.  The last such installment shall be in an amount sufficient to discharge all unpaid principal of, redemption premium, if any, and accrued interest on this Series 2023B Bond Note in full.  The principal of, redemption premium, if any, and interest on this Series 2023B Bond Note are payable in any coin or currency of the United States of America which, at the respective times of payment, is legal tender for the payment of public and private debts.  The principal hereof and redemption premium, if any, and interest hereon shall be paid by means of the Loan Payments which shall be due and payable as set forth in the Loan Agreement.   The obligation evidenced by this Series 2023B Bond Note shall terminate only when payment in full of the principal hereof and redemption premium, if any, and interest hereon has been made.

This Series 2023B Bond Note is issued for the purpose of evidencing and securing the indebtedness of the Corporation resulting from the making available to the Corporation of the proceeds of the issuance and sale of the Series 2023B Bonds.  If and when the Series 2023B Bonds are no longer Outstanding under the Bond Indenture, this Series 2023B Bond Note shall be deemed to have been paid and to be no longer Outstanding.

**Credits on the Series 2023B Bond Note.**  The Corporation shall receive certain credits against its required payments on this Series 2023B Bond Note as specified in the Loan Ageement.

**Security for Series 2023B Bond Note.**  This Series 2023B Bond Note and the indebtedness evidenced hereby is secured by (a) the Mortgage and Security Agreement of even date herewith (as may be amended from time to time, the "Mortgage") between the Corporation, as mortgagor, in favor of the Authority, as mortgagee, which covers the real property described on Exhibit "A" attached thereto, together with all buildings and improvements now or hereafter placed thereon and the appurtenances, hereditaments and all other rights thereunto belonging, together with a pledge of the Gross Receipts, rents, issues and profits thereof (the "Mortgaged Property"), all as more fully set forth in the Mortgage, (b) the Loan Agreement, (c) Pledged Assets and (d) all other documents providing security herefor, which documents are incorporated herein by reference.
.

Copies of the Loan Agreement and the Bond Indenture are on file at the principal corporate trust office of the Bond Trustee and reference is hereby made to the Loan Agreement and the Bond Indenture for the provisions, among others, with respect to the nature and extent of the security for and the rights of the holders of this Series 2023B Bond Note, the terms and conditions on which, and purposes for which, this Series 2023B Bond Note is issued and the rights, duties and obligations of the Corporation under the Loan Agreement, to all of which the holder hereof, by acceptance of this Series 2023B Bond Note, assents.  The Loan Agreement may be modified, amended or supplemented only to the extent and under the circumstances permitted by, and subject to the terms and conditions of, the Loan Agreement.

**Redemption Prior to Maturity**.  The principal of this Series 2023B Bond Note is subject to redemption from time to time in the manner, under the circumstances, upon such notice and at the prices set forth in the Loan Agreement and as set forth for redemption of the Series 2023B Bonds in the Bond Indenture.

Upon the call for redemption of any Series 2023B Bonds pursuant to the Bond Indenture, the same principal amount of this Series 2023B Bond Note shall be deemed to have been called for

redemption on the same redemption date and at the same redemption price (plus accrued interest to the redemption date) as such Series 2023B Bonds so called for redemption. Mailing of notice to the registered Owners of the Series 2023B Bonds in accordance with the terms of the Bond Indenture shall, without further notice or action by the Bond Trustee or the Corporation Representative, constitute notice of redemption of the corresponding amount of principal on this Series 2023B Bond Note and the same shall thereby become due and payable on the date specified for the redemption of such Series 2023B Bonds and at a redemption price (plus accrued interest to the redemption date) equal to the redemption price payable with respect to such Series 2023B Bonds.

This Series 2023B Bond Note may also be redeemed in whole or in part by paying the amount necessary to provide for the payment, prepayment, redemption, refunding, defeasance or refunding of the Series 2023B Bonds or any portion of the Series 2023B Bonds. In the event this Series 2023B Bond Note is to be redeemed as set forth in the preceding sentence, notice thereof identifying the portion of this Series 2023B Bond Note to be redeemed, unless waived, will be given by mailing a copy of the redemption notice to the holder hereof, at the address shown on the registration books, at the times and in the manner provided in the Loan Agreement.

This Series 2023B Bond Note or the portion hereof called for redemption will cease to bear interest on the specified redemption date, provided funds for its redemption are on deposit at the place of payment at that time, and this Series 2023B Bond Note or such portion will not be deemed to be Outstanding.

**Acceleration of Series 2023B Bond Note**. In certain events (including the occurrence of an "Event of Default" as defined in the Loan Agreement), on the conditions, in the manner and with the effect set forth in the Loan Agreement, the Authority or the Bond Trustee may declare the outstanding principal of this Series 2023B Bond Note due and payable before the stated maturity thereof, together with interest accrued thereon.

**Waiver of Presentment or Notice**. The Corporation waives grace, presentment for payment, notice of non-payment, demand of payment, protest and notice of protest, notice of dishonor and diligence in the collection of this Series 2023B Bond Note and in filing suit hereon and consents and agrees that their liability for the payment hereof shall not be affected or impaired by any release or change in the security for the payment of this Series 2023B Bond Note, or as set forth above, by any extension of the time of payment, or the addition of any parties hereto, which extension and addition may be made without notice to any party hereto and without affecting their liability hereunder.

The holder hereof shall not be liable for failure to collect or for lack of diligence in bringing suit on this Series 2023B Bond Note or on any renewal or extension hereof or upon or with respect to any security or to foreclose the Mortgage, given to secure the payment hereof or for failure to make demand or presentment for payment or to protest or give notice of protest, dishonor or non-payment or any other notice, or generally for any act of omission or commission.

**No Waiver by Holder.** The failure of the holder hereof to exercise any of the remedies or options set forth in this Series 2023B Bond Note, the Loan Agreement, or in any instrument securing payment hereof, upon the occurrence of one or more of the events of default shall not constitute a waiver of the right to exercise the same or any other remedy at any subsequent time in respect to the

same or any other event of default.  The acceptance by the holder hereof of any payment which is less than the total of all amounts due and payable at the time of such payment shall not constitute a waiver of the right to exercise any of the foregoing remedies or options at that time or at any subsequent time, or nullify any prior exercise otherwise provided by law.

**Attorney Fees**.  It is further agreed by the Corporation that if this Series 2023B Bond Note is not paid promptly in accordance with its terms and is placed in the hands of an attorney for collection or if suit be instituted hereon or to foreclose the Mortgage given as security herefor and as often as this Series 2023B Bond Note is placed in the hands of an attorney for collection and as often as suit is filed to collect this Series 2023B Bond Note or to foreclose the Mortgage, the Corporation agrees to pay in addition to the unpaid principal balance hereof and any and all interest accrued and due hereon but then unpaid, all costs of collection, including, without limitation, a reasonable attorneys' fee.

**Oklahoma Law.** This Series 2023B Bond Note shall be construed and enforced in accordance with the laws of the State of Oklahoma and shall be conclusively deemed for all purposes to have been executed and delivered in the State of Oklahoma for performance therein.

**Payments on Holidays.** If the prescribed date of payment of any of the principal hereof or interest thereon is a Saturday, Sunday or legal holiday as prescribed by the laws of the United States of America or the State of Oklahoma, such payment shall be due on the next following business day.

**Provisions Severable.**  If any provision of this Series 2023B Bond Note or the application thereof to any party or circumstance is held invalid or unenforceable, the remainder of this Series 2023B Bond Note and the application of such provision to other parties or circumstance shall not be affected thereby, the provisions of this Series 2023B Bond Note being severable in any such instance.

**Consent to Assignment.**  The Corporation hereby consents to the assignment of this Series 2023B Bond Note by the Authority to the Bond Trustee.

To the extent permitted by law, in the event that the Corporation fails to pay when due any amount required to be paid under the Loan Agreement, the Bond Indenture or the other Related Documents, the Corporation without further consent or notice thereto irrevocably and unconditionally authorizes any attorney, as attorney for the Corporation to Confess Judgment against the Corporation in favor of the Bond Trustee and the Bondholder Representative and their successors and assigns as set forth more fully in the Loan Agreement.

**IT IS HEREBY CERTIFIED** that all conditions, acts and things required to exist, happen and be performed precedent to and in the issuance of this Series 2023B Bond Note, exist, have happened and have been performed, in regular and due form and time as required by the laws of the State of Oklahoma and by the terms of the Corporation's governing instruments and other governing instruments, rules and regulations and that the issuance, authentication and delivery of this Series 2023B Bond Note have been duly authorized by resolutions of the Corporation duly adopted.

**IN WITNESS WHEREOF, CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC.** has caused this Series 2023B Bond Note to be executed by the manual signature of its President, and attested by the manual signature of its Secretary, and this Series 2023B Bond Note to be dated as of the Dated Date shown above.

**CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC.**

_____
President

ATTEST

_____
Secretary

A-11

**ASSIGNMENT**

The undersigned pledges and assigns all of its right, title and interest in and to the above Series 2023B Bond Note to BancFirst, the Bond Trustee under the Bond Trust Indenture dated as of December 1, 2023, between the undersigned and said bank, as trustee, or to its successor or successors as Bond Trustee under that Bond Trust Indenture, for the benefit and security of the Owners of the Bonds secured by said Bond Trust Indenture.  This assignment is without recourse against or warranty of any nature or description by the undersigned.

Dated: _____, 2023.

**OKLAHOMA COUNTY FINANCE AUTHORITY**

_____
**Chairman**

**ATTEST:**

_____
**Secretary**

**(SEAL)**

**THIS NOTE HAS NOT BEEN REGISTERED UNDER
THE SECURITIES ACT OF 1933, AS AMENDED**

**No. R-1**                                                       **$13,724,671.00**

**CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC.
PROMISSORY NOTE
SERIES 2023C**

| **Final
Maturity
Date** | **Dated
Date** |
|---|---|
| December 1, 2047 | December____, 2023 |

**HOLDER:    OKLAHOMA COUNTY FINANCE AUTHORITY**

**PRINCIPAL AMOUNT:    THIRTEEN MILLION SEVEN HUNDRED TWENTY FOUR
THOUSAND SIX HUNDRED SEVENTY ONE AND NO 100s DOLLARS**

     **CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC.**, an Oklahoma not for profit corporation (the "Corporation"), for value received, hereby promises to pay to the holder shown above, or assigns, the principal amount shown above on and prior to the final maturity date shown above, in installments in the amounts and on the dates that are the same as and correspond with the principal amounts of the Oklahoma County Finance Authority Senior Living Facilities Capital Appreciation Revenue Bonds (Epworth Villa Project) Series 2023C Bonds (the "Series 2023C Bonds"), issued pursuant to the Bond Trust Indenture dated as of December 1, 2023 (as amended or supplemented from time to time in accordance with its terms, the "Bond Indenture") between the Oklahoma County Finance Authority (the "Authority") and BancFirst, Oklahoma City, Oklahoma, as Bond Trustee (the "Bond Trustee") coming due (and the dates on which those amounts come due) whether at maturity or by scheduled mandatory redemption, and earlier upon any other redemption in whole or in part of the Series 2023C Bonds described herein, all as set forth in the Bond Indenture, and to pay to the holder hereof (i) interest on the unpaid principal balance hereof from the date of this Series 2023C Bond Note shown above to the final maturity date shown above at the rate of interest on the Series 2023C Bonds so that the interest coming due on this Series 2023C Bond Note on any date corresponds with the interest component on the Series 2023C Bonds on that date, until this Series 2023C Bond Note is paid and (ii) such redemption premiums and other amounts as are required to be paid by the Corporation to the Authority as part of the Loan Payments as provided in the Loan Agreement, dated as of December 1, 2023 (as amended and supplemented from time to time in accordance with its terms, the "Loan Agreement"), between the Authority and the Corporation, which is incorporated herein by reference and made a part hereof. Capitalized terms used herein and not otherwise defined shall have the meanings given such terms in the Bond Indenture.

     **Time, Method and Place of Payment**. The principal hereof, redemption premium, if any, and interest hereon shall be payable at the times and in the amounts as provided in the Bond

Indenture described herein.  The last such installment shall be in an amount sufficient to discharge all unpaid principal of, redemption premium, if any, and accrued interest on this Series 2023C Bond Note in full.  The principal of, redemption premium, if any, and interest on this Series 2023C Bond Note are payable in any coin or currency of the United States of America which, at the respective times of payment, is legal tender for the payment of public and private debts.  The principal hereof and redemption premium, if any, and interest hereon shall be paid by means of the Loan Payments which shall be due and payable as set forth in the Loan Agreement.   The obligation evidenced by this Series 2023C Bond Note shall terminate only when payment in full of the principal hereof and redemption premium, if any, and interest hereon has been made.

This Series 2023C Bond Note is issued for the purpose of evidencing and securing the indebtedness of the Corporation resulting from the making available to the Corporation of the proceeds of the issuance and sale of the Series 2023C Bonds.  If and when the Series 2023C Bonds are no longer Outstanding under the Bond Indenture, this Series 2023C Bond Note shall be deemed to have been paid and to be no longer Outstanding.

**Credits on the Series 2023C Bond Note.**  The Corporation shall receive certain credits against its required payments on this Series 2023C Bond Note as specified in the Loan Ageement.

**Security for Series 2023C Bond Note.**  This Series 2023C Bond Note and the indebtedness evidenced hereby is secured by (a) the Mortgage and Security Agreement of even date herewith (as may be amended from time to time, the "Mortgage") between the Corporation, as mortgagor, in favor of the Authority, as mortgagee, which covers the real property described on Exhibit "A" attached thereto, together with all buildings and improvements now or hereafter placed thereon and the appurtenances, hereditaments and all other rights thereunto belonging, together with a pledge of the Gross Receipts, rents, issues and profits thereof (the "Mortgaged Property"), all as more fully set forth in the Mortgage, (b) the Loan Agreement, (c) Pledged Assets and (d) all other documents providing security herefor, which documents are incorporated herein by reference.
.

Copies of the Loan Agreement and the Bond Indenture are on file at the principal corporate trust office of the Bond Trustee and reference is hereby made to the Loan Agreement and the Bond Indenture for the provisions, among others, with respect to the nature and extent of the security for and the rights of the holders of this Series 2023C Bond Note, the terms and conditions on which, and purposes for which, this Series 2023C Bond Note is issued and the rights, duties and obligations of the Corporation under the Loan Agreement, to all of which the holder hereof, by acceptance of this Series 2023C Bond Note, assents.  The Loan Agreement may be modified, amended or supplemented only to the extent and under the circumstances permitted by, and subject to the terms and conditions of, the Loan Agreement.

**Redemption Prior to Maturity**.  The principal of this Series 2023C Bond Note is subject to redemption from time to time in the manner, under the circumstances, upon such notice and at the prices set forth in the Loan Agreement and as set forth for redemption of the Series 2023C Bonds in the Bond Indenture.

Upon the call for redemption of any Series 2023C Bonds pursuant to the Bond Indenture, the same principal amount of this Series 2023C Bond Note shall be deemed to have been called for

redemption on the same redemption date and at the same redemption price (plus accrued interest to the redemption date) as such Series 2023C Bonds so called for redemption. Mailing of notice to the registered Owners of the Series 2023C Bonds in accordance with the terms of the Bond Indenture shall, without further notice or action by the Bond Trustee or the Corporation Representative, constitute notice of redemption of the corresponding amount of principal on this Series 2023C Bond Note and the same shall thereby become due and payable on the date specified for the redemption of such Series 2023C Bonds and at a redemption price (plus accrued interest to the redemption date) equal to the redemption price payable with respect to such Series 2023C Bonds.

This Series 2023C Bond Note may also be redeemed in whole or in part by paying the amount necessary to provide for the payment, prepayment, redemption, refunding, defeasance or refunding of the Series 2023C Bonds or any portion of the Series 2023C Bonds. In the event this Series 2023C Bond Note is to be redeemed as set forth in the preceding sentence, notice thereof identifying the portion of this Series 2023C Bond Note to be redeemed, unless waived, will be given by mailing a copy of the redemption notice to the holder hereof, at the address shown on the registration books, at the times and in the manner provided in the Loan Agreement.

This Series 2023C Bond Note or the portion hereof called for redemption will cease to bear interest on the specified redemption date, provided funds for its redemption are on deposit at the place of payment at that time, and this Series 2023C Bond Note or such portion will not be deemed to be Outstanding.

**Acceleration of Series 2023C Bond Note**. In certain events (including the occurrence of an "Event of Default" as defined in the Loan Agreement), on the conditions, in the manner and with the effect set forth in the Loan Agreement, the Authority or the Bond Trustee may declare the outstanding principal of this Series 2023C Bond Note due and payable before the stated maturity thereof, together with interest accrued thereon.

**Waiver of Presentment or Notice**. The Corporation waives grace, presentment for payment, notice of non-payment, demand of payment, protest and notice of protest, notice of dishonor and diligence in the collection of this Series 2023C Bond Note and in filing suit hereon and consents and agrees that their liability for the payment hereof shall not be affected or impaired by any release or change in the security for the payment of this Series 2023C Bond Note, or as set forth above, by any extension of the time of payment, or the addition of any parties hereto, which extension and addition may be made without notice to any party hereto and without affecting their liability hereunder.

The holder hereof shall not be liable for failure to collect or for lack of diligence in bringing suit on this Series 2023C Bond Note or on any renewal or extension hereof or upon or with respect to any security or to foreclose the Mortgage, given to secure the payment hereof or for failure to make demand or presentment for payment or to protest or give notice of protest, dishonor or non-payment or any other notice, or generally for any act of omission or commission.

**No Waiver by Holder.** The failure of the holder hereof to exercise any of the remedies or options set forth in this Series 2023C Bond Note, the Loan Agreement, or in any instrument securing payment hereof, upon the occurrence of one or more of the events of default shall not constitute a waiver of the right to exercise the same or any other remedy at any subsequent time in respect to the

same or any other event of default. The acceptance by the holder hereof of any payment which is less than the total of all amounts due and payable at the time of such payment shall not constitute a waiver of the right to exercise any of the foregoing remedies or options at that time or at any subsequent time, or nullify any prior exercise otherwise provided by law.

**Attorney Fees**. It is further agreed by the Corporation that if this Series 2023C Bond Note is not paid promptly in accordance with its terms and is placed in the hands of an attorney for collection or if suit be instituted hereon or to foreclose the Mortgage given as security herefor and as often as this Series 2023C Bond Note is placed in the hands of an attorney for collection and as often as suit is filed to collect this Series 2023C Bond Note or to foreclose the Mortgage, the Corporation agrees to pay in addition to the unpaid principal balance hereof and any and all interest accrued and due hereon but then unpaid, all costs of collection, including, without limitation, a reasonable attorneys' fee.

**Oklahoma Law.** This Series 2023C Bond Note shall be construed and enforced in accordance with the laws of the State of Oklahoma and shall be conclusively deemed for all purposes to have been executed and delivered in the State of Oklahoma for performance therein.

**Payments on Holidays.** If the prescribed date of payment of any of the principal hereof or interest thereon is a Saturday, Sunday or legal holiday as prescribed by the laws of the United States of America or the State of Oklahoma, such payment shall be due on the next following business day.

**Provisions Severable.** If any provision of this Series 2023C Bond Note or the application thereof to any party or circumstance is held invalid or unenforceable, the remainder of this Series 2023C Bond Note and the application of such provision to other parties or circumstance shall not be affected thereby, the provisions of this Series 2023C Bond Note being severable in any such instance.

**Consent to Assignment.** The Corporation hereby consents to the assignment of this Series 2023C Bond Note by the Authority to the Bond Trustee.

To the extent permitted by law, in the event that the Corporation fails to pay when due any amount required to be paid under the Loan Agreement, the Bond Indenture or the other Related Documents, the Corporation without further consent or notice thereto irrevocably and unconditionally authorizes any attorney, as attorney for the Corporation to Confess Judgment against the Corporation in favor of the Bond Trustee and the Bondholder Representative and their successors and assigns as set forth more fully in the Loan Agreement.

**IT IS HEREBY CERTIFIED** that all conditions, acts and things required to exist, happen and be performed precedent to and in the issuance of this Series 2023C Bond Note, exist, have happened and have been performed, in regular and due form and time as required by the laws of the State of Oklahoma and by the terms of the Corporation's governing instruments and other governing instruments, rules and regulations and that the issuance, authentication and delivery of this Series 2023C Bond Note have been duly authorized by resolutions of the Corporation duly adopted.

**IN WITNESS WHEREOF, CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC** has caused this Series 2023C Bond Note to be executed by the manual signature of its President and attested by the manual signature of its Secretary, and this Series 2023C Bond Note to be dated as of the Dated Date shown above.

**CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC.**


_____
President

ATTEST



_____
Secretary

## ASSIGNMENT

The undersigned pledges and assigns all of its right, title and interest in and to the above Series 2023C Bond Note to BancFirst, the Bond Trustee under the Bond Trust Indenture dated as of December 1, 2023, between the undersigned and said bank, as trustee, or to its successor or successors as Bond Trustee under that Bond Trust Indenture, for the benefit and security of the Owners of the Bonds secured by said Bond Trust Indenture.  This assignment is without recourse against or warranty of any nature or description by the undersigned.

Dated: _____, 2023.

**OKLAHOMA COUNTY FINANCE AUTHORITY**


_____
**Chairman**

**ATTEST:**


_____
**Secretary**

**(SEAL)**

**EXHIBIT B**

**FORM OF MORTGAGE AND SECURITY AGREEMENT**

<u>**MORTGAGE AND SECURITY AGREEMENT**</u>

<u>**A POWER OF SALE HAS BEEN GRANTED IN THIS MORTGAGE. A POWER OF SALE MAY ALLOW THE MORTGAGEE TO TAKE THE MORTGAGED PROPERTY AND SELL IT WITHOUT GOING TO COURT IN A FORECLOSURE ACTION UPON DEFAULT BY THE MORTGAGOR UNDER THIS MORTGAGE.**</u>

**KNOW ALL MEN BY THESE PRESENTS:**

That the undersigned **CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC.,** an Oklahoma not-for-profit corporation (hereinafter called the **"Mortgagor"**), located at 14901 N. Pennsylvania Avenue, Oklahoma City, Oklahoma 73102 for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby mortgage, grant, bargain, sell, assign, transfer, convey and grant a security interest unto **OKLAHOMA COUNTY FINANCE AUTHORITY**, a public trust located at 320 Robert S. Kerr Avenue, Oklahoma City, Oklahoma 73102 and **BANCFIRST**, a state banking association located at 100 N. Broadway Avenue Oklahoma City, Oklahoma 73102 as Trustee, under the Bond Trust Indenture (the "Bond Indenture") dated as of December 1, 2023 between the Oklahoma County Finance Authority and BancFirst (the Oklahoma County Finance Authority and BancFirst, as Trustee, together with their successors and assigns, are collectively referred to herein as the **"Mortgagee"**), the following described property (all of which is hereinafter collectively called the "Mortgaged Property"):

(a)    The following described real property situated in Oklahoma County, State of Oklahoma, to-wit:

See "Exhibit A" attached hereto

together with all and singular the tenements, hereditaments, easements, rights-of-way, licenses, privileges and appurtenances thereto belonging or in any wise appertaining; all the rents, issues and profits therefrom; and all right, title and interest, if any, of the Mortgagor in and to the land lying within any street, alley, passageway, water course or roadway adjoining said real property and in and to any strips or gores adjoining said real property or any part thereof; and

(b)    All buildings, structures and other improvements now owned or hereafter acquired by the Mortgagor; all materials intended for construction, reconstruction, alteration or repair of, or installation in, the aforesaid buildings, structures and improvements; all fixtures, machinery, appliances, apparatus and equipment now owned or hereafter acquired by the Mortgagor and now or hereafter used for the operation or maintenance of the aforesaid buildings, structures and improvements, including but not limited to all heating, lighting, incinerating, refrigerating, ventilating, air-conditioning, air-cooling, lifting, fire extinguishing, plumbing, cleaning, communications and power equipment, fixtures, appliances, machinery and apparatus, all gas, water and electrical equipment, all elevators, escalators, switchboards, engines, motors, tanks,

compressors, pumps, boilers, generators, transformers, pipes and pipe connections, conduits, ducts, partitions, screens, awnings, blinds, storm and screen windows, shades, carpets and other floor coverings, sprinkling and irrigation systems and equipment and all furniture, furnishings and fixtures, **TOGETHER WITH** any and all replacements thereof, substitutions therefor and betterments and additions thereto and the proceeds thereof and any and all licenses, permits or other documents used in connection with the ownership or operation of the Mortgaged Property; and

(c)     All awards or payments made in respect of any taking of all or any part of the Mortgaged Property under the power of eminent domain or other statutory power or authority by any public, quasi public or private authority or agency and all awards or payments made in lieu of or under threat of taking of any portion of the Mortgaged Property by condemnation or other statutory authority; and

(d)     All insurance proceeds payable in respect of any damage, destruction or loss to the Mortgaged Property or any part thereof; and

(e)     All Gross Receipts of the Mortgagor from the operation of the Facilities located on the Mortgaged Property and Pledged Assets; and

(f)     All right, title and interest of the Mortgagor, as lessor, in and to any leases, licenses or tenancies heretofore or hereafter made or entered into with respect to the whole or any part of the Mortgaged Property and the rents, issues and profits arising and to arise during the term of this Mortgage under any such leases, licenses or tenancies.

**TO HAVE AND TO HOLD** the Mortgaged Property unto the Mortgagee, its successors and assigns forever.

If the Mortgagor shall pay the indebtedness evidenced by the Mortgage Notes (as defined herein) secured hereby and hereafter described in accordance with their terms and shall punctually comply with and perform all of the covenants, agreements and obligations contained in said Mortgage Notes and contained in this Mortgage, then this Mortgage shall be and become null and void; otherwise, this Mortgage shall continue in full force and effect.

This Mortgage is given as security for the performance of the covenants and agreements of the Mortgagor contained herein, in the Loan Agreement and the Continuing Covenants Agreement and for the payment to the Mortgagee, its successors and assigns, of the principal sum of **EIGHTY SIX MILLION FOUR HUNDRED TWENTY FOUR THOUSAND SIX HUNDRED SEVENTY ONE AND NO/100 DOLLARS ($86,424,671.00)** according to the terms and conditions of the following described promissory notes (herein called the "Mortgage Notes"):

Central Oklahoma United Methodist Retirement Facility, Inc., Bond Note, Series 2023A, maker, and payable to the order of the Mortgagee, as payee, in the principal sum of Six Million and no/100 Dollars ($6,000,000.00), bearing interest from its date on the unpaid principal balance as therein provided, the final installment being due and payable on the 1st day of December, 2030.

B-2

Central Oklahoma United Methodist Retirement Facility, Inc., Bond Note, Series 2023B, maker, and payable to the order of the Mortgagee, as payee, in the principal sum of Sixty Six Million Seven Hundred Thousand and no/100 Dollars ($66,700,000.00), bearing interest from its date on the unpaid principal balance as therein provided, the final installment being due and payable on the 1st day of December, 2047.

Central Oklahoma United Methodist Retirement Facility, Inc., Bond Note, Series 2023C, maker, and payable to the order of the Mortgagee, as payee, in the principal sum of Thirteen Million Seven Hundred Twenty Four Thousand Six Hundred Seventy One and no/100 Dollars ($13,724,671.00), bearing interest from its date on the unpaid principal balance as therein provided, the final installment being due and payable on the 1st day of December, 2047.

This Mortgage is also security for the payment of any and all future advancements made by the Mortgagee and the Bondholder Representative necessary for protection of the Mortgaged Property, together with any and all extensions, renewals, substitutions and changes in form of the indebtedness represented by the Mortgage Notes which extensions or renewals of said Mortgage Notes and this Mortgage may be from time to time and for any term or terms with or without notice to the Mortgagor.

Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Bond Indenture.

And for the consideration aforesaid, the undersigned the Mortgagor hereby covenants and agrees with and warrants and represents to the Mortgagee, the Bondholder Representative and their respective successors and assigns, as follows:

1.      **Warranty of Title.**   The Mortgagor does hereby represent and warrant that it has merchantable fee simple title to that portion of the Mortgaged Property described in paragraph (a) above, subject only to those enumerated encumbrances set forth on Exhibit "B" attached hereto, that the Mortgagor will, at the time any other property becomes Mortgaged Property covered by this Mortgage, have good title thereto free and clear of any defect, lien, security interest or other encumbrance except the lien of this Mortgage.  The Mortgagor warrants and agrees to defend its aforesaid title to the Mortgaged Property and the validity and priority of the lien of this Mortgage and all privileges, rights and appurtenances thereunto belonging unto the Mortgagee, its successors and assigns, forever against all persons claiming or to claim any right, title, lien or interest therein.

2.      **Security Agreement.**   This Mortgage shall also be construed to be, and shall be construed as, a security agreement with respect to any of the Mortgaged Property described herein and now or hereafter owned by the Mortgagor which is characterized by law as fixtures or personal property, of whatever nature (hereinafter referred to as the "Collateral").

(a)    **Assembly of Collateral.**    Upon default hereunder and acceleration of the indebtedness secured hereby pursuant to the provisions hereof or of the Loan Agreement, the Continuing Covenants Agreement or the Mortgage Notes, the Mortgagee may, with the consent of the Bondholder Representative or, shall at the direction of the Controlling Holders, require the Mortgagor to assemble the Collateral and make it available to the Mortgagee at a place reasonably convenient to both parties to be designated by the Mortgagee.

(b)    **Manner of Sale.**    Upon default hereunder and acceleration of the indebtedness secured hereby pursuant to the provisions hereof or of the Loan Agreement, the Continuing Covenants Agreement or the Mortgage Notes, all or any part of the Collateral may, with the consent of the Bondholder Representative or, shall at the direction of the Controlling Holders, be combined with the real property covered hereby and sold together with such real property as an entirety, or the Collateral (or any part of the Collateral not sold together with the real property) may be sold separately, as one parcel or in such parcels, manner or order as the Mortgagee, may with the consent of the Bondholder Representative or, shall at the direction of the Controlling Holders, elect.

(c)    **Notice of Sale.**    The Mortgagee shall with the consent of the Bondholder Representative, give the Mortgagor notice, by registered or certified mail, postage prepaid, of the time and place of any public sale of any Collateral disposition thereof is to be made by sending notice to the Mortgagor at least twenty (20) days before the time of the sale or other disposition, which provisions for notice the Mortgagor, the Bondholder Representative and the Mortgagee agree are reasonable.

(d)    **Additional Documents.**    The Mortgagor will, from time to time, within fifteen (15) days after request by the Mortgagee or the Bondholder Representative, execute, acknowledge and deliver any financing statement, renewal affidavit, certificate, continuation statement, inventory or other similar documents as the Mortgagee or the Bondholder Representative may request in order to protect, preserve, continue, extend or maintain the security interest under the priority of this Mortgage and will, upon demand, pay any expenses incurred by the Mortgagee or the Bondholder Representative in the preparation, execution and filing of any such documents. The Mortgagor hereby authorizes the Mortgagee or the Bondholder Representative to execute and file any financing statements or other instruments to perfect the security interest granted herein or to continue the effectiveness of the same.

3.    **Further Assurances.**    The Mortgagor from time to time shall execute, acknowledge and deliver such further agreements, documents, and other instruments as the Mortgagee or the Bondholder Representative may request for the purpose of assuring to it the lien and security interest in the Mortgaged Property covered by this Mortgage or intended to be created or covered by this Mortgage.

4.    **Sale or Encumbrance of Mortgaged Property; Condemnation.**    Except as permitted by Article V of the Loan Agreement and Section 5.3 of the Continuing Covenants Agreement, the Mortgagor will not convey, sell, assign, transfer, further mortgage, create any security interest in, pledge or otherwise dispose of or further encumber, whether by operation of law or otherwise, the Mortgaged Property or any part thereof. If the Mortgagor shall sell, convey, assign, transfer, mortgage, create any security interest in, pledge or otherwise dispose of or further encumber

the Mortgaged Property or any part thereof in violation hereof, the Mortgagee shall be entitled to exercise any or all remedies provided or referenced in this Mortgage. This provision shall apply to each and every sale, assignment, transfer, encumbrance, pledge or conveyance regardless of whether or not the Mortgagee has consented to or waived its rights hereunder in connection with any previous sale, assignment, transfer, encumbrance, pledge or conveyance, whether one or more.

The Mortgagor shall give the Mortgagee and the Bondholder Representative prompt notice of any actual or threatened condemnation or eminent domain proceedings affecting the Mortgaged Property and hereby assigns, transfers and sets over to the Mortgagee the entire proceeds of any award or claim for damages or settlement in lieu thereof for all or any part of the Mortgaged Property taken or damaged under such eminent domain or condemnation proceedings, the Mortgagee being hereby authorized to intervene, with the consent of the Bondholder Representative, or shall intervene at the direction of the Controlling Holders, in any such action and to collect and receive from the condemning authorities and give proper receipts and acquittances for such proceeds. The Mortgagor will not enter into any agreements with the condemning authority permitting or consenting to the taking of the Mortgaged Property or agreeing to a settlement unless the prior written consent of the Mortgagee and the Bondholder Representative and Majority Holders is obtained. Any expenses incurred by the Mortgagee or the Bondholder Representative in intervening in such action or collecting such proceeds, including attorneys' fees, shall be reimbursed to the Mortgagee or the Bondholder Representative, as applicable, first out of the proceeds and second by the Mortgagor. The proceeds shall be deposited and disbursed as set forth in Section 5.17 of the Loan Agreement.

5.  **Abstract.**  The Mortgagor will furnish to the Mortgagee and the Bondholder Representative, upon demand, an abstract or abstracts of title to the Mortgaged Property, certified from inception of title to date. The cost of any abstracting required or desired by the Mortgagee or the Bondholder Representative in connection with any foreclosure proceedings instituted to foreclose this Mortgage may be added to any judgment in foreclosure and collected as part of the indebtedness hereby secured.

6.  **Future Advances By Mortgagee or Bondholder Representative.**  Nothing herein contained shall limit the amount secured by this Mortgage if such amount is increased by advances made by the Mortgagee or the Bondholder Representative, as herein provided, to protect the Mortgaged Property. In addition, nothing herein contained shall be construed, expressly or impliedly, to obligate the Mortgagee or the Bondholder Representative to make any further or future advance or loan to the Mortgagor whether requested or not.

7.  **Assignment of Leases and Rents**.  The Mortgagor assigns to the Mortgagee all leases and the rents of, from or in connection with the Mortgaged Property and the buildings and improvements thereon and such assignment is effective immediately upon the execution of this Mortgage. This assignment includes an assignment of the right, but not the obligations, to collect, receive, demand, sue for and recover the rents when due and payable. The Mortgagee shall not exercise any of its rights and remedies under this section until the occurrence of an Event of Default under the Loan Agreement. This assignment shall be operative during any foreclosure or other proceeding taken to enforce this Mortgage and during any redemption period. The Mortgagor will comply with all terms of all the leases. Upon request of the Mortgagee or the Bondholder Representative, the Mortgagor shall deliver to the Mortgagee and the Bondholder Representative

copies of all the leases and similar agreements assigned to the Mortgagee pursuant to this section, including all renewals and amendments thereof.

8.    **Fixture Financing Statement.**  A part of the Mortgaged Property constitutes goods which are or are to become fixtures related to the Mortgaged Property, and it is intended that, as to those goods, this Mortgage shall be effective as a financing statement filed as a fixture filing from the date of its filing for record in the real estate records of the county in which the Mortgaged Property is situated.  Information concerning the security interest created by this instrument may be obtained from the Mortgagee, as secured party, at the address of the Mortgagee stated above.  The mailing address of the Mortgagor, as debtor, is as stated above.

The Mortgagor from time to time shall execute, acknowledge and deliver such further agreements, documents, and other instruments as the Mortgagee or the Bondholder Representative may request for the purpose of assuring to it the lien and security interest in the Mortgaged Property covered by this Mortgage or intended to be created or covered by this Mortgage.

9.    **Event of Default.**  Any one or more of the following events shall be deemed an Event of Default hereunder:

(a)    The Mortgagor should fail to pay the indebtedness evidenced by the Mortgage Notes or any part or installment thereof as and when the same shall become due and payable, whether by acceleration, extension or otherwise subject to any express cure period set forth in the Loan Agreement or the Continuing Covenants Agreement; or

(b)    The Mortgagor should fail to keep, observe, perform or comply with any term, provision or covenant enjoined upon the Mortgagor by the terms of this Mortgage, the Mortgage Notes, the Continuing Covenants Agreement or any other instrument evidencing or securing the indebtedness evidenced by the Mortgage Notes and failure to cure the same in accordance with the terms of the Loan Agreement or the Continuing Covenants Agreement; or

(c)    Any warranty, representation or statement made or furnished to the Mortgagee or the Bondholder Representative by or on behalf of the Mortgagor proves to have been false or misleading in any material respect when made or furnished; or

(d)    Upon the institution of any foreclosure proceeding by the holder of any mortgage or lien upon the Mortgaged Property and such foreclosure proceeding is not vacated, set aside, discharged or bonded within thirty (30) days after the occurrence of such event; or

(e)    The Mortgagor should fail to pay any of the taxes, assessments, debts, liens or other charges herein described as the same become due and payable (unless the Mortgagor is contesting such in good faith) or the Mortgagor should fail to keep the Mortgaged Property insured in the manner and time herein provided or to fail to deliver to the Mortgagee or the Bondholder Representative renewal policies in the manner and time herein provided; or

(f)     If at any time, during the term of this Mortgage, the Mortgaged Property shall, in the reasonable opinion of the Mortgagee or the Bondholder Representative, become insufficient to secure the indebtedness then remaining unpaid; or

(g)     Upon the actual or threatened destruction, demolition, removal, condemnation or taking of all or any part of the Mortgaged Property, but subject to the provisions of Sections 4 and 10 hereof; or

(h)     Should any levy, seizure, execution, replevin or attachment be issued or commenced against the Mortgagor or any of the Mortgagor's property and such levy, seizure, execution, replevin or attachment is not vacated, set aside, discharged or bonded within thirty (30) days after the occurrence of such event; or

(i)     Any Event of Default as described in Section 7.1 of the Loan Agreement, Section 6.1 of the Continuing Covenants Agreement or Section 701 of the Bond Indenture shall occur.

10.     **Remedies.**  If an Event of Default shall occur, the Mortgagee may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, exercise any one or more of the following remedies, without notice:

(a)     **Acceleration.**  The Mortgagee may declare the indebtedness immediately due and payable, without notice, whereupon the same shall become immediately due and payable.  The Mortgagor hereby waives notice of intent to accelerate, except as may be otherwise provided in the Mortgage Notes.

(b)     **Power of Sale.** The Mortgagor hereby confers on the Mortgagee (acting at the direction of the Controlling Holders) the power to sell the Mortgaged Property described in this Mortgage and the interests of persons therein in the manner provided in the Oklahoma Power of Sale Mortgage Foreclosure Act [Title 46, Okla. Stat. (2021), § 40, et seq.] as the same may be amended from time to time (the "Act") or other applicable statutory authority. Such power of sale shall be exercised by giving the Mortgagor Notice of Intent to Foreclose by Power of Sale and setting forth, among other things, the nature of the breach(es) or default(s) and the action required to effect a cure thereof and the time period within which such cure may be effected, all in compliance with and as may be required by the Act or other applicable statutory authority. If no cure is effected within the statutory time limits, the Mortgagee may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, accelerate the indebtedness secured hereby without further notice (the aforementioned statutory cure period shall run concurrently with any contractual provisions for notice and opportunity to cure), and the Mortgagee may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, then proceed in the manner and subject to and as required by the conditions of the Act or other applicable statutory authority to send to the Mortgagor and other necessary parties a Notice of Sale and to sell and convey the Mortgaged Property in accordance with the Act or other applicable statutory authority. The sale shall be made at one or more sales, as an entirety or in parcels, upon such notice, at such time and place, subject to all conditions and with the proceeds thereof to be applied all as provided in said Act or other applicable statutory authority. No action of the Mortgagee based upon the provisions contained herein or contained in the Act, including, without limitation, the giving of the Notice of

Intent to Foreclose by Power of Sale or the Notice of Sale, shall constitute an election of remedies which would preclude the Mortgagee from pursuing judicial foreclosure before or at any time after commencement of the power of sale foreclosure procedure.

(c)    **Judicial Foreclosure.** Whether or not proceedings have been commenced by the exercise of the power of sale above given, the Mortgagee, in lieu of proceeding with the power of sale, may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, declare the whole amount of the indebtedness secured by this Mortgage remaining unpaid, immediately due and payable without notice, and the Mortgagee may with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, then proceed by suit or suits in equity or at law to foreclose this Mortgage remaining unpaid, immediately due and payable without notice, and the Mortgagee may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, then proceed by suit or suits in equity or at law to foreclose this Mortgage. Appraisement of the Mortgaged Property is hereby waived or not waived at the option of the Mortgagee (acting at the direction of the Controlling Holders), such option to be exercised at or prior to the time judgment is rendered in such judicial foreclosure.

(d)    **Appointment of Receiver.** The Mortgagee shall have the immediate and continuing right to appointment of a receiver for the Mortgaged Property as provided by law [Title 12, Okla. Stat. (2021), § *1551, et seq.]* as amended, which the Mortgagee shall exercise at the direction of the Controlling Holders, and the Mortgagor specifically consents and agrees to appointment of a receiver for the Mortgaged Property after any default hereunder. Without limitation, the receiver shall have the power to protect and preserve the Mortgaged Property, operate the Mortgaged Property prior to and during any foreclosure proceedings, to collect the rents and apply the proceeds, over and above the costs of the receivership, to the payment of the Mortgage Notes. The receiver shall serve without bond, if permitted by law.

(e)    **Foreclosure of Security Interest.** In addition to all other remedies described or referenced in this Mortgage, the Mortgagee may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, have all or any part of the personal property combined with the Mortgaged Property covered hereby and sold together with such Mortgaged Property as an entirety at any foreclosure sale, or the Mortgagee may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders,  proceed solely or separately against the personal property or any part thereof and have the same sold separately as provided by the Uniform Commercial Code as adopted in the State of Oklahoma, either in one parcel or in such parcels, manner or order as the Mortgagee may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, elect; the Mortgagee shall, acting at the direction of the Controlling Holders, have the right to take immediate and exclusive possession of the personal property or any part thereof and for that purpose may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, with or without judicial process, enter upon any premises on which the personal property or any part thereof may be situated and remove the same therefrom; the Mortgagee shall, acting at the direction of the Controlling Holders, be entitled to hold, maintain, preserve and prepare the personal property for sale until disposed of, or may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, propose to retain the personal property subject to the

Mortgagor's right of redemption in partial or total satisfaction of the Mortgagor's obligations as provided in the Uniform Commercial Code as adopted in the State of Oklahoma; the Mortgagee without removal may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, render the personal property unusable *and* dispose of the personal property on the Mortgagor's premises; the Mortgagee may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, require the Mortgagor to assemble the personal property and make it available to the Mortgagee for its possession at a place to be designated by the Mortgagee which is reasonably convenient to both parties; unless the personal property is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Mortgagee shall give the Mortgagor at least ten (10) days' notice of the time and place of any public sale of any personal property or of the time after which any private sale or other intended dispositions thereof is to be made, by United States registered or certified mail, postage prepaid, addressed to the Mortgagor at the address provided in this Mortgage, which provisions for notice the Mortgagor, the Bondholder Representative and the Mortgagee agree are reasonable; the Mortgagee may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, buy all or part of the personal property at any public sale, and if the personal property is of a type which is subject to widely distributed standard price quotations, the Mortgagee may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, buy at private sale; and further, the Mortgagee shall have all of the rights and remedies of a Secured Party under the Uniform Commercial Code as adopted in the State of Oklahoma. The Mortgagee shall be entitled to exercise any and all other rights and remedies available by applicable laws and judicial decisions with the consent or at the direction of the Controlling Holders, including without limitation the ability to credit bid the Series 2023 Notes.

(f)    **Sale of Parcels.** In case of any sale under this Mortgage, by virtue of judicial proceedings or otherwise, the Mortgaged Property may be sold in one parcel and as an entity or in such parcels, manner or order as the Mortgagee may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, elect.

By executing this Mortgage, the Mortgagor waives, in the event of a foreclosure of this Mortgage or the enforcement by the Mortgagee of any other rights and remedies in this Mortgage, any right otherwise available in respect to marshalling of assets which secure the Mortgage Notes or to require the Mortgagee to pursue its remedies against any other such assets. The Mortgagor waives all errors and imperfections in any proceedings instituted by the Mortgagee to enforce any of its rights and remedies. The exercise of any one right or remedy by the Mortgagee at the direction of the Controlling Holders under this Mortgage, the Continuing Covenants Agreement or the Loan Agreement shall not impair or waive the Mortgagee's right to exercise any other rights or remedies available to it at law, in equity, under this Mortgage, the Continuing Covenants Agreement or the Loan Agreement, all such rights and remedies being cumulative. All fees, costs and expenses incurred by the Mortgagee and the Bondholder Representative in pursuing or enforcing its rights and remedies at law, in equity, under this Mortgage, the Continuing Covenants Agreement or the Loan Agreement, whether or not a lawsuit or legal action is filed, including attorneys' fees and court costs, shall be payable by the Mortgagor to the Mortgagee or the Bondholder Representative, as applicable, on demand and shall be secured by this Mortgage.

(g)    **Entry on Mortgaged Property.**  To the extent permitted by applicable laws, upon occurrence of an Event of Default hereunder, the Mortgagee may enter into and upon and take possession of all or any part of the Mortgaged Property, and may exclude the Mortgagor, and all persons claiming under the Mortgagor, and its or their agents or servants, wholly or partly therefrom; and, holding the same, the Mortgagee may use, administer, manage, operate, and control the Mortgaged Property and may exercise all rights and powers of the Mortgagor in the name, place and stead of the Mortgagor, or otherwise, as the Mortgagee shall, acting at the direction of the Controlling Holders, deem best; and in the exercise of any of the foregoing rights and powers, neither the Mortgagee nor the Bondholder Representative shall be liable to the Mortgagor for any loss or damage thereby sustained unless due solely to the willful misconduct or gross negligence of the Mortgagee or the Bondholder Representative.

(h)    **Mortgagee's Right to Perform.**  Upon the Mortgagor's failure to make a payment or perform an act required hereby, then at any time thereafter, and without notice to or demand upon the Mortgagor and without waiving or releasing any other right, remedy or recourse, the Mortgagee may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, (but shall not be obligated to) make such payment or perform such act for the account of and at the expense of the Mortgagor, and shall have the right to enter upon the Mortgaged Property for such purpose and to take all such action as it may deem necessary or appropriate.

(i)    **Reimbursement of Expenditures.**  If the Mortgagee or the Bondholder Representative shall expend any money chargeable to the Mortgagor or subject to reimbursement by the Mortgagor under the terms of the loan secured hereby, the Mortgagor shall repay the same to the Mortgagee or the Bondholder Representative, as applicable, immediately at the place where the Mortgage Notes are payable, together with interest thereon at the Default Rate (as defined in the Bond Indenture) from and after the date of each such expenditure by the Mortgagee or the Bondholder Representative.  If the Mortgagee, with consent of the Bondholder Representative or at the direction of the Controlling Holders, institutes any suit or action to enforce any of the terms of this Mortgage, the Mortgagee shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees for the Mortgagee and the Bondholder Representative at trial and upon any appeal.  Whether or not any court action occurs, and to the extent not prohibited by law, all reasonable expenses that the Mortgagee or the Bondholder Representative incurs that in their respective opinions are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the indebtedness secured hereby, shall be payable on demand and shall bear interest at the rate accruing under the Mortgage Notes secured hereby from the date of the expenditure until repaid in full.  Expenses covered by this paragraph include, without limitation, subject to any limits under applicable law, attorneys' fees and legal expenses of the Mortgagee and the Bondholder Representative, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law.  The Mortgagor also will pay any court costs, in addition to all other sums provided by applicable law.  It is the intention of the Mortgagor, the Bondholder Representative and the Mortgagee that all of the foregoing shall be preserved post-judgment.  The Bondholder Representative shall not make any advances on behalf of the Mortgagor

B-10

without the prior written consent of the Owners of a majority in the principal amount of the Series 2023B Bonds.

(j) **Other Rights.** The Mortgagee may, with the consent of the Bondholder Representative, or shall, at the direction of the Controlling Holders, exercise any and all other rights, remedies and recourse granted under the Loan Agreement, the Continuing Covenants Agreement and other loan instruments now or hereafter existing in equity or at law for the protection and preservation of the Mortgaged Property.

(k) **Remedies Cumulative, Concurrent and Nonexclusive.** The Mortgagee shall have all rights, remedies and recourse granted in the Loan Agreement, the Continuing Covenants Agreement and other loan instruments and available at law or equity (including, without limitation, those granted by the Uniform Commercial Code as adopted in the State of Oklahoma and applicable to the Mortgaged Property, or any portion thereof), and the same (i) shall be cumulative and concurrent, (ii) may be pursued separately, successively or concurrently against the Mortgagor or others obligated for the indebtedness secured hereby, or any part thereof or against any one or more of them, or against the Mortgaged Property, as the Mortgagee may be directed by the Controlling Holders, (iii) may be exercised as often as occasion therefor shall arise, it being agreed by the Mortgagor that the exercise of or failure to exercise any of the same shall in no event be construed as a waiver or release thereof or of any other right, remedy or recourse, and (iv) are intended to be, and shall be, nonexclusive, with each such remedy being exercised by the Mortgagee at the direction of the Controlling Holders.

11. **Mortgagor's Waivers.** To the extent permitted by applicable laws, the Mortgagor hereby waives and releases the following:

(a) All benefits that might accrue to the Mortgagor by virtue of any present or future law exempting the Mortgaged Property or any part of the proceeds arising from any sale thereof from attachment, levy or sale on execution, or providing for any stay of execution, exemption from civil process or extension of time for payment; and

(b) All notices of the Mortgagor's default (except as otherwise required by the Loan Agreement or the Continuing Covenants Agreement) or of the Mortgagee's election to exercise or the Mortgagee's actual exercise (at the direction of the Controlling Holders) of any option granted it by the terms of the Mortgage Notes, the Loan Agreement, the Continuing Covenants Agreement or this Mortgage or any guaranty or other security document which secures the payment of the Mortgage Notes.

12. **Estoppel Certificate.** The Mortgagor will from time to time immediately upon request of the Mortgagee or the Bondholder Representative therefor furnish to the Mortgagee, the Bondholder Representative or any person designated by them a statement in form satisfactory to the Mortgagee and the Bondholder Representative showing as of the date of the certificate the unpaid principal balance and accrued interest on the Mortgage Notes and stating that the Mortgagor is not in default hereunder (or describing any default if the Mortgagor is in default) and stating that the Mortgagor has no defense, right of set off or counter-claim to the payment of any part of the indebtedness secured hereby or to the observance or performance by the Mortgagor of any of its

covenants and agreements herein contained or contained in the Mortgage Notes (or if any such defense, set off or counter-claim exists, describing the same). Any purchaser or assignee of the Mortgage Notes and this Mortgage or any interest therein may rely on such certificate.

13.    **Subrogation.** If all or any portion of the proceeds of the loan evidenced and secured hereby is used for the purpose of retiring any indebtedness secured by any prior lien or encumbrance upon or against the Mortgaged Property, the Mortgagee, with the consent of the Bondholder Representative, or at the direction of the Controlling Holders, shall be subrogated to all such liens or encumbrances so discharged, satisfied or paid, and to all of the rights of the party to whom such payments have been made, and may immediately enforce the same against the Mortgagor and the Mortgaged Property.

14.    **Notices Required of Mortgagor.** In addition to any other notice required by the terms of this Mortgage, the Mortgage Notes or any other document or instrument executed in connection with the Mortgage Notes or this Mortgage, the Mortgagor shall notify the Mortgagee and the Bondholder Representative in writing immediately upon the occurrence of any of the following events:

(a)    A fire or other casualty causing damage to any part of the Mortgaged Property;

(b)    Receipt of any notice of condemnation or taking of any part of the Mortgaged Property;

(c)    Receipt of notice from any governmental authority relating to the structure, use or occupancy of the Mortgaged Property;

(d)    Any substantial change in the occupancy of the Mortgaged Property;

(e)    Commencement of any litigation affecting the Mortgaged Property or the title thereto or the lien of this Mortgage; or

(f)    As soon thereafter as the Mortgagor is able to notify the Mortgagee and the Bondholder Representative, using its best efforts, receipt of any notice of any general or special assessment against the Mortgaged Property or receipt of any notice of any increase of any taxes, insurance or other imposition against the Mortgaged Property or any part thereof; and true and complete copies of all such notices received by the Mortgagor shall be furnished to the Mortgagee and the Bondholder Representative by the Mortgagor immediately upon receipt thereof.

15.    **Warranties, Covenants and Indemnities Regarding Environmental Matters.**

(a)    The Mortgagor warrants and represents that, to the knowledge of the Mortgagor, except as described in the Phase I Environmental Site Assessment by _____, (i) there has not, at any time during the Mortgagor's ownership of the Mortgaged Property, nor at any time prior to the Mortgagor's ownership of the Mortgaged Property, been any "release" (as defined in 42 U.S.C. Section 9601(22)) or threat of a "release" by the Mortgagor or any third party of any Hazardous Substances on, about, or near the Mortgaged Property (including adjacent or nearby

properties) which to the Mortgagor's actual knowledge could have come to be located upon the Mortgaged Property or in the water or the groundwater thereon or thereunder; (ii) except in the ordinary course of the operation of the Mortgagor's business and in compliance with all Environmental Laws, no part of the Mortgaged Property is or has been used at any time during the Mortgagor's ownership of the Mortgaged Property nor at any time prior to the Mortgagor's ownership of the Mortgaged Property for any handling, treatment, storage, refining or disposal of any Hazardous Substances; (iii) no part of the Mortgaged Property is or has been at any time during the Mortgagor's ownership of the Mortgaged Property, nor at any time prior to the Mortgagor's ownership of the Mortgaged Property, a "facility" (as defined in 42 U.S.C. Section 9601(9)(B)); (iv) there are not now, nor has there been during the Mortgagor's ownership of the Mortgaged Property, nor at any time prior to the Mortgagor's ownership of the Mortgaged Property, any underground storage tanks located in or on any of the Mortgaged Property; (v) no asbestos or asbestos-containing materials are located in or have been installed, used, incorporated into or disposed of on or about the Mortgaged Property except to the extent conforming with all Environmental Laws; (vi) there are no conditions on or about the Mortgaged Property which are violative of any Environmental Laws; and (vii) no claims or demands have been asserted or made by any third parties arising out of, relating to or in connection with any Hazardous Substances on or about or allegedly on or about the Mortgaged Property for any injuries suffered or incurred or allegedly suffered or incurred by reason of any of the foregoing.

(b)    The Mortgagor will provide the Mortgagee and the Bondholder Representative with copies of any notifications of releases of Hazardous Substances or of any environmental hazards or potential hazards which are given by or on behalf of the Mortgagor to any federal, state or local or other agencies or authorities or which are received by the Mortgagor from any federal, state or local or other agencies or authorities with respect to the Mortgaged Property.  Such copies shall be sent to the Mortgagee and the Bondholder Representative concurrently with their being mailed or delivered to the governmental agencies or authorities or within ten days after they are received by the Mortgagor.

(c)    The Mortgagor warrants and represents that no emergency and hazardous chemical inventory forms (hereinafter "Environmental Notices") that relate to the Mortgaged Property have been previously given by the Mortgagor to any federal, state or local governmental authority or agency as required pursuant to the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C.A. Section 11001 *et seq*., or any other Environmental Laws.  The Mortgagor will provide the Mortgagee and the Bondholder Representative with copies of all Environmental Notices that relate to the Mortgaged Property subsequently sent to any such governmental authority or agency as required pursuant to the Emergency Planning and Community Right-to-Know Act of 1986 or any other Environmental Laws.  Such copies of subsequent Environmental Notices shall be sent to the Mortgagee and the Bondholder Representative concurrently with their being mailed to any such governmental authority or agency.

(d)    The Mortgagor will comply with and at all times keep and maintain and will require all lessees or operators of the Mortgagor's property to operate, use, keep and maintain the Mortgaged Property and every part thereof (whether or not such property constitutes a facility, as defined in CERCLA) in conformance with all Environmental Laws.  Without limiting the generality of the foregoing, the Mortgagor will not use, generate, treat, store, dispose of or otherwise introduce any

Hazardous Substance into or on the Mortgaged Property or any part thereof nor cause, suffer, allow or permit anyone else to do so except in the ordinary course of the operation of the hospital facility and in compliance with all Environmental Laws.

(e)        The Mortgagor agrees to indemnify, protect and hold harmless the Mortgagee and its officers, directors, employees, counsel and agents and the Bondholder Representative and its officers, directors, employees, counsel and agents from and against any and all claims, demands, costs, liabilities, damages or expenses, including attorneys' fees, arising from (i) any release (as defined above) or threat of a release, actual or alleged, of any Hazardous Substances, upon or about the Mortgaged Property or respecting any products or materials previously, now or thereafter located upon, delivered to or in transit to or from the Mortgaged Property, regardless of whether such release or threat of release or alleged release or threat of release has occurred prior to the date hereof or hereafter occurs and regardless of whether such release occurs as the result of any act, omission, negligence or misconduct of the Mortgagor or any third party or otherwise, (ii) (A) any violation (actual or alleged) now existing of, or any other liability under or in connection with, any Environmental Laws relating to or affecting the Mortgaged Property, or (B) any now-existing or hereafter arising violation, actual or alleged, or any other liability, under or in connection with, any Environmental Laws relating to any products or materials previously, now or hereafter located upon, delivered to or in transit to or from the Mortgaged Property, regardless of whether such violation or alleged violation or other liability is asserted or has occurred or arisen prior to the date hereof or is asserted or occurs or arises hereafter and regardless of whether such violation or alleged violation or other liability occurs or arises, as the result of any act, omission, negligence or misconduct of the Mortgagor or any third party or otherwise, (iii) any assertion by any third party of any claims or demands for any loss or injury arising out of, relating to or in connection with any Hazardous Substances now or hereafter on or about or allegedly on or about the Mortgaged Property, or (iv) any breach, falsity or failure of any of the representations, warranties, covenants and agreements contained in this Section.  This Section shall survive any termination of this Mortgage.

(f)        As used in this Section, the following terms have the following meanings:

"Environmental Laws" means any now-existing or hereafter enacted or promulgated federal, state, local, or other law, statute, ordinance, rule, regulation or court order pertaining to (i) environmental protection, regulation, contamination or clean-up, (ii) toxic waste, (iii) underground storage tanks, (iv) asbestos or asbestos-containing materials, or (v) the handling, treatment, storage, use or disposal of Hazardous Substances, including without limitation the Comprehensive Environmental Response, Compensation and Liability Act and The Resources Conservation and Recovery Act, all as exist from time to time.

"Hazardous Substances" means all (i) "hazardous substances" (as defined in 42 U.S.C. Section 9601(14)), (ii) chemicals subject to regulation under Title III of the Superfund Amendments and Reauthorization Act of 1986, as amended from time to time, (iii) natural gas liquids, liquefied natural gas or synthetic gas, (iv) any petroleum, petroleum-based products or crude oil or any fraction, or (v) any other hazardous or toxic substances, wastes or materials, pollutants, contaminants or any other substances or materials which are included under or regulated by any Environmental Law.

16.    **Releases or Extensions.**  Without affecting the liability of Mortgagor or any guarantor or other party (except any party expressly released in writing) for payment of any indebtedness secured hereby or for the performance of any obligation contained herein and without affecting the rights of the Mortgagee with respect to any security not expressly released in writing, the Mortgagee may, with the consent of the Bondholder Representative and the Majority of Holders, or shall, at the direction of the Controlling Holders, at any time and from time to time, either before or after the maturity of the Mortgage Notes, and without notice or consent of the Mortgagor or any guarantor or other party liable for the payment of the indebtedness secured hereby:

(a)    Release any person liable for payment of all or any part of the indebtedness secured hereby or for performance of any obligations herein contained.

(b)    Make any agreement extending the time or otherwise altering the terms of payment of all or any part of the indebtedness hereby secured, or modifying or waiving any obligation, or subordinating, modifying or otherwise dealing with the lien or charge hereof, each such agreement to be in writing to be binding and effective.

(c)    Exercise or refrain from exercising or waive any right the Mortgagee may have hereunder.

(d)    Accept additional security of any kind or additional parties to the Mortgage Notes.

(e)    Release or otherwise deal with any property, real or personal, securing the indebtedness secured hereby including all or any part of the Mortgaged Property.

17.    **Foreclosure Costs and Expenses.**  In case the indebtedness secured hereby shall be collected by legal proceedings or through any probate or bankruptcy court and/or shall be placed in the hands of an attorney for collection and/or if suit is filed thereon and/or for foreclosure of this Mortgage, and as often as any of such events occur, the Mortgagor shall be chargeable with and shall pay all costs and expenses thereof, including without limitation, reasonable attorney's fees and receiver's fees, all of which costs and expenses, including attorney's fees, and costs and fees of the Bondholder Representative, shall be immediately due and payable and added to the indebtedness secured hereby and shall likewise be secured by this Mortgage.

18.    **Miscellaneous Provisions.**

(a)    **Notices.**  Any notice, demand or communication under or in connection with this Mortgage or any other document securing the payment of the Mortgage Notes shall be in writing and shall be deemed effective when given in accordance with the Loan Agreement.

(b)    **Severability.**  If one or more of the provisions of this Mortgage shall be invalid, void or unenforceable in any respect, such provision shall be deemed to be severed from this Mortgage and the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. Without limiting the generality of the foregoing, any provision herein or in the Mortgage Notes, the Continuing Covenants Agreement or in any other security document given to secure such Mortgage Notes to the contrary notwithstanding, the

Mortgagee shall in no event be entitled to receive or collect, nor shall or may amounts received hereunder be credited, so that the Mortgagee shall be paid, as interest, a sum greater than the maximum amount permitted by law. If any construction of this Mortgage or the Mortgage Notes or other security document indicates a different right given to the Mortgagee to ask for, demand or receive any larger sum, as interest, such is a mistake in calculation or in wording, which this clause shall override and control, and proper adjustment shall automatically be made accordingly.

(c)     **Consideration For Extension of Credit.**  The covenants, agreements and obligations contained in the Mortgage Notes, the Loan Agreement, the Continuing Covenants Agreement and the covenants, agreements and obligations in this Mortgage contained are each and all part of the consideration for the extension of credit by the Mortgagee to the Mortgagor.

(d)     **Release of Mortgage.**  When all indebtedness secured hereby has been indefeasibly paid in full, this Mortgage and all assignments herein contained shall be void and this Mortgage shall be released by the Mortgagee at the cost and expense of the Mortgagor; otherwise, to remain in full force and effect.

(e)     **Amendment and Waiver.**  This Mortgage cannot be changed or amended except by written agreement in recordable form signed and dated by the party against whom enforcement of the change or amendment is sought and with the consent of the Bondholder Representative and the Owners of a majority in the principal amount of the Series 2023B Bonds.  Likewise, no waiver of any of the provisions of this Mortgage or the Mortgage Notes shall be deemed valid or binding unless in writing duly dated and signed by the party sought to be charged therewith and with the consent of the Bondholder Representative and the Owners of a majority in the principal amount of the Series 2023B Bonds..

(f)     **Captions.**  The captions preceding the text of the paragraphs or subparagraphs of this Mortgage are inserted only for convenience of reference and shall not constitute a part of this Mortgage nor shall they in any way affect or be used as an aid in determining the interpretation, meaning, construction or effect of this Mortgage.

(g)     **Covenants Running With The Land.**  Any act or agreement to be done or performed by the Mortgagor shall be construed as a covenant running with the land and shall be binding upon the Mortgagor, its successors and assigns, as if they and each of them had personally made such agreement.

(h)     **Applicable Law.**  This Mortgage shall be governed by, construed and enforced in accordance with the laws of the State of Oklahoma and all rights and obligations of the parties hereto shall be governed thereby.

(i)     **Definitions and Construction.**  Whenever used in this Mortgage, unless indicates a contrary intent:

(i)     The word "Mortgagor" shall mean the party who executes this Mortgage and any subsequent owner or owners of any interest or estate in the Mortgaged Property and their respective heirs, legal and personal representatives, successors and assigns.

(ii)     The word "Mortgagee" shall mean the party specifically named herein as the "Mortgagee" or any subsequent holder of this Mortgage.

(iii)    The word "person" or "party" shall mean individual, corporation, partnership (limited or general), joint venturer, trustee or unincorporated association.

(v)     The use of any gender shall include all genders, the singular number shall include the plural and the plural the singular as the context may require.

(j)     **Successors and Assigns; Third Party Beneficiaries**.  Each and all of the covenants and obligations of this Mortgage shall be binding upon and inure to the benefit of the parties hereto, and, except as herein otherwise specifically provided, their respective successors and assigns, subject at all times, nevertheless, to all agreements and restrictions herein contained with respect to the transfer of the Mortgagor's interest in the Mortgaged Property.  It is specifically acknowledged and agreed that to the extent of their rights hereunder, the Bondholder Representative and the owners of the Series 2023 Bonds are a third party beneficiaries of this Mortgage.  The Mortgagor specifically consents to the Mortgagee's Assignment of this Mortgage to BancFirst, as Trustee under the Bond Indenture as security for the Series 2023 Bonds issued thereunder.

(k)     **Compliance With Loan Agreement and** Continuing Covenants Agreement.  This Mortgage is subject to and secures the performance of the terms and provisions of a certain Loan Agreement, between the Mortgagor and the Mortgagee and a certain Continuing Covenants Agreement, between the Mortgagor and the Mortgagee.  A default under the Loan Agreement or the Continuing Covenants Agreement shall constitute an event of default under this Mortgage.

(l)     **Construction Mortgage.**  This Mortgage is a "construction mortgage" within the meaning of Title 12A, Oklahoma Statutes, 2021, as amended, Section 1-9-334 to the extent that it secures an obligation incurred for the construction of an improvement on the land.

(m)     **Non-Merger.**  In the event the Mortgagee shall acquire title to the Mortgaged Property by conveyance from the Mortgagor or as a result of foreclosure, this Mortgage shall not merge in the fee estate of the Mortgaged Property but shall remain and continue as an existing and enforceable lien for the indebtedness secured hereby until the same shall be released of record by Mortgagee in writing.

**IN WITNESS WHEREOF**, the Mortgagor has duly executed this Mortgage this ___ day of December, 2023.

**CENTRAL OKLAHOMA UNITED METHODIST
RETIREMENT FACILITY, INC.,**
an Oklahoma not-for-profit corporation

ATTEST:                    By: _____
                              President and Chief Executive Officer

_____
Secretary


## "MORTGAGOR"


STATE OF OKLAHOMA        )
                         ) ss.
COUNTY OF OKLAHOMA       )

      The foregoing instrument was acknowledged before me this ____ day of December, 2023, by Ron Kelly, President and Chief Executive Officer of **Central Oklahoma United Methodist Retirement Facilities, Inc.,** an Oklahoma not-for-profit corporation, on behalf of the corporation.


_____
Notary Public

My Commission Expires:_____
My Commission Number:_____

## ASSIGNMENT

The Trustees of the Oklahoma County Finance Authority, a public trust, hereby assign the foregoing Mortgage and Security Agreement and all benefits and advantages accruing thereunder to BancFirst, Oklahoma City, Oklahoma, as Trustee under the Bond Trust Indenture dated as of December 1, 2023 relating to the issuance of the $6,000,000 Senior Living Facilities Revenue Bonds (Epworth Villa Project) Series 2023A; the $66,700,000 Senior Living Facilities Revenue Bonds (Epworth Villa Project) Series 2023B; and the $13,724,671 Senior Living Facilities Revenue Bonds (Epworth Villa Project) Series 2023C; each dated _____ 2023, on this _____ day of December, 2023.

**OKLAHOMA COUNTY FINANCE AUTHORITY**

ATTEST:

_____
Chairman


_____
Secretary

(SEAL)

B-19

Exhibit "A"

**Legal Description of Mortgaged Property**

Tract 1:

Block ONE (1), EPWORTH VILLA, an addition to the City of Oklahoma City, Oklahoma County, State of Oklahoma, according to the recorded plat thereof.

Tract 2:

A tract of land lying in the Northeast Quarter (NE/4) of Section 7, Township 13, North, Range 3 West of the Indian Meridian, Oklahoma County, State of Oklahoma, being more particularly described as follows:

COMMENCING at the Northeast Corner of said Northeast Quarter (NE/4); Thence North 89°41'02" West, along the North line of said Northeast Quarter (NE/4), a distance of 1077.60 feet to the POINT OF BEGINNING; Thence South 00°07'17" East, parallel with the East line of said Northeast Quarter (NE/4), a distance of 1324.40 feet; Thence North 89°39'50" West a distance of 170.91 feet; Thence North 00°07'17" West a distance of 1324.34 feet to a point on the North line of said Northeast Quarter (NE/4); Thence South 89°41'02" East, along said North line, a distance of 170.91 feet to the POINT OF BEGINNING.

Tract 3:

A parcel of tract of land located in the Northeast Quarter (NE/4), of Section SEVEN (7), Township THIRTEEN (13) North, Range THREE (3) West of the Indian Meridian, Oklahoma City, Oklahoma County, State of Oklahoma, said parcel of land being more particularly described as follows: COMMENCING at the Northeast corner of said Northeast Quarter (NE/4); Thence North 89°41'2" West along the North line of said Northeast Quarter (NE/4) a distance of 1248.51 feet to the Point of Beginning; Thence from said Point of Beginning South 00°07'17" East a distance of 1384.34 feet; Thence North 89°39'50" West a distance of 25.00 feet; Thence North 00°07'17" West a distance of 1384.33 feet to a point on the North line of said Northeast Quarter (NE/4); Thence South 89°41'02" East along the North line of said Northeast Quarter (NE/4) a distance of 25.00 feet to the Point or Place of Beginning.

Tract 4:

Block Three (3), Epworth Villa Section Four, an addition to the City of Oklahoma City, Oklahoma County, State of Oklahoma, according to the recorded plat thereof.

A-1

**Exhibit "B"**

**Permitted Encumbrances**

**EXHIBIT C**

**FORM OF FINANCING STATEMENTS**

Financing Statement between Authority as Debtor and Trustee as Secured Party covering the following

The following described property from time to time held or controlled by the Secured Party under the terms of a Bond Trust Indenture denominated "Oklahoma County Finance Authority Senior Living Facilities Revenue Bonds (Epworth Villa Project) Bond Trust Indenture", dated as of December 1, 2023, between Debtor and Secured Party (the "Bond Indenture"):

(a)     All right, title and interest of the Debtor (including the right to enforce any of the terms thereof) in, to and under (i) the Loan Agreement, and all payments derived by the Debtor from the Central Oklahoma United Methodist Retirement Facility, Inc. (the "Corporation") including Loan Payments and other amounts to be received by the Debtor and paid by the Corporation under and pursuant to and subject to the Loan Agreement (but excluding the Debtor's rights to payment of its fees and expenses and to indemnification (and the right to enforce such rights), to notice and as otherwise expressly set forth in the Loan Agreement and excluding any payments made by the Secured Party or the Corporation to meet the rebate requirements of Section 148(f) of the Internal Revenue Code), and including the pledge of the Gross Receipts by the Corporation thereunder; (ii) the Mortgage; (iii) the Series 2023 Bond Notes, and (iv) all financing statements or other instruments or documents evidencing, securing or otherwise relating to the loan of the proceeds of the Bonds;

(b)     all moneys and securities (except moneys and securities held in the Rebate Fund) from time to time held by the Secured Party in the funds and accounts under the terms of this Bond Indenture; *provided, however,* (i) that amounts held in the Series 2023A Account of the Debt Service Fund shall be pledged only to the Owners of the Series 2023A Bonds, (ii) that amounts held in the Series 2023B Account of the Debt Service Fund shall be pledged only to the Owners of the Series 2023B Bonds, (iii) that amounts held in the Series 2023C Account of the Debt Service Fund shall be pledged only to the Owners of the Series 2023C Bonds, (iv) that amounts held in the Series 2023A Account of the Debt Service Reserve Fund shall be pledged only to the Owners of the Series 2023A Bonds, and (v) that amounts held in the Series 2023B Account of the Debt Service Reserve Fund shall be pledged only to the Owners of the Series 2023B Bonds;

(c)     Any and all other property (real, personal or mixed) of every kind and nature from time to time hereafter, by delivery or by writing of any kind, pledged, assigned or transferred as and for additional security under the Bond Indenture, to the Secured Party, which is authorized by the Bond Indenture to receive any and all such property at any and all times and to hold and apply the same subject to the terms of the Bond Indenture.

Proceeds and products of the collateral are also covered.

Capitalized terms used herein and not otherwise defined shall have the meaning assigned thereto in the Bond Indenture.

Financing Statement between Corporation as Debtor and Authority and Trustee as Secured Party covering the following:

(a)     All contract rights and all of the rents, issues and profits now due or to become due from the Mortgage and Security Agreement executed as of December _____, 2023, from the Debtor to the Secured Party, as amended or supplemented from time to time (the "Mortgage") covering the real property described in the Mortgage, as well as on Exhibit "B" attached hereto, together with all and singular the tenements, hereditaments, easements, rights-of-way, licenses, privileges and appurtenances thereto belonging or in any wise appertaining; all the rents, issues and profits therefrom; and all right, title and interest, if any, of the Debtor in and to the land lying within any street, alley, passageway, water course or roadway adjoining said real property and in and to any strips or gores adjoining said real property or any part thereof; and

(b)     All buildings, structures and other improvements now owned or hereafter acquired by the Debtor; all materials intended for construction, reconstruction, alteration or repair of, or installation in, the aforesaid buildings, structures and improvements; all fixtures, machinery, appliances, apparatus and equipment now owned or hereafter acquired by the Debtor and now or hereafter used for the operation or maintenance of the aforesaid buildings, structures and improvements, including but not limited to all heating, lighting, incinerating, refrigerating, ventilating, air-conditioning, air-cooling, lifting, fire extinguishing, plumbing, cleaning, communications and power equipment, fixtures, appliances, machinery and apparatus, all gas, water and electrical equipment, all elevators, escalators, switchboards, engines, motors, tanks, compressors, pumps, boilers, generators, transformers, pipes and pipe connections, conduits, ducts, partitions, screens, awnings, blinds, storm and screen windows, shades, carpets and other floor coverings, sprinkling and irrigation systems and equipment and all furniture, furnishings and fixtures, **TOGETHER WITH** any and all replacements thereof, substitutions therefor and betterments and additions thereto and the proceeds thereof and any and all licenses, permits or other documents used in connection with the ownership or operation of the Mortgaged Property (as hereinafter defined); and

(c)     All awards or payments made in respect of any taking of all or any part of the Mortgaged Property under the power of eminent domain or other statutory power or authority by any public, quasi public or private authority or agency and all awards or payments made in lieu of or under threat of taking of any portion of the Mortgaged Property by condemnation or other statutory authority; and,

(d)     All insurance proceeds payable in respect of any damage, destruction or loss to the Mortgaged Property or any part thereof; and

(e)     All Gross Receipts and Pledged Assets of Debtor;

(f)     All right, title and interest of Debtor, as lessor, in and to any leases, licenses or tenancies heretofore or hereafter made or entered into with respect to the whole or any part of the Mortgaged Property and the rents, issues and profits arising and to arise during the term of this Mortgage under any such leases, licenses or tenancies.

C-2

Proceeds and products of the collateral are also covered.

**"Facilities"** means the continuing care retirement facilities and health care delivery or residential facilities designed to provide services to the elderly and all facilities necessary for the operation of such facilities that are wholly-owned or leased pursuant to a capital lease by the Debtor.

**"Gross Receipts"** means all rents, revenues, income, receipts, entrance fees and money (other than proceeds of borrowing and moneys received from residents that are held in escrow) received in any period by or on behalf of the Debtor, including (a) revenues derived from its operations, (b) gifts, grants, bequests, donations and contributions and the income therefrom, exclusive of any gifts, grants, bequests, donations and contributions to the extent specifically restricted by the donor to a particular purpose inconsistent with their use for the payment of Debtor's Series 2023 Bond Notes, (c) proceeds derived from (i) insurance, (ii) accounts (as defined in the Uniform Commercial Code as adopted in the State of Oklahoma), (iii) securities, investment property and other investments, (iv) inventory and other tangible and intangible property, (v) medical or health care insurance, indemnity or reimbursement programs or agreements and (vi) contract rights and other rights and assets now or hereafter owned, held or possessed by the Debtor, and (d) rentals received from the leasing of real or tangible personal property.

**"Pledged Assets"** means all accounts, Gross Receipts, Equipment, Software, general intangibles, inventory, documents, instruments, chattel paper, deposit accounts, commercial tort claims, letter of credit rights and investment property of the Debtor, now owned or hereafter acquired, and all proceeds thereof, excluding, however, pledges, gifts, grants, bequests, donations and contributions to the Debtor that are specifically restricted by the donor, testator or grantor to a particular purpose that is inconsistent with their use for payments required under the Loan Agreement, the Continuing Covenants Agreement, the Continuing Covenants Agreement Note, the Mortgage or the Series 2023 Bond Notes, and, if also so restricted, the income and gains derived therefrom. All terms used in this definition are used with the meanings given such terms, if any, in the Uniform Commercial Code as adopted in the State of Oklahoma.

**"Series 2023 Bond Notes"** means collectively the Series 2023A Bond Note, the Series 2023B Bond Note, and the Series 2023C Bond Note.

**"Series 2023A Bond Note"** means the Central Oklahoma United Methodist Retirement Facility, Inc., Bond Note, Series 2023A, in the principal amount of $6,000,000, issued pursuant to the Loan Agreement.

**"Series 2023B Bond Note"** means the Central Oklahoma United Methodist Retirement Facility, Inc., Bond Note, Series 2023B, in the principal amount of $66,700,000.00, issued pursuant to the Loan Agreement.

**"Series 2023C Bond Note"** means the Central Oklahoma United Methodist Retirement Facility, Inc., Bond Note, Series 2023C, in the principal amount of $13,724,671, issued pursuant to the Loan Agreement.

All of the foregoing described property herein collectively referred to as "Mortgaged Property".

## EXHIBIT "B"

All that property purchased by Debtor and covering the real property located in Oklahoma County, Oklahoma more particularly described as follows to wit:

Tract 1:

Block ONE (1), EPWORTH VILLA, an addition to the City of Oklahoma City, Oklahoma County, State of Oklahoma, according to the recorded plat thereof.

Tract 2:

A tract of land lying in the Northeast Quarter (NE/4) of Section 7, Township 13, North, Range 3 West of the Indian Meridian, Oklahoma County, State of Oklahoma, being more particularly described as follows:

COMMENCING at the Northeast Corner of said Northeast Quarter (NE/4); Thence North 89°41'02" West, along the North line of said Northeast Quarter (NE/4), a distance of 1077.60 feet to the POINT OF BEGINNING; Thence South 00°07'17" East, parallel with the East line of said Northeast Quarter (NE/4), a distance of 1324.40 feet; Thence North 89°39'50" West a distance of 170.91 feet; Thence North 00°07'17" West a distance of 1324.34 feet to a point on the North line of said Northeast Quarter (NE/4); Thence South 89°41'02" East, along said North line, a distance of 170.91 feet to the POINT OF BEGINNING.

Tract 3:

A parcel of tract of land located in the Northeast Quarter (NE/4), of Section SEVEN (7), Township THIRTEEN (13) North, Range THREE (3) West of the Indian Meridian, Oklahoma City, Oklahoma County, State of Oklahoma, said parcel of land being more particularly described as follows: COMMENCING at the Northeast corner of said Northeast Quarter (NE/4); Thence North 89°41'2" West along the North line of said Northeast Quarter (NE/4) a distance of 1248.51 feet to the Point of Beginning; Thence from said Point of Beginning South 00°07'17" East a distance of 1384.34 feet; Thence North 89°39'50" West a distance of 25.00 feet; Thence North 00°07'17" West a distance of 1384.33 feet to a point on the North line of said Northeast Quarter (NE/4); Thence South 89°41'02" East along the North line of said Northeast Quarter (NE/4) a distance of 25.00 feet to the Point or Place of Beginning.

Tract 4:

Block Three (3), Epworth Villa Section Four, an addition to the City of Oklahoma City, Oklahoma County, State of Oklahoma, according to the recorded plat thereof.

**EXHIBIT D**

**EXPANDED SERVICE OF SOLUTIONS ADVISORS, LLC**

**EXHIBIT E**

**ENTRANCE FEE PRICING SCHEDULE**

Exhibit 7-3

(Series 2023 Continuing Covenants Agreement)

**CONTINUING COVENANTS AGREEMENT**

dated as of December 1, 2023

by and between

**CENTRAL OKLAHOMA UNITED METHOD RETIREMENT FACILITY, INC.**

**d/b/a EPWORTH VILLA**

and

**BANCFIRST**,
as Trustee

Relating to

**Oklahoma County Finance Authority**

**$6,000,000**
**Senior Living Facilities Revenue Bonds**
**(Epworth Villa Project)**
**Series 2023A**

**THIS AGREEMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION IN SECTION 6.3 WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS THAT THE BORROWER MAY HAVE AND ALLOWS THE TRUSTEE, FOR THE BENEFIT OF THE HOLDERS OF THE BONDS FROM TIME TO TIME, TO OBTAIN A JUDGMENT AGAINST THE BORROWER WITHOUT ANY FURTHER NOTICE.**

TABLE OF CONTENTS

ARTICLE I DEFINITIONS ................................................................................................ 1
    Section 1.1.    Certain Defined Terms ......................................................... 1
    Section 1.2.    Computation of Time Periods............................................. 16
    Section 1.3.    Construction........................................................................ 16
    Section 1.4.    Accounting Terms and Determinations................................ 16
    Section 1.5.    Related Documents; Incorporation by Reference................. 17
ARTICLE II REPRESENTATIONS AND WARRANTIES ........................................... 17
    Section 2.1.    Organization; Powers. ......................................................... 17
    Section 2.2.    Authorization. ..................................................................... 18
    Section 2.3.    Enforceability ..................................................................... 18
    Section 2.4.    Governmental Approvals..................................................... 18
    Section 2.5.    No Default ........................................................................... 18
    Section 2.6.    Title to Properties; Liens. ................................................... 19
    Section 2.7.    Litigation; Compliance with Laws and Agreements. .......... 19
    Section 2.8.    Contracts, Etc...................................................................... 19
    Section 2.9.    Tax Matters.......................................................................... 19
    Section 2.10.   No Untrue Statements or Omissions of Material Facts....... 20
    Section 2.11.   Employee Benefit Matters................................................... 20
    Section 2.12.   Environmental Matters.  Except as identified in the Phase I Report: ...... 21
    Section 2.13.   Related Party Transactions.................................................. 22
    Section 2.14.   Survival. .............................................................................. 22
ARTICLE III PAYMENT OBLIGATIONS; SECURITY............................................... 22
    Section 3.1.    Payment Obligations............................................................ 22
    Section 3.2.    Mandatory Redemption. ...................................................... 25
    Section 3.3.    Obligations Absolute .......................................................... 25
    Section 3.4.    Security................................................................................ 26
ARTICLE IV AFFIRMATIVE COVENANTS ............................................................. 28
    Section 4.1.    Preservation of Existence, Etc. ........................................... 28
    Section 4.2.    Performance and Compliance with Other Covenants.......... 28
    Section 4.3.    Books and Records; Reports; Communications. ................. 28
    Section 4.4.    Insurance.............................................................................. 32
    Section 4.5.    Taxes.................................................................................... 34
    Section 4.6.    Maintenance of 501(c)(3) Status, Accreditations, Etc........ 35
    Section 4.7.    ERISA.................................................................................. 35
    Section 4.8.    Compliance with Laws. ....................................................... 35
    Section 4.9.    Environmental Matters. ....................................................... 35
    Section 4.10.   Operation and Maintenance of Facilities. ........................... 36
    Section 4.11.   Limitation on Alteration of Facilities.................................. 37
    Section 4.12.   Debt Service Coverage Ratio. ............................................. 37
    Section 4.13.   Days' Cash on Hand............................................................ 38
    Section 4.14.   Occupancy............................................................................ 39
    Section 4.15.   Damage, Destruction or Condemnation. .............................. 40

Section 4.16.    Calculation of Debt Service and Debt Service Coverage. ...................... 42
Section 4.17.    Availability of Board-Designated Funds............................................. 44
Section 4.18.    Unit Configuration. ....................................................................... 44
Section 4.19.    Management. ................................................................................. 44
Section 4.20.    Consultants. ................................................................................. 44
ARTICLE V NEGATIVE COVENANTS ............................................................................. 44
Section 5.1.    Indebtedness. ................................................................................. 45
Section 5.2.    Investments. ................................................................................. 45
Section 5.3.    Mergers and Consolidations; Transfers of Assets. .................................. 45
Section 5.4.    Guarantees .................................................................................... 46
Section 5.5.    Competition. ................................................................................. 46
Section 5.6.    Derivative Agreements. .................................................................... 46
Section 5.7.    Liens. .......................................................................................... 46
Section 5.8.    Tax-Exempt Nature of Bonds; Validity of Bonds ................................... 46
Section 5.9.    No Material Amendment or Alteration of Certain Documents. ................... 46
Section 5.10.    Transactions with Affiliates. ............................................................ 47
Section 5.11.    Business of the Borrower. ............................................................... 47
Section 5.12.    Other Agreements. ......................................................................... 47
Section 5.13.    Change of Control. ........................................................................ 48
Section 5.14.    Inconsistent Agreements. ................................................................. 48
Section 5.15.    Bankruptcy. ................................................................................. 48
ARTICLE VI EVENTS OF DEFAULT .............................................................................. 48
Section 6.1.    Events of Default. ........................................................................... 48
Section 6.2.    Remedies. ..................................................................................... 50
Section 6.3.    Confession of Judgment. .................................................................. 51
Section 6.4.    Attorneys' Fees and Other Expenses..................................................... 53
Section 6.5.    Remedies Cumulative; Solely for the Benefit of Bondholders and
                Bondholder Representative.................................................................. 53
Section 6.6.    Waivers or Omissions. ..................................................................... 53
Section 6.7.    Discontinuance of Proceedings. ......................................................... 53
Section 6.8.    Injunctive Relief. ........................................................................... 54
ARTICLE VII INDEMNIFICATION .................................................................................. 54
Section 7.1.    Indemnification. ............................................................................. 54
ARTICLE VIII MISCELLANEOUS .................................................................................. 56
Section 8.1.    Further Assurances. ........................................................................ 56
Section 8.2.    Amendments and Waivers.................................................................. 56
Section 8.3.    Notices. ....................................................................................... 56
Section 8.4.    No Third-Party Rights. ..................................................................... 58
Section 8.5.    Severability.................................................................................... 58
Section 8.6.    Governing Law; Consent to Jurisdiction and Venue; Waiver of
                Jury Trial...................................................................................... 58
Section 8.7.    Prior Understandings. ...................................................................... 59
Section 8.8.    Duration. ...................................................................................... 59
Section 8.9.    Counterparts................................................................................... 59
Section 8.10.    Successors and Assigns.................................................................... 59
Section 8.11.    Bondholder Representative Acts......................................................... 59

Section 8.12.    Waiver of Personal Liability. ................................................................... 59

EXHIBIT A – Form of Compliance Certificate
EXHIBIT B – Related Party Transaction Disclosure

## CONTINUING COVENANTS AGREEMENT

This Continuing Covenants Agreement, dated as of December 1, 2023 (this "Agreement," as defined herein), is between **CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC. D/B/A EPWORTH VILLA** , a not-for-profit corporation organized and existing under the laws of the State of Oklahoma (the "Borrower"), and **BANCFIRST**, as trustee (together with its successors and assigns, the "Trustee") under the Bond Trust Indenture of even date herewith between the Oklahoma County Finance Authority (the "Issuer") and the Trustee (the "Indenture").

## RECITALS

Concurrently with the execution and delivery of this Agreement, the Issuer has authorized the issuance of its $6,000,000 Senior Living Facilities Revenue Bonds (Epworth Villa Project) Series 2023A (the "Bonds") under the Indenture.

The proceeds of the Bonds will be used to make a loan to the Borrower pursuant to a Loan Agreement of even date herewith, between the Issuer and the Borrower (the "Loan Agreement"). The obligations of the Borrower under the Loan Agreement to pay the principal of, or premium (if any) and interest on, the Bonds will be secured by, among other things, a Mortgage and Security Agreement dated December __, 2023 (the "Mortgage"), from the Borrower to the Trustee as mortgagee with respect to certain real property of the Borrower (the "Mortgaged Property," as defined therein).

The Borrower is entering into this Agreement in order to induce the Issuer to issue the Bonds and the owners from time to time of the Bonds to purchase the Bonds.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Borrower and the Trustee hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1.    *Certain Defined Terms*.  Terms used herein that are not defined herein shall have the meanings ascribed to such terms in the Indenture or the other Related Documents (as defined herein).  In addition to the terms defined in the recitals and elsewhere in this Agreement, the following terms shall have the following meanings:

"Additional Payment" means a payment required to be made under Section 3.1(b).

"Affiliate" means, with respect to any Person, any Person which directly or indirectly through one or more intermediaries controls, is controlled by or is under the control of another Person.  For purposes of this definition, "control" means the power to direct the management and policies of a Person through the ownership of a majority of its voting securities or membership interests, the right to designate or elect and remove, with or without cause, a majority of the members of its Governing Body, by contract or otherwise.

"Agreement" means this Continuing Covenants Agreement, as amended and supplemented from time to time with the prior written consent of the Bondholder Representative.

"Assignment" means the Collateral Assignment of Contract Rights delivered by the Borrower, as assignor, for the benefit of the Trustee, as assignee.

"Assisted Living Unit" means each assisted living unit constituting a part of the Facilities.

"Authorized Officer" means, with respect to the Borrower, the [President or Chief Financial Officer], in the case of any act to be performed or duty to be discharged, any other member, officer or employee of the Borrower then authorized by any such officer to perform such act or discharge such duty in writing reciting that such authorization is effective pursuant to the organizational documents of the Borrower then in effect accompanied by a written certificate of the Secretary of the Borrower furnished to the Trustee containing the specimen signature of such person.

"Bond Counsel" means Hilborne & Weidman, a professional corporation, or any other firm of attorneys nationally recognized on the subject of tax-exempt municipal finance selected by the Issuer.

"Bond Purchase Agreement" means the Bond Purchase Agreement dated December __, 2023 by and among the Underwriter, the Borrower and the Issuer.

"Bondholder Representative" means (a) Hamlin Capital Management, LLC, so long as a majority in aggregate principal amount of the Outstanding 2023A Bonds are beneficially owned by Persons for whom Hamlin Capital Management, LLC serves as investment advisor or limited partnership manager; and (b) at any other time, the designee, if any, of the holders of a majority in aggregate principal amount of the Outstanding 2023A Bonds. If there shall be no designee, the term "Bondholder Representative" shall be disregarded; provided that, in such event, all notices required to be given to the Bondholder Representative shall be given to the holders of the Outstanding 2023A Bonds.

"Bondholders" or "Holders" means the owners of the 2023A Bonds.

"Bonds" or "2023A Bonds" means the $6,000,000 Oklahoma County Finance Authority Senior Living Facilities Revenue Bonds (Epworth Villa Project) Series 2023A.

"Borrower" means Central Oklahoma United Methodist Retirement Facility, Inc., d/b/a Epworth Villa, and its successors and permitted assigns.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"Change of Control" means one or more transactions resulting in (i) a majority of the membership or other interests in the Borrower being held by a Person or group of Persons other than the Borrower (whether by merger, reorganization, consolidation or otherwise), (ii) any Person having the right to appoint a majority of the Governing Body of the Borrower or (iii) the sale or other transfer of all or substantially all of the assets of the Borrower.

"Chapter 11 Proceeding" means the voluntary bankruptcy proceeding filed by the Borrower in the United States Bankruptcy Court for the Western District of Oklahoma captioned *In re Central Okla. United Methodist Retirement Facility, Inc. dba Epworth Villa*, Case No. 23-12607.

"Closing Date" means December ___, 2023.

"Code" means the Internal Revenue Code of 1986, as amended, and the applicable regulations thereunder.

"Collateral" means, collectively, the Mortgaged Property and all of the tangible and intangible Property (excluding real property) owned by the Borrower, the Facilities or the Mortgaged Property, including (without limitation) all of the following: money; accounts; chattel paper; equipment; deposit accounts; all existing and future Entrance Fees; instruments; inventory; general intangibles; documents; investment property; cash and noncash proceeds therefrom; books and records, including those relating to any of the foregoing; additions or accessions to any of the foregoing; substitutions for any of the foregoing; rights relating to the storage, withdrawal and retrieval of the foregoing and access to the foregoing; and replacements, products, and proceeds of the foregoing. For the avoidance of doubt, Collateral does not include (a) donor-restricted funds, (b) funds of residents held by the Borrower for the payment of residency, medical care or personal needs, and (c) any funds pledged or otherwise subject to any Permitted Encumbrance.

"Consultant" means any independent professional consulting (including operational and management consulting), accounting, auditing, financial advisory, investment banking or commercial banking firm or individual selected by the Borrower or, to the extent required by this Agreement, the Bondholder Representative, having the skill and experience necessary to render the particular report required, which firm or individual does not control and is not controlled by the Borrower, and which is approved by the Bondholder Representative.

"Continuing Disclosure Agreement" means the Continuing Disclosure Agreement dated as of December 1, 2023 by and between the Borrower and BancFirst, as dissemination agent.

"Control Agreement" means, collectively (i) the Deposit Account Control Agreement dated as of December ___, 2023 by and among the Borrower, the Trustee and _____ and (ii) any other deposit account control agreement executed and delivered by the Borrower in favor of the Trustee.

"Days' Cash on Hand" means, as of the date of determination, the amount determined by dividing (a) the amount of Unrestricted Cash and Marketable Securities of the Borrower on such date, by (b) the quotient obtained by dividing (i) total cash operating expenses of the Borrower for the 12 month period ending on such date, including (without limitation) accrued interest on Indebtedness, other than any interest which is payable from the proceeds of such Indebtedness, but excluding amortization, depreciation and any other non-cash expenses, in each case as shown on the most recent annual audited Financial Statements delivered to the Bondholder Representative pursuant to Section 4.3(a) or, in the case of any determination with respect to any date other than the last day of the Fiscal Year, the most recent unaudited Financial Statements delivered to the Bondholder Representative pursuant to Section 4.3(a), by (ii) 365 or 366, as the case may be.

"Debt Service Coverage Ratio" means, as of any date, the Net Revenues Available for Debt Service for the 12-month period ending on such date, divided by Maximum Annual Debt Service on all outstanding Long-Term Debt as of such date (pro-rated in the event that Net Revenues Available for Debt Service are calculated for a period of less than 12-months).

"Debt Service Reserve Fund Requirement" means, as of any date of calculation, an amount equal to $_____.

"Default" means any event that, with notice or lapse of time or both, would become an Event of Default.

"Default Rate" means, for any day, a rate of interest per annum equal to the lesser of (i) the highest rate of interest borne by the Bonds as of such date plus three percent (3.00%) and (ii) the Maximum Interest Rate.

"Derivative Agreement" means an interest rate swap, exchange, hedge, cap or similar agreement entered into in order to hedge the interest payable on all or a portion of any Indebtedness, any asset or any other derivative arrangement, including (without limitation) an interest rate swap, a forward or futures contract or an option (e.g., a call, put, cap, floor or collar), which agreement does not constitute an obligation to repay money borrowed, credit extended or the equivalent thereof.

"Determination of Taxability" means and shall be deemed to have occurred on the first to occur of the following:

(a)     the filing by the Borrower of any statement, supplemental statement or other tax schedule, return or document which discloses that the interest on any Bond is includable in the gross income of the owner or former owner of such Bond for federal income tax purposes;

(b)     receipt by the Borrower of notice that the Trustee, the Bondholder Representative or any Bondholder or former Bondholder has received a written opinion of Bond Counsel to the effect that the interest on any Bond is includable in the gross income of the owner or former owner of such Bond for federal income tax purposes unless, within 180 days (or such longer period(s) as consented to in writing by the Bondholder Representative) after receipt by the Borrower of such notice, the Borrower shall deliver to the Trustee and the Bondholder Representative a ruling or determination letter issued to or on behalf of the Issuer or the Borrower by the Commissioner or any District Director of the Internal Revenue Service (or any other governmental official exercising the same or a substantially similar function from time to time) to the effect that, after taking into consideration such facts as form the basis for such opinion, the interest on such Bond is not includable in the gross income of the owners or former owners of such Bond for federal income tax purposes;

(c)     receipt by the Issuer, the Trustee, the Bondholder Representative or any Bondholder or former Bondholder of written notice from the Commissioner or any District Director of the Internal Revenue Service (or any other government official or agent exercising the same or a substantially similar function from time to time) that the interest on any Bond is includable in the gross income of the owner or former owner of such Bond for federal income tax purposes; or

(d)      receipt by the Issuer, the Trustee, the Bondholder Representative or any Bondholder or former Bondholder of written notice that the Internal Revenue Service (or any other government official or agency exercising the same or a substantially similar function from time to time) has assessed as includable in the gross income of such Bondholder or such former Bondholder the interest on any Bond.

Notwithstanding the foregoing, no event described in clause (c) or (d) above shall constitute a Determination of Taxability unless the Borrower has been afforded the opportunity, at its sole expense, to contest any such assessment for a period of no more than 180 days so long as the Borrower is contesting the same during such 180-day period in good faith by appropriate proceedings diligently pursued until the earliest of (i) the date on which the Borrower abandons the contest; (ii) the date on which such contest has been concluded adversely to the Borrower and no further appeals are possible; and (iii) the date that is six months after the initial receipt by the Issuer, the Trustee, the Bondholder Representative or any Bondholder or former Bondholder of such notice or assessment; *provided, however,* that upon demand from the Trustee or the Bondholder Representative, the Borrower shall promptly reimburse the Trustee, the Bondholder Representative, such Bondholder or such former Bondholder for any payments, including (without limitation) any taxes, interest, penalties, charges or expenses incurred by the Trustee, the Bondholder Representative, such Bondholder or such former Bondholder as a result of such Determination of Taxability.

"Entrance Fee" means any fee paid by a resident of the Facilities pursuant to a Residency Agreement in order to take possession of a Unit and any entrance deposit in respect thereof.

"Environmental Claim" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any Environmental Permit or Regulated Chemical or arising from alleged injury or threat to health, safety or the environment, for enforcement, cleanup, removal, response, remedial or other actions or damages, contribution, indemnification, cost recovery, compensation or injunctive relief, in each case by, from or with any Person.

"Environmental Laws" means all applicable federal, state, regional or local laws, statutes, rules, regulations or ordinances concerning public health, safety or the environment, including (without limitation) CERCLA; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Solid and Hazardous Waste Amendments of 1984, 42 U.S.C. §6901, et seq. ("RCRA"); the federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 U.S.C. §1251, et seq.; the Toxic Substances Control Act of 1976, 15 U.S.C. §2601, et seq.; the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. §11001, et seq.; the Clean Air Act of 1966, as amended, 42 U.S.C. §7401, et seq.; the National Environmental Policy Act of 1975, 42 U.S.C. §4321, et seq.; the Rivers and Harbors Act of 1899, 33 U.S.C. §401 et seq.; the Endangered Species Act of 1970, as amended, 29 U.S.C. §651, et seq.; the Safe Drinking Water Act of 1974, as amended, 42 U.S.C. §300(f), et seq.; and all rules, regulations, policies and guidance documents promulgated or published thereunder, and any state, regional, parish or local statute, law, rule, regulation or

ordinance relating to public health, safety or the environment, including (without limitation) those relating to:

(a)     releases, discharges, emissions or disposals to air, water, land or groundwater;

(b)     the withdrawal or use of groundwater;

(c)     the use, handling, or disposal of polychlorinated biphenyls ("PCBs"), asbestos or urea formaldehyde;

(d)     the transportation, treatment, storage, disposal, release or management of hazardous substances or materials (including, without limitation, petroleum, its derivatives, by-products or other hydrocarbons) and any other solid, liquid or gaseous substance exposure to which is prohibited, limited or regulated, or may or could pose a hazard to the health and safety of the occupants of the Facilities or any property adjacent to or surrounding the Facilities;

(e)     the exposure of persons to toxic, hazardous or other controlled, prohibited or regulated substances; and

(f)     any Regulated Chemical.

"Environmental Permit" means any permit, approval, identification number, license, registration, certification or other authorization required under any Environmental Law to operate the Facilities.

"Environmental Report" means any environmental assessment, test, investigation or other environmental report or audit conducted at the Mortgaged Property for any reason.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute.

"ERISA Affiliate" means any trade or business the employees of which, together with the employees of the Borrower, are treated as employed by a single employer under Section 414(b), (c), (m) or (o) of the Code.

"ERISA Event" means any of the following with respect to a Plan or Multiemployer Plan: (a) a Reportable Event with respect to such Plan or Multiemployer Plan, respectively; (b) a complete or partial withdrawal by the Borrower from a Multiemployer Plan that results in liability under Section 4201 or 4204 of ERISA, or the receipt by the Borrower or any member of the ERISA Group of notice from a Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA or that it intends to terminate or has terminated under Section 4041A of ERISA; (c) the distribution by the Borrower or any member of the ERISA Group under Section 4041 or 4041A of ERISA of a notice of intent to terminate any Plan, receipt of notice of termination of a Multiemployer Plan pursuant to Section 4041A of ERISA or the taking of any action to terminate any Plan; (d) the commencement of proceedings by the PBGC under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the receipt by the Borrower or any member of the ERISA Group of a notice from any Multiemployer Plan that such action has been taken by the PBGC with respect to such

Multiemployer Plan; (e) the institution of a proceeding by any fiduciary of any Multiemployer Plan against the Borrower or any member of the ERISA Group to enforce Section 515 of ERISA that is not dismissed within 30 days; (f) the imposition upon the Borrower or any member of the ERISA Group of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, or the imposition or threatened imposition of any Lien upon any assets of the Borrower or any member of the ERISA Group as a result of any alleged failure to comply with the Code or ERISA in respect of any Plan; (g) the engaging in or otherwise becoming liable for a nonexempt Prohibited Transaction by the Borrower or any member of the ERISA Group; (h) a violation of the applicable requirements of Section 404 or 405 of ERISA or the exclusive benefit rule under Section 401(a) of the Code by any fiduciary of any Plan for which the Borrower or any member of the ERISA Group may be directly or indirectly liable; or (i) the adoption of an amendment to any Plan that, pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA, would result in the loss of tax-exempt status of the trust of which such Plan is a part if the Borrower or any member of the ERISA Group fails to timely provide security to such Plan in accordance with the provisions of such sections.

"ERISA Group" means any trade or business (whether or not incorporated) which is a member of a group of which the Borrower is a member and that is under common control within the meaning of Section 414 of the Code.

"Event of Default," when used in or with respect to this Agreement has the meaning set forth in Section 6.1 and, when used with respect to any other Related Document, has the meaning assigned therein.

"Excess Interest Amount" has the meaning specified in Section 3.1(c).

"Facilities" means the real property and all buildings, structures and improvements thereon and interests therein located on the Mortgaged Property and all fixtures, machinery, equipment, furniture, furnishings and other personal property attached thereto, located therein or used in connection therewith, whether now owned or hereafter acquired.

"Financial Statement," "Income Statement," "Balance Sheet" or any similar reference to a statement of financial condition means a financial statement, income statement, balance sheet or other statement of financial condition of the Borrower.

"Fiscal Quarter" means the three month periods ending on [March 31, June 30, September 30 and December 31] in each Fiscal Year or, in the event that the Fiscal Year is changed, the three-month period beginning on the first day of a Fiscal Year and on the first day of each third month thereafter.

"Fiscal Year" means the period of 12 consecutive months beginning on [January 1] in any year and ending on [December 31] of the same year, or such other fiscal year as the Borrower, with the prior written approval of the Bondholder Representative (which approval shall not be unreasonably withheld), shall establish as the fiscal year of the Borrower.

"Fitch" means Fitch, Inc., or any successor thereto.

"GAAP" means accounting principles generally accepted in the United States of America, except as otherwise herein expressly provided, consistently applied.

"Governing Body" means, when used with respect to any Person, the Board of Directors, Board of Trustees, Board of Managers or other governing body of such Person.

"Governmental Approval" means an authorization, consent, approval, license, exemption, registration granted by, or filing with or report to any Governmental Authority.

"Governmental Authority" means the United States of America, any state, county, township or other municipality and any court, agency, department, bureau, board, commission or instrumentality of any of the foregoing now existing or hereafter created.

"Gross Revenues" means all receipts, revenues, rentals, income, insurance proceeds and other money received by or on behalf of the Borrower (whether classified as unrestricted or Board restricted), including (without limitation): (a) Monthly Service Fees, Entrance Fees and any other fees payable by or on behalf of residents or other clients of the Facilities, (b) resident service revenues, (c) other operating revenues, (d) unrestricted investment income, and (e) gifts, grants, bequests, donations and contributions heretofore or hereafter made that are legally available to meet any of the obligations of the Borrower incurred in the financing, operation, maintenance or repair of any portion of the Borrower's Property, and all rights to receive the same, whether in the form of accounts, accounts receivable, contract rights, general intangibles, chattel paper, instruments, investment property or other rights, and the proceeds of such rights, whether now existing or hereafter coming into existence or whether now owned or held or hereafter acquired. For the avoidance of doubt, Gross Revenues does not include (a) donor-restricted funds, (b) funds of residents held by the Borrower for the payment of residency, medical care or personal needs and (c) any funds pledged or otherwise subject to any Permitted Encumbrance.

"HCA" means Hamlin Capital Advisors, LLC and its successors and assigns.

"Indebtedness" means, with respect to any Person (a) any obligation for borrowed money incurred or assumed by such Person, (b) any obligation under any lease that is capitalized under GAAP incurred or assumed by such Person, (c) any installment or conditional sale or other title retention agreement incurred or assumed by such Person, (d) any obligation to pay the deferred purchase price of property or services incurred or assumed by such Person, (e) any obligation secured by (or having an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (f) any obligation as an account party in respect of letters of credit or similar facilities and bankers' acceptances incurred or assumed by such Person and (g) any guaranty, loan commitment or other obligation of such Person guaranteeing in any manner, whether directly or indirectly, any obligation of any Person that would be described above if incurred or assumed directly by such Person; but excluding obligations under contracts for supplies, services and pensions allocable to current operating expenses during the current or any future Fiscal Years in which the supplies are to be delivered, services to be rendered, or pensions paid.

"Indemnitee" has the meaning specified in Section 7.1.

"Indenture" means the Trust Indenture of even date herewith between the Issuer and the Trustee, as the same may be amended and supplemented from time to time with the prior written consent of the Bondholder Representative.

"Independent Living Unit" means an independent living unit constituting a part of the Facilities.

"Insurance Consultant" means an independent Consultant having skill and experience in the insurance requirements of or relating to the Borrower's business and reasonably acceptable to the Bondholder Representative.

"Land" means the land and interests in land constituting the site of the Mortgaged Property, as set forth in Exhibit A to the Mortgage and all now owned or hereafter acquired appurtenant easements.

"Law" means any treaty or any federal, regional, state and local law, statute, rule, ordinance, regulation, code, license, authorization, decision, injunction, interpretation, order or decree of any court or other Governmental Authority.

["Leases" means _____.]

"Liabilities" has the meaning specified in Section 7.1.

"Lien"  as applied to any Property or the income or profits therefrom, whether the same is consensual or non-consensual or arises by contract, operation of law, legal process or otherwise, means:  (a) any mortgage, lien, pledge, attachment, charge, lease, conditional sale or other title retention agreement, financing statement or encumbrance of any kind in respect of such Property or upon the income or profits therefrom; or (b) any arrangement, expressed or implied, under which such Property is transferred, sequestered or otherwise identified for the purpose of making such Property available for the payment of debt or performance of any other obligation in priority to the payment of the general, unsecured creditors of the Borrower.

"Liquidity Requirement" has the meaning set forth in Section 4.13(a) of this Agreement.

"Liquidity Testing Date" has the meaning set forth in Section 4.13(a) of this Agreement.

"Loan Agreement" means the Loan Agreement dated as of December 1, 2023 between the Issuer and the Borrower, as the same may be as amended and supplemented from time to time with the prior written consent of the Bondholder Representative.

"Long-Term Debt" means Indebtedness of the Borrower that has a final maturity of more than one year from the date of its creation or which is renewable or extendible at the option of the Borrower for a period of more than one year from the date of its creation; but excluding any operating line of credit which is required to be paid in full within 364 days in accordance with the provisions of any such line of credit.

"Management Agreement" means any management agreement with respect to the Facilities entered into by the Borrower in accordance with Section 4.19, as the same may be supplemented

and amended with the prior written consent of the Bondholder Representative. For the avoidance of doubt, at the time of issuance of the 2023A Bonds, there is not a Management Agreement in place with respect to the Facilities.

"Management Fees" means any fees payable to a Manager by the Borrower under any Management Agreement, including, without limitation, any termination or other fees owed under the Management Agreement.

"Manager" means any manager of the Facilities retained by the Borrower in accordance with Section 4.19, and their respective successors.

"Material Adverse Effect" means a material adverse effect on (a) the validity or enforceability of this Agreement or any other Related Document, (b) the ability of the Trustee to enforce its legal remedies pursuant to this Agreement or any other Related Document, (c) the status of the Borrower as an organization described in Section 501(c)(3) of the Code, (d) the business, condition (financial or other), operations or prospects of the Borrower, (e) the ability of the Borrower to perform its obligations hereunder or under any other Related Document or (f) the rights and remedies of or benefits available to the Trustee or the Bondholder Representative under this Agreement or any other Related Document.

"Maximum Annual Debt Service" means, when used with respect to the Bonds as of any date of calculation, the greatest amount required in the then-current or any future Fiscal Year to pay the principal of, the amount required to effect the mandatory sinking fund redemption of and the interest on all such outstanding Bonds; *provided* however, that in calculating the Debt Service Coverage Ratio, the principal component of the Bonds shall be excluded to the extent such principal payment is the last maturing installment of principal on the Bonds and is reasonably expected to be paid from proceeds available in the Debt Service Reserve Fund and the Debt Service Reserve Fund is funded at the Debt Service Reserve Fund Requirement.

"Maximum Interest Rate" means the maximum rate of interest permitted by applicable Law.

"Memory Care Unit" means each memory care unit constituting a part of the Facilities.

"Monthly Service Fee" means any monthly fee payable by a resident of a Unit under the Residency Agreement between the Borrower and such resident.

"Moody's" means Moody's Investors Service, Inc., and its successors and assigns.

"Mortgage" means the Mortgage and Security Agreement dated December __, 2023 from the Borrower as mortgagor to the Trustee as mortgagee, which grants a Lien on the Mortgaged Property to the Trustee as security for the Borrower's obligations under the Loan Agreement and this Agreement, and any other instrument executed and delivered by the Borrower to the Trustee granting a Lien on property of the Borrower to secure its obligations under the Loan Agreement and this Agreement, as amended and supplemented from time to time with the prior written consent of the Bondholder Representative.

"Mortgaged Property" has the meaning set forth in the Mortgage.

"Multiemployer Plan" means an employee benefit plan subject to Title IV of ERISA to which the Borrower or any member of the ERISA Group, and one or more employers other than the Borrower or any member of the ERISA Group, is making or accruing an obligation to make contributions or, in the event that any such plan has terminated, to which the Borrower or any member of the ERISA Group made or incurred an obligation to make contributions, during any of the five plan years preceding the date of termination of such plan.

"Net Proceeds" means the gross proceeds from any insurance recovery or condemnation award or payment in lieu thereof remaining after payment of reasonable attorneys' fees, reasonable fees and expenses of the Trustee and the Bondholder Representative and all other reasonable expenses incurred in the collection of such gross proceeds.

"Net Revenues Available for Debt Service" means, for any period, the change in unrestricted net assets of the Borrower for such period, plus (a) the sum of: (i) Entrance Fees received (excluding Entrance Fees paid by initial residents of units) less refunds; (ii) depreciation and amortization; (iii) interest; (iv) any increase in the future service obligation; (v) any unrealized loss on investments and derivative agreements; and (vi) any loss on the extinguishment of debt, any losses due to any impairments of goodwill, intangible assets or other long-lived assets and any other non-cash losses of a non-recurring nature, minus (b) the sum of (i) earned entrance fees, (ii) any decrease in the future service obligation, (iii) any unrealized gain on investments and derivative agreements and (iv) any gain on the extinguishment of indebtedness and any other non-cash items, in each case for such period.

"Occupied Unit" means a Unit with respect to which a Residency Agreement or other contract that is then in effect has been executed and delivered by or on behalf of one or more residents of such Unit, the full amount of the Entrance Fee for such Unit has been paid without any discount or concession granted below the market rate and the full amount of Monthly Service Fees with respect to such Unit are payable, and have not been waived, and the Borrower expects payment thereof and will pursue appropriate collection steps to collect the same, if necessary.

"Officer's Certificate" means a certificate signed by an Authorized Officer.

"Operating Reserve Fund" has the meaning set forth in the Indenture.

"Organizational Documents" means the instruments pursuant to which a Person was created and which govern its powers and the authority of its representatives to act on its behalf, including (without limitation) (a) with respect to any corporation, the articles of incorporation, certificate of incorporation, corporate charter or other documents pursuant to which such corporation was organized, and its by-laws or code of regulations, and (b) with respect to any limited liability company or other type of entity, the articles or certificate of formation or organization and any operating agreement, each as amended from time to time.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Permitted Encumbrances" means:

(i)      liens for *ad valorem* taxes, contributions or payments in lieu of levied *ad valorem* taxes, special assessments, levies, fees, water and sewer rents or charges that are not then delinquent or are being contested in good faith in accordance with Section 4.5;

(ii)      liens arising by reason of any good faith deposit made to secure any public or statutory obligation or the payment of taxes or assessments or other similar charges, and any deposit given as a condition to the transaction of any business or the exercise of any privilege or license or in connection with workers' compensation, unemployment insurance, any pension or profit sharing plan or other social security;

(iii)      any lien of any mechanic, materialman, laborer, supplier or vendor for work or services performed or materials furnished in connection with such property that is not due and payable or the amount or validity of which is being contested by appropriate proceedings diligently pursued and execution thereon stayed;

(iv)      any lien arising under Law or by contract with respect to initial deposits made under life care or continuing care contracts;

(v)      any lien arising under Law with respect to the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 *et seq*.) and any statutes succeeding thereto, and all Laws, pertaining to such program, including (without limitation) all applicable provisions of manuals, administrative and reimbursement guidelines and requirements of any Governmental Authority promulgated in connected with such program (whether or not having the force of law), in each case as the same may be amended, supplemented or otherwise modified from time to time ("Medicare");

(vi)      such minor defects, irregularities, encumbrances, easements, rights of way, covenants running with the land and clouds on title as normally exist with respect to properties similar in character to the Facilities that do not in the aggregate, in the opinion of legal counsel to, or a Consultant approved by, the Bondholder Representative, materially impair the use of property affected thereby for the purposes for which it was acquired or is held by the Borrower, or the value of such property;

(vii)      the Mortgage;

(viii)      liens securing Indebtedness permitted by this Agreement and the Indenture;

(ix)      encumbrances identified in the mortgagee's title insurance policy delivered in connection with the issuance of the Bonds issued on the Closing Date;

(x)      any lien on Property received by the Borrower through gifts, grants or bequests due to restrictions imposed at the time of the making thereof;

(xi)      any lien on moneys deposited by residents or others with the Borrower as security for prepayment of the cost of residency and/or medical care; and

(xii)    such other Liens as shall be approved in writing by the Bondholder Representative.

"Permitted Investments" means:

(a)    direct obligations of, or obligations the timely payment of the principal of and the interest on which is unconditionally guaranteed by, the United States of America ("Government Obligations");

(b)    direct obligations of, or obligations the timely payment of the principal of and interest on which is guaranteed by, the Federal National Mortgage Corporation, the Federal Home Loan Bank System, the Federal Home Loan Mortgage Corporation or a Federal Farm Credit Bank ("Agency Obligations");

(c)    United States dollar denominated deposit accounts, certificates of deposit and bankers' acceptances with domestic commercial banks (i) that are invested in a money market or other similar bank product secured solely by Government Obligations, or (ii) that are fully insured by the Federal Deposit Insurance Corporation;

(d)    repurchase agreements for Government Obligations or Agency Obligations or investment agreements which are, or are issued or guaranteed by an entity, rated by Moody's or S&P in one of its three highest rating categories (without regard to any refinement or gradation by numerical modifier or otherwise) or fully collateralized by Government Obligations or Agency Obligations (any such collateralized investment agreement being referred to herein as a "Collateralized Investment Agreement"); provided, that (i) such Government Obligations or Agency Obligations shall be delivered to or supported by a safekeeping receipt or other confirmatory documentation issued by a third-party; (ii) the Trustee shall have a perfected security interest in such Government Obligations or Agency Obligations; (iii) such Government Obligations or Agency Obligations shall be free and clear of any other Liens; and (iv) such repurchase agreements or Collateralized Investment Agreements shall provide that the value of the underlying Government Obligations or Agency Obligations shall be continuously maintained at a current market value of not less than 102% of the repurchase price or the amount deposited thereunder, respectively (the value of such Government Obligations or Agency Obligations to be determined by the Trustee at least once in each seven-day period);

(e)    obligations issued by or on behalf of any state of the United States of America or any political subdivision thereof which are rated in one of the two highest rating categories of Moody's or S&P at their time of purchase;

(f)    commercial paper that matures in 270 days or less and that is rated in the highest rating category of Moody's or S&P at their time of purchase;

(g)    shares in investment companies that are rated AAAm or AAAm-G by Moody's or S&P at their time of purchase, at least 90% of the assets of which consist of Government Obligations or Agency Obligations and repurchase agreements backed by Government Obligations or Agency Obligations; and

(h)    such other investments as are approved in writing by the Bondholder Representative.

"Person" means an individual, association, unincorporated organization, corporation, limited liability company, partnership, limited partnership, joint venture, business trust, trust, government or agency or political subdivision thereof or other entity.

"Phase I Report" means the Phase 1 Environmental Site Assessment Update dated _____ and prepared by _____.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA in respect of which the Borrower or any member of the ERISA Group is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Prohibited Transaction" means a prohibited transaction as defined in Section 406 of ERISA or Section 4975 of the Code.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, tangible or intangible, whether now owned or hereafter acquired.

"Rating Agency" means Fitch, Moody's or S&P and their successors and assigns, and *"Rating Agencies"* means each such Rating Agency, collectively.

"Regulated Chemicals" means any substance, the presence of which requires investigation, permitting, control or remediation under any federal, state or local statute, regulation, ordinance or order, including (without limitation):

(a)     any substance defined as "hazardous waste" under RCRA;

(b)     any substance defined as a "hazardous substance" under CERCLA;

(c)     any substance defined as a "hazardous material" under the federal Regulated Chemicals Transportation Law (49 U.S.C. § 5101 et seq.);

(d)     any substance defined under any analogous state statute;

(e)     asbestos;

(f)     urea formaldehyde;

(g)     PCBs;

(h)     petroleum or any distillate or fraction thereof; and

(i)     any hazardous or toxic substance designated pursuant to the Laws of a state.

"Related Documents" means the Bonds, the Bond Purchase Agreement, the Indenture, the Loan Agreement, the Mortgage, the Continuing Disclosure Agreement, the Control Agreement, the Assignment, this Agreement, the 2023A Note, the 2023 CCA Note and all other documents and instruments executed and delivered in connection with the transactions contemplated hereby.

"Reportable Event" means: (a) any "reportable event" within the meaning of Section 4043(c) of ERISA for which the 30-day notice under Section 4043(a) of ERISA has not been waived by the PBGC (including any failure to meet the minimum funding standard of, or timely make any required installment under, Section 412 of the Code or Section 302 of ERISA, regardless of the issuance of any waivers in accordance with Section 412(d) of the Code); (b) any such "reportable event" subject to advance notice to the PBGC under Section 4043(b)(3) of ERISA; (c) any application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code; and (d) a cessation of operations described in Section 4062(e) of ERISA.

"Repository" means the same as set forth in the Continuing Disclosure Agreement.

"Residency Agreement" means a contract between the Borrower and a resident of the Facilities giving the resident certain rights of occupancy in the Facilities and providing for certain services to such resident, as amended from time to time.

"Response Action" has the meaning specified in Section 2.12(e).

"S&P" means S&P Global Ratings, and any successor rating agency.

"Skilled Nursing Unit" means each skilled nursing unit constituting a part of the Facilities.

"Social Security Act" means the Social Security Act of 1965, as amended.

"State" means the State of Oklahoma.

"Taxable Date" means the date as of which interest on any of the Bonds was first includable in gross income of a Bondholder or former Bondholder, as such a date is established pursuant to a Determination of Taxability.

"Taxable Period" means the same as set forth in Section 3.1(d).

"Taxable Rate" means, as of any particular date of calculation, 1.40 times the interest rate that would have been borne by any of the Bonds if a Determination of Taxability with respect to such Bond had not occurred.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholdings), assessments, fees or other charges imposed by any Governmental Authority, including (without limitation) any interest, fines, additions to tax or penalties applicable thereto.

"Trustee" means BancFirst and any successor Trustee under and as defined in the Indenture.

"UCC" means the Uniform Commercial Code as enacted in the State.

"Underwriter" means Raymond James & Associates, Inc. and its successors and assigns.

"Unit" means an Independent Living Unit, Assisted Living Unit, Memory Care Unit, Skilled Nursing Unit or any other unit constituting a part of the Facilities. "Units" means all Units constituting a part of the Facilities.

"Unrestricted Cash and Marketable Securities" means the sum of unrestricted cash, cash equivalents and marketable securities, including board-designated funds, but excluding (a) all Trustee-held funds other than funds on deposit in the Operating Reserve Fund and in the Revenue Fund (but only to the extent the amounts in the Revenue Fund on the next Business Day will be deposited in the Operating Fund, the Ancillary Operating Fund or the Operating Reserve Fund), (b) donor-restricted funds, (c) any cash which by its terms is not available to pay debt service and (d) any funds pledged or otherwise subject to any Lien other than the Liens created by this Agreement and the other Related Documents.

"2023A Note" means the Oklahoma United Methodist Retirement Facility, Inc. Note in the principal amount of $6,000,000 in favor of the Issuer and assigned by the Issuer to the Trustee to evidence and secure the loan of the proceeds of the Bonds by the Issuer to the Borrower under the Loan Agreement.

"2023B Bonds" means the Issuer's Senior Living Facilities Revenue Bonds (Epworth Villa Project) Series 2023B.

"2023B/C Bonds" means the 2023B Bonds and the Issuer's Senior Living Facilities Capital Appreciation Revenue Bonds (Epworth Villa Project) Series 2023C.

"2023 CCA Note" means the Oklahoma United Methodist Retirement Facility, Inc. Continuing Covenants Agreement Note issued to the Trustee to secure the Borrower's obligations under this Agreement.

Section 1.2.    *Computation of Time Periods.*  In this Agreement, in the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding."

Section 1.3.    *Construction.*  Unless the context otherwise clearly requires (a) references to the plural include the singular, to the singular include the plural and to the part include the whole; (b) words of the masculine gender include correlative words of the feminine and neuter genders; (c) the word "including" shall be deemed to mean "including but not limited to" or "without limitation"; (d) "or" has the inclusive meaning represented by the phrase "and/or"; (e) the words "hereof," "herein," "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; (f) the Section headings contained in this Agreement and the table of contents preceding this Agreement are for reference purposes only and shall not control or affect the construction of this Agreement or the interpretation thereof in any respect; and (g) section, subsection and exhibit references are to this Agreement.

Section 1.4.    *Accounting Terms and Determinations.* Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder will

-16-

be made, and all financial statements required to be delivered hereunder shall be prepared, in accordance with GAAP.

Section 1.5.    *Related Documents; Incorporation by Reference.*

(a)    Nothing in this Agreement shall be deemed to amend or relieve the Borrower of its obligations under any other Related Document to which it is a party.  Conversely, to the extent that the provisions of any other Related Document require or permit the Borrower to take or refrain from taking certain actions, such as (without limitation) provisions relating to Liens, transfers of assets and maintenance of financial ratios, the Borrower nevertheless shall be fully bound by the provisions of this Agreement.

(b)    Except as provided in paragraph (c) of this Section, all references to other documents shall be deemed to include all amendments, modifications and supplements thereto to the extent such amendments, modifications and supplements are made in accordance with the provisions of such document and this Agreement.

(c)    All provisions of this Agreement making reference to specific Sections of any other Related Document shall be deemed to incorporate such Sections into this Agreement by reference as though specifically set forth herein (with such changes and modifications as may be herein provided) and, except to the extent otherwise provided herein, shall continue in full force and effect with respect to this Agreement notwithstanding payment of all amounts due under or secured by such other Related Document, the termination or defeasance thereof or any amendment thereto or any waiver given in connection therewith, so long as this Agreement is in effect and until the Bonds and all Obligations hereunder are paid in full.  Except to the extent otherwise provided herein, no amendment, modification, consent, waiver or termination with respect to any of such Sections shall be effective as to this Agreement until specifically agreed to in writing by the Bondholder Representative and the parties hereto with specific reference to this Agreement.

(d)    Provisions of the Indenture governing the rights, immunities and protections of the Trustee thereunder are hereby granted to the Trustee and incorporated by reference into this Agreement as though fully set forth herein.

(e)    In addition to the representations and warranties of the Borrower set forth in Article II, the representations and warranties made by the Borrower in the Related Documents are incorporated by reference into this Agreement as though fully set forth herein.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

In order to induce the owners from time to time of the Bonds to purchase the Bonds, the Borrower hereby represents and warrants to the Trustee and the Bondholder Representative, as of the Closing Date, as follows:

Section 2.1.    *Organization; Powers.* The Borrower: (a) is a not-for-profit corporation, duly organized, validly existing and in good standing under the Laws of the State of Oklahoma; (b) has the power and authority to own its Property and to carry on its business as now conducted and as proposed to be conducted; (c) is qualified to do business and is in good standing in every

jurisdiction where such qualification is required, except where the failure so to qualify would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect; and (d) has the power and authority to execute, deliver and perform its obligations under each of the Related Documents to which it is a party.

Section 2.2.    *Authorization.*  The execution, delivery and performance by the Borrower of each of the Related Documents to which the Borrower is or is to become a party, the Borrower's obligations thereunder and the consummation of the transactions contemplated thereby (a) have been duly authorized by all necessary action on the part of the Borrower; and (b) will not (i) violate any Law, the Borrower's Organizational Documents or any provision of any material indenture, agreement or other instrument to which the Borrower is a party or by which the Borrower or any of its Property is or may be bound, (ii) result in a breach of or constitute (alone or with notice or lapse of time or both) a default under or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument or (iii) result in the creation or imposition of any Lien (other than a Permitted Encumbrance) upon or with respect to any Property now owned or hereafter acquired by the Borrower.

Section 2.3.    *Enforceability*.  This Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Related Document to which the Borrower is a party, when executed and delivered by the Borrower, will constitute, a legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with its terms, subject to (a) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and other similar Laws or enactments in effect now or in the future relating to or affecting the enforceability of creditors' rights generally; (b) the application of general principles of equity (including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing), regardless of whether considered in a proceeding in equity or at law and the availability of the remedy of specific performance; and (c) considerations of public policy with respect to indemnity provisions.

Section 2.4.    *Governmental Approvals*. The Borrower has obtained or will obtain in the ordinary course all Governmental Approvals and has complied or will comply in all material respects with all Laws necessary to conduct its business as it is presently conducted and contemplated to be conducted and to own and operate the Facilities.  The Borrower has all Governmental Approvals that are (i) required to be obtained by the Borrower as a condition precedent to the issuance of the Bonds and the execution and delivery of the Related Documents and (ii) obtainable to date for the performance by the Borrower of its obligations under the Related Documents and the operation of the Facilities.  No Governmental Approval or other action by any Governmental Authority that has not been obtained is required in connection with the transactions contemplated hereby.

Section 2.5.    *No Default*. No event has occurred (other than as disclosed in the Chapter 11 Proceeding) and no condition exists with respect to the Borrower which would constitute an Event of Default as defined in this Agreement or any of the other Related Documents or which, with the lapse of time or with the giving of notice or both, would become such an "event of default."  The Borrower is not in default under its Organizational Documents or any agreement or instrument to which it is a party or by which it or its Property is bound.  The Borrower is not in

default or alleged to be in default in any material respect under any Indebtedness or any agreement under which any Indebtedness shall have been issued or incurred.

Section 2.6.    *Title to Properties; Liens.*

(a)    The Borrower has good and marketable title to all Property purported to be owned by it, free and clear of any Liens, other than Permitted Encumbrances.

(b)    Except [for the Leases and] as otherwise set forth in the Indenture, the Borrower represents and warrants that it has not made a pledge of, granted a Lien on or security interest in or made an assignment or sale of the Gross Revenues or any of its other Property, or described or consented to the description of the Gross Revenues or such Property in any UCC financing statement that will remain in effect upon the issuance of the Bonds, other than Permitted Encumbrances.

Section 2.7.    *Litigation; Compliance with Laws and Agreements.*

(a)    There are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any business, Property or rights of the Borrower.

(b)    Neither the Borrower nor any of its Property is in violation of, nor will the operation of the Facilities violate, any Law in any material respect.  The Borrower is not in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority.

Section 2.8.    *Contracts, Etc.*  The Borrower is not in default or, to the knowledge of the Borrower, alleged to be in default, in any material respect with respect to any of its obligations under any of its material agreements nor would be in default or alleged to be in default with the giving of notice, passage of time or both.  To the knowledge of the Borrower, no party other than the Borrower is in default with respect to such party's obligations under any agreements (or would be in default or alleged to be in default with the giving of notice, passage of time or both) with the Borrower other than ordinary course delinquencies under Residency Agreements.  No claim has been asserted against the Borrower that is or could be materially adverse to its interests under any of such agreements.  None of such agreements is subject to any material rights of set-off, recoupment or similar deduction or offset.  The Borrower has not assigned or encumbered any of its rights, title or interest in or under any of such agreements or agreed to any oral modifications of any of the material provisions of any of such agreements.

Section 2.9.    *Tax Matters*.

(a)    The Borrower has received a determination letter from the Internal Revenue Service classifying it as an organization (i) described in Section 501(c)(3) of the Code which is exempt from federal income taxation under Section 501(a) of the Code (except with respect to "unrelated business taxable income" within the meaning of Section 512(a) of the Code) and (ii) which is not a "private foundation" as defined in Section 509(a) of the Code. Such determination letter has not been modified, limited, revoked or suspended.  The Borrower has not received any indication or notice, written or oral, from representatives of the Internal Revenue Service to the effect that its

exemption under Section 501(c)(3) of the Code has been modified, limited, revoked or superseded, or that the Internal Revenue Service is considering modifying, limiting, revoking or superseding such exemption. The Borrower is in compliance in all material respects with all of the terms, conditions and limitations, if any, contained in such determination letter. There has been no change in the facts and circumstances represented to the Internal Revenue Service as a basis for receiving, and which formed the basis on which the Internal Revenue Service issued, the determination letter relating to the status of the Borrower as an organization described in Section 501(c)(3) of the Code and as an organization which is not a "private foundation" as defined in Section 509 of the Code of a nature or to a degree as would warrant any action by the Internal Revenue Service to modify, limit, revoke or supersede such determination letter. The Borrower is an organization organized and operated exclusively for charitable purposes and not for pecuniary profit and no part of the net earnings of the Borrower inures to the benefit of any person, private stockholder or individual, within the meaning of Section 3(a)(4) of the Securities Act of 1933, as amended.

(b)    The Borrower has filed, or caused to be filed, all federal, state, and local tax returns which are required to have been filed by it or has filed extensions therefor and has paid or caused to be paid all taxes as and when due and payable by it and all assessments received by it, except taxes that are being contested in good faith by appropriate proceedings diligently pursued and for which the Borrower has set aside on its books adequate reserves.

Section 2.10.    *No Untrue Statements or Omissions of Material Facts*. None of the statements contained in any report, financial statement, offering document, exhibit or schedule furnished by or on behalf of the Borrower, or any of its Affiliates, to the Trustee or the Bondholder Representative in connection with the negotiation of any Related Document or included therein or delivered pursuant thereto, contained or contains any untrue statement of material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading as of the time when made or delivered.

Section 2.11.    *Employee Benefit Matters*.

(a)    [The Borrower has no Multiemployer Plans.] With respect to each Plan, (i) no "accumulated funding deficiency," as such term is defined in Section 302 of ERISA or Section 412 of the Code, exists or has existed at any time, (ii) no waiver of the minimum funding standards of Section 302 of ERISA and Section 412 of the Code has been requested from or granted by the Internal Revenue Service, and (iii) no Lien in favor of any Plan has arisen under Section 302(f) of ERISA or Code Section 412(n).

(b)    There have been no Reportable Events, and the execution and performance of the Related Documents will not constitute a Reportable Event. No employee benefit plan as defined in Section 3(3) of ERISA has been terminated since the effective date of ERISA which could result in any tax, penalty or liability being imposed upon the Borrower or any ERISA Affiliate.

(c)    To the knowledge of the Borrower, neither the Borrower nor any ERISA Affiliate, or any predecessor-in-interest to any of them, has participated in, and the execution and performance of this Agreement will not involve, any Prohibited Transaction that could subject the

Borrower or any ERISA Affiliate to any liability under ERISA or tax or penalty imposed by Section 4975 of the Code.

(d)     Each Plan is now and always has been operated in all material respects in accordance with Law and its terms, and all obligations required to be performed under each Plan have been performed such that there is no material default or violation by any party to any Plan. Each Plan that is intended to be qualified under Section 401(a) of the Code and each trust established in connection with any Plan that is intended to be exempt from federal income taxation under Section 501(a) of the Code has received a favorable determination letter from the Internal Revenue Service that it is so qualified or exempt, respectively, and no fact or event has occurred and is continuing since the date of such determination letter that could reasonably be expected to adversely affect the qualified status of such Plan or the exempt status of any such trust.

(e)     The execution and performance of this Agreement will not (i) constitute a stated triggering event under any Plan that will result in any payment becoming due to any employee, officer, director or independent contractor of the Borrower or any ERISA Affiliate or (ii) accelerate the time of payment or vesting for, or increase the amount of any compensation or benefits due to, any such individual.

Section 2.12.  *Environmental Matters*.  Except as identified in the Phase I Report:

(a)     The Mortgaged Property does not contain any Regulated Chemical in an amount or concentration which (i) constitutes a violation of, (ii) requires remedial action under or (iii) could reasonably be expected to give rise to liability under any Environmental Law.

(b)     The Mortgaged Property and all operations of the Borrower are in compliance in all material respects with every Environmental Law.  The Mortgaged Property has no underground storage tanks or drums.  All aboveground tanks and drums located at the Mortgaged Property are in compliance with Environmental Laws, including, but not limited to, being equipped with required secondary containment.

(c)     The Borrower has obtained every Environmental Permit required under any Environmental Law that is necessary for the ordinary operations of its business; every such Environmental Permit is in full force and effect, and the Borrower is in compliance with every material term and condition of each such Environmental Permit.

(d)     Neither the Borrower nor any of its Properties or operations is subject to any outstanding written order from or agreement with any Governmental Authority or subject to any judicial or docketed administrative proceeding respecting any Environmental Law, Environmental Claim or Regulated Chemical.

(e)     There has been no release or threatened release in violation of any applicable Environmental Law at, from, under or proximate to the Mortgaged Property or at any other Property that would (i) require material removal and remedial action ("Response Action") under any Environmental Law, (ii) could give rise to material liability under any Environmental Law or (iii) could otherwise reasonably be expected to have a Material Adverse Effect.

-21-

(f)    The Borrower has not received any notice of an Environmental Claim in connection with the Mortgaged Property, other Property it owns or operates, its operations or with regard to any Person whose liability under any Environmental Law has been retained or assumed, in whole or in part, contractually, by operation of law or otherwise, by the Borrower and the Borrower has no reason to believe that any such notice will be received or is being threatened.

(g)    No Regulated Chemical has been (i) transported from the Mortgaged Property by the Borrower in violation of any Environmental Law, or (ii) generated, treated, stored or disposed of at, on or under any of the Mortgaged Property by the Borrower in a manner that could reasonably be expected to give rise to liability under any Environmental Law. To the Borrower's knowledge, no Regulated Chemical has been (i) transported from the Mortgaged Property by any Person other than the Borrower in violation of any Environmental Law, or (ii) generated, treated, stored or disposed of at, on or under any of the Mortgaged Property by any Person other than the Borrower in a manner that could reasonably be expected to give rise to liability under any Environmental Law. The Borrower has not retained or assumed any liability, contractually, by operation of law or otherwise, with respect to the generation, treatment, storage or disposal of any Regulated Chemical.  The Borrower does not own or operate any underground storage tank that is not properly permitted and in compliance with applicable Environmental Laws, or that is experiencing or has ever experienced a material release of Regulated Chemical.

Section 2.13.  *Related Party Transactions.*  The Borrower has not entered into any agreement (whether written or oral) with a director, trustee, officer or member of the Borrower in excess of $[10,000] in the aggregate (each a "Related Party Agreement").

Section 2.14.  *Survival.*  The Borrower's representations and warranties contained herein or incorporated in this Agreement (a) shall remain operative and in full force and effect regardless of the issuance of the Bonds, and (b) are made as of the date of this Agreement and shall survive the issuance of the Bonds.

# ARTICLE III
# PAYMENT OBLIGATIONS; SECURITY

Section 3.1.    *Payment Obligations*.

(a)    *General*.  The Borrower shall make all payments required by Article IV of the Loan Agreement as and when they become due and shall promptly pay all other amounts necessary to enable the Trustee to make the payments and transfers required by Article IV of the Indenture.  To provide for the repayment of the Bonds under Section 404 of the Indenture and the deposits required to be made to the funds and accounts created by the Indenture, the Borrower agrees to pay to the Trustee in immediately available funds the following amounts on the following dates:

(i)    with respect to the payments to be made under Section 404(b)(i) of the Indenture with respect to the Bonds from amounts on deposit therein in the Series 2023A Interest Account in the Debt Service Fund, on or before the first day of each month from [January 1], 2024 through [May 1, 2024], one-[fifth (1/5)] of the amount of interest which will become due and payable on the Outstanding Bonds on the first Interest Payment Date, and thereafter, one-sixth (1/6th) of the amount of interest which will become due and payable on the Outstanding Bonds on

the next succeeding Interest Payment Date, or such lesser amount as shall be required to make the amount on deposit in the applicable Interest Account of the Debt Service Fund sufficient to pay interest on such Bonds on the next succeeding Interest Payment Date; and

(ii)    with respect to the payments to be made under Section 404(c)(i) of the Indenture with respect to the Bonds from amounts on deposit therein in the Series 2023A Principal Account in the Debt Service Fund, on or before the first day of each month beginning [December 1], 2025, an amount equal to $1/12^{\text{th}}$ of the principal payable and any amount required to effect any mandatory sinking fund redemption of Bonds on the next succeeding principal payment date; and

(iii)    on each date on which the redemption price of any Outstanding Bonds becomes due (other than the redemption price of Outstanding Bonds subject to mandatory sinking fund redemption on such date), the redemption price of the Bonds due on such date, or such lesser amount as shall be required to make the amount on deposit in Redemption Fund available to pay such redemption price on such date; and

(iv)    on or before the first day of each month during any period in which the amount on deposit in the Debt Service Reserve Fund is less than the Debt Service Reserve Fund Requirement (A) if such deficiency results from a withdrawal from the Debt Service Reserve Fund, an amount equal to one-twelfth (1/12) of the amount of such deficiency until the amount on deposit in the Debt Service Reserve Fund is at least equal to the Debt Service Reserve Fund Requirement or (B) if such deficiency results from a decline in value of the assets on deposit in the Debt Service Reserve Fund, an amount equal to the amount of the deficiency until the amount on deposit in the Debt Service Reserve Fund equals the Debt Service Reserve Fund Requirement.

For the avoidance of doubt, nothing in clause (a) of this Section shall be construed to conflict with or otherwise modify the priority of payments for the Bonds and the 2023B/C Bonds as set forth in Article IV of the Indenture.

(b)    *Additional Payments*.  In addition, the Borrower shall pay the following amounts (collectively, the "Additional Payments") as and when the same become due:

(i)    (A) to the Bondholder Representative, upon receipt of invoices therefor, the reasonable fees and expenses of the Bondholder Representative relating to ongoing monitoring of the Borrower and the proceeds of the Bonds, not to exceed $2,500 annually and (B) to or on the order of the Bondholder Representative, the reasonable fees and expenses of the Bondholder Representative's counsel in connection with the Bonds from time to time;

(ii)    to the Trustee, fees and charges of the Trustee incurred in connection with the rendering of its ordinary and any extraordinary services provided by the Trustee under the Indenture, this Agreement and the other Related Documents, as and when the same become due, including the reasonable fees and expenses of its counsel;

(iii)    to the Issuer, the Issuer fees described in the Loan Agreement, as and when the same becomes due, including the reasonable fees and expenses of its counsel;

(iv)    if an Event of Default shall have occurred, all costs and expenses of the Bondholder Representative and the Trustee (including reasonable fees and expenses of counsel to the Bondholder Representative and/or the Trustee) in connection with the enforcement (whether by means of legal proceedings or otherwise) of any of its rights under this Agreement and the other Related Documents;

(v)    all costs and expenses of the Trustee, the Bondholder Representative and HCA (including reasonable fees and expenses of counsel to the Trustee and/or the Bondholder Representative) in connection with each amendment of this Agreement or any other Related Document and each request of the Borrower for any consent, approval, waiver or other action from the Bondholder Representative or waiver by the Bondholder Representative under any Related Document;

(vi)    any amounts advanced by or on behalf of the Trustee or the Bondholder Representative to the extent required to cure any Default, Event of Default or event of nonperformance hereunder or under any other Related Document, together with interest at the Default Rate; and

(vii)    any rebates or payment in lieu thereof required to be paid under Section 148 of the Code in accordance with Section 5.6 of the Loan Agreement;

(c)    *Excess Interest*.

(i)    If the amount of interest payable for any period in accordance with the terms hereof or the Indenture or the Bonds exceeds the amount of interest that would be payable for such period had interest for such period been calculated at the Maximum Interest Rate, then interest for such period shall be payable in an amount calculated at the Maximum Interest Rate.  The excess, if any, of the interest that would have been due and payable on any Bond for any period but for the operation of this paragraph shall constitute the "Excess Interest Amount" with respect to such Bond and shall accrue and be payable as provided in this subsection.  If, as of any date, there exists any accrued and unpaid Excess Interest Amount, then the principal amount with respect to which interest is payable hereunder shall bear interest at the Maximum Interest Rate until payment to the holder of each Bond of the entire Excess Interest Amount with respect to such Bond.

(ii)    Notwithstanding the foregoing and to the extent permitted by Law, on the date on which no principal amount with respect to a Bond remains unpaid, the Borrower shall pay to the holder a fee equal to any accrued and unpaid Excess Interest Amount due with respect to such Bond.

(d)    *Determination of Taxability*.  If a Determination of Taxability with respect to any Bonds occurs and the Bondholder Representative waives the mandatory prepayment of such Bond in accordance with Section 3.2(a) of this Agreement, then such Bond shall remain outstanding and shall bear interest at the Taxable Rate from the date of the Determination of Taxability, and, in such event, the Borrower hereby agrees to pay to each Bondholder or former Bondholder (i) an amount equal to the difference between (A) the amount of interest that would have been paid to such Bondholder or former Bondholder on such Bond during the period for which interest on such

Bond is included in the gross income of such Bondholder or former Bondholder if such Bond had borne interest at the Taxable Rate (the *"Taxable Period"*) and (B) the amount of interest on such Tax-Exempt Bond actually paid to the Bondholder or former Bondholder during the Taxable Period and (ii) an amount equal to any interest, penalties or charges owed by such Bondholder or former Bondholder as a result of interest on such Bond being included in the gross income of such Bondholder or former Bondholder, together with any and all attorneys' fees, court costs, or other out-of-pocket costs incurred by such Bondholder or former Bondholder (or their Bondholder Representative) in connection therewith. The obligations of the Borrower under this subsection shall survive the termination of this Agreement, the termination of any of the other Related Documents, and the redemption or other payment in full of such Bond. For the avoidance of doubt, the Bondholder Representative is not obligated to waive the mandatory prepayment of the Bonds.

Section 3.2.     *Mandatory Redemption*.

(a)     In the event of a Determination of Taxability with respect to any Bond, the Borrower shall forthwith, and in any event within 180 days after any such Determination of Taxability, pay to the Trustee an amount equal to the principal amount of the Bonds Outstanding and accrued interest thereon to the date on which such Bonds are redeemed, plus a premium equal to 5% of the outstanding principal amount of such Bonds, for deposit in the Debt Service Fund; *provided*, that if the Borrower delivers to the Trustee and the Bondholder Representative an opinion of Bond Counsel to the effect that interest on such Bonds will not be includable in the gross income of the owners thereof if less than all of such Bonds are redeemed, then the Borrower shall pay the amount necessary to redeem the amount of such Bonds required to be redeemed in order to preserve the tax-exempt status of the Bonds remaining outstanding as set forth in such opinion. The Borrower agrees to take all action required to cause the requisite amount of such Bonds to be redeemed on the earliest practicable date. Notwithstanding the foregoing, the Bondholder Representative may waive the requirement that the Bonds be redeemed upon a Determination of Taxability by written notice to the Borrower, the Issuer and the Trustee, in which event such Bonds shall bear interest at the Taxable Rate during the Taxable Period in accordance with Section 3.1(d).

(b)     The Borrower shall take all action reasonably required to cause Bonds to be redeemed in an amount equal to the amount of the Net Proceeds and other amounts required to be paid to the Trustee in accordance with Section 4.15.

Section 3.3.     *Obligations Absolute*.

(a)     The obligation of the Borrower to make the payments required under the Related Documents shall be absolute and unconditional.  Until such time as the principal of and premium (if any) and interest on the Bonds shall have been fully paid or provision for the payment thereof shall have been made in accordance with the Indenture and all other amounts due hereunder and under the other Related Documents shall have been paid, the Borrower (i) shall perform and observe all of its agreements contained in this Agreement and the other Related Documents to which it is a party, and (ii) shall pay without abatement, diminution or deduction (whether for taxes or otherwise) all amounts required to be paid hereunder and under the other Related

Documents, regardless of any cause or circumstance whatsoever, including (without limitation) the following: any defense, set off, recoupment or counterclaim which the Borrower may have or assert against the Bondholder Representative, the Trustee or any other Person; any Indebtedness or liability at any time owing to the Borrower by the Bondholder Representative, the Trustee or any other Person; any acts or circumstances that may constitute failure of consideration; damage to or condemnation of the Mortgaged Property; failure or delay in completion of the Project; eviction by paramount title; commercial frustration of purpose; bankruptcy or insolvency of the Trustee; any change in the tax or other laws of the United States of America or of the State or any political subdivision of either; foreclosure of the Mortgage; or any failure of the Bondholder Representative or the Trustee to perform and observe any agreement, whether express or implied, or any duty, liability or obligation arising out of or connected with this Agreement or the other Related Documents.

(b)     The Borrower hereby waives, to the extent permitted by Law, any and all rights that it may now have or that at any time hereafter may be conferred upon it, by statute or otherwise, to terminate or cancel, or to limit its liability under, this Agreement or the other Related Documents except in accordance with the express terms hereof.

Section 3.4.    *Security*.

(a)     As security for the performance by the Borrower of its obligations hereunder, the Borrower hereby collaterally assigns to the Trustee, and grants to the Trustee a lien on and security interest in, all of its now owned and hereafter acquired, created or arising Collateral, including (without limitation) the Gross Revenues, subject to no Liens or encumbrances in each case regardless of where such Collateral may be located and whether such Collateral may be in possession of the Borrower or the Trustee or a third party or if any of such Collateral may be held or stored with any third party. Without limiting the generality of the foregoing, until such time as all amounts Outstanding under the Bonds have been indefeasibly paid in full, the lien and security interest granted hereunder shall continuously apply to the Collateral, including (without limitation) all rights to receive Gross Revenues, and the proceeds of the other Collateral. In addition to the rights and remedies granted to the Trustee herein and in the other Related Documents, the Trustee shall have all of the rights and remedies of a secured party under the UCC with respect to all of the Collateral and all of the pledged Property.

(b)     The Borrower at all times will subject all of its Property constituting Collateral to a first priority, perfected lien (subject to Permitted Encumbrances) in favor of the Trustee pursuant to the terms and conditions of this Agreement, the Indenture, the Mortgage and the other Related Documents and shall execute, acknowledge and deliver such further conveyances, transfers, assurances, financing statements and other instruments, in form and substance reasonably satisfactory to the Bondholder Representative, as the Trustee or the Bondholder Representative, respectively, shall reasonably request for better assuring, conveying, granting, assigning and confirming any rights and liens on the Collateral granted hereunder, including (without limitation), the Lien on the Gross Revenues, the Mortgaged Property and other Property on which a lien is granted, or intended to be, or that the Borrower may hereafter become bound to mortgage, pledge or assign. The Borrower shall adhere to the covenants regarding the location or existence of the Borrower's personal and real Property set forth herein and in the other Related Documents.

(c)     If subsequent to the Closing Date, the Borrower shall (i) acquire any securities, instruments, chattel paper or other personal Property related to the Mortgaged Property or establish any bank account, brokerage account or investment account not theretofore pledged to the Trustee as Collateral under the Related Documents and which constitutes Collateral as defined herein, or (ii) acquire or lease any real Property not theretofore subject to the Mortgage, the Borrower shall promptly notify the Bondholder Representative thereof.  The Borrower shall promptly (but in no event later than 30 days following the acquisition of such Property, subject to the provisions of this Agreement or any other Related Document requiring prior or more immediate action or notice with respect thereto) take such action at its own expense as shall be determined by the Bondholder Representative to be necessary or advisable to ensure that the Trustee has a first priority perfected lien to secure the payment and performance obligations of the Borrower hereunder and under each other Related Document in each account and all personal and real Property of the Borrower, subject in each case only to Permitted Encumbrances, and execute a landlord waiver for leased real Property in form and substance acceptable to the Bondholder Representative.  Such action shall include delivery by or on behalf of the Borrower of (A) such Related Documents or supplements thereto as are necessary for the Borrower to comply with this Section, and (B) such other documentation as the Trustee or the Bondholder Representative may reasonably request in connection with the foregoing, including (without limitation) certified resolutions and documents evidencing the authority of the Borrower to execute and deliver such documents and instruments and favorable opinions of counsel to the Borrower (which shall cover, among other things, the legality, validity, binding effect and enforceability of such documentation), all in form, content and scope reasonably satisfactory to the Bondholder Representative.

(d)     The Borrower will, to the extent required by Law, cause this Agreement, the Mortgage and all supplements hereto and thereto, together with all related UCC financing statements and other instruments, to be kept, recorded and filed in such manner and in such places as may be required by Law in order to create, perfect, preserve and protect fully the Lien of the Trustee on the Gross Revenues, the Mortgaged Property and the other Collateral provided by or on behalf of the Borrower and the rights granted the Trustee for the benefit of the holders of the Obligations or the Trustee for the benefit of the Bondholders.

(e)     The Borrower hereby authorizes the Trustee at any time and from time to time, at the Borrower's expense, to file in any appropriate filing office any initial financing statements and amendments thereto and continuations thereof covering any Collateral provided by the Borrower under the Related Documents.  The Trustee shall be entitled to conclusively rely upon any originally filed financing statements timely delivered to it in filing any continuation statements hereunder.  The Borrower shall not file any amendments, correction statements or termination statements concerning any Collateral without the prior written consent of the Trustee and the Bondholder Representative.  The Borrower authorizes the Trustee to request other secured parties of the Borrower to provide accountings, continuations of collateral and confirmations of statements of account concerning the Borrower.  As long as any Bonds remain outstanding, and not thereafter, the Borrower hereby designates and appoints the Trustee and its designees as attorneys-in-fact of the Borrower, irrevocably and with power of substitution, with authority to endorse its name on requests to other secured parties of the Borrower for accountings, confirmations of Collateral and confirmations of statements of account made pursuant to Section 7-210 of the UCC. The Borrower will pay or cause to be paid all filing fees incident to such filing and all expenses incident to the preparation, execution and acknowledgment of any instruments of further assurance, and all

federal or state fees and other fees, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of such instruments of further assurance.

(f)     The Borrower shall ensure that the Collateral in each deposit account, each brokerage account and each investment account of the Borrower at all times shall be subject to a Control Agreement in form satisfactory to the Bondholder Representative.  Under all such Control Agreements, the Borrower will maintain control of its account until such time as an Event of Default has occurred.

<h2 align="center">ARTICLE IV<br>AFFIRMATIVE COVENANTS</h2>

The Borrower hereby covenants and agrees that until all of the Bonds and all other amounts payable hereunder and under the Indenture with respect to the Bonds have been fully paid and performed, unless the Bondholder Representative shall otherwise consent in writing, the Borrower shall comply with the provisions of this Article.

Section 4.1.   *Preservation of Existence, Etc.*

(a)     The Borrower will do or cause to be done all things necessary to preserve and maintain its legal existence, and all rights, privileges and franchises necessary and desirable in the conduct of its business (including, without limitation, its right to do business in each jurisdiction in which the Borrower conducts business) and in the performance of its obligations under the Related Documents and will not dissolve or otherwise discontinue its existence or operations.

(b)     The Borrower shall do or cause to be done all things necessary to: (i) obtain, preserve, renew, extend and keep in full force and effect the Governmental Approvals and intellectual property material to the conduct of the Borrower's business; and (ii) use its best efforts, in the ordinary course of business, to preserve the goodwill and business of the customers, suppliers and others having material business relations with it.

Section 4.2.   *Performance and Compliance with Other Covenants.*  The Borrower will perform and comply with the covenants of the Borrower set forth in the other Related Documents in accordance with the terms of this Agreement and other Related Documents.

Section 4.3.   *Books and Records; Reports; Communications.*  The Borrower will keep accurate records and books of account in accordance with GAAP, consistently applied.

(a)     The Borrower will provide to the Trustee, the Bondholder Representative and, upon its request, the Underwriter, the following items at the following times, each in form and substance satisfactory to the Bondholder Representative:

(i)     within 120 days after the last day of each Fiscal Year beginning with the Fiscal Year ended December 31, 2023 (A) the annual Financial Statements of the Borrower, prepared in accordance with GAAP, which shall be accompanied by an unqualified report of an independent certified public accountant reasonably acceptable to the Bondholder Representative,

-28-

(B) a letter from such independent certified public accountant setting forth the Debt Service Coverage Ratio and the Days' Cash on Hand as of the last day of such Fiscal Year, (C) any letter to management or governance letter from such independent certified public accountant and (D) an Officer's Certificate of the Borrower substantially in the form set forth in <u>Exhibit A</u> (1) setting forth (I) the Debt Service Coverage Ratio for the 12-month period ended on the last day of each such Fiscal Year, (II) the Days' Cash on Hand as of the last day of such Fiscal Year, (III) the total number of Units that constituted Occupied Units as of the last day of such Fiscal Year and (IV) certain other matters set forth in the form of Exhibit A attached hereto and (2) including a statement to the effect that, to the best of such officer's knowledge (I) such Financial Statements fairly present, in all material respects, the financial position and results of operations of the Borrower as of the date and for the period covered by such Financial Statements and (II) no Event of Default or Default under any Related Document has occurred and is continuing or, if any such Event of Default or Default has occurred, stating the nature thereof and the steps the Borrower intends to take to cure such default;

(ii)    (A) within 25 days after the last day of each month beginning with the month ending [January 31, 2024] (1) unaudited interim financial statements of the Borrower for such month and for the period from the beginning of the then-current Fiscal Year to the last day of such month and (2) a report detailing the total number of Units that constituted Occupied Units as of the last day of such month; (B) within [seven] days following the end of each week (which shall be sent via e-mail), a report detailing (I) the total number of Units that constituted Occupied Units as of the last day of such week, (II) the number of Units vacated during such week, specifying the reason each Unit was vacated (e.g. move out, death, etc.), (III) the number of individuals on the waitlist for Units, and (IV) the resident origin for newly occupied Units during such week; (C) within 25 days following the last day of each Fiscal Quarter, an Officer's Certificate of the Borrower substantially in the form set forth in <u>Exhibit A</u> (1) setting forth (I) the Debt Service Coverage Ratio for the 12-month period ended on the last day of each such Fiscal Quarter commencing with the Fiscal Quarter ending December 31, 2024, (II) the Days' Cash on Hand as of the last day of such Fiscal Quarter (*provided*, however, that, to the extent that the last day of such Fiscal Quarter is not a Liquidity Testing Date, such calculation is delivered solely for informational purposes and not for determining compliance with the Liquidity Covenant), (III) the total number of Units that constituted Occupied Units as of the last day of such Fiscal Quarter and (IV) certain other matters set forth in the form of Exhibit A attached hereto and (2) including a statement to the effect that, to the best of such officer's knowledge (I) such Financial Statements fairly present, in all material respects, the financial position and results of operations of the Borrower as of the date and for the period covered by such Financial Statements, subject to year-end adjustments and (II) no Event of Default or Default under any Related Document has occurred and is continuing or, if any such Event of Default or Default has occurred, stating the nature thereof and the steps the Borrower intends to take to cure such default;

(iii)    within 25 days after the last day of each month, beginning with the last day of the month in which the Bonds were issued, an occupancy and Entrance Fee report detailing (A) the total number of Units that constituted Occupied Units as of the last day of such month, (B) the number of Units vacated during such month, specifying the reason each Unit was vacated (e.g. move out, death, etc.), (C) the number of individuals on the waitlist for Units, (D) the resident

origin for newly occupied Units during such month, (E) the current Entrance Fees and Monthly Service Fees, and (F) the total Entrance Fee refunds paid during such month and currently owing;

(iv)    as soon as practicable, and in any event (A) not later than 30 days prior to commencement of each Fiscal Year and prior to adoption thereof by the Governing Body, a copy of the Borrower's annual operating and capital budgets (detailed on a month to month basis) for such Fiscal Year, and (B) at least ten days prior to the Governing Body's adoption thereof, a copy of any amendment of the capital or operating budget;

(v)    within 10 days of receipt or completion, copies of any material healthcare survey and any state inspection results applicable to the Borrower;

(vi)    [within __ days of the Closing Date and] within 30 days subsequent to the end of every Fiscal Year thereafter, (A) a report of an Insurance Consultant to the effect that the Borrower has in effect insurance of the types and in the amounts required by the Loan Agreement and this Agreement, (B) a report detailing the real estate market characteristics and competitors of the primary market area for the Facilities, (C) an annual marketing and sales plan reviewed by an independent Consultant selected by the Borrower and approved by the Bondholder Representative, (D) a report detailing a review of the prior year's Medicare and Medicaid billing practices at the Facilities and (E) a copy of an annual resident satisfaction survey conducted for residents of the Facilities;

(vii)    as soon as possible and in any event within five days after the Borrower knows or has reason to know of the occurrence of any Event of Default, Default or other noncompliance with any of the Related Documents, an Officer's Certificate setting forth details of such Event of Default, Default or noncompliance, describing in detail any and all provisions of this Agreement and the other Related Documents that have been breached or violated and the action that the Borrower proposes to take with respect thereto;

(viii)    as soon as possible and in any event within 10 days after the Borrower knows or has reason to know of the occurrence of any event or the existence of any circumstance or series of events or circumstances that could reasonably be expected to have a Material Adverse Effect, an Officer's Certificate setting forth details of such event or circumstance, the possible results thereof and the action that the Borrower proposes to take with respect thereto;

(ix)    promptly, and in any event within 10 days after the filing or commencement of, or any written threat or notice of intention of any Person to file or commence any action, suit or proceeding involving a claim in an aggregate amount exceeding $[500,000] that is not covered by insurance carried by the Borrower that is then in effect, whether at law or in equity or by or before any Governmental Authority, by or against the Borrower or otherwise affecting the Borrower, and any judgments entered against the Borrower, written notice thereof;

(x)    promptly, and in any event within 10 days after receipt thereof, copies of any notices received by the Borrower that indicate that any Governmental Approval necessary for the operation of the Facilities may be suspended or withdrawn;

(xi)    promptly, and in any event by the time the next Financial Statements are required to be delivered hereunder, written notice of any material change in the accounting policies or financial reporting practices by the Borrower (including a change in Fiscal Year), *provided* however, that the Borrower shall not be required to give notice of any changes made solely as a result of changes required by GAAP;

(xii)    as soon as possible, and in any event within 10 days after the Borrower or any member of the ERISA Group knows or has reason to know thereof, written notice of any ERISA Event that alone or together with any other ERISA Event could reasonably be expected to result in liability of the Borrower or such ERISA Affiliate in respect of any employee benefit plan as defined in Section 3(3) of ERISA in an aggregate amount exceeding $500,000, together with a statement of the director of finance of the Borrower setting forth details as to such ERISA Event and the action, if any, that the Borrower proposes to take with respect thereto;

(xiii)    as soon as possible, and in any event within 10 days after the Borrower knows or has reason to know thereof, written notice of any of the following that could reasonably be expected to result in liability or loss to the Borrower, either individually or in the aggregate, in excess of $500,000:  (A) any enforcement, cleanup, removal or other regulatory action instituted, completed or threatened by any Governmental Authority against the Borrower, any of its Property or the Mortgaged Property pursuant to any applicable Environmental Law; (B) any other environmental claim against the Borrower, any of its Property or the Mortgaged Property; or (C) any environmental or similar condition on any real property adjoining any Mortgaged Property that could reasonably be anticipated to cause the Mortgaged Property or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use of such Mortgaged Property under any Environmental Laws;

(xiv)    during any period in which the number of Independent Living Units constituting Occupied Units is less than 90%, if requested by the Bondholder Representative, the Borrower shall conduct a weekly conference call with the Bondholder Representative or its designee to discuss sales and marketing of the Facilities;

(xv)    during any period in which the Borrower shall have failed to comply with or observe any of the terms, covenants, conditions or agreements in this Agreement, within 30 days after the last day of each month a certificate of the director of finance of the Borrower setting forth the Days' Cash on Hand as of the last day of such month and including a statement to the effect that, to the best of such officer's knowledge such financial statements fairly set forth the financial position and results of operations of the Borrower as of the date and for the period covered by such financial statements, subject to year-end adjustments;

(xvi)    promptly following each meeting of the Governing Body of the Borrower, copies of minutes of meetings of the Governing Body of the Borrower and any written consents executed by the Governing Body of the Borrower in lieu of meetings;

(xvii)    promptly following any change in the Governing Body of the Borrower, a written notice thereof;

(xviii) as soon as possible, and in any event within five business days after the Borrower changes its Executive Director, written notice of such change;

(xix) copies of each Form 990 filed with the Internal Revenue Service and copies of any extension requests made by Borrower in connection with any such filing; and

(xx) within a reasonable period following any request therefor received by the Borrower from the Trustee or the Bondholder Representative, such other information regarding the operations, business affairs and condition (financial or other) of the Borrower and compliance by the Borrower with the terms of the Related Documents as the Trustee or the Bondholder Representative, respectively, may from time to time reasonably request.

(b) The Borrower, on a quarterly basis, and at such other times as may be reasonably requested by the Bondholder Representative, shall conduct a conference call with the Bondholder Representative or host a site visit with the Bondholder Representative and otherwise will permit any representatives designated by the Bondholder Representative to inspect the financial records and Property of the Borrower at reasonable times during normal business hours and as often as reasonably requested and to make extracts from and copies of such financial records at the expense of the Borrower, and permit any representatives, accountants and advisors designated by the Bondholder Representative to discuss the affairs, finances and condition of the Borrower with the officers thereof and with the Borrower's independent certified public accountant.

(c) The Borrower will provide written notice to its Governing Body of the occurrence of any event or circumstance described in clauses (v) and (vii)-(xiii) of subsection (a) of this Section at or before the time such notice is required to be provided to the Trustee and the Bondholder Representative.

(d) The Borrower agrees to cause a copy of each item delivered to the Bondholder Representative pursuant to clauses (ii)-(iv) and (vi)-(xv) of subsection (a) of this Section to be delivered to the Repository contemporaneously with the delivery thereof to the Bondholder Representative.

(e) The Trustee shall not have a duty to review and shall not be responsible for the contents of any reports, consents, statements, or other documents delivered to it hereunder, and shall hold the same solely as repository for the benefit of the Bondholders.

Section 4.4.    *Insurance*.

(a) The Borrower shall maintain, or cause to be maintained on its behalf, at its cost and expense, the following insurance:

(i) insurance against loss or damage to the Mortgaged Property under a policy covering such risks as are ordinarily insured against by similar businesses, including (without limitation) builder's risk during construction, terrorism insurance, windstorm, fire and extended coverage in an amount not less than the full insurable replacement value of the Mortgaged Property, which shall mean the actual replacement cost of the Mortgaged Property (excluding

foundation and excavation costs and costs of underground flues, pipes, drains and other uninsurable items) and equipment, such value to be determined, at the expense of the Borrower, every year by an Insurance Consultant or an insurer selected by the Borrower, with the approval of the Bondholder Representative;

(ii)     comprehensive general public liability insurance, including personal injury liability, and, if the Borrower owns or leases automobiles, automobile insurance, including owned, non-owned and hired automobiles, against liability for injuries to persons or property, in the minimum amount for each occurrence and for each year of $2,000,000 and, to the extent the Borrower provides any health care services, medical and professional liability insurance in amounts estimated to fully indemnify the Borrower against the reasonably estimated loss or damage, in each case endorsed to show the Trustee as an additional insured (except with respect to professional liability insurance for which an additional insured endorsement shall not be required unless available in the future);

(iii)     business interruption insurance covering actual losses in gross operating earnings of the Borrower resulting directly from necessary interruption of business caused by damage to or destruction (resulting from fire and lightning, accident to a fired pressure vessel or machinery or other perils, including, without limitation, windstorm and hail, explosion, civil commotion, aircraft and vehicles, sprinkler leakage, smoke, terrorism, cyber attacks, vandalism and malicious mischief and accident), to real or personal property constituting part of the Mortgaged Property, less charges and expenses which do not necessarily continue during the interruption of business, for such length of time as may be required with the exercise of due diligence and dispatch to rebuild, repair or replace such properties as have been damaged or destroyed and in any case for at least the sum of 12 months' operating expenses, plus $2,000,000; and

(iv)     such other insurance, including (without limitation) workers' compensation insurance respecting all employees of the Borrower, fidelity insurance respecting employees of the Borrower handling the Borrower's money and directors' and officers' liability insurance, in such amounts as are customarily carried by like organizations engaged in like activities of comparable size and liability exposure.

All insurance required in this Section will be provided by financially sound and reputable insurance companies selected by the Borrower that are authorized under the laws of the State of Oklahoma or assume the risks covered thereby. No policy of insurance will be so written that the proceeds thereof will produce less than the minimum coverage required above, by reason of co-insurance provisions or otherwise, without the prior written consent of the Bondholder Representative. Each policy evidencing insurance required by clause (a)(i) above with respect to the Mortgaged Property shall be carried in the names of the Borrower and the Trustee as their respective interests may appear, shall contain standard mortgagee clauses reasonably acceptable to the Bondholder Representative, specifically naming the Trustee as mortgagee, shall provide that the insurer shall give at least 30 days' notice in writing to the Borrower, the Bondholder Representative and the Trustee of cancellation, termination or modification of such policy and shall provide that the Trustee will have sole right to receive the proceeds of such policy. The Borrower will deposit annually with the Trustee and the Bondholder Representative policies evidencing all insurance required by this subsection (a), or certificates or binders of the respective

insurers stating that such insurance is in force and effect.  Not less than 10 days prior to the expiration of any policy, the Borrower shall furnish to the Trustee and the Bondholder Representative evidence satisfactory to the Bondholder Representative that the policy has been renewed or replaced by another policy conforming to the provisions of this Section, or that there is no necessity therefor under the terms hereof.  In lieu of separate policies, the Borrower may maintain a single policy, blanket or umbrella policies, or a combination thereof, having the coverage required herein, in which event the Borrower shall deposit with the Trustee and the Bondholder Representative a certificate or certificates of the respective insurers as to the amounts of coverage provided thereby.

The Borrower shall retain at its own expense an Insurance Consultant each Fiscal Year, beginning with the Fiscal Year ending December 31, 2024, to determine and recommend the types of insurance required for the Facilities and the Borrower and the required coverage, unless such requirement is waived in writing by the Bondholder Representative. The Borrower covenants to purchase such insurance as shall be recommended by such Insurance Consultant and shall timely pay the premiums therefor.

(b)    With the Bondholder Representative's prior written consent, the Borrower may satisfy the requirements of clauses (a)(ii) and (a)(iv) of this Section by establishing and maintaining a self-insurance plan, which may include (without limitation) an insurance company or association controlled by the Borrower (either singly or with other Persons) or a risk retention group, protecting the Borrower against the risks required to be insured against by such clauses.  Such plan shall provide for (i) establishment of a segregated fund of cash or marketable securities for the defense and payment of claims arising from such risks, (ii) funding of such fund in initial and subsequent amounts determined annually by an independent actuary employing accepted actuarial techniques customarily employed by the casualty insurance industry, such actuarial determination to be submitted to the Trustee and the Bondholder Representative within 60 days after the end of each plan year, (iii) annual reporting to the Bondholder Representative and the Trustee of the current fund balance of such fund as of the end of each plan year and an evaluation of the aggregate potential effect on the fund balance of claims asserted and pending that could ultimately be payable from such fund, such reports to be submitted within 60 days after the end of each plan year, (iv) establishment and operation of a claims processing and risk management program, and (v) adequate reserves for, or insurance coverage protecting the Borrower against, any potential retained liability with respect to the period during which such plan was in effect upon termination of such plan.  In connection with any such plan, the Borrower shall furnish to the Bondholder Representative and the Trustee, annually within 60 days after the end of each plan year, a report from an independent actuary to the effect that the plan is maintaining adequate reserves and has been adequately funded.

Section 4.5.    *Taxes*.    The Borrower will pay and discharge when due all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its Property, before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or other claims that, if unpaid, might give rise to a Lien upon such Property or any part thereof (other than Permitted Encumbrances), *provided*, however, that such payment and discharge shall not be required with respect to any such tax, assessment, charge, levy or claim so long as (i) the Borrower, at its expense, in good faith, shall contest the validity or amount thereof by appropriate proceedings diligently pursued, (ii) no Lien has attached with respect thereto, (iii) the Borrower shall have set aside on its books adequate

reserves with respect thereto in accordance with GAAP and (iv) such contest operates to suspend such Lien, unless the Trustee or the Bondholder Representative shall notify the Borrower that, by nonpayment thereof, the Mortgaged Property or any part thereof, or the revenue therefrom, will be subject to loss or forfeiture, in which event such taxes, assessments, charges, levies or claims shall be paid promptly.

Section 4.6.    *Maintenance of 501(c)(3) Status, Accreditations, Etc.*

(a)    To the extent applicable, the Borrower shall take or cause to be taken all action necessary to maintain the status of the Borrower as an organization described in Section 501(c)(3) of the Code. The Borrower will give prompt written notice to the Trustee and the Bondholder Representative of any loss of such status or of any investigation, proceeding or ruling that might result in such loss of status.

(b)    The Borrower shall maintain all licensing required by applicable Law in order to conduct its business as now being conducted.

Section 4.7.    *ERISA.*  The Borrower shall comply, and cause each member of the ERISA Group to comply, with the applicable provisions of ERISA; *provided*, that no contested noncompliance with applicable provisions of ERISA shall constitute a breach of this Section if (a) such contest is being conducted in good faith and in appropriate proceedings which remain pending and are being diligently prosecuted by the Borrower or another ERISA Group member, (b) any contested liability is covered by adequate reserves, and (c) the non-payment of such contested liability shall not materially and adversely affect the security for the Bonds.

Section 4.8.    *Compliance with Laws.*  The Borrower will comply in all material respects with all Laws, whether now in effect or hereafter enacted; *provided*, that the Borrower may, at its expense, in good faith, by appropriate proceedings diligently pursued, contest any such Laws so long as notice of such contest is given to the Trustee and the Bondholder Representative and such contest could not reasonably be expected to have a Material Adverse Effect.

Section 4.9.    *Environmental Matters.*

(a)    The Borrower shall conduct its operations in compliance in all material respects with all applicable Environmental Laws. The Borrower shall maintain the Mortgaged Property free from contamination by Regulated Chemicals and shall not intentionally or unintentionally allow a release, discharge or emission, or threat of release, discharge or emission, of any Regulated Chemical on, under, in or about the Mortgaged Property, and shall not permit the migration or threatened migration of any of the foregoing from other properties upon, about or beneath the Mortgaged Property.

(b)    The Borrower promptly, and in no event later than 15 days from the date on which the Borrower has knowledge thereof, shall provide to the Bondholder Representative and the Trustee a copy of any notice, letter, citation, order, warning, complaint, inquiry, claim or demand that:

(i)     the Borrower or any tenant or sublessee of the Borrower has violated, or is about to violate, any Environmental Law;

(ii)     there has been a release, or there is a threat of release, of any Regulated Chemical from the Mortgaged Property;

(iii)     the Borrower or any tenant or sublessee of the Borrower may be or is liable, in whole or in part, for the costs of cleaning up, remediating, removing or responding to a release of any Regulated Chemical; or

(iv)     any portion of the Mortgaged Property is subject to a Lien in favor of any Governmental Authority for any liability, cost or damage under any Environmental Law arising from, or costs incurred by such Governmental Authority in response to, a release of any Regulated Chemical.

(c)     The Borrower promptly and in no event later than five business days from the date on which the Borrower has knowledge thereof (or sooner if the Borrower is required by Environmental Laws to provide notice to any Governmental Authority), shall provide to the Bondholder Representative and the Trustee notice of any discovery of Regulated Chemicals or other conditions related to the Facilities that would reasonably be expected to be hazardous to the environment.

(d)     The Borrower shall take all appropriate responsive action, including (without limitation) any Response Action, in the event of a release, emission, discharge or disposal of any Regulated Chemical in, on, under or about the Mortgaged Property, so as to remain in compliance with Environmental Laws, to keep the Mortgaged Property free from, and unaffected by, noncomplying Regulated Chemicals and to prevent the imposition of any Liens against the Mortgaged Property for the costs of any response, removal or remedial action or cleanup of any Regulated Chemicals. The Borrower shall (i) provide the Trustee, within 60 days after providing the notice required under paragraph (b) above, with a bond, letter of credit or similar financial assurance approved in writing by the Bondholder Representative for an amount not less than the remaining unpaid cost of the Response Action that may be drawn upon by the Trustee for the purpose of completing the Response Action if an Event of Default or Default occurs or if the Response Action is not completed within six months of the issuance of the financial assurance (or such longer period as shall be reasonably acceptable to the Bondholder Representative) and (ii) discharge any assessment or Lien which may be established on any portion of the Mortgaged Property as a result thereof.

(e)     The Borrower shall provide the Trustee and the Bondholder Representative with a copy of any Environmental Report obtained by the Borrower with respect to the Mortgaged Property.

Section 4.10.    *Operation and Maintenance of Facilities*.

(a)     The Borrower agrees to keep or cause to be kept the Facilities in good repair, working order and condition (ordinary wear and tear excepted) and from time to time make, or

cause to be made, all repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted.

(b)    The Borrower will obtain when needed all Governmental Approvals required for the performance of its obligations hereunder and under the other Related Documents, the operation of the Facilities and the acquisition and capital expenditures funded with proceeds of the Bonds, if any, and has no reason to believe that all such Governmental Approvals cannot be promptly obtained when needed.

Section 4.11.    *Limitation on Alteration of Facilities*.  The Borrower shall not make any change in or alteration (including demolition or removal) of any portion of the Facilities or replace any portion of the structure or equipment constituting a portion of the Facilities that materially and adversely affects the value or the operating efficiency of the Facilities.

All alterations of the Facilities shall be located within the boundary lines of the Land and shall become a part of the Mortgaged Property.  No alterations shall impair the structural soundness or utility of the Facilities, significantly alter the character or purpose of the Facilities or significantly impair the revenue producing capacity thereof.

All work in connection with any alterations shall be completed promptly and in good and workmanlike manner and in compliance with Law, including (without limitation) building and zoning Laws of Governmental Authorities of the jurisdiction in which the Property is located, and the provisions of any policy of insurance covering the Property.

Section 4.12.    *Debt Service Coverage Ratio*.

(a)    The Borrower will charge and collect such rents, fees and other charges with respect to the Mortgaged Property and will restrict expenses relating to the Mortgaged Property as shall be necessary to achieve in each 12-month period ending on the last day of each Fiscal Quarter (each, a "Debt Service Coverage Ratio Testing Date") commencing December 31, 2024 and thereafter, a Debt Service Coverage Ratio of at least 1.20 to 1.00.  The Borrower shall provide a certificate to the Bondholder Representative and the Trustee substantially in the form set forth in Exhibit A demonstrating compliance with the Debt Service Coverage Ratio within 45 days after each Debt Service Coverage Ratio Testing Date in accordance with Section 4.3(a).

(b)    If the Borrower fails to achieve the Debt Service Coverage Ratio for any such Debt Service Coverage Ratio Testing Date, then the Borrower shall employ, at the expense of the Borrower, as soon as practicable thereafter, a Consultant acceptable to the Bondholder Representative, to submit a written report and recommendations with respect to the rents, fees and other charges of the Borrower in connection with the operation of the Mortgaged Property and with respect to improvements or changes in the operation and management of the Mortgaged Property unless such requirement for a Consultant is waived in writing by the Bondholder Representative; *provided* that a majority of the holders of the Series 2023B Bonds do not object to the selection of such Consultant within five days following the filing of notice by the Borrower with the Repository of the failure to achieve such Debt Service Coverage Ratio for any such Debt Service Coverage Ratio Testing Date then such holders of the Series 2023B Bonds shall be deemed to have consented to the selection of such Consultant; *provided* further that the Bondholder

-37-

Representative may, in its sole discretion, permit the Borrower to deliver to the Trustee and the Bondholder Representative a written report of management of the Borrower, in lieu of the retention of a Consultant, within 60 days after such Debt Service Coverage Ratio Testing Date, describing in detail its operations and other factors resulting in the failure to meet such Debt Service Coverage Ratio and its plan to increase the Debt Service Coverage Ratio so as to meet the requirement of this Section, which report shall have been approved by action of the Governing Body of the Borrower.  The Borrower agrees to cause a copy of any report delivered under this subsection to be delivered to the Repository contemporaneously with the delivery thereof to the Bondholder Representative.  Notwithstanding the foregoing, the failure of the Borrower to achieve the Debt Service Coverage Ratio for any two consecutive Debt Service Coverage Testing Dates shall constitute an Event of Default.

(c)    The Borrower shall revise or cause to be revised such rents, fees (including Entrance Fees and related healthcare obligations), rates, expenses and other charges in conformity with any recommendations of the Consultant and shall otherwise follow the recommendations of the Consultant, in each case as approved by the Bondholder Representative, unless the Governing Body of the Borrower determines by resolution, a copy of which shall be provided to the Trustee and the Bondholder Representative, that compliance with such recommendations would jeopardize the tax-exempt status of the Borrower.  If the Bondholder Representative waives in writing the requirement for a Consultant or the Borrower complies with the requirements of paragraph (b) and this paragraph (c) then the failure of the Borrower to meet the required Debt Service Coverage Ratio as of any Debt Service Coverage Ratio Testing Date shall not constitute an Event of Default.

(d)    Notwithstanding anything to the contrary contained herein if (i) the Borrower fails to achieve a Debt Service Coverage Ratio of 1.00 as of any Debt Service Coverage Ratio Testing Date or (ii) the Borrower fails to achieve the required Debt Service Coverage Ratio for two consecutive Debt Service Coverage Ratio Testing Dates, an Event of Default shall be deemed to have occurred under this Agreement unless waived in writing by the Bondholder Representative.

Section 4.13.  *Days' Cash on Hand.*

(a)    The Borrower covenants and agrees to maintain, as of each June 30 and December 31 beginning with December 31, 2025 (each, a "Liquidity Testing Date"), as shown on the Borrower's quarterly Financial Statements delivered to the Trustee and the Bondholder Representative, at least 60 Days' Cash on Hand (the "Liquidity Requirement").  Commencing with the Fiscal Quarter ending December 31, 2025, the Borrower shall provide a certificate to the Bondholder Representative and the Trustee substantially in the form set forth in Exhibit A setting forth its Days' Cash on Hand within 45 days after the last day of each Fiscal Quarter in accordance with Section 4.3(a).

(b)    If the Borrower fails to achieve the Liquidity Requirement for any such Liquidity Testing Date, then the Borrower shall employ, at the expense of the Borrower, as soon as practicable thereafter, a Consultant acceptable to the Bondholder Representative, to submit a written report and recommendations with respect to the rents, fees and other charges of the Borrower in connection with the operation of the Mortgaged Property and with respect to improvements or changes in the operation and management of the Mortgaged Property unless such

requirement for a Consultant is waived in writing by the Bondholder Representative; *provided* that a majority of the holders of the Series 2023B Bonds do not object to the selection of such Consultant within five days following the filing of notice by the Borrower with the Repository of the failure to achieve such Liquidity Requirement for any such Liquidity Testing Date then such holders of the Series 2023B Bonds shall be deemed to have consented to the selection of such Consultant; *provided* further that the Bondholder Representative may, in its sole discretion, permit the Borrower to deliver to the Trustee and the Bondholder Representative a written report of management of the Borrower, in lieu of the retention of a Consultant, within 60 days after such Liquidity Testing Date, describing in detail its operations and other factors resulting in the failure to meet such Liquidity Requirement and its plan to increase the Days' Cash on Hand so as to meet the requirement of this Section, which report shall have been approved by action of the Governing Body of the Borrower.  The Borrower agrees to cause a copy of any report delivered under this Section to be delivered to the Repository contemporaneously with the delivery thereof to the Bondholder Representative.  Notwithstanding the foregoing, the failure of the Borrower to achieve the Liquidity Requirement for any two consecutive Liquidity Testing Dates shall constitute an Event of Default.

(c)     The Borrower shall revise or cause to be revised such rents, fees (including Entrance Fees and related healthcare obligations), rates, expenses and other charges in conformity with any recommendations of the Consultant and shall otherwise follow the recommendations of the Consultant, in each case as approved by the Bondholder Representative, unless the Governing Body of the Borrower determines by resolution, a copy of which shall be provided to the Trustee and the Bondholder Representative, that compliance with such recommendations would jeopardize the tax-exempt status of the Borrower.  If the Bondholder Representative waives in writing the requirement for a Consultant or the Borrower complies with the requirements of paragraph (b) and this paragraph (c) then the failure of the Borrower to meet the required Liquidity Requirement as of any Liquidity Testing Date shall not constitute an Event of Default.

(d)     Notwithstanding anything to the contrary contained herein if the Borrower fails to achieve at least 45 Days' Cash on Hand as of any Liquidity Testing Date, an Event of Default shall be deemed to have occurred under this Agreement unless waived in writing by the Bondholder Representative.

(e)     Notwithstanding anything herein to the contrary, and for the avoidance of doubt, the Borrower may expend its Unrestricted Cash and Marketable Securities between Liquidity Testing Dates without restriction, *provided* that the Borrower shall be in compliance with the Liquidity Requirement on each Liquidity Testing Date.

Section 4.14.    *Occupancy.*

(a)     For each [three-month] period ending on the last day of each Fiscal Quarter beginning with the quarter ended _____, 2024 (each, an "Occupancy Testing Date"), (i) the average number of Independent Living Units that are Occupied Units shall be not less than __%, (ii) the average number of Assisted Living Units that are Occupied Units shall be not less than __%, (iii) the average number of Memory Care Units that are Occupied Units shall not be less than __%, and

(iv) the average number of Skilled Nursing Units that are Occupied Units shall be not less than ___% (collectively, the Occupancy Covenant").

(b)      The Borrower shall provide a certificate to the Bondholder Representative and the Trustee, in the form of Exhibit A hereto, demonstrating compliance with the requirements of this Section for each Fiscal Quarter of each Fiscal Year in accordance with Section 4.3(a).

(c)      If the Borrower fails to meet the requirement of Section 4.14(a) as of any Occupancy Testing Date, then the Borrower shall employ, at the expense of the Borrower, as soon as practicable thereafter, a Consultant acceptable to the Bondholder Representative, to submit a written report and recommendations with respect to marketing of the Units unless such requirement for a Consultant is waived in writing by the Bondholder Representative; *provided* that a majority of the holders of the Series 2023B Bonds do not object to the selection of such Consultant within five days following the filing of notice by the Borrower with the Repository of the failure to achieve the Occupancy Covenant for any Occupancy Testing Date then such holders of the Series 2023B Bonds shall be deemed to have consented to the selection of such Consultant; *provided* further that the Bondholder Representative may, in its sole discretion, permit the Borrower to deliver to the Trustee and the Bondholder Representative a written report of management of the Borrower, in lieu of the retention of a Consultant, within 60 days after such Occupancy Testing Date, describing in detail its marketing efforts and other factors resulting in the failure to meet such Occupancy Covenant and its plan to increase the occupancy of the Units so as to meet the requirement of this Section, which report shall have been approved by action of the Governing Body of the Borrower.  The Borrower agrees to cause a copy of any report delivered under this Section to be delivered to the Repository contemporaneously with the delivery thereof to the Bondholder Representative.

(d)      Failure by the Borrower to meet the requirement of Section 4.14(a) for any three consecutive Occupancy Testing Dates shall constitute an Event of Default hereunder.

Section 4.15.  *Damage, Destruction or Condemnation*.

(a)      The Borrower agrees to give written notice to the Trustee and the Bondholder Representative immediately if the Mortgaged Property, the Facilities or any material portion thereof is damaged, destroyed or taken in the exercise of the power of eminent domain, condemnation or through the exercise of any right or any obligation on the part of any public authority to purchase the same, or as a result of any agreement between the Borrower and any such public authority in lieu thereof.  In the event that the value of the property damaged, destroyed or taken does not exceed $[500,000], the Net Proceeds thereof shall be retained by or paid by the Trustee to the Borrower and the Borrower shall forthwith replace, repair, reconstruct or restore the Facilities to substantially the same or an improved condition and value as existed prior to such damage, destruction or taking and, to the extent necessary to accomplish such replacement, repair, reconstruction or restoration, the Borrower will apply the Net Proceeds received by the Borrower to the payment or reimbursement of the costs thereof.

(b)      In the event that the value of the Mortgaged Property or the Facilities or portion thereof that is damaged, destroyed or taken equals or exceeds $[500,000], then the Borrower shall deposit any Net Proceeds received by the Borrower with the Trustee upon receipt thereof, within

30 days after such damage, destruction or taking, elect one of the options set forth below by written notice of such election to the Trustee and the Bondholder Representative.

        (i)    *Repair and Restoration*. The Borrower may elect to replace, repair, reconstruct or restore the portion of the Facilities damaged, destroyed or taken. In such event, the Borrower shall proceed forthwith to replace, repair, reconstruct or restore the damaged, destroyed or taken property to substantially the same condition and value as existed prior to the event causing such damage, destruction or taking and, to the extent necessary to accomplish such replacement, repair, reconstruction and restoration, the Borrower will apply the Net Proceeds thereof received by the Borrower from the Trustee to the payment or reimbursement of the costs thereof. So long as no Event of Default or Default exists, any Net Proceeds received by the Trustee shall be released from time to time by the Trustee to the Borrower, *provided*, that there is delivered to the Trustee and the Bondholder Representative within 60 days of receipt of such Net Proceeds:

        (A)    an Officer's Certificate specifying the expenditures made or to be made in connection with such replacement, repair, reconstruction or restoration and stating that such Net Proceeds, together with any other money legally available for such purposes, which shall be deposited with the Trustee, unless the written consent of the Bondholder Representative shall be obtained, will be sufficient to complete such replacement, repair, reconstruction or restoration;

        (B)    the written concurrence with such Officer's Certificate from an independent engineer approved by the Bondholder Representative;

        (C)    evidence reasonably satisfactory to the Bondholder Representative that such replacement, repair, reconstruction or restoration can be completed within 12 months;

        (D)    evidence reasonably satisfactory to the Bondholder Representative that the proceeds of business interruption insurance and other available funds will be sufficient to pay the principal of and interest on all Indebtedness of the Borrower and to meet the other obligations of the Borrower during the period of replacement, repair, reconstruction or restoration; and

        (E)    in the event of a taking, the written approval of the Bondholder Representative.

In the event the Borrower shall elect the option set forth in this subsection (b)(i), the Borrower shall complete the replacement, repair, reconstruction or restoration of the Mortgaged Property and the Facilities, whether or not the Net Proceeds received by the Borrower for such purposes are sufficient to pay for the same. Net Proceeds not required for the replacement, repair, reconstruction or restoration of the Mortgaged Property may be applied to the prepayment of the Bonds or used for such other purpose as the Borrower determines with the prior written consent of the Bondholder Representative and, if required by the Bondholder Representative, an opinion of Bond Counsel to the effect that such other purpose will not adversely affect the tax-exempt status of interest on the Bonds.

(ii)    *Redemption of Bonds.* If the Borrower shall determine that it is not practicable or desirable to repair, reconstruct or restore the Facilities or the Borrower is unable to deliver or does not deliver the certificates or reports necessary under Section 4.15(b)(i), the Outstanding Bonds shall be redeemed in whole unless otherwise directed by the Bondholder Representative on the earliest practicable date after the date of the notice given as to exercise of the option set forth in this Section 4.15(b)(ii). In such event, the Bonds shall be redeemed at par plus accrued interest and any other expenses as may be payable by the Borrower to the Trustee and the Bondholder Representative hereunder, and redemption shall be effected pursuant to the provisions of, in the manner, and with the effect provided in the Indenture.  If the Net Proceeds, together with all amounts then held by the Trustee under the Indenture available to redeem or retire the Bonds shall be insufficient to so redeem all of the Outstanding Bonds (including payment of principal, accrued interest and expenses of redemption), the Borrower shall pay the amount of the deficiency to the Trustee as an Additional Payment. If the Bonds have been fully paid and all other amounts payable under this Agreement and the Indenture have been paid or provided for, all remaining Net Proceeds shall be paid to the Borrower, subject to the terms of the Indenture.

The Borrower may elect to repair or replace a portion of the lost, damaged, destroyed or taken property and to pay or redeem a portion of the Outstanding Bonds so long as the Borrower shall satisfy the requirements of paragraph (i) above.

(iii)    *Other Uses of Proceeds.*  Notwithstanding the foregoing, the Borrower shall be entitled to apply any Net Proceeds to another lawful purpose, including (without limitation) the redemption of the Outstanding Bonds in part rather than in whole, if the Borrower receives the prior written consent of the Bondholder Representative and, if required by the Bondholder Representative, obtains an opinion of Bond Counsel that such application of such Net Proceeds will not adversely affect the tax-exempt status of interest on the Bonds.

The Borrower hereby irrevocably assigns to the Trustee all of its right, title and interest in and to any Net Proceeds payable in connection with the taking of any of the Mortgaged Property in the exercise of the power of eminent domain, condemnation or through the exercise of any right or any obligation on the part of any public authority to purchase the same, or as a result of any agreement between the Borrower and any such public authority in lieu thereof.  The Trustee shall cooperate fully with the Borrower in the conduct of any prospective or pending condemnation proceedings with respect to the Mortgaged Property.

Section 4.16.    *Calculation of Debt Service and Debt Service Coverage.*

(a)    For the purpose of determining the interest rate on Long-Term Debt the interest rate on which is not established at a fixed rate for the remaining term thereof, such interest rate shall be assumed to be equal to (A) if the interest rate is fixed for a period of at least three years from the date of issuance of such Long-Term Debt or the most recent adjustment date, whichever is the later (without giving effect to any adjustments that may be required as a result of the occurrence of certain events), the actual interest rate borne by such Long-Term Debt and in any other case, the higher of (1) the interest rate that such Long-Term Debt would have borne had it been issued at a fixed rate for the remaining term thereof as determined on the date of issuance thereof or on the date on which such interest rate on such Long-Term Debt is converted to a variable rate, whichever is the later, by an investment banking firm, financial advisor or other consultant

knowledgeable in the marketing of debt issued on behalf of continuing care retirement communities and (2) the weighted average interest rate per annum borne by such Long-Term Debt for the most recent 12-month period; notwithstanding the foregoing, if such calculation is made within the 12-months immediately preceding any date on which 25% or more of the principal amount of any Balloon Debt (defined below) becomes due or the scheduled mandatory purchase date of any Tender Debt (defined below), the interest rate equal to the greater of (A) the Municipal Market Data Index for general obligation bonds having an "Aaa" or "AAA" credit rating from Moody's or S&P, respectively, having a term equal to the remaining term of such Long-Term Debt as published on the most recent date on or prior to such date by Thomson Reuters in the Thompson Municipal Market Monitor, or if such index shall not be available, another comparable index, plus 350 basis points (3.50%), or (B) the current interest rate.

(b)    The principal amount becoming due on Balloon Debt in any 12-month period in which 25% or more of such Long-Term Debt becomes due and the amount of any Tender Debt that is or could be required to be purchased or redeemed by the Borrower shall be disregarded.

(c)    For the purpose of determining the debt service requirements of any guaranty of any of any Indebtedness that would constitute Long-Term Debt if incurred directly by the Borrower (a "Guaranty") becoming due in any 12-month period:

(i)    so long as no default shall have occurred and be continuing with respect to such Indebtedness and no demand for payment shall have been made under such Guaranty, there shall be excluded the percentage of the debt service requirements of such guaranteed Indebtedness set forth in the following table to the extent that the aggregate income available for debt service of all primary obligors with respect to such guaranteed Indebtedness for their most recent fiscal year expressed as a percentage of the maximum annual debt service (determined on a basis consistent with the determination of Net Revenues Available for Debt Service under this Agreement) on all Long-Term Debt with respect to which such persons are primary obligors for such period year (determined on a basis consistent with the determination of Maximum Annual Debt Service on Long-Term Debt under this Agreement) is equal to the amount set forth in the following table:

| Income Available for Debt Service as a Percentage of Maximum Annual Debt Service | Percentage of Guaranteed Indebtedness to Be Excluded |
|---|---|
| 300% or more | 100% |
| At least 250% but less than 300% | 80 |
| At least 200% but less than 250% | 75 |
| At least 175% but less than 200% | 50 |
| At least 150% but less than 175% | 25 |
| Less than 150% | 0 |

(ii)    if a default shall have occurred with respect to such Indebtedness or a demand for payment shall have been made under such Guaranty, 100% of the debt service requirements of such Indebtedness shall be taken into account in such calculation; and

(iii)    such Indebtedness shall be taken into account only once in calculating the debt service requirements of all Long-Term Indebtedness.

(d)    For the purpose of determining the debt service requirements of any agreement (a "Credit Facility Agreement") under which any letter of credit, bond insurance policy, bond purchase agreement, guaranty, line of credit, surety bond or similar credit or liquidity facility securing any Long-Term Debt of the Borrower (a "Credit Facility"), so long as no demand for payment under the Credit Facility issued under such Credit Facility Agreement shall have been made, the debt service requirements of such Credit Facility Agreement shall be excluded from such calculation.

(e)    As used herein (i) "Balloon Debt" means Long-Term Debt 25% or more of the principal amount of which matures in the same 12-month period, which portion of such principal amount is not required by the documents governing such Long-Term Indebtedness to be amortized by redemption prior to such period and (ii) "Tender Debt" means Long-Term Debt that is subject to optional or mandatory purchase or redemption prior to the stated maturity date thereof.

Section 4.17.  *Availability of Board-Designated Funds.*   The Borrower hereby acknowledges and agrees that any assets and revenues that currently or in the future may be classified as board-designated are and shall remain available for the payment of operating expenses and debt service on the Bonds.

Section 4.18.  *Unit Configuration.*  The Borrower shall not modify the composition of the Units as in effect as of the Closing Date without obtaining the prior written consent of the Bondholder Representative.

Section 4.19.  *Management.*

(a)    The Borrower shall not make any changes to its management without prior written approval of the Bondholder Representative.

(b)    The Borrower shall not enter into any Management Agreement without the prior written approval of the Bondholder Representative.

Section 4.20.  *Consultants.*  In addition to any other Consultants provided for herein, at the request of the Bondholder Representative, in its sole discretion, the Borrower shall engage, at the Borrower's expense, such other Consultants as the Bondholder Representative directs.

## ARTICLE V
## NEGATIVE COVENANTS

The Borrower hereby covenants and agrees that until all of the Outstanding Bonds and other amounts payable under this Agreement, the Indenture and the other Related Documents in each case with respect to the Bonds have been fully paid and performed to the satisfaction of the

Bondholder Representative and this Agreement has been terminated, unless the Bondholder Representative shall otherwise consent in writing:

Section 5.1.    *Indebtedness.*  The Borrower shall not, directly or indirectly incur, create, assume or permit to exist any Indebtedness other than the following:

(a)    Indebtedness created under this Agreement and the other Related Documents;

(b)    Indebtedness approved in writing by the Bondholder Representative and a majority of the holders of the Series 2023B/C Bonds; and

(c)    Non-Recourse Indebtedness for a term not in excess of three (3) years and in an amount up to but not in excess of $250,000.

The Borrower shall, prior to the incurrence of any Indebtedness, deliver to the Turstee and the Bondholder Representative an Officer's Certificate which identifies the Indebtedness to be incurred, identifies the subsection pursuant to which such Indebtedness was incurred and demonstrates compliance with such subsection.

Section 5.2.    *Investments.*

(a)    The Borrower shall not purchase, hold or acquire any common stock, evidence of indebtedness or other securities (including, without limitation, any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, guaranty any obligations of or make or permit to exist any investment in or otherwise acquire any interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person, except for Permitted Investments.

(b)    Any cash shall be invested in a money market or other similar bank product secured solely by Government Obligations or other Permitted Investments.

Section 5.3.    *Mergers and Consolidations; Transfers of Assets.*

(a)    The Borrower shall not merge, consolidate or enter into any analogous reorganization or transaction with any Person without the prior written consent of the Bondholder Representative.

(b)    Except as otherwise expressly permitted by this Agreement, the Borrower shall not consummate any sale, lease, transfer, loan or other disposition (in one transaction or a series of transactions) (each, transactions a "disposition") of any Property, including (without limitation) cash, except as follows and *provided* that no Event of Default shall have occurred and be continuing:

(i)    the sale of inventory in the ordinary course of business for fair market value based upon an appraisal acceptable to the Bondholder Representative and on an arms' length basis;

(ii)    dispositions of obsolete, uneconomical, negligible, worn-out or surplus tangible personal property in the ordinary course of business;

(iii)    dispositions of tangible personal property or real property (other than the Mortgaged Property) if the Borrower receives consideration in an amount equal to the fair market value of such property based upon an appraisal acceptable to the Bondholder Representative;

(iv)    the transfer of cash from an account of the Borrower in the ordinary course for use by the Borrower in the Borrower's operations pursuant to the authority granted to the Borrower in Section 3.4(f) prior to the occurrence of an Event of Default; and

(v)    [the Leases.]

Section 5.4.    *Guarantees.*  Notwithstanding anything to the contrary contained herein, the Borrower shall not, directly or indirectly, guaranty or otherwise secure the Indebtedness of any Person without the prior written consent of the Bondholder Representative.

Section 5.5.    *Competition.*    Without the prior written consent of the Bondholder Representative, the Borrower shall not construct, promote, develop or acquire any additional independent living facility within the primary market area of the Facilities (as described in Appendix A to the Offering Memorandum).

Section 5.6.    *Derivative Agreements.*  The Borrower shall not enter into any interest rate swap agreements or other hedging or derivative transactions without the prior written consent of the Bondholder Representative.

Section 5.7.    *Liens.*  Except as otherwise specifically permitted by this Agreement, the Borrower shall not create any Lien nor allow any Lien to remain against any of its Property, including (without limitation) the Gross Revenues and the Mortgaged Property, except for Permitted Encumbrances.

Section 5.8.    *Tax-Exempt Nature of Bonds; Validity of Bonds.*  The Borrower shall not take or permit to be taken on its behalf any action that would adversely affect (a) the exclusion from gross income for federal income tax purposes of interest paid on the Bonds or (b) the validity of any of the Bonds.

Section 5.9.    *No Material Amendment or Alteration of Certain Documents.*    The Borrower shall not amend, supplement or otherwise modify any material terms of its Organizational Documents (except as contemplated by this Agreement), any Related Document or any Management Agreement without the prior written consent of the Bondholder Representative. The Borrower shall not amend, supplement or otherwise modify any material term of any Residency Agreement (including, without limitation, pricing terms, Entrance Fees, refund terms or healthcare benefits) except for (i) any changes required to comply with applicable law or an order of a Governmental Authority exercising jurisdiction over the Borrower, (ii) annual increases in resident fees or (iii) minor modifications required to remain competitive.  The Borrower shall provide the Bondholder Representative with prior written notice of any proposed amendment, supplement or other modification to any Residency Agreement.  For the avoidance of doubt, any

-46-

changes to contract types offered for residents at the Facilities or reconfiguration of any of the Units shall be deemed to be material.

Section 5.10.  *Transactions with Affiliates.* Except as otherwise expressly provided in this Agreement or with the prior written consent of the Bondholder Representative, the Borrower shall not purchase or acquire any Property from, or otherwise engage in any other transactions with, any officer, director, employee or Affiliate of the Borrower, except that the Borrower (i) may pay reasonable compensation to employees for actual services rendered to the Borrower in the ordinary course of business; (ii) may reimburse actual out-of-pocket expenses of officers, directors and employees incurred in the performance of their duties as such officers, directors and employees, respectively; and (iii) may pay Management Fees to the extent permitted by this Agreement.

Section 5.11.  *Business of the Borrower.*   The Borrower shall not engage at any time in any business or business activity other than the ownership and operation of the Facilities as a retirement community.  The Borrower shall not, without providing at least 30 days' prior written notice to the Trustee and the Bondholder Representative, change its name, its place of business, its chief executive office, the location of any of its Property, its mailing address or its organizational identification number, if any.  The Borrower shall not acquire or create any new subsidiary.

Section 5.12.  *Other Agreements.*

(a)     The Borrower shall not enter into any agreement or arrangement which would restrict in any material respect the ability of the Borrower to fulfill its obligations hereunder or under the Related Documents.

(b)     If the Borrower enters into or otherwise becomes bound by any loan agreement or other agreement which (i) includes additional or more restrictive covenants than those contained in this Agreement or events of default that do not constitute Events of Default hereunder or (ii) provides, upon any default under or noncompliance with the provisions of such agreement, greater rights or remedies to the creditor under such agreement than the rights or remedies contained in this Agreement or otherwise available to the Trustee pursuant to the Related Documents, then the Borrower shall so advise the Trustee and the Bondholder Representative and this Agreement shall be amended to include any and all of such additional or more restrictive covenants, any and all such additional or different events of default and any and all such greater rights or remedies available upon default or noncompliance (collectively, the "Additional Provisions"). Such Additional Provisions automatically shall be incorporated into this Agreement and the Trustee shall have the benefit thereof as if specifically set forth herein, but only for so long as such Additional Provisions are in effect.   Promptly upon request of the Bondholder Representative, the Borrower shall execute and deliver such documents or instruments (which may include an amendment to this Agreement specifying the Additional Provisions) as the Bondholder Representative may reasonably require in order to confirm or carry out the provisions of this subsection.  Notwithstanding the foregoing, "Additional Provisions" shall not include provisions relating to, or providing for, fees, pricing or interest rates.

Section 5.13.   *Change of Control.*  The Borrower shall not undertake, or agree or consent to undertake, any Change of Control without the prior written consent of the Bondholder Representative.

Section 5.14.   *Inconsistent Agreements.*  The Borrower shall not enter into any agreement or arrangement which would restrict in any material respect the ability of the Borrower to fulfill its obligations under this Agreement or under any of the Related Documents.

Section 5.15.   *Bankruptcy.*  The Borrower shall not file a petition or other pleading seeking an "order for relief" within the meaning of the United States Bankruptcy Code or file any petition or other pleading seeking any reorganization, composition, readjustment, liquidation or similar relief for itself under any present or future Law or regulation, or seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of the Borrower, or of substantially all of its assets, or make a general assignment for the benefit of creditors without first obtaining the unanimous consent of its Governing Body and the consent of the Bondholder Representative.

Section 5.16   *Change in Chief Executive Officer*.  The Borrower shall provide immediate written notice of any change of the Chief Executive Officer in place at the time of issuance of the Bonds and shall obtain the prior approval of the Bondholder Representative in connection with the Borrower's retention of a replacement Chief Executive Officer.

Section 5.17   *Payment of Subordinate Debt.*  The Borrower shall not make any payments with respect to any subordinate indebtedness or any "hope notes" without the prior written consent of the Bondholder Representative.  For the avoidance of doubt, this Section shall not be deemed to restrict the ability of the Borrower to make payments required under the Loan Agreement in order to cause the Trustee to make the payments, when due, on the 2023B/C Bonds under the Indenture.

## ARTICLE VI
## EVENTS OF DEFAULT

Section 6.1.   *Events of Default.*  The occurrence of any of the following events or the existence of any of the following circumstances (whatever the reason for such event or circumstance and whether voluntary, involuntary or effected by operation of Law) shall be an "Event of Default" hereunder, unless waived in writing by the Trustee, which may waive any such event or circumstance with the written consent of the Bondholder Representative and shall waive any such event or circumstance at the written direction of the Bondholder Representative:

(a)     any representation or warranty made or incorporated herein or any statement or representation made in any certificate, report, financial statement or other instrument furnished by or on behalf of the Borrower in connection with this Agreement or any of the other Related Documents proves to have been incorrect, false or misleading in any material respect when made;

(b)     the principal or redemption price of or interest or premium on any Bond shall not be paid when due, whether at maturity, upon proceedings for redemption, acceleration or otherwise;

(c)      any payment required to be made under Section 3.1(a) of this Agreement shall not be made when due;

(d)      the Borrower shall fail to pay any other amount payable hereunder within 15 days of the due date for the payment thereof;

(e)      the Borrower shall fail to pay any Taxes in accordance with Section 4.5 or any insurance premiums within 60 days of the due date for the payment thereof;

(f)      the Borrower shall fail to duly and promptly perform, comply with or observe any of the terms, covenants, conditions or agreements contained in Section 3.1, 3.3, 4.1, 4.3, 4.4(a), 4.15 or 4.17 or in Article V;

(g)      the Borrower shall fail to duly and promptly perform, comply with or observe any of the terms, covenants, conditions or agreements contained in Section 4.12, 4.13, 4.14, or 4.19, except as otherwise provided in such Sections;

(h)      except as otherwise provided in this Section, the Borrower shall fail to observe or perform any of the covenants, conditions or agreements on its part under any other Section of this Agreement or any other Related Documents (other than the Continuing Disclosure Agreement) for a period of 30 days after written notice thereof (unless the Borrower and the Trustee shall agree in writing, with the written consent of the Bondholder Representative, to an extension of such time prior to its expiration), specifying such failure and requesting that it be remedied, is given to the Borrower by the Trustee or the Bondholder Representative, or in the case of any default which cannot with due diligence be cured within such 30 day period, failure by the Borrower to proceed promptly to pursue the curing of such default with due diligence and to cure such failure within 90 days;

(i)      the Borrower shall default in the payment of principal of or interest on any Indebtedness of the Borrower, which default shall not have been cured within any applicable grace period provided in such Indebtedness or any agreement for the repayment of such Indebtedness;

(j)      the Borrower shall have become insolvent or shall be the subject of any insolvency proceeding (other than as described in subsection (k) below) or shall file a petition or other pleading seeking an "order for relief" within the meaning of the United States Bankruptcy Code or shall file any petition or other pleading seeking any reorganization, composition, readjustment, liquidation or similar relief for itself under any present or future Law or regulation, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of the Borrower, or of substantially all of its assets, or shall make a general assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due;

(k)      a petition or other pleading shall be filed against the Borrower seeking an "order for relief" within the meaning of the United States Bankruptcy Code or any reorganization, composition, readjustment, liquidation or similar relief under any present or future Law or regulation and shall remain undismissed or unstayed for an aggregate period of 90 days (whether or not consecutive); or if, by an order or decree of a court of competent jurisdiction, the Borrower

shall become the subject of an "order for relief" within the meaning of the United States Bankruptcy Code or relief shall be granted under or pursuant to any such petition or other pleading; or if, by order or decree of such court, there shall be appointed, without the consent or acquiescence of the Borrower, a trustee in bankruptcy or reorganization or a receiver or liquidator of the Borrower or of all or any substantial part of the property of the Borrower and such order or decree continues unvacated or unstayed, on appeal or otherwise, and in effect for a period of 90 days;

(l)    the State or any other Governmental Authority having jurisdiction over the Borrower imposes a debt moratorium, debt restructuring, or comparable restriction on repayment when due and payable of the principal or redemption price of or premium or interest on the Bonds;

(m)    any provision of this Agreement or the Bonds setting forth the payment obligations of the Borrower shall at any time for any reason cease to be valid and binding on the Borrower, or shall be declared to be null and void, or the validity or enforceability thereof shall be contested by the Borrower, or any case, proceeding or action shall be commenced by any Governmental Authority seeking to establish the invalidity or unenforceability thereof, or the Borrower shall deny that it has any or further liability or obligation for such payment obligations;

(n)    any judgment, decree or order for the payment of money in an amount in excess of $500,000 which is uninsured (or the carrier of any insurance with respect to such judgment, decree, or order has denied coverage thereon) shall be rendered against the Borrower and either (i) enforcement proceedings with respect to such judgment, decree, or order shall have been commenced by any creditor upon any such judgment, decree or order, or (ii) there shall be any period of 20 consecutive days during which a stay of enforcement of such judgment, decree, or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(o)    this Agreement, the Indenture, the Mortgage or the other Related Documents shall cease to create a Lien on the Collateral with the priority purported to be created thereby securing the obligations of the Borrower under this Agreement or the obligations of the Borrower under the other Related Documents.

Section 6.2.    *Remedies.*  Upon the occurrence of any Event of Default, the Trustee may, with the written consent of the Bondholder Representative, and shall, at the written direction of the Bondholder Representative, take one or more of the following actions at any time and from time to time (regardless of whether the actions are taken at the same or different times):

(a)    declare the Outstanding amount of the Bonds and accrued interest thereon to be immediately due and payable by written notice to the Borrower or take such other remedial action as is provided for in the Indenture or request the Trustee to take such other remedial actions as is provided for and to extent permitted by the Indenture;

(b)    by written notice to the Borrower, declare all amounts payable under this Agreement and the other Related Documents with respect to the Bonds to be immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived, and an action therefor shall immediately accrue;

-50-

(c) either personally or by attorney or agent without bringing any action or proceeding, or by a receiver appointed by a court of competent jurisdiction in any appropriate action or proceeding, take whatever action at law or in equity shall be deemed by the Bondholder Representative to be reasonably necessary or appropriate to collect the amounts due and payable under the Related Documents with respect to the Bonds or to enforce performance or observance of any obligation, agreement or covenant of the Borrower under the Related Documents subject to the provisions included therein, whether for specific performance of any agreement or covenant of the Borrower or in aid of the execution of any power granted to the Trustee in the Related Documents;

(d) cure any Default, Event of Default or event of nonperformance hereunder or under any other Related Document; *provided*, however, neither the Trustee nor the Bondholder Representative shall have any obligation to effect such a cure;

(e) exercise, or cause to be exercised, any and all remedies it may have under the Related Documents and as otherwise available at law and at equity; and

(f) in addition to the foregoing, upon the occurrence of an Event of Default hereunder, the Bondholder Representative may enter into any agreement it deems necessary with any Consultant selected by the Bondholder Representative for the benefit of the Borrower. Such Consultant may be paid by the Borrower or with moneys held by the Trustee under the Indenture, as directed in writing by the Bondholder Representative.

Any amounts collected by the Trustee upon the pursuit of remedies hereunder or under the other Related Documents shall be applied to the payment of amounts payable under this Agreement and the Indenture as provided therein, subject to approval by the Bondholder Representative to the extent required hereby and thereby.

Section 6.3.   *Confession of Judgment.*   To the extent permitted by law, in the event that the Borrower fails to pay when due any amount required to be paid under Section 3.1(a) or any other amounts due under this Agreement, the Loan Agreement, the 2023A Note, the 2023 CCA Note, the Indenture or the other Related Documents, for a period of 15 days, except in the case of a failure to pay principal and interest hereunder, in which case there is no additional grace period, after notice in writing (unless the Borrower and the Trustee shall agree in writing, with the consent of the Bondholder Representative, to an extension of such time prior to its expiration), specifying such failure and requesting that it be remedied, given by the Issuer, the Trustee or the Bondholder Representative to the Borrower, **THE BORROWER, WITHOUT FURTHER CONSENT OF OR NOTICE THERETO, HEREBY IRREVOCABLY AND UNCONDITIONALLY AUTHORIZES ANY ATTORNEY OF ANY COURT OF RECORD IN THE STATE, OR ANY OTHER JURISDICTION, AS ATTORNEY FOR THE BORROWER TO APPEAR FOR THE BORROWER IN SUCH COURT AND, WITH OR WITHOUT ONE OR MORE COMPLAINTS FILED, CONFESS JUDGMENT OR JUDGMENTS AGAINST THE BORROWER IN FAVOR OF THE TRUSTEE, THE BONDHOLDER REPRESENTATIVE AND THEIR SUCCESSORS AND ASSIGNS, AT ANY TIME FOLLOWING THE OCCURRENCE OF ANY EVENT OF DEFAULT FOR ALL OR ANY PORTION OF SUMS DUE UNDER THIS AGREEMENT, THE INDENTURE, THE LOAN**

AGREEMENT, THE 2023A NOTE, THE 2023 CCA NOTE OR THE OTHER RELATED DOCUMENTS, TOGETHER WITH COSTS OF SUIT AND ATTORNEY'S COMMISSION OF THE GREATER OF FIFTEEN PERCENT (15%) OF SUCH SUMS FOR COLLECTION OR $1,000, AS A REASONABLE ATTORNEYS' FEE, WITH RELEASE OF ALL PROCEDURAL ERRORS AND WAIVER OF ANY RIGHT TO A STAY OF EXECUTION, FOR WHICH THIS AGREEMENT AND THE SERIES 2023A BONDS OR A VERIFIED COPY HEREOF AND THEREOF SHALL BE SUFFICIENT WARRANT. THE AUTHORITY TO ENTER JUDGMENT SHALL NOT BE EXHAUSTED BY ONE EXERCISE HEREOF, BUT, TO THE EXTENT PERMITTED BY LAW, SHALL CONTINUE FROM TIME TO TIME UNTIL FULL PAYMENT OF ALL AMOUNTS HEREUNDER. THE FOREGOING RIGHT AND REMEDY IS IN ADDITION TO AND NOT IN LIEU OF ANY OTHER RIGHT OR REMEDY AVAILABLE TO THE TRUSTEE AND/OR THE BONDHOLDER REPRESENTATIVE UNDER THIS AGREEMENT OR OTHERWISE.

THE BORROWER, BEING FULLY AWARE OF THE RIGHT TO PRIOR NOTICE AND A HEARING CONCERNING THE VALIDITY OF ANY AND ALL CLAIMS THAT MAY BE ASSERTED AGAINST THE BORROWER BY THE TRUSTEE AND/OR THE BONDHOLDER REPRESENTATIVE BEFORE A JUDGMENT CAN BE RENDERED HEREUNDER OR BEFORE EXECUTION MAY BE LEVIED ON SUCH JUDGMENT AGAINST ANY AND ALL PROPERTY OF THE BORROWER, HEREBY WAIVES THESE RIGHTS AND AGREES AND CONSENTS TO JUDGMENT BEING ENTERED BY CONFESSION IN ACCORDANCE WITH THE TERMS HEREOF WITHOUT FIRST GIVING NOTICE AND THE OPPORTUNITY TO BE HEARD ON THE VALIDITY OF THE CLAIM OR CLAIMS UPON WHICH SUCH JUDGMENT IS ENTERED.

THE TRUSTEE AND/OR THE BONDHOLDER REPRESENTATIVE MAY CONFESS ONE OR MORE JUDGMENTS IN THE SAME OR DIFFERENT JURISDICTIONS FOR ALL OR ANY PART OF THE AMOUNT OWING HEREUNDER, WITHOUT REGARD TO WHETHER JUDGMENT HAS THERETOFORE BEEN CONFESSED ON MORE THAN ONE OCCASION FOR THE SAME AMOUNT. IN THE EVENT ANY JUDGMENT CONFESSED AGAINST THE BORROWER IS STRICKEN OR OPENED UPON APPLICATION BY OR ON THE BORROWER'S BEHALF FOR ANY REASON, THE TRUSTEE AND/OR THE BONDHOLDER REPRESENTATIVE ARE HEREBY AUTHORIZED AND EMPOWERED TO AGAIN APPEAR FOR AND CONFESS JUDGMENT AGAINST THE BORROWER FOR ANY PART OR ALL OF THE AMOUNTS OWING HEREUNDER OR UNDER THE INDENTURE, THE LOAN AGREEMENT, THE 2023A NOTE, THE 2023 CCA NOTE OR ANY OTHER RELATED DOCUMENT, AS PROVIDED FOR HEREIN, IF DOING SO WILL CURE ANY PROCEDURAL ERRORS OR DEFECTS IN SUCH PRIOR PROCEEDINGS.

THE BORROWER ACKNOWLEDGES AND AGREES THAT THE TRUSTEE AND/OR THE BONDHOLDER REPRESENTATIVE MAY, AFTER ENTRY OF JUDGMENT, FORECLOSE UPON, ATTACH, LEVY, TAKE POSSESSION OF OR OTHERWISE SEIZE PROPERTY OF THE BORROWER IN FULL OR PARTIAL PAYMENT OF THE JUDGMENT. BEING FULLY AWARE OF ITS RIGHTS AFTER

**JUDGMENT IS ENTERED (INCLUDING THE RIGHT TO MOVE OR OPEN OR STRIKE THE JUDGMENT), THE BORROWER HEREBY FREELY, KNOWINGLY AND INTELLIGENTLY WAIVES THESE RIGHTS AND EXPRESSLY AGREES AND CONSENTS TO THE TRUSTEE AND/OR THE BONDHOLDER REPRESENTATIVE TAKING SUCH ACTIONS AS MAY BE PERMITTED UNDER APPLICABLE STATE AND FEDERAL LAW WITHOUT PRIOR NOTICE TO THE BORROWER.**

Any invoice furnished to the Borrower by the Trustee, the Bondholder Representative or the Issuer pursuant to any provisions hereunder shall be deemed to constitute a written notice under this Section 6.3 sufficient to cause the 15-day period specified herein to commence.

Section 6.4.    *Attorneys' Fees and Other Expenses.*  Upon the occurrence of an Event of Default, the Borrower shall within 10 days of demand pay to the Trustee and the Bondholder Representative the reasonable fees and expenses of attorneys and other reasonable expenses incurred by them in the collection of payments due on the Bonds or the enforcement of performance of any other obligations of the Borrower hereunder and under the other Related Documents.

Section 6.5.    *Remedies Cumulative; Solely for the Benefit of Bondholders and Bondholder Representative.*  To the extent permitted by, and subject to the mandatory requirements of, applicable Law, each and every right, power and remedy herein specifically given to the Trustee or the Bondholder Representative in the Related Documents shall be cumulative, concurrent and nonexclusive and shall be in addition to every other right, power and remedy specifically given or now or hereafter existing at law, in equity or by statute, and each and every right, power and remedy (whether specifically herein given or otherwise existing) may be exercised from time to time and as often and in such order as may be deemed expedient by the Trustee or the Bondholder Representative, respectively, and the exercise or the beginning of the exercise of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.

The rights and remedies of the Trustee and the Bondholder Representative specified herein are for the sole and exclusive benefit, use and protection of the Trustee, the Bondholder Representative and the Bondholders, and the Trustee and the Bondholder Representative are entitled, but shall have no duty or obligation to the Borrower or any other Person or otherwise, to exercise or to refrain from exercising any right or remedy reserved to the Trustee or the Bondholder Representative hereunder or under any of the other Related Documents.

Section 6.6.    *Waivers or Omissions.*  No delay or omission by the Trustee or the Bondholder Representative in the exercise of any right, remedy or power or in the pursuit of any remedy shall impair any such right, remedy or power or be construed to be a waiver of any default on the part of the Trustee or the Bondholder Representative or to be an acquiescence therein.  No express or implied waiver by the Trustee or the Bondholder Representative of any Event of Default shall in any way be a waiver of any future or subsequent Event of Default.

Section 6.7.    *Discontinuance of Proceedings.*  In case the Trustee or the Bondholder Representative shall proceed to invoke any right, remedy or recourse permitted hereunder or under the other Related Documents and shall thereafter elect to discontinue or abandon the same for any

reason, the Borrower, the Trustee and the Bondholder Representative shall be restored to their former positions hereunder, under the other Related Documents and otherwise, and the rights, remedies, recourse and powers of the Trustee and the Bondholder Representative hereunder shall continue as if the same had never been invoked.

Section 6.8.    *Injunctive Relief.*  The Borrower recognizes that in the event that an Event of Default occurs, any remedy of Law may prove to be inadequate relief to the Trustee; therefore, the Borrower agrees that the Trustee at the written request of the Bondholder Representative may or upon the written direction of the Bondholder Representative shall seek and be entitled to temporary and permanent injunctive relief or specific performance in any such case.

## ARTICLE VII
## INDEMNIFICATION

Section 7.1.    *Indemnification.*  In addition to any and all rights of reimbursement, indemnification, subrogation or any other rights hereunder and under the other Related Documents or at law or in equity, the Borrower hereby agrees (to the extent permitted by Law) to indemnify, hold harmless and defend the Trustee and its officers, directors, employees and agents and the Bondholder Representative and its officers, directors, employees and agents (each, an "Indemnitee") from and against any and all claims, damages, losses, liabilities, costs or expenses of any conceivable nature, kind or character (including reasonable fees and expenses of attorneys, accountants, consultants and other experts, litigation and court costs, amounts paid in settlement and amounts paid to discharge judgments) to which any Indemnitee may become subject under statutory Law (including federal or state securities Laws) or at common Law or otherwise (collectively, "Liabilities"), arising out of or based upon or in any way relating to:

(a)    the Bonds, this Agreement, the Indenture, the Mortgage or any other Related Document or the execution or amendment hereof or thereof or in connection with the transactions contemplated hereby or thereby, including (without limitation) the issuance, sale or resale of the Bonds;

(b)    any act or omission of the Borrower or any of its agents, contractors, servants, employees, tenants or licensees in connection with the Facilities or the operations thereof, or the condition, environmental or other, occupancy, use, possession, conduct or management of work done in or about, or from the planning, design, acquisition, installation or construction of the Facilities or any part thereof;

(c)    any Lien or charge upon payments by the Borrower to the Trustee or the Bondholder Representative hereunder, or any taxes (including *ad valorem* taxes and sales taxes), assessments, impositions and other charges imposed on the Trustee or the Bondholder Representative in respect of any portion of the Facilities;

(d)    any violation of any environmental regulations with respect to, or the release of any Regulated Chemicals from the Facilities or any part thereof;

(e)    the defeasance or redemption, in whole or in part, of the Bonds;

(f)     any untrue statement or misleading statement or alleged untrue statement or alleged misleading statement of a material fact contained in any offering or disclosure document or disclosure or continuing disclosure document with respect to the Bonds or any of the documents relating to the Bonds, or any omission or alleged omission from any offering or disclosure document or disclosure or continuing disclosure document with respect to the Bonds of any material fact necessary to be stated therein in order to make the statements made therein, in light of the circumstances under which they were made, not misleading;

(g)     any declaration of taxability of interest on the Bonds, or allegations that interest on the Bonds is taxable or any regulatory audit or inquiry regarding whether interest on the Bonds is taxable;

(h)     the Trustee's acceptance or administration of the trust created by the Indenture, or the exercise or performance of any of its powers or duties thereunder or under any of the other Related Documents to which it is a party; and

(i)     any injury to or death of any Person or damage to property in or upon the Facilities or growing out of or connected with the use, nonuse, condition or occupancy of the Facilities;

provided, however, that no Indemnitee shall be entitled to indemnification with respect to any Liabilities to the extent that such Liabilities are caused by the negligence or willful misconduct of an Indemnitee.

In the event that any action or proceeding is brought against any Indemnitee with respect to which indemnity may be sought hereunder, the Borrower, upon written notice from the Indemnitee to the Borrower, shall assume the investigation and defense thereof, including the employment of counsel selected by the Indemnitee, and shall assume the payment of all reasonable expenses related thereto, with full power to litigate, compromise or settle the same in its sole discretion; *provided* that the Indemnitee shall have the right to review and approve or disapprove any such compromise or settlement.  Each Indemnitee shall have the right to employ separate counsel in any such action or proceeding and participate in the investigation and defense thereof, and the Borrower shall pay the reasonable fees and expenses of such separate counsel; *provided*, however, that such Indemnitee may only employ separate counsel at the expense of the Borrower if in the judgment of such Indemnitee a conflict of interest exists by reason of common representation or if all Persons commonly represented do not agree as to the action (or inaction) of counsel.

The indemnity provided to the Bondholder Representative shall cover any actions taken by the Bondholder Representative under the Related Documents, including (without limitation) enforcing any remedies, foreclosure and directing, waiving or consenting to any actions of the Trustee, including (without limitation) acceleration.

The rights of any persons to indemnity hereunder and rights to payment of fees and reimbursement of expenses shall survive the final payment or defeasance of the Bonds and in the case of the Trustee any resignation or removal of the Trustee.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.1.    *Further Assurances.*  From time to time upon the request of the Trustee or the Bondholder Representative, the Borrower shall promptly and duly execute, acknowledge and deliver any and all such further instruments and documents as the Trustee or the Bondholder Representative may in its reasonable discretion deem necessary or desirable to confirm this Agreement and the other Related Documents, to carry out the purpose and intent hereof and thereof or to enable the Trustee or the Bondholder Representative to enforce any of its rights hereunder or thereunder.  At any time, and from time to time, upon request by the Trustee or the Bondholder Representative, the Borrower will, at the Borrower's expense, correct any defect, error or omission that may be discovered in the form or content of any of the Related Documents.

Section 8.2.    *Amendments and Waivers.* The Trustee and the Borrower may, with the consent of the Bondholder Representative, from time to time enter into agreements amending, modifying or supplementing this Agreement or any of the other Related Documents or changing the rights of the Trustee, the Borrower or the Bondholder Representative hereunder or thereunder, and the Trustee may, with the written consent of the Bondholder Representative, and shall, upon the written direction of the Bondholder Representative, from time to time grant waivers or consents to a departure from the due performance of the obligations of the Borrower hereunder or thereunder.  Any such agreement, waiver or consent must be in writing and shall be effective only to the extent specifically set forth in such writing.

Section 8.3.    *Notices.*    All notices, requests, demands, directions and other communications (collectively "notices") under the provisions of this Agreement shall be in writing (including facsimile communication), unless otherwise expressly permitted hereunder, shall be sent by first-class mail or overnight delivery and shall be deemed received as follows: (a) if by first class mail, five days after mailing and (b) if by overnight delivery, on the next business day. All notices shall be sent to the applicable party at the address shown below or in accordance with the last unrevoked written direction from such party to the other parties hereto.  Any such communication also may be transmitted to the appropriate party by telephone or other electronic transmission and shall be deemed given or made at the time of such transmission if, and only if, such transmission of notice shall be confirmed in writing sent as specified above.

If to the Borrower:          Central Oklahoma United Methodist Retirement
                             Facility, Inc.
                             14901 N. Pennsylvania Avenue
                             Oklahoma City, Oklahoma 73134
                             Attention: Chief Financial Officer
                             Telephone:
                             Email:

with a copy to:

If to the Bondholder            Hamlin Capital Management, LLC
Representative:                 640 Fifth Avenue, 11th Floor
                                New York, New York 10019
                                Attention: Joe Bridy
                                Telephone: (212) 752-8777
                                Email:  jbridy@hamlincm.com

with a copy to:                 McCarter & English, LLP
                                100 Mulberry Street, Four Gateway Center
                                Newark, New Jersey 07102
                                Attention: Jacqueline Shanes
                                Telephone: (973) 639-7955
                                Email:  jshanes@mccarter.com

If to HCA:                      Hamlin Capital Advisors, LLC
                                5550 West Executive Drive, Suite 235
                                Tampa, Florida 33609
                                Attention: Paul Towell
                                Telephone: (813) 280-1001
                                Email:  ptowell@hamlinadvisors.com

If to the Trustee:              BancFirst
                                100 N. Broadway Avenue
                                Oklahoma City, Oklahoma
                                Attention:
                                Telephone:
                                Email:

If to the Underwriter:          Raymond James & Associates, Inc.
                                300 Conshohocken State Road, Suite 400
                                West Conshohocken, Pennsylvania 19428
                                Telephone:
                                Email:  david.fields@raymondjames.com

|  | with a copy to: | McKennon Shelton & Henn LLP |
|--|--|--|

with a copy to: McKennon Shelton & Henn LLP
401 East Pratt St., Suite 2600
Baltimore, Maryland 21202
Attention: David Gregory
Telephone: (410) 843-3543
Email:  david.gregory@mshllp.com

A duplicate copy of each demand, notice, approval, consent, request, opinion or other communication given hereunder or under any other Related Document by either the Trustee or the Borrower to the other shall also be given to the Bondholder Representative and, if requested by the Underwriter or HCA, the Underwriter and HCA, respectively.  The Borrower, the Trustee, the Bondholder Representative, the Underwriter and HCA may, by notice given hereunder, designate any further or different addresses to which subsequent demands, notices, approvals, consents, requests, opinions or other communications shall be sent or persons to whose attention they shall be directed.

Except as otherwise directed by the Bondholder Representative, no notices shall be sent to the Holder of any Bond, including (without limitation) notices of the occurrence of an Event of Default.  Notwithstanding the foregoing, the Trustee may send routine payment processing and similar notices to DTC, or its nominee, as long as DTC or such nominee respectively, is the registered owner of the Bonds.

The Bondholder Representative may rely on any notice (including telephonic communication) purportedly made by or on behalf of the Borrower or the Trustee and shall have no duty to verify the identity or authority of the Person giving such notice.

Section 8.4.    *No Third-Party Rights.*  Nothing in this Agreement, whether express or implied, shall be construed to give to any Person other than the parties hereto, the Bondholder Representative and the Bondholders any legal or equitable right, remedy or claim under or in respect of this Agreement, which is intended for the sole and exclusive benefit of the parties hereto, the Bondholder Representative and the Bondholders.

Section 8.5.    *Severability.*  The provisions of this Agreement are intended to be severable. If any provision of this Agreement shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions hereof in any jurisdiction.

Section 8.6.    *Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.*

(a)    This Agreement shall be governed by, and construed in accordance with, the Laws of the State without giving effect to conflicts of law provisions.

(b)    Each party hereto consents to and submits to *in personam* jurisdiction and venue exclusively in the State and in the federal district courts that are located in the State.  Each party (i) asserts that it has purposefully availed itself of the benefits of the Laws of the State, (ii) waives any objection to *in personam* jurisdiction on the grounds of minimum contacts, (iii) waives any

objection to venue and waives any plea of forum *non conveniens* and (iv) agrees not to seek removal of such proceedings to any court or forum other than as specified above.  This consent and submission to jurisdiction is with regard to any action related to this Agreement.

(c)     To the extent permitted by applicable Law, each of the parties hereto hereby waives its right to a jury trial of any claim or cause of action based upon or arising out of this Agreement, any other Related Documents or any of the transactions contemplated hereby or thereby, including contract claims, tort claims, breach of duty claims and all other common law or statutory claims.

(d)     The covenants and waivers made pursuant to this Section shall be applicable to any subsequent amendments, renewals, supplements or modifications of this Agreement.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

Section 8.7.     *Prior Understandings.*  This Agreement and the other Related Documents supersede all other prior understandings and agreements, whether written or oral, among the parties hereto relating to the transactions provided for herein and therein.

Section 8.8.     *Duration.*  All representations and warranties of the Borrower contained herein or made in connection herewith shall survive the making of and shall not be waived by the execution and delivery of this Agreement or the other Related Documents.  All covenants and agreements of the Borrower contained herein shall continue in full force and effect from and after the date hereof until the Bonds and all other amounts payable hereunder have been fully discharged.

Section 8.9.     *Counterparts.*  This Agreement may be executed in any number of counterparts and by each of the parties hereto on separate counterparts each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 8.10.     *Successors and Assigns.*  This Agreement is a continuing obligation and shall be binding upon the Borrower, its successors, transferees and assigns and shall inure to the benefit of the Bondholder Representative and the Bondholders and their respective permitted successors, transferees and assigns.  The Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Bondholder Representative.

Section 8.11.     *Bondholder Representative Acts.*  In the event that there ceases to be a Bondholder Representative, then any reference herein to the Bondholder Representative shall be of no further force and effect and where there is a reference to an action being taken solely by the Bondholder Representative, such reference shall be deemed instead to be a reference to the holders of a majority in aggregate principal amount of Outstanding Bonds.

Section 8.12.     *Waiver of Personal Liability*.  No member, director, officer, agent or employee of the Borrower shall be individually or personally liable for the payment of the principal or Redemption Price of or interest on the Bonds or be subject to any personal liability or accountability by reason of the issuance thereof or the performance of any duty hereunder; but

nothing herein contained shall relieve any such member, officer, agent or employee from the performance of any official duty provided by law or by this Agreement.

[*Remainder of Page Left Intentionally Blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the Closing Date.

CENTRAL OKLAHOMA UNITED METHODIST RETIREMENT FACILITY, INC.

By: _____

BANCFIRST, as Trustee

By: _____

[Signature Page to Continuing Covenants Agreement]

**EXHIBIT A**

**FORM OF COMPLIANCE CERTIFICATE**

The undersigned duly authorized officer of Central Oklahoma United Methodist Retirement Facility, Inc., d/b/a Epworth Villa (the "Borrower") hereby certifies as follows to demonstrate compliance with certain provisions of the Continuing Covenants Agreement dated as of December 1, 2023, between BancFirst and the Borrower (the "Continuing Covenants Agreement"):

This Certificate is being delivered with respect to the following (each, a "Testing Period"):

Fiscal Year ended December 31, 20___:  OR

Fiscal Quarter ended [March 31] [June 30] [September 30], 20___:

Capitalized terms used but not defined in this Certificate shall have the meanings set forth in the Continuing Covenants Agreement.

*(Unless otherwise indicated, all calculations shall be made in accordance with accounting principles generally accepted in the United States of America.)*

(a)    <u>Debt Service Coverage Ratio</u>

　　　　　　Net Revenues Available for Debt Service (A) ................. _____

　　　　　　Maximum Annual Debt Service (B) ................................ _____

　　　　　　Debt Service Coverage Ratio (A/B) ................................ _____

　　　Is the Debt Service Coverage Ratio of the Borrower an amount at least equal to the Debt Service Coverage Ratio requirement for the applicable period?
_____ (Y) _____ (N)

　　　In order to meet the Debt Service Coverage Ratio requirement, did the Borrower defer any Management Fees payable during the Testing Period?
_____ (Y) _____ (N)

　　　If yes, please identify the amount of such deferral:　$_____

A-1

(b)  <u>Days' Cash on Hand Requirement</u>

      Unrestricted Cash and Marketable Securities (A) .................  $ _____

      Operating expenses    ......................................................  $ _____
          (Deduct):
            Depreciation  ......................................................  _____
            Amortization ................................................  _____
            Deferred Management Fees ...................................  _____
                Total Operating Expenses (B) ....................  $ _____

      Days' Cash on Hand (Ratio of A to B/365 or 366, as applicable)  _____

Is the Days' Cash on Hand of the Borrower an amount at least equal to the Days' Cash on Hand requirement for the applicable period?

            \_\_\_\_\_ (Y) \_\_\_\_\_ (N)

In order to achieve the Days' Cash on Hand requirement, did the Borrower defer any Management Fees?

            \_\_\_\_\_ (Y) \_\_\_\_\_ (N)

If yes, please identify the amount of such funds deferred:  $ _____

(c)  <u>Occupancy.</u>

**Independent Living Units.**

Total Number of Independent Living Units in the Facilities (A)  _____

Average Number of Occupied Independent Living Units (B)  _____

Percent of Occupied Independent Living Units (B/A)......  _____

**Assisted Living Units.**

Total Number of Assisted Living Units in the Facilities (A)  _____

Average Number of Occupied Assisted Living Units (B)  _____

Percent of Occupied Assisted Living Units (B/A)............  _____

A-2

**Memory Care Units.**

Total Number of Memory Care Units in the Facilities (A)    _____

Average Number of Occupied Memory Care Units (B)...    _____

Percent of Occupied Memory Care Units (B/A)..............    _____

**Skilled Nursing Units.**

Total Number of Skilled Nursing Units in the Facilities (A)    _____

Average Number of Occupied Skilled Nursing Units (B)    _____

Percent of Occupied Skilled Nursing Units (B/A)............    _____

Is the occupancy of the Borrower an amount at least equal to the occupancy requirement for the applicable period?

\_\_\_\_\_ (Y) \_\_\_\_\_ (N)

(d)    <u>Entrance Fees</u>

Budgeted Entrance Fees to be collected during
 the Testing Period (A)    $_____
Actual Entrance Fees collected during the Testing Period (B)    $_____
Actual v. Budgeted collected Entrance Fees (B-A) ..........    $_____

Budgeted Entrance Fees to be refunded during
 the Testing Period (C)    $_____
Actual Entrance Fees refunded during the Testing Period (D)    $_____
Actual v. Budgeted refunded Entrance Fees (D-C) ..........    $_____

Number of due but unpaid Entrance Fee refunds .............    _____
Amount of due but unpaid Entrance Fee refunds .............    $_____

(e)    <u>Net Operating Income</u>[1]

Budgeted net operating income during the Testing Period (A)    $_____
Actual net operating income during the Testing Period (B)    $_____
Actual v. Budgeted net operating income (B-A)    $_____

---

[1] To be calculated in accordance with the Borrower's financial statements.

(f)    <u>Related Party Transactions</u>

During the Testing Period, has the Borrower entered into any Related Party Agreement?

_____ (Y) _____ (N)

If yes, please attach Agreement (if written) or describe the Agreement (if oral).


During the Testing Period, has any director, trustee, officer or member of the Borrower filed a Conflict of Interest Questionnaire?

_____ (Y) _____ (N)

If yes, please attach


(g)    <u>Certification as to Financial Statements.</u>  To the best of the undersigned's knowledge, the financial statements provided to the Trustee with this Compliance Certificate fairly set forth the financial position and results of operations of the Borrower as of the date and for the period covered by such financial statements, subject to year-end adjustments.

(h)    <u>Certification as to no Event of Default.</u>

To the best of the undersigned's knowledge, has an Event of Default or Default under any Related Document occurred?

_____ (Y) _____ (N)

If yes, please attach a statement describing the nature thereof and the steps the Borrower intends to take to cure such default.


IN WITNESS WHEREOF, I have hereunto set my hand, this ___ day of _____, 20__.


CENTRAL OKLAHOMA UNITED
METHODIST RETIREMENT FACILITY, INC.


By: _____
      Name:
      Title:


A-4

**EXHIBIT B**

## RELATED PARTY TRANSACTIONS